RECORD NO. 14-4220

In The

# United States Court of Appeals
### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## PHILLIP DUCTAN,

*Defendant – Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE

———————

**JOINT APPENDIX
VOLUME I OF II
(Pages 1 – 371)**

———————

Joshua B. Carpenter
FEDERAL DEFENDERS OF
   WESTERN NORTH CAROLINA, INC.
One Page Avenue, Suite 210
Asheville, North Carolina  28801
(828) 232-9992

Erin E. Comerford
OFFICE OF THE U.S. ATTORNEY
227 West Trade Street, Suite 1650
Charlotte, North Carolina  28202
(704) 816-1625

Amy E. Ray
OFFICE OF THE U.S. ATTORNEY
100 Otis Street, Room 233
Asheville, North Carolina  28801
(828) 271-4661

*Counsel for Appellant*          *Counsel for Appellee*          *Counsel for Appellee*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA  23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS
## VOLUME I OF II

**Appendix Page**

**Docket Entries** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Bill of Indictment**
      filed September 28, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Order of**
**The Honorable David S. Cayer**
**Re:  Granting Defendant's Motion for Leave to Appear Pro Hac Vice**
      filed July 12, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Defendant's Motion to Withdraw**
      filed October 2, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Transcript of Motions Hearing before**
**The Honorable David S. Cayer**
      on October 5, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**Order of**
**The Honorable David S. Cayer**
**Re:  Granting Defendant's Motion to Withdraw**
      filed October 5, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**Defendant's Motion to Withdraw**
      filed November 18, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**Transcript of Motions Hearing before**
**The Honorable David S. Cayer**
      on November 26, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**Order of**
**The Honorable David S. Cayer**
**Re:  Denying Defendant's Motion to Withdraw**
      filed November 11, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Transcript of Jury *Voir Dire* before
The Honorable Robert J. Conrad, Jr.
　　　on December 4, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  63

Transcript of Jury Trial Proceedings before
The Honorable Robert J. Conrad, Jr.
　　　on December 4, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  116

**Testimony of Stephen Whitesell:**

Direct Examination by Ms. Comerford . . . . . . . . . . . . . . . . . . . . . . . .  135

**Testimony of Mandrell Dunn:**

Direct Examination by Mr. Washington . . . . . . . . . . . . . . . . . . . . . . . .  150

**Testimony of Robert Melton:**

Direct Examination by Mr. Washington . . . . . . . . . . . . . . . . . . . . . . . .  160

**Testimony of Shawn Blee:**

Direct Examination by Ms. Comerford . . . . . . . . . . . . . . . . . . . . . . . .  168

**Testimony of Luke Sell:**

Direct Examination by Mr. Washington . . . . . . . . . . . . . . . . . . . . . . . .  175
Cross Examination by Mr. Ductan . . . . . . . . . . . . . . . . . . . . . . . . . . . .  182

**Testimony of Catherine Bowles:**

Direct Examination by Ms. Comerford . . . . . . . . . . . . . . . . . . . . . . . .  185
Cross Examination by Mr. Ductan . . . . . . . . . . . . . . . . . . . . . . . . . . . .  209

**Testimony of Andrew Oprysko:**

Direct Examination by Ms. Comerford . . . . . . . . . . . . . . . . . . . . . . . .  220
Cross Examination by Mr. Ductan . . . . . . . . . . . . . . . . . . . . . . . . . . . .  231

Transcript of Jury Trial Proceedings before
The Honorable Robert J. Conrad, Jr.
     on December 4, 2012, continued:

    <u>Testimony of Gerod King</u>:

    Direct Examination by Mr. Washington . . . . . . . . . . . . . . . . . . . . . . . . . . 232

    <u>Testimony of Kelly Little</u>:

    Direct Examination by Ms. Comerford . . . . . . . . . . . . . . . . . . . . . . . . . 237

    <u>Testimony of Catherone Bowles</u>:

    Direct Examination by Mr. Ductan . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

Transcript of Jury Trial Proceedings before
The Honorable Robert J. Conrad, Jr.
     on December 5, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Jury Verdict
    filed December 5, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 336

Transcript of Sentencing Proceedings before
The Honorable Robert J. Conrad, Jr.
     on February 26, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

Judgment in a Criminal Case
    filed March 12, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 364

Defendant's Notice of Appeal
    filed March 18, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 370

## <u>TABLE OF CONTENTS</u>
## VOLUME II OF II - UNDER SEAL

<u>Appendix Page</u>

**Defendant's Objections to Presentence Report**
      **filed November 22, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **372**

**Final Presentence Investigation Report**
      **filed December 10, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **377**

**Final Revised Presentence Investigation Report**
      **filed February 24, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **393**

**Statement of Reasons**
      **filed March 11, 2014** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **409**

APPEAL

# U.S. District Court
## Western District of North Carolina (Charlotte)
## CRIMINAL DOCKET FOR CASE #: 3:04-cr-00252-RJC-DSC-1

Case title: USA v. Ductan et al                    Date Filed: 09/28/2004
                                                   Date Terminated: 02/26/2014

Assigned to: Chief Judge Robert J. Conrad,
Jr
Referred to: Magistrate Judge David S.
Cayer

Appeals court case number: 14-4220
FCCA

**Defendant (1)**

**Phillip Ductan**                    represented by  **Charles Tyrone Brant ,**
*TERMINATED: 02/26/2014*                             Colom and Brant, Attorneys at Law, LLC
                                                     191 Peachtree Tower
                                                     191 Peachtree Street, N.E., Suite 3300
                                                     Atlanta, GA 30303
                                                     404-522-5900
                                                     Fax: 404-946-1949
                                                     Email: cbrant@colomandbrantlaw.com
                                                     *TERMINATED: 10/05/2012*
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Designation: Retained*

                                                     **Kenneth D. Snow**
                                                     Law office of Kenneth D. Snow
                                                     229 S Brevard Street # 300
                                                     Charlotte, NC 28202
                                                     704-358-0026
                                                     Fax: 704-358-0029
                                                     Email: kennsnow@snowlegal.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Designation: CJA Appointment*

                                                     **Randolph Marshall Lee**
                                                     P. O. Box 77005
                                                     Charlotte, NC 28271
                                                     704-841-2222
                                                     Email: Randolph@LeeLaw.biz
                                                     *TERMINATED: 09/12/2013*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Richard Lamb Brown , Jr.**
Law Offices of Richard L. Brown, Jr.
309 Lancaster Ave
Monroe, NC 28112
704-283-6800
Fax: 704-291-7725
Email:
richardbrown@richardLbrownlaw.com
*TERMINATED: 10/11/2012*
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| 21:841A=MD.F and 21:846 M ARIJUANA - SELL, DISTRIBUTE, OR DISPENSE (1) | 24 mos imp conc w/ cnt 2 + 5 yr SRT conc. + $100 assess |
| 21:841A=MD.F and 18:2 MARIJUANA - SELL, DISTRIBUTE, OR DISPENSE (2) | 24 mos. imp conc w/ cnt 1 + 5 yr SRT conc. + $100 assess |
| 18:924C.F VIOLENT CRIME/DRUGS /MACHINE GUN (3) | 60 mos imp consec to cnts 1 & 2 for a total of 84 mos. imp + 5 yr SRT conc. + $100 assess |

**Highest Offense Level (Opening)**
Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:922G.F UNLAWFUL TRANSPORT OF FIREARMS, ETC. (4) | Dismissed |

**Highest Offense Level (Terminated)**
Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

**USA**                    represented by  **AUSA Keith Michael Cave**
U.S. Attorney Office
227 West Trade St.

#1700
Charlotte, NC 28202
704-344-6222
Email: berlinda.rogers@usdoj.gov
*TERMINATED: 10/05/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ann Claire Phillips**
US Attorneys Office
227 West Trade Street, Suite 1650
Charlotte, NC 28203
704-344-6222
Fax: 704-227-0254
Email: annclaire.phillips@usdoj.gov
*TERMINATED: 12/03/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dana Owen Washington**
227 West Trade Street, Suite 1650
Charlotte, NC 28202
704-338-3107
Fax: (704) 344-6629
Email: dana.washington@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Elizabeth Comerford**
U.S. Attorney's Office
227 West Trade Street
Suite 1650, Carillon Building
Charlotte, NC 28202
704-816-1625
Email: erin.comerford@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William A. Brafford**
U.S. Attorney's Office
227 West Trade Street
Suite1650, Carillon Building
Charlotte, NC 28202
704/344-6222
Fax: 704/344-6629
Email: william.brafford@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| | | |
|---|---|---|
| 09/28/2004 | 1 | INDICTMENT as to Phillip Ductan (1) count(s) 1, 2, 3, 4, Landis Richardson (2) count(s) 1, 2, 3, 5, Mark . Lowery (3) count(s) 1, 2, 3 (tob) (Entered: 09/29/2004) |
| 09/28/2004 | 129 | Arrest WARRANT issued as to Phillip Ductan, Landis Richardson, Mark . Lowery (tob) (bsw). (Entered: 09/29/2004) |
| 01/10/2005 | | CASE reassigned to Judge Richard L. Voorhees (bsw) (Entered: 01/10/2005) |
| 05/16/2005 | 12 | ORDER as to Phillip Ductan, Landis Richardson, Mark Lowery Case is administratively transferred and reassigned to Judge Mullen.. Signed by Judge Richard Voorhees on 5/16/05. (Hankins, Susan) (Entered: 05/17/2005) |
| 05/16/2005 | | Case as to Phillip Ductan, Landis Richardson, Mark Lowery reassigned to Judge Graham Mullen. Judge Richard Voorhees no longer assigned to the case. (Hankins, Susan) (Entered: 05/17/2005) |
| 07/15/2005 | | Case assignmt to Judge Conrad correctd: as to Phillip Ductan, Landis Richardson, Mark Lowery (Wallace, Betsy) (Entered: 07/15/2005) |
| 04/10/2009 | | Case reassigned for case referral to Magistrate Judge David S. Cayer. (Entered: 04/10/2009) |
| 05/18/2012 | 130 | Warrant Returned Executed on 5/11/2012 in case as to Phillip Ductan. (tmg) (Entered: 05/18/2012) |
| 05/18/2012 | 131 | NOTICE OF ATTORNEY APPEARANCE Ann Claire Phillips appearing for USA. (Phillips, Ann Claire) (Entered: 05/18/2012) |
| 05/29/2012 | 132 | Rule 5(c)(3) Documents Received as to Phillip Ductan (Attachments: # 1 letter, # 2 minutes, # 3 waiver of removal hearing, # 4 waiver of timely pretrial detention hearing, # 5 order, # 6 minutes, # 7 minutes, # 8 order on initial appearance)(blf) (Entered: 05/30/2012) |
| 07/02/2012 | | Set/ Deadlines/Hearings as to Phillip Ductan: Initial Appearance set for 7/3/2012 10:15 AM in Magistrate Courtroom, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David Keesler. (tob) (Entered: 07/02/2012) |
| 07/03/2012 | | Minute Entry: INITIAL APPEARANCE as to Phillip Ductan held before Magistrate Judge David Keesler. Defendant advised of rights & charges. Defendant retained counsel - Charles Brent (GA). Government moved for detention. Defendant detained pending detention hearing. Arraignment and Detention hearing set for 7/6/2012 10:45 AM in Magistrate Courtroom, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David Keesler.Government attorney: Jennifer Dillon. Defendant attorney: Emily Marroquin. Court Reporter FTR. (tob) (Entered: 07/03/2012) |
| 07/06/2012 | | Minute Entry: ARRAIGNMENT as to Phillip Ductan (1) Count 1,2,3,4 and DETENTION HEARING held before Magistrate Judge David Keesler. Defendant pled not guilty. Government moved for detention.. Defendant waived detention hearing. Defendant detained. Government attorney: Jennifer Dillon. Defendant attorney: Charles Brant (Atlanta GA) will be filing Mtn to proceed PHV with local counsel Richard Brown. Court Reporter FTR. (tob) (Entered: 07/06/2012) |
| 07/06/2012 | 133 | **ORDER OF DETENTION as to Phillip Ductan. Signed by Magistrate Judge David Keesler on 7/6/12. (tob)** (Entered: 07/06/2012) |

| 07/06/2012 | | **SCHEDULING ORDER as to Phillip Ductan. (Click on this link to obtain the Standard Arraignment Order). Docket Call set for 8/6/2012 09:30 AM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before Chief Judge Robert J. Conrad Jr.. Entered by Magistrate Judge David Keesler on 7/6/12. (Pro se litigant served by US Mail.)(tob)** (Entered: 07/06/2012) |
| 07/06/2012 | | **Standard Discovery Order in case as to Phillip Ductan. (Click on this link to obtain the Standard Criminal Discovery Order). Entered by Magistrate Judge David Keesler on 7/6/12. (tob)** (Entered: 07/06/2012) |
| 07/11/2012 | 134 | MOTION for Leave to Appear Pro Hac Vice as to Charles T. Brant (Filing fee $ 276, receipt number 0419-1729345) by Phillip Ductan. Motions referred to David S. Cayer(Brown, Richard) (Entered: 07/11/2012) |
| 07/12/2012 | 135 | **ORDER granting 134 Motion for Leave to Appear Pro Hac Vice added Charles T. Brant for Phillip Ductan as to Phillip Ductan (1) Signed by Magistrate Judge David S. Cayer on 7/11/12.(mga)** (Entered: 07/12/2012) |
| 07/12/2012 | | Notice to Charles T. Brant: Pursuant to Local Rule 83.1 you are required to **Register** for ECF at www.ncwd.uscourts.gov. Deadline by 7/23/2012. (mga) (Entered: 07/12/2012) |
| 07/20/2012 | 136 | Deleted Document. Filed in wrong case. Modified on 7/20/2012 (tmg). (Entered: 07/20/2012) |
| 07/20/2012 | | Docket Call as to Phillip Ductan. Docket Call set for 8/6/2012 09:30 AM in Courtroom 2, 401 W Trade St, Charlotte, NC 28202 before Chief Judge Robert J. Conrad Jr. (tmg) (Entered: 07/20/2012) |
| 07/24/2012 | 137 | Unopposed MOTION to Continue Docket Call/Trial by Phillip Ductan. Responses due by 8/3/2012 (Brown, Richard) (Entered: 07/24/2012) |
| 07/25/2012 | 138 | **ORDER granting 137 Motion to Continue Docket Call/Trial as to Phillip Ductan (1) Docket Call set for 10/1/2012 09:30 AM in Courtroom 2, 401 W Trade St, Charlotte, NC 28202 before Chief Judge Robert J. Conrad Jr. Signed by Chief Judge Robert J. Conrad, Jr on 7/25/2012.(Pro se litigant served by US Mail.) (eef)** (Entered: 07/25/2012) |
| 09/11/2012 | | NOTICE OF HEARING as to Phillip Ductan: Jury Trial RESET for 10/9/2012 09:30 AM in Courtroom 2, 401 W Trade St, Charlotte, NC 28202 before Chief Judge Robert J. Conrad Jr. *This is your only notice - you will not receive a separate document.*(ssh) (Entered: 09/11/2012) |
| 09/12/2012 | | Set/Reset Hearings as to Phillip Ductan: Docket Call set for 10/9/2012 09:30 AM in Courtroom 2, 401 W Trade St, Charlotte, NC 28202 before Chief Judge Robert J. Conrad Jr. (ssh) (Entered: 09/12/2012) |
| 09/17/2012 | 139 | Unopposed MOTION to Continue Docket Call/Trial by Phillip Ductan. Responses due by 9/27/2012 (Brown, Richard) (Entered: 09/17/2012) |
| 10/02/2012 | 140 | MOTION to Withdraw as Attorney by Charles Brant, Richard Brown. by Phillip Ductan. Motions referred to David S. Cayer(Brown, Richard) (Entered: 10/02/2012) |
| 10/02/2012 | | NOTICE OF HEARING ON MOTION in case as to Phillip Ductan 140 MOTION to Withdraw as Attorney by Charles Brant, Richard Brown. : Motion Hearing set for 10/5/2012 09:40 AM in Magistrate Courtroom, 401 W Trade St, Charlotte, NC 28202 |

| | | |
|---|---|---|
| | | before Magistrate Judge David S. Cayer. *This is your only notice - you will not receive a separate document.*(tob) (Entered: 10/02/2012) |
| 10/04/2012 | 141 | **ORDER granting 139 Motion to Continue Docket Call/Trial as to Phillip Ductan (1) Docket Call set for 12/3/2012 09:30 AM in Courtroom 2, 401 W Trade St, Charlotte, NC 28202 before Chief Judge Robert J. Conrad Jr. Signed by Chief Judge Robert J. Conrad, Jr on 10/3/2012.(Pro se litigant served by US Mail.) (blf)** (Entered: 10/04/2012) |
| 10/05/2012 | | Minute Entry: MOTION HEARING as to Phillip Ductan held before Magistrate Judge David S. Cayer. Re 140 MOTION to Withdraw as Attorney by Charles Brant, Richard Brown. Order to issue. Government attorney: Robert Gleason. Defendant attorney: Charles Brant. Court Reporter FTR. (tob) (Entered: 10/05/2012) |
| 10/05/2012 | 142 | **ORDER granting 140 Motion to Withdraw as Attorney. Charles Tyrone Brant withdrawn from case as to Phillip Ductan (1). The Federal Defender's office is directed to appoint stand-by counsel for Defendant. Signed by Magistrate Judge David S. Cayer on 10/5/2012.(Pro se litigant served by US Mail.) (tmg)** (Entered: 10/05/2012) |
| 10/11/2012 | 143 | **CJA 20 *(Restricted)* as to Phillip Ductan: Appointment of Attorney Randolph Marshall Lee as STAND BY COUNSEL for Phillip Ductan (tob)** Modified on 10/11/2012 (tob). (Entered: 10/11/2012) |
| 10/11/2012 | | Attorney update in case as to Phillip Ductan. Attorney Richard Lamb Brown, Jr terminated. (tob) (Entered: 10/11/2012) |
| 10/22/2012 | 144 | Reservation of Rights by Phillip Ductan (ssh) (Entered: 10/22/2012) |
| 11/08/2012 | 145 | MOTION for Discovery - *Alternative Production* by USA as to Phillip Ductan. Responses due by 11/19/2012 Motions referred to David S. Cayer(Phillips, Ann Claire) (Entered: 11/08/2012) |
| 11/18/2012 | 146 | MOTION to Withdraw as Attorney by Randolph M. Lee. by Phillip Ductan. Motions referred to David S. Cayer(Lee, Randolph) (Entered: 11/18/2012) |
| 11/18/2012 | 147 | RESPONSE to Motion by Phillip Ductan re 145 MOTION for Discovery - *Alternative Production* (Lee, Randolph) (Entered: 11/18/2012) |
| 11/19/2012 | | NOTICE OF HEARING ON MOTION in case as to Phillip Ductan 146 MOTION to Withdraw as Attorney by Randolph M. Lee. : Motion Hearing set for 11/26/2012 02:20 PM in Magistrate Courtroom, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. *This is your only notice - you will not receive a separate document.*(mga) (Entered: 11/19/2012) |
| 11/20/2012 | 148 | NOTICE OF ATTORNEY APPEARANCE Erin Elizabeth Comerford appearing for USA. (Comerford, Erin) (Entered: 11/20/2012) |
| 11/26/2012 | 149 | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to Phillip Ductan *Expert Notice* (Attachments: # 1 CV, # 2 CV)(Comerford, Erin) (Entered: 11/26/2012) |
| 11/26/2012 | | Minute Entry: MOTION HEARING as to Phillip Ductan held before Magistrate Judge David S. Cayer. Re 146 MOTION to Withdraw as Attorney by Randolph M. Lee.. Order to issue. Government attorney: Ann Claire Phillips. Defendant attorney: Randolph Lee. Court Reporter: FTR. (tob) (Entered: 11/26/2012) |

| | | |
|---|---|---|
| 11/27/2012 | 150 | **ORDER denying 146 Motion to Withdraw as Attorney as to Phillip Ductan (1) Signed by Magistrate Judge David S. Cayer on 11/26/2012.(Pro se litigant served by US Mail.) (blf)** (Entered: 11/27/2012) |
| 11/27/2012 | 151 | **ORDER granting 145 Motion for alternative production of Discovery as to Phillip Ductan (1) Signed by Magistrate Judge David S. Cayer on 11/26/2012.(blf)** (Entered: 11/27/2012) |
| 11/29/2012 | 152 | ATTACHMENT by USA as to Phillip Ductan re: 149 Notice of Intent to Use Evidence - Government filed by USA (Comerford, Erin) (Entered: 11/29/2012) |
| 11/29/2012 | 153 | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to Phillip Ductan *Notice of Expert* (Attachments: # 1 Attachment - King CV)(Comerford, Erin) (Entered: 11/29/2012) |
| 12/02/2012 | 154 | GOVERNMENT's NOTICE of Intent to Use Evidence by USA as to Phillip Ductan *Third Notice of Expert* (Attachments: # 1 Attachment - Kerns CV)(Comerford, Erin) (Entered: 12/02/2012) |
| 12/02/2012 | 155 | AMENDED DOCUMENT by USA as to Phillip Ductan Amendment to 154 Notice of Intent to Use Evidence - Government *Results Received* (Attachments: # 1 Lab Report - Prints)(Comerford, Erin) (Entered: 12/02/2012) |
| 12/03/2012 | 156 | NOTICE OF ATTORNEY APPEARANCE Dana Owen Washington appearing for USA. (Washington, Dana) (Entered: 12/03/2012) |
| 12/03/2012 | 157 | Notice of Substitution of Counsel in case as to Phillip Ductan. Attorney Ann Claire Phillips added on behalf of USA. Attorney Ann Claire Phillips terminated. (Phillips, Ann Claire) (Entered: 12/03/2012) |
| 12/03/2012 | 158 | WITNESS LIST *(Sealed - Participants)* by USA as to Phillip Ductan (Comerford, Erin) (Entered: 12/03/2012) |
| 12/03/2012 | 159 | NOTICE *NOTICE OF PROPOSED JURY INSTRUCTIONS AND SPECIAL VERDICT SHEET FOR FORFEITURE PROCEEDING* by USA as to Phillip Ductan (Brafford, William) (Entered: 12/03/2012) |
| 12/03/2012 | 160 | EXHIBIT LIST by USA as to Phillip Ductan (Comerford, Erin) (Entered: 12/03/2012) |
| 12/04/2012 | | Oral MOTION to Dismiss count 4by USA as to Phillip Ductan. Motions referred to David S. Cayer(ssh) (Entered: 12/07/2012) |
| 12/04/2012 | | **Oral ORDER granting oral Motion to Dismiss count 4 as to Phillip Ductan (1) Signed by Chief Judge Robert J. Conrad, Jr on 12/4/12.(Pro se litigant served by US Mail.) (ssh)** (Entered: 12/07/2012) |
| 12/04/2012 | | Minute Entry: JURY TRIAL as to Phillip Ductan held before Chief Judge Robert J. Conrad, Jr. Jury selected and sworn. Opening Statements. Evidence Introduced. Government rested. Defendant rested. Government attorney: Commerford, Washingrton. Defendant attorney: pro se Randy Lee stand by counsel. Court Reporter: Andersen. (ssh) (Entered: 12/07/2012) |
| 12/05/2012 | | Minute Entry: JURY TRIAL as to Phillip Ductan held before Chief Judge Robert J. Conrad, Jr.. Closing arguments. Courts charge. Jury retired to deliberate. Jury returns verdict. Oral Rule 29 Motion by defendant is granted as to the "use" prong or count 3 by court. Government attorney: Comerford, Washington. Defendant attorney: pro se |

|  |  | Randy Lee stand by counsel. Court Reporter: Anderson. (ssh) (Entered: 12/07/2012) |
|---|---|---|
| 12/05/2012 | 162 | JURY VERDICT as to Phillip Ductan (1) Guilty on Count 1,2,3. (Attachments: # 1 Unredacted Signature Page)(ssh) (Entered: 12/07/2012) |
| 12/10/2012 | 163 | MOTION for Forfeiture of Property *MOTION FOR PRELIMINARY ORDER OF FORFEITURE* by USA as to Phillip Ductan. Responses due by 12/20/2012 (Brafford, William) (Entered: 12/10/2012) |
| 12/18/2012 | 164 | MOTION for Transcripts at Government Expense by Phillip Ductan. (Attachments: # 1 Envelope)Motions referred to David S. Cayer(blf) (Entered: 12/20/2012) |
| 12/18/2012 | 165 | NOTICE OF APPEAL by Phillip Ductan (IFP/CJA). Judgment not yet entered. (Attachments: # 1 Envelope)(blf) (Entered: 12/20/2012) |
| 12/19/2012 | 167 | Pro se MOTION for summary dismissal of jury trial by Phillip Ductan. Responses due by 1/2/2013 (Attachments: # 1 Envelope)(blf) (Entered: 12/21/2012) |
| 12/20/2012 | 166 | Transmission of Notice of Appeal as to Phillip Ductan to US Court of Appeals re 165 Notice of Appeal (blf) (Entered: 12/20/2012) |
| 12/20/2012 |  | Original Assembled Electronic Record as to Phillip Ductan Transmitted to Fourth Circuit re 165 Notice of Appeal. (blf) (Entered: 12/20/2012) |
| 12/24/2012 | 168 | 4th Circuit NOTICE as to Phillip Ductan regarding staying appeal until entry of CR Jgm (bsw) (Entered: 12/24/2012) |
| 12/26/2012 | 169 | **ORDER granting 164 Motion for Transcripts at Government Expense as to Phillip Ductan (1) Signed by Magistrate Judge David S. Cayer on 12/21/12.(Pro se litigant served by US Mail.) (bsw)** (Entered: 12/26/2012) |
| 03/11/2013 | 170 | TRANSCRIPT of Initial Appearance as to Phillip Ductan held on 7/3/2012 before Judge David Keesler. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 6/10/2013. (Reporter: Laura Andersen, 704-350-7493) Modified text on 3/11/2013 (tmg). (Entered: 03/11/2013) |
| 03/11/2013 | 171 | TRANSCRIPT of Arraignment as to Phillip Ductan held on 7/6/2012 before Judge David Keesler. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 6/10/2013. (Reporter: Laura Andersen, 704-350-7493) (Entered: 03/11/2013) |
| 03/11/2013 | 172 | TRANSCRIPT of Motion to Withdraw by Attorney Brant as to Phillip Ductan held on 10/5/2012 before Judge David Cayer. **NOTICE RE: REDACTION OF** |

| | | |
|---|---|---|
| | | **TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 6/10/2013. (Reporter: Laura Andersen, 704-350-7493) (Entered: 03/11/2013) |
| 03/11/2013 | 173 | TRANSCRIPT of Motion to Withdraw by Attorney Lee as to Phillip Ductan held on 11/26/2012 before Judge David Cayer. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 6/10/2013. (Reporter: Laura Andersen, 704-350-7493) (Entered: 03/11/2013) |
| 03/13/2013 | 174 | NOTICE *of unavailability June 15 - 22, 2013 due to secured leave* by Phillip Ductan (Lee, Randolph) (Entered: 03/13/2013) |
| 03/27/2013 | 175 | **CJA 24 *(Sealed - Court)* as to Phillip Ductan: Authorization to Pay Laura Andersen Voucher # 130321000067.. Signed by Magistrate Judge David S. Cayer on 3/19/13. (Pro se litigant served by US Mail.)(lhg)** (Entered: 03/27/2013) |
| 06/07/2013 | 176 | **PRELIMINARY ORDER OF FORFEITURE as to Phillip Ductan. Signed by District Judge Robert J. Conrad, Jr on 6/7/13. (Pro se litigant served by US Mail.)(ssh)** (Entered: 06/07/2013) |
| 07/10/2013 | 177 | PRESENTENCE INVESTIGATION REPORT (Draft Report) *(SEALED - Attorney)* as to Phillip Ductan. Objections to PSI due 07/27/2013. (available to USA, Phillip Ductan)(Emily E. Hood - nth) (Entered: 07/10/2013) |
| 07/11/2013 | 178 | USDOJ Process Receipt and Return by USA as to Phillip Ductan re 176 Judgment of Forfeiture (Brafford, William) (Entered: 07/11/2013) |
| 07/25/2013 | 179 | Service/Declaration of Publication by USA as to Phillip Ductan (Attachments: # 1 Exhibit A)(Brafford, William) (Entered: 07/25/2013) |
| 08/29/2013 | 180 | MOTION for Forfeiture of Property *Motion for Final Order and Judgment Confirming Forfeiture* by USA as to Phillip Ductan. Responses due by 9/9/2013 (Brafford, William) (Entered: 08/29/2013) |
| 08/30/2013 | 181 | Pro se MOTION for Extension of Time to File objection to 177 Presentence Investigation Report by Phillip Ductan. (Attachments: # 1 Envelope)Motions referred to David S. Cayer(blf) (Entered: 09/03/2013) |
| 09/03/2013 | 182 | **ORDER granting 181 Motion for Extension of Time to File objections to PSR as to Phillip Ductan (1) Signed by District Judge Robert J. Conrad, Jr on 9/3/2013.(Pro se litigant served by US Mail.) (blf)** (Entered: 09/03/2013) |
| 09/03/2013 | 183 | **Final Order and Judgment Confirming Forfeiture as to Phillip Ductan. Signed by District Judge Robert J. Conrad, Jr on 9/3/2013. (tmg)** (Entered: 09/03/2013) |

| 09/04/2013 | 184 | MOTION for Transcripts at Government Expense by Phillip Ductan. (Attachments: # 1 Envelope)Motions referred to David S. Cayer(blf) (Entered: 09/06/2013) |
| 09/06/2013 | | **TEXT-ONLY ORDER finding as moot 184 Motion for Transcripts at Government Expense as to Phillip Ductan (1)** *Text of Order: The Court previously granted Defendant's Motion for Transcripts at Government's Expense. See doc. 169. The Motion is denied as moot. So Ordered.* **Entered by Magistrate Judge David S. Cayer on September 6, 2013.(Pro se litigant served by US Mail.) (DSC)** (Entered: 09/06/2013) |
| 09/06/2013 | 185 | MOTION to Appoint Counsel by Phillip Ductan. (Attachments: # 1 Envelope)Motions referred to David S. Cayer(blf) (Entered: 09/09/2013) |
| 09/09/2013 | | NOTICE OF HEARING ON MOTION in case as to Phillip Ductan 185 MOTION to Appoint Counsel : Motion Hearing set for 9/12/2013 11:10 AM in Magistrate Courtroom, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David S. Cayer. *This is your only notice - you will not receive a separate document.*(tob) (Entered: 09/09/2013) |
| 09/12/2013 | | Minute Order: granting 185 Motion to Appoint Counsel as to Phillip Ductan (1); MOTION HEARING as to Phillip Ductan held before Magistrate Judge David S. Cayer. Re 185 MOTION to Appoint Counsel. Government attorney: Erin Comerford. Defendant attorney: Randolph Lee. Court reporter: FTR. (tob) (Entered: 09/12/2013) |
| 09/12/2013 | | **ORAL ORDER as to Phillip Ductan granting Oral Motion to Appoint Counsel by Magistrate Judge David S. Cayer on 9/12/13. (tob)** (Entered: 09/12/2013) |
| 09/12/2013 | | **ORAL Order Terminating Attorney in case as to Phillip Ductan ; STAND-BY representation by attorney Randolph Marshall Lee terminated. by Magistrate Judge David S. Cayer on 9/12/13. (tob)** (Entered: 09/12/2013) |
| 09/17/2013 | 186 | **CJA 20 *(Restricted)* as to Phillip Ductan: Appointment of Attorney Kenneth D. Snow for Phillip Ductan. (Click on this link to obtain the CJA 19 Notice to Appointed Counsel of Public Disclosure of Attorney Fee Information) (Pro se litigant served by US Mail.)(tob)** (Entered: 09/17/2013) |
| 09/18/2013 | 187 | MOTION for Extension of Time to File objections to presentence investigation report by Phillip Ductan. (Attachments: # 1 Envelope)Motions referred to David S. Cayer(blf) (Entered: 09/19/2013) |
| 09/19/2013 | 188 | Supplemental MOTION for Extension of Time to File *Objections to Presentence Investigation Report* by Phillip Ductan. Motions referred to David S. Cayer(Snow, Kenneth) (Entered: 09/19/2013) |
| 10/18/2013 | 189 | Second MOTION for Extension of Time to File *Objections to PSI* by Phillip Ductan. Motions referred to David S. Cayer(Snow, Kenneth) (Entered: 10/18/2013) |
| 10/23/2013 | 190 | **ORDER granting 187 188 189 Motion for Extension of Time to File Response/Reply as to Phillip Ductan (1) Signed by District Judge Robert J. Conrad, Jr on 10/23/2013.(blf)** (Entered: 10/23/2013) |
| 11/22/2013 | 191 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT *(Sealed - Attorney)* (available to: USA, Phillip Ductan) (Snow, Kenneth) (Entered: 11/22/2013) |
| 12/10/2013 | 192 | PRESENTENCE INVESTIGATION REPORT (Final Report) *(SEALED - Attorney)* as to Phillip Ductan. (available to USA, Phillip Ductan) Schedule for Sentence on or after |

| | | 12/19/2013(Emily E. Hood - trb) (Entered: 12/10/2013) |
|---|---|---|
| 01/06/2014 | | NOTICE OF HEARING as to Phillip Ductan: Sentencing set for 1/30/2014 02:00 PM in Courtroom 2, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. *This is your only notice - you will not receive a separate document.*(ssh) (Entered: 01/06/2014) |
| 01/13/2014 | 194 | Unopposed MOTION to Continue Sentencing Hearing by Phillip Ductan. Responses due by 1/24/2014 (Snow, Kenneth) (Entered: 01/13/2014) |
| 01/14/2014 | | **Oral ORDER granting 194 Motion to Continue sentencing as to Phillip Ductan (1) Sentencing RESET for 2/26/2014 02:00 PM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. Signed by District Judge Robert J. Conrad, Jr on 1/14/14.(Pro se litigant served by US Mail.) (ssh)** (Entered: 01/14/2014) |
| 02/17/2014 | 196 | TRANSCRIPT of Testimony of Mandrell Dunn as to Phillip Ductan held on 12/4/2012 before Judge Robert J. Conrad, Jr.. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov Release of Transcript Restriction set for 5/19/2014.** (Reporter: Laura Andersen, 704-350-7493) (Entered: 02/17/2014) |
| 02/17/2014 | 197 | TRANSCRIPT of Testimony of Detectives Whitesell and Bowles as to Phillip Ductan held on 2/4/2012 before Judge Robert J. Conrad, Jr.. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov Release of Transcript Restriction set for 5/19/2014.** (Reporter: Laura Andersen, 704-350-7493) (Entered: 02/17/2014) |
| 02/20/2014 | 198 | SEALED SENTENCING MEMORANDUM *(Sealed - Attorney)* by USA; (available to: USA, Phillip Ductan) (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Comerford, Erin) (Entered: 02/20/2014) |
| 02/24/2014 | 199 | PRESENTENCE INVESTIGATION REPORT (Revised) *(SEALED - Attorney)* as to Phillip Ductan. (available to USA, Phillip Ductan)(Emily Hood - trb) (Entered: 02/24/2014) |
| 02/26/2014 | | Minute Entry: SENTENCING as to Phillip Ductan held before District Judge Robert J. Conrad, Jr. Factual Basis Found. Government attorney: Comerford. Defendant attorney: Snow. Court Reporter: Beverly Gramm w/ Huseby. (ssh) (Entered: 03/04/2014) |
| 03/11/2014 | 202 | **STATEMENT OF REASONS *(Sealed - Attorney)* re: 201 Judgment, (available to: USA, Phillip Ductan). Signed by District Judge Robert J. Conrad, Jr on 3/11/14. (Pro se litigant served by US Mail.)(ssh)** (Entered: 03/12/2014) |

| 03/12/2014 | 201 | **JUDGMENT as to Phillip Ductan (1), Count(s) 1, 24 mos imp conc w/ cnt 2 + 5 yr SRT conc. + $100 assess; Count(s) 2, 24 mos. imp conc w/ cnt 1 + 5 yr SRT conc. + $100 assess; Count(s) 3, 60 mos imp consec to cnts 1 & 2 for a total of 84 mos. imp + 5 yr SRT conc. + $100 assess; Count(s) 4, Dismissed. Signed by District Judge Robert J. Conrad, Jr on 3/11/14. (Pro se litigant served by US Mail.)(ssh)** (Entered: 03/12/2014) |
|---|---|---|
| 03/18/2014 | | USCA Case Number as to Phillip Ductan 14-4220 for 165 Notice of Appeal USCA Case Manager: C Tyree. (ssh) (Entered: 03/18/2014) |
| 03/18/2014 | 203 | NOTICE OF APPEAL by Phillip Ductan. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, Transcript Order Form, and CJA 24 Vouchers.* Note: Your Transcript Order Form (and CJA 24 if applicable) must be served on the District Court as well as the Circuit Court. (No fee required) (Snow, Kenneth) (Entered: 03/18/2014) |
| 03/18/2014 | 204 | Transmission of Notice of Appeal as to Phillip Ductan to US Court of Appeals re 203 Notice of Appeal (tmg) (Entered: 03/18/2014) |
| 03/21/2014 | 205 | ORDER of USCA as to Phillip Ductan re: appointing Federal Defender (ssh) (Entered: 03/21/2014) |
| 04/09/2014 | 206 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT as to Phillip Ductan re 203 Notice of Appeal, (ssh) (Entered: 04/09/2014) |
| 04/09/2014 | 207 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT as to Phillip Ductan re 203 Notice of Appeal, (motion hearing 9/12/13) (ssh) (Entered: 04/09/2014) |
| 04/09/2014 | 208 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT as to Phillip Ductan re 203 Notice of Appeal, (sentencing 2/26/14) (ssh) (Entered: 04/09/2014) |
| 04/22/2014 | 209 | TRANSCRIPT of Sentencing as to Phillip Ductan held on 2/26/2014 before Judge Robert J. Conrad, Jr, Court Reporter: Beverly Gramm w/ Huseby, telephone number 704-333-9889. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov (*Does this satisfy all appellate orders for this reporter? - Yes.*)** Release of Transcript Restriction set for 7/21/2014. (tmg) (Entered: 04/22/2014) |
| 05/16/2014 | 210 | TRANSCRIPT of Voir Dire *(Restricted)* as to Phillip Ductan held on 12/4/2012 before Judge Conrad. Partial Release of Transcript Restriction set for 8/14/2014. (Reporter: Laura Andersen, 704-350-7493) (Entered: 05/16/2014) |
| 05/16/2014 | 211 | TRANSCRIPT of JURY TRIAL-OPENING STATEMENTS AND TESTIMONY as to Phillip Ductan held on 12/4/2012 before Judge ROBERT J. CONRAD, JR., **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the** |

| | | |
|---|---|---|
| | | **90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** *(Does this satisfy all appellate orders for this reporter? - No.)* Release of Transcript Restriction set for 8/14/2014. (Reporter: Laura Andersen, 704-350-7493) (Entered: 05/16/2014) |
| 05/16/2014 | 212 | TRANSCRIPT OF JURY TRIAL-CLOSING STATEMENTS, JURY INSTRUCTIONS, VERDICT as to Phillip Ductan held on 12/5/2012 before Judge ROBERT J. CONRAD, JR., **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a** *Notice of Intent to Request Redaction* **and 21 calendar days to file a** *Redaction Request.* **If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** *(Does this satisfy all appellate orders for this reporter? - No.)* Release of Transcript Restriction set for 8/14/2014. (Reporter: Laura Andersen, 704-350-7493) (Entered: 05/16/2014) |
| 05/16/2014 | 213 | TRANSCRIPT of MOTION TO APPOINT COUNSEL as to Phillip Ductan held on 9/12/2013 before Judge DAVID CAYER, **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a** *Notice of Intent to Request Redaction* **and 21 calendar days to file a** *Redaction Request.* **If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** *(Does this satisfy all appellate orders for this reporter? - Yes.)* Release of Transcript Restriction set for 8/14/2014. (Reporter: Laura Andersen, 704-350-7493) (Entered: 05/16/2014) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/12/2014 13:49:27 | | |
| **PACER Login:** | dp1619 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:04-cr-00252-RJC-DSC |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

FILED
CHARLOTTE, N.C.

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA SEP 28  PM 4: 14
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO: 3:04CR252-MCK |
| | ) | |
| v. | ) | BILL OF INDICTMENT |
| | ) | |
| (1) PHILLIP DUCTAN | ) | Violations: |
| a/k/a "Jacob Miller" | ) | 21 U.S.C. § 841 |
| (2) LANDIS RICHARDSON | ) | 21 U.S.C. § 846 |
| (3) MARK LOWERY | ) | 18 U.S.C. § 922(g) |
| | ) | 18 U.S.C. § 924(c) |
| | ) | 18 U.S.C. § 2 |

**THE GRAND JURY CHARGES:**

<u>COUNT ONE</u>

1.    From in or about April 2004 and continuing until the present in Mecklenburg County, within the Western District of North Carolina, and elsewhere,

(1) PHILLIP DUCTAN
a/k/a "Jacob Miller"
(2) LANDIS RICHARDSON
(3) MARK LOWERY

did knowingly and unlawfully combine, conspire, confederate and agree with each other, and others, both known and unknown to the Grand Jury to possess with intent to distribute a quantity of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841.

2.    All in violation of Title 21, United States Code, Section 846.

<u>COUNT TWO</u>

1.    On or about June 3, 2004, in Mecklenburg County, within the Western District of North Carolina, and elsewhere,

(1) PHILLIP DUCTAN
a/k/a "Jacob Miller"
(2) LANDIS RICHARDSON
(3) MARK LOWERY

Case 3:04-cr-00252-RJC-DSC   Document 1   Filed 09/28/04   Page 1 of 5

- 14 -

*US v. Phillip Ductan, et al.*
Bill of Indictment
Page 2

did knowingly and unlawfully possess with intent to distribute, a quantity of marijuana, a Schedule I controlled substance, and did aid and abet one another, in violation of Title 21, United States Code, Section 841 and Title 18, United States Code, Section 2.

## COUNT THREE

On or about June 3, 2004, in Mecklenburg County, within the Western District of North Carolina, and elsewhere,

(1) PHILLIP DUCTAN
a/k/a "Jacob Miller"
(2) LANDIS RICHARDSON
(3) MARK LOWERY

during and in relation to a drug trafficking crime, that is, conspiracy to possess with intent to distribute marijuana, a violation of Title 21, United States Code, Section 846, for which they may be prosecuted in a court of the United States, did knowingly use and carry firearms, and, in furtherance of such drug trafficking crime, did possess one or more of the following firearms, to wit: Smith & Wesson .38 caliber revolver, a Taurus 9mm handgun, and Hungary 9mm handgun and did aid and abet one another and others in violation of Title 18, United States Code, Section 2 and Title 18, United States Code, Section 924(c)(1).

## COUNTY FOUR

On or about June 3, 2004,  in Mecklenburg County, within the Western District of North Carolina, and elsewhere,

(1) PHILLIP DUCTAN
a/k/a "Jacob Miller"

having been previously convicted of a crime punishable by imprisonment for a term exceeding one year, to wit: Forgery Second Degree, in the Dekalb County Superior Court, Georgia, on or about December 4, 1997; did knowingly and unlawfully possess a firearm in and affecting interstate commerce, to wit: a Smith & Wesson .38 caliber revolver.

All in violation of Title 18, United States Code, Section 922(g)(1).

*US v. Phillip Ductan, et al.*
Bill of Indictment
Page 3

<u>COUNT FIVE</u>

On or about June 3, 2004, in Mecklenburg County, within the Western District of North Carolina, and elsewhere,

(2) LANDIS RICHARDSON

having been previously convicted of a crime punishable by imprisonment for a term exceeding one year, to wit: Marijuana Possession First Degree, in the Montgomery County Superior Court, Alabama, on or about May 12, 1999; did knowingly and unlawfully possess a firearm in and affecting interstate and foreign commerce, to wit: a Hungary 9mm handgun.

All in violation of Title 18, United States Code, Section 922(g)(1).

<u>NOTICE OF FORFEITURE</u>

Notice is hereby given of the provisions of 21 U.S.C. § 853. The defendants have or had a possessory or legal interest in the following property that is subject to forfeiture in accordance with § 853.

    a)      all property constituting, or derived from, any proceedings the defendants obtained, directly or indirectly, as a result of the violations alleged in this bill of indictment; and,

    b)      all property used or intended to be used, in any manner or part, to commit or to facilitate the commission of such violations.

The grand jury finds that there is probable cause to believe the following property is subject to forfeiture on one or more of the grounds stated above:

    (a)      A Ford Expedition automobile seized on or about June 3, 2004 in Mecklenburg County, North Carolina.

    (b)      A Chevrolet Tahoe automobile seized on or about June 3, 2004 in Mecklenburg County, North Carolina.

*US v. Phillip Ductan, et al.*
Bill of Indictment
Page 4

## SENTENCING ALLEGATIONS

The Grand Jury further charges that Count One, with respect to Phillip Ductan, involved at least 45 kilograms of marijuana [U.S.S.G. § 2D1.1(10)].

The Grand Jury further charges that Count Two, with respect to Phillip Ductan, Landis Richardson and Mark Lowery, involved at least 5 kilograms of marijuana [U.S.S.G. § 2D1.1(13)].

The Grand Jury further charges that Count Two, with respect to Phillip Ductan, Landis Richardson and Mark Lowery, each possessed a dangerous weapon, to wit: firearms on or about June 3, 2004, as set forth in U.S.S.G., Section 2D1.1(b)(1).

The Grand Jury further charges that with respect to Count Four, Phillip Ductan, used and possessed a firearm in connection with another felony offense, to wit: possession with intent to distribute marijuana, as set forth in U.S.S.G., Section 2K2.1(b)(5).

The Grand Jury further charges that with respect to Count Five, Landis Richardson, used and possessed a firearm in connection with another felony offense, to wit: possession with intent to distribute marijuana, as set forth in U.S.S.G., Section 2K2.1(b)(5).

Case 3:04-cr-00252-RJC-DSC    Document 1    Filed 09/28/04    Page 4 of 5

*US v. Phillip Ductan, et al.*
Bill of Indictment
Page 5

A TRUE BILL:

███████████████████████

GRAND JURY FOREMAN

GRETCHEN C. F. SHAPPERT
UNITED STATES ATTORNEY

KEITH M. CAVE
ASSISTANT U.S. ATTORNEY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL ACTION NO. 3:04CR252-RJC-DSC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | **O R D E R** |
| | ) | |
| PHILLIP DUCTAN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

THIS MATTER is before the Court on Defendant's "Application for Admission to Practice Pro Hac Vice" (document #134) of defense counsel Charles T. Brant.   For the reasons set forth therein, the Motion will be **GRANTED**.

The Clerk is directed to send copies of this Order to counsel for the parties, including but not limited to moving counsel; and to the Honorable Robert J. Conrad, Jr.

**SO ORDERED**.

Signed: July 11, 2012

_____

David S. Cayer
United States Magistrate Judge

```
1                   UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                        CHARLOTTE DIVISION

3    UNITED STATES OF AMERICA,    )    DOCKET NO. 3:04-cr-252
                                  )
4                    Plaintiff,   )
             vs.                  )
5                                 )
     PHILLIP DUCTAN,              )
6                                 )
                     Defendant.   )
7    _____ )

8
                    TRANSCRIPT OF ELECTRONICALLY RECORDED
9                        MOTION TO WITHDRAW
                   BY ATTORNEY CHARLES TYRONE BRANT
10            BEFORE THE HONORABLE DAVID S. CAYER
                   UNITED STATES MAGISTRATE JUDGE
11                        OCTOBER 5, 2012

12   APPEARANCES:

13   On Behalf of the Government:

14             ROBERT JOHN GLEASON, ESQ.,
               Assistant United States Attorney
15             227 West Trade Street, Suite 1700
               Charlotte, North Carolina 28202
16
     On Behalf of the Defendant:
17
               CHARLES TYRONE BRANT, ESQ.,
18             Colom and Brant, Attorneys at Law, LLC
               191 Peachtree Street, N.E., Suite 3300
19             Atlanta, Georgia 30303

20             RICHARD LAMB BROWN, JR, ESQ.,
               Law Offices of Richard L. Brown, Jr.
21             309 Lancaster Avenue
               Monroe, North Carolina 28112
22

23        Proceedings digitally-recorded and transcribed by:

24                  LAURA ANDERSEN, RMR
                    Official Court Reporter
25               United States District Court
                   Charlotte, North Carolina
```

2

P R O C E E D I N G S

(Transcript of proceedings digitally recorded on October 5, 2012 at 10:16:48 a.m.)

THE COURT:  United States versus Phillip Ductan.

Counsel, this is Mr. Brant's motion to withdraw, and the reason the court put it on for a hearing is that I have some questions about what's been happening in this case.  From what I see in the record, Mr. Brant was admitted Pro Hac on July 12th of this year.  The case was scheduled for docket call October 1st.  And I understand that's now been continued, but it was scheduled for docket call October 1st. September 17th, counsel filed a motion to continue the docket call.  And part of what was in that motion was, "the government does not oppose a continuance in this matter and as of today's date, negotiations are continual."

Then counsel filed a motion to withdraw on October 2nd, and alleged in that motion is, "defendant refuses to sign the discovery waiver in order for counsel to receive a copy of the discovery."

So my first question Mr. Brant is, if you entered the case on July 12th, why did you wait until October 2nd to say that you hadn't gotten discovery?

MR. BRANT:  Well, Your Honor, what happened was --

THE COURT:  Stand up, sir.

MR. BRANT:  Yeah.  We -- because I'm out of state,

3

1  we -- and I was engaging with defendant, we sent him a package

2  of information waiting for a response.  In between my first

3  court appearance and the continuance, I communicated with his

4  wife who had indicated to me that they no longer wanted my

5  services.

6              THE COURT:  When did that happen?

7              MR. BRANT:  It happened sometime after October, Your

8  Honor.  And that's -- it was right before the continuance.

9  Because I had been talking to -- to the prosecutor, and we

10  were trying to work the case out.  I indicated to her, she was

11  preparing for a trial --

12              THE COURT:  Well, and that gets to my next question

13  which is, how were you trying to work the case out if you

14  didn't have any discovery?

15              MR. BRANT:  Well, we talked about the case.  She

16  made an offer.  She sent me a plea.  She sent me a plea offer

17  without having discovery.  I -- after -- even after his wife

18  had indicated to me that they no longer wanted me on the case,

19  I wrote up -- I made a copy of that.  I also informed him of

20  what his wife had indicated to me.  Sent a self-returned

21  envelope to him to tell me if that was in fact the case, and

22  had informed the prosecutor that I was waiting for that

23  information in order to move forward.

24              So while that was out, that's why we asked for the

25  continuance.  Because we did not -- we had not, and even to

4

1   this day we have not received back anything from the defendant

2   saying, no, I don't want you on the case.

3       In fact, Mr. Brown subsequently went down to the

4   jail to ask him, when he informed him -- and that was just

5   recently that, no, he didn't want our services.

6       So everything I could do -- immediately once I got

7   the recommendation from the government, I mailed the

8   recommendation along with the information to Mr. Ductan to the

9   jail.

10      THE COURT:  But how can he consider a plea offer

11  when he hasn't seen the discovery?

12      MR. BRANT:  Well, that was -- that was my concern

13  Judge.  That's whey we --

14      THE COURT:  Well then why didn't you bring it up

15  before October?  You've been in the case since July.

16      MR. BRANT:  We --

17      THE COURT:  I'm concerned about why you didn't raise

18  that before October.

19      MR. BRANT:  I didn't raise the issue of...

20      THE COURT:  Having no discovery.

21      MR. BRANT:  Well, the government knew we didn't have

22  discovery.  And she told me she wasn't going to give it to me

23  until we signed it.  And I told her I'll be about the business

24  of trying to get it.  But in the meantime, this is an

25  eight-year-old case.  It's an old case where co-defendants had

5

1   already served their time.  She had all the information, and
2   she already -- apparently there was a plea already written up.
3           So there was a real discussion based on the
4   information we both understood.  But I understood there was
5   more discovery to be had, and the idea was to get that
6   discovery.  So we were continuing because she was preparing
7   for a trial.  We both agreed that there was no sense going
8   forward at that point in time.  And so we were going to
9   continue it to allow me to try to get this information.
10          So I -- I don't -- from my perspective, Your Honor,
11  there was not a lag or a gap in my efforts to try to get
12  discovery or to move forward with the case.
13          The joint agreement was because she was preparing
14  for another trial, and I think had just gotten back from some
15  illness or some surgery, and it was -- and deeply involved in
16  another case.
17          And when we were discussing the facts, it was
18  brought to my attention that we needed to get him to sign off
19  to get the discovery.  And that was during the time which I
20  was informed by his wife that they no longer wanted our
21  services, and she wanted an accounting of everything.  I took
22  care of that.  I sent the mail out to him.  I never got
23  anything back.  And then I still waited because my belief,
24  Judge, is this, that my obligation was, you can't go forward
25  with a trial without discovery.  So, you know, my -- so I

6

1   waited and I informed the government of the same.  I said, I'm
2   going to wait and hold out to see if I can get anything back.
3   At which time I contacted Mr. Brown and asked him to go down
4   and talk to him, which he did.  Which he was informed that he
5   did not in fact want our services.
6           The problem Judge is, even to this date we don't
7   have discovery, and it's because we don't have a signed
8   release.
9           THE COURT:  And I understand that completely.  What
10  I don't understand is why you didn't raise this as an issue
11  before October when the case was set for docket call?
12          MR. BRANT:  I think I did raise it as an issue, Your
13  Honor.  I spoke with the government about it, and we both
14  understood what was going on.  I don't think -- when we asked
15  for the continuance, there was not a disagreement about where
16  we were with the case or what was going on.
17          So I didn't -- I didn't -- when the Court said I
18  didn't raise it as an issue, it -- my interpretation of that
19  is, there's something wrong that I'm having a conflict with
20  the government and how we're moving forward, or there's a
21  problem with my ability to represent.  And the only problem is
22  I'm not getting a signature so I can turn in the form to get
23  the discovery.  And whether I go to the jail or not, I can't
24  make him sign a document so I can get discovery.
25          So I don't -- other -- and the government was

7

1    appraised of those facts.

2         So, I guess, I'm sorry, Your Honor, I'm not

3    understanding when the Court says, inform the Court of a

4    problem.  Because everything I did was with the government's

5    knowledge.  I was constantly in communication with the

6    government.  I -- we talked back and forth.  I knew what she

7    was doing.  She knew what I was doing.  I even asked her to

8    allow me more time to wait to get a response back so we could

9    try to get the discovery.  But the things that were going on

10   outside of the legal process was defendant and his wife saying

11   they no longer wanted our services.

12        But despite that fact, I felt that I had an

13   obligation to at least not try to leave this on a calendar to

14   move forward for a trial before we had discovery.  And

15   that's -- that's why nothing happened.  That's why we asked

16   for the continuance and she agreed, she understood, and that's

17   why she agreed to it.

18             THE COURT:  Mr. Gleason, I'm assuming you're not the

19   prosecutor in this case?

20             MR. GLEASON:  That's correct, Your Honor.

21             THE COURT:  Do you know who is?

22             MR. GLEASON:  It's Ann Claire Phillips, Your Honor.

23             THE COURT:  All right.  Well, does the government

24   have a position on this?

25             MR. GLEASON:  Well, Your Honor, I don't have all the

8

```
1   facts.  Ms. Phillips will be back in the office on Monday.
2   And I think she would be the one who would be --
3           THE COURT:  All right.
4           MR. GLEASON:  -- in the best position to know the
5   facts and history.
6           THE COURT:  All right.  Well, that's fine.
7           Mr. Ductan, am I pronouncing that right?
8           DEFENDANT DUCTAN:  With all due respect, I am a
9   secured party creditor.
10          THE COURT:  All right, sir.  Let me ask you a
11  question.
12          Mr. Brant is asking to withdraw.  What he's put in
13  this motion is that you don't want to be represented by him
14  anymore.
15          DEFENDANT DUCTAN:  That's absolutely correct.
16          THE COURT:  Is that correct?
17          DEFENDANT DUCTAN:  That's correct.
18          THE COURT:  All right.  And if I agree to let him
19  out of the case, then I'm going to have to address with you
20  what you want to do about a lawyer, do you want to hire a
21  lawyer, do you want me to consider appointing a lawyer, that
22  will be the next step.  Do you understand that?
23          DEFENDANT DUCTAN:  Yes, I do understand that.
24          THE COURT:  All right.  Well, I'll grant the motion
25  as to allowing Mr. Brant, and Mr. Brown -- I guess you're on
```

9

1   there as local counsel.

2            MR. BROWN:  Yes, sir, Your Honor.

3            THE COURT:  I'll grant the motion allowing you to

4   withdraw.

5            DEFENDANT DUCTAN:  And I also would like a waiver

6   form 226, waiver of counsel.

7            THE COURT:  Well, that's -- that's what I'm going to

8   get into now with you, sir.

9            You had retained counsel.  If you would like to try

10  to hire another lawyer, you may certainly do that.  If you

11  want me to consider appointing a lawyer, then I will do that.

12  Did you want to try to hire a lawyer, or do you want me to

13  consider appointing you one?

14           DEFENDANT DUCTAN:  That would be nice but, you know,

15  given the situation that I'm in right now, that's almost

16  impossible to do that being incarcerated so...

17           THE COURT:  All right, sir.  And I understand that.

18           DEFENDANT DUCTAN:  Exactly.

19           THE COURT:  Do you want me to consider appointing a

20  lawyer?

21           DEFENDANT DUCTAN:  No, sir.  I do not want to

22  consent to having a lawyer appointed to my --

23           THE COURT:  Are you saying you want to represent

24  yourself?

25           DEFENDANT DUCTAN:  No.  I would like to present

10

1   myself on my behalf.  That's what I would like to do.

2           THE COURT:  Well, that's -- that's not an option.

3   Your options are to represent yourself.  And by that I mean

4   you go ahead on your own with no lawyer.  Or I'll consider

5   appointing a lawyer, or allowing you to try to hire one.

6           DEFENDANT DUCTAN:  Well, I would like --

7           THE COURT:  Those are the only choices you've got.

8           DEFENDANT DUCTAN:  Well, I would like a form 226

9   form, waiver of counsel.

10          THE COURT:  Sir I -- I don't know what you're

11  talking about there.  What I'm talking about is -- are the

12  choices that you have to make.

13          DEFENDANT DUCTAN:  Do you not have my form, my

14  paperwork, any of my paperwork before you?

15          Prosecutor, do they have any of my paperwork that

16  was mailed?

17          THE COURT:  Sir, you should have -- you should have

18  received a copy of the indictment at some point, and that's

19  what contains the charges against you.

20          DEFENDANT DUCTAN:  Are you not aware of the fact

21  that I am a secured party creditor?

22          THE COURT:  I am --

23          DEFENDANT DUCTAN:  And the name that you are using

24  is my property, and it is copyrighted.  So I just want you

25  guys to be aware of that before you do use that name again.

11

```
 1            THE COURT:  Do you want to try to hire a lawyer,
 2    sir?
 3            DEFENDANT DUCTAN:  I told you that I am a secured
 4    party creditor and that the name that you guys are using --
 5            THE COURT:  That's --
 6            DEFENDANT DUCTAN:  That's --
 7            THE COURT:  That's not a --
 8            DEFENDANT DUCTAN:  That's copyright material.  That
 9    does belong to me.  That is my property.
10            THE COURT:  Do you want me to consider appointing a
11    lawyer?
12            DEFENDANT DUCTAN:  I do not want an attorney
13    appointed to me --
14            THE COURT:  All right.
15            DEFENDANT DUCTAN:  -- out of state.
16            THE COURT:  Mr. Gleason, what is he charged with?
17    Can you summarize that?
18            Listen to what he's saying, sir.
19            MR. GLEASON:  All right.  Your Honor, the Bill of
20    Indictment that's been filed against the defendant, it also
21    lists two other co-defendants.
22            In Count One of the Bill of Indictment it alleges
23    that on or about April 2004 and continuing until the present
24    time, that being the time that the indictment was filed, in
25    Mecklenburg County, within the Western District of North
```

- 30 -

12

Carolina, Phillip Ductan, a/k/a Jacob Miller, Landis

Richardson, and Mark Lowery, did knowingly and unlawfully,

combine, conspire, confederate and agree with one another and

others, both known and unknown to the Grand Jury, to possess

with intent to distribute a quantity of marijuana, a Schedule

I controlled substance.

          In violation of 21 U.S. Code 841.  All in violation

of Title 21 U.S. Code 846.  That's a drug conspiracy.  I don't

know, Your Honor, if you want me to actually read the

indictment or just summarize the counts?

          THE COURT:  No.  No.  I just want a summary of the

charges and the penalties.

          MR. GLEASON:  Very good.  Well, there's one count of

drug conspiracy, 21 U.S. Code 846.

          And then in Count Two he is charged along with the

two co-defendants on June 3rd, 2004, with possession with

intent to distribute marijuana, and aiding and abetting

thereof.  In violation of 21 U.S. Code 841 and 18 U.S. Code

Section 2.

          Count Three, on June 3rd, 2004, the defendant along

with Landis Richardson and Mark Lowery, are also charged with

a violation of 18 U.S. Code 924(c) and aiding and abetting

thereof, that being possession, possessing a firearm in

furtherance of a drug trafficking crime.  And this involved

one or more firearms.

13

1       Count Four, the defendant is charged with a
2  violation of 18 U.S. Code 922(g)(1), on June 3rd, 2004, that
3  being possession of a firearm by a convicted felon, having a
4  prior felony conviction from the State of Georgia, did
5  knowingly possess a Smith and Wesson .38 caliber revolver.
6       Your Honor, the final count does not charge the
7  defendant, it charges a co-defendant.
8       THE COURT:  All right.
9       MR. GLEASON:  And then there is a forfeiture count
10  in the indictment.
11       THE COURT:  And the penalties he is facing are what?
12       And I apologize.  It's not your case Mr. Gleason,
13  but for purposes of what's happening today I need for him to
14  hear this.
15       MR. GLEASON:  Yes, Your Honor.
16       Your Honor, I do have a summary here in the file.
17       Count One, violation 21 U.S. Code 846, according to
18  what I have here, a sentence of not more than five years,
19  $250,000 fine.  If he has a prior felony drug offense, then
20  that becomes not more than 10 years, a $500,000 fine.
21       Count Two would be the same punishment as Count One.
22  Count Two is for possession with intent to distribute
23  marijuana.  A violation of 21 U.S. Code 841.  Carries the same
24  punishment I just read for the drug conspiracy.
25       And then in Count Three, the 924(c) violation,

14

1    that's punishable by not less than five years, punishable by a

2    maximum of life imprisonment, a $250,000 fine or both, and

3    that count must be run consecutive to any other count that he

4    would be convicted of.

5            And then finally in Count Four, a violation of 18

6    U.S. Code 922(g)(1), possession of firearm by convicted felon,

7    it's punishable by a maximum of 10 years, $250,000 fine or

8    both.  Unless he is an armed career criminal, meaning that if

9    he has three prior convictions for violent felony or drug

10   trafficking offense, then his penalty becomes not less than 15

11   years, to not more than life imprisonment, a $250,000 fine or

12   both.

13           THE COURT:  Sir, did you just hear and understand

14   what the U.S. Attorney said about the charges and the

15   penalties?

16           DEFENDANT DUCTAN:  I do not understand what he is

17   saying.  I'm only here for settlement of the account.  That's

18   all I'm here for.

19           THE COURT:  And you have told me you do not want an

20   appointed lawyer; is that correct?

21           DEFENDANT DUCTAN:  I do not want a court-appointed

22   lawyer.

23           THE COURT:  And you do not want to try to hire a

24   lawyer; is that correct?

25           DEFENDANT DUCTAN:  If I am to hire an attorney on my

15

1   behalf, I will do so being outside of being incarcerated.  I

2   do not consent to being incarcerated.

3           THE COURT:  But are you going to try to hire a

4   lawyer even though you're incarcerated?

5           DEFENDANT DUCTAN:  Well how could I do that being

6   incarcerated?

7           THE COURT:  Well, then that's why I'm asking you did

8   you want me to consider appointing a lawyer?

9           DEFENDANT DUCTAN:  No, I do not want a

10  court-appointed lawyer.

11          THE COURT:  All right, sir.

12          DEFENDANT DUCTAN:  Do not.  And I've already -- I

13  filed a UCC-3.  I mean, if you guys -- you guys haven't got my

14  file so I don't know, is this a hearing for withdrawal of

15  counsel, or are we here pretrial hearing?

16          THE COURT:  Well I'm going to ask you some other

17  questions, sir, because I have to resolve this issue of what

18  you're going to do about a lawyer.

19          Are you under the influence of any alcohol or drugs

20  at this point?

21          DEFENDANT DUCTAN:  Are you asking me to testify?

22          THE COURT:  No.  I'm asking to you answer my

23  question.  Have you taken any alcohol or drugs?

24          DEFENDANT DUCTAN:  Do you guys have any proof of

25  claims?  Does the state have any proof of claims?

16

1       THE COURT:  Well, sir, what I'm going to do is,
2   based on your --
3       DEFENDANT DUCTAN:  I have yet -- I have yet to see
4   any proof of claims.
5       THE COURT:  Based on your responses to my questions,
6   I am not going to pursue your hiring a lawyer.  I'm not going
7   to appoint a lawyer, because you say you don't want me to
8   consider appointing a lawyer.
9       But what you're doing, sir, is obstructing the
10  process by making nonsense statements.  And the problem in
11  doing that is, that under the law you can be found to have
12  waived your right to counsel.  So I'm not going to appoint
13  counsel.  What I am going to do is direct the Federal Defender
14  to appoint somebody as standby counsel for you.  Which means
15  that --
16      DEFENDANT DUCTAN:  I do not consent to any standby
17  counsel --
18      THE COURT:  Well, I didn't ask you --
19      DEFENDANT DUCTAN:  -- or counsel --
20      THE COURT:  If you consented to it.
21      DEFENDANT DUCTAN:  -- by the state.
22      THE COURT:  And that attorney will be available
23  should you want to consult that attorney as -- as your case
24  progresses.
25      So I'll allow the motion to withdraw.  I'll direct

17

1   standby counsel to be appointed to the extent that you want to

2   avail yourself of that person's services, and that's all

3   that's going to happen today, sir.

4         DEFENDANT DUCTAN:  So, okay.  If that's the case

5   then I don't have any problems filing any criminal complaints

6   against you guys, of all parties in here.  I do not consent to

7   being incarcerated.

8         MR. BRANT:  Your Honor, that concludes my business,

9   may I be excused?

10        THE COURT:  Yes, sir.  Thank you.

11        MR. BRANT:  Thank you.

12  (The hearing concluded at 10:36:17 a.m.)

13                      * * * * * *

14  UNITED STATES DISTRICT COURT
    WESTERN DISTRICT OF NORTH CAROLINA
15  CERTIFICATE OF REPORTER

16
          I, Laura Andersen, Official Court Reporter, certify
17  that the foregoing transcript is a true and correct transcript
    of the electronically-recorded proceedings transcribed under
18  my direction.

19        Dated this the 14th day of February, 2013.

20                          s/Laura Andersen
                            Laura Andersen, RMR
21                          Official Court Reporter

22

23

24

25

- 36 -

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTE DIVISION

**DOCKET NO.: 3:04CR252**

_____

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **VS** ) | **MOTION TO WITHDRAW** |
| ) | |
| **Phillip Ductan** ) | |
| _____) | |

**COMES NOW** undersigned counsel and moves to withdraw from the aforementioned case and shows unto the court the following.

1. The defendant is charged in a Bill of Indictment filed on September 28, 2004 in the Western District of North Carolina, which alleges violations of 18 USC 922(g), 18 USC 922(c), 21 USC 846, and 21 USC 841.

2. Defendant appeared at his initial arraignment on July 6, 2012.

3. Defendant retained undersigned Charles Brant.  Undersigned Richard Brown moved for pro hac vice admission of Charles Brant on July 11, 2012.

4. Defendant refuses to sign the discovery waiver in order for counsel to receive a copy of the discovery. Receiving a copy of said discovery is imperative because lead counsel resides in Atlanta, Ga. and does not have ready access to review the discovery in the US attorney's office.

5. Defendant has expressed to counsel that he does not wish to have counsel nor anyone associated with counsel to represent him.

6. Defendant has expressly demanded that counsel withdraw from his case.

7. Defendant otherwise refuses to have any communication with counsel.

8. Based upon the aforementioned information, it would be in the interest of justice for the Court to grant the motion.

**Wherefore**, this Honorable Court is respectfully requested to allow defense counsel to withdraw from defendant's case.

This the 2nd day of October, 2012.

<u>s/Charles Brant</u>
<u>s/Richard L. Brown, Jr.</u>
Richard L. Brown, Jr.
Attorney at Law
309 Lancaster Ave.
Monroe, NC 28112
(704) 283-6800
NC Bar #: 23021

## CERTIFICATE OF SERVICE

This is to certify that the above captioned motion has been served upon the following interested parties by electronic filing:

Anne Claire Phillips
US Attorneys Office
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, NC  28202

This the 2nd day of October, 2012.

<u>s/Charles Brant</u>
<u>s/Richard L. Brown, Jr.</u>
Richard L. Brown, Jr.
Attorney at Law
309 Lancaster Ave.
Monroe, NC 28112
(704) 283-6800
NC Bar #: 23021

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO.   3:04CR252-RJC-DSC**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER** |
| PHILLIP DUCTAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

THIS MATTER is before the Court on defense counsel Charles Brant's "Motion to Withdraw," Doc. 140, filed October 2, 2012.  The Court conducted a hearing in this matter on October 5, 2012.

Having fully considered the arguments, the record, and the applicable authority, the Court finds that there is a sufficient basis to allow withdrawal by counsel for Defendant, as discussed below.

Defense counsel represents that Defendant refuses to have any communication with him. Defendant has also refused to sign a waiver so that counsel may obtain discovery.  At the hearing, Defendant told the Court that he does not want Mr. Brant to represent him. The Court orally **GRANTED** the Motion to Withdraw.

The Court advised Defendant that he now had the options of hiring new counsel, asking for appointed counsel, or representing himself.  Defendant stated that he was unable to retain counsel because he is incarcerated.  The Court asked if Defendant wanted to apply for appointed counsel. Defendant stated that he did  not want appointed counsel.  At this point, Defendant responded to the Court's further questions by making frivolous arguments about his "settlement of account", his making a "special appearance", and the Uniform Commercial Code.

The Court proceeded with an inquiry pursuant to <u>Faretta v. California</u>, 422 U.S. 806, 819 (1975). The Assistant United States Attorney summarized the charges against Defendant as well as the applicable minimum and maximum penalties. When asked if he understood the charges and penalties, Defendant responded that he did not understand. Defendant gave a frivolous response to the Court's question about whether he was under the influence of any alcohol or drugs. The Court discontinued the <u>Faretta</u> hearing when it became clear that Defendant was intentionally obstructing the orderly process of addressing the counsel issue.

The Court does not find that Defendant has knowingly and intentionally waived his right to counsel. To be effective, "[a]n assertion of the right of self representation must be (1) clear and unequivocal; (2) knowing, intelligent and voluntary; and (3) timely." <u>United States v. Frazier-El</u>, 204 F.3d 553, 558 (4th Cir. 2000) (internal citations omitted).

Based upon the Defendant's frivolous arguments and answers to questions, the Court finds that he has intentionally obstructed the Court's efforts to protect his right to counsel. The Court further finds that Defendant has forfeited his right to counsel in this matter. <u>See</u> <u>United States v. Coleman</u>, No. 3:09-CR-207, 2010 WL 4395358, at *5 (E.D.Va. October 28, 2010) (finding Defendant waived his right to counsel by his dilatory tactics and unwillingness to work with his attorneys including filing three pro se motions, communicating regularly with the Clerk's office and dismissing his attorneys when they failed to pursue his preferred courses of action). The Court, in its discretion, directs the Federal Defender's office to appoint stand-by counsel for Defendant. The Court explained the role of stand-by counsel to Defendant.

Based on the above facts, the Court finds that there is sufficient basis for allowing defense counsel to withdraw. Therefore, Mr. Brant's "Motion to Withdraw," Doc. 140, is **GRANTED**. The

2

Federal Defender's office is directed to appoint stand-by counsel for Defendant.

The Clerk is directed to send copies of this Order to counsel for the parties; <u>and to the</u> <u>Honorable Robert J. Conrad, Jr</u>.

**SO ORDERED.**

Signed: October 5, 2012

David S. Cayer
United States Magistrate Judge

3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

DOCKET NUMBER 3:04CR252

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | } | |
| | } | |
| v. | } | MOTION TO WITHDRAW |
| | } | |
| PHILLIP DUCTAN | } | |
| _____ | } | |

     NOW COMES the undersigned counsel who hereby moves to withdraw as standby counsel in this matter. In support of this motion, the following is presented to this Honorable Court:

1.     Your undersigned counsel was appointed as standby counsel on October 10, 2012. This appointment as standby counsel followed an Order by this Honorable Court allowing prior counsel to withdraw.  Docket  Doc. No. 142.

2.     Prior counsel had moved to withdraw because the defendant refused to sign the discovery agreement which would have governed the defendant's and defense counsel's access to the government discovery file.  It was also  represented by prior counsel that they were not wanted as counsel by the defendant.  It was also noted in prior counsel's motion to withdraw that defendant did not want any counsel representing him.  See generally Dkt. Doc. No. 140.

3.     Defendant has informed your undersigned that he does not wish for your undersigned to represent him in any capacity.  Furthermore, the defendant has refused to sign the discovery agreement sent him by your undersigned counsel.

4.     The status of the case presents difficulties for your undersigned. The case is currently set for trial during the term of December 3, 2012 before The Honorable Robert J. Conrad, Jr., Chief Judge.   Your undersigned is without discovery if this time.[1]   Furthermore, your undersigned believes that, as standby counsel,  he cannot ethically move to continue the case from the December 3 trial term over the presumed objection of the defendant.

5.     Should your undersigned be requested at trial by either the Court or the defendant to assume full duties as counsel at trial, under the current posture of this case, your undersigned's assumption of those duties presents great difficulties, the nature of which are self-evident (lack of discovery and opportunity for meaningful trial preparation).

6.     While this Honorable Court can not be presumed to be clairvoyant and foresee how or whether the defendant will be able to fulfill his chosen role as counsel *pro se*, the defendant's filing at *Docket*, Document Number 144 and the defendant's behavior observed by the Court at the October 5, 2012 hearing on whether to allow prior counsel to withdraw (*see Dkt.* Doc. No. 142), offers some basis upon which a prediction might be made.

7.     As noted by the Fourth Circuit in a recent unpublished opinion, the right to self-representation is not absolute.   It was also noted in that opinion that the trial court need not wait until the trial itself before full-fledged counsel could be appointed.  The Fourth Circuit discussion of the law seemed to recognize the inherent difficulty of standby counsel status and of *pro se* status in a case where it appeared there might be an

---

[1]  It should be noted that there is pending before this Court a motion by the government for alternative discovery protocols. Dkt Doc. No. 145. Your undersigned is of the opinion that he cannot meritoriously respond to that motion given that the defendant does not want your undersigned to be involved in any capacity.

inclination by the defendant to disrupt proceedings or to assert frivolous pleadings.   See generally  United States v. Brunson, No. 11-4071 (4th Cir.  June 6, 2012) (unpublished).

8.    Your undersigned counsel is situated similarly to prior counsel in this case and to standby counsel in the *Brunson* case.   In the absence of an order appointing your undersigned as full-fledged counsel in this case, your undersigned sees no alternative but to request permission to withdraw as standby counsel.

9.    Should your undersigned not be permitted to withdraw as standby counsel, your undersigned would accept appointment as full counsel, but respectfully informs the Court that he would then move to continue the matter so that pretrial motions could be considered and so that adequate review of the government's discovery could be made.

WHEREFORE, it is respectfully prayed of this Honorable Court that the undersigned counsel be allowed to withdraw as standby counsel.

This, the 18th day of November, 2012.

 /s/ Randolph M. Lee
Standby counsel for Defendant Ductan
NCSB No. 9329
305-A West Franklin Street
Monroe, NC 28112
704.841.2222
Randolph@LeeLaw.Biz

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18,  2012  I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user, who appears on the Docket as counsel for the United States of America:

> Ms.  Ann Claire Phillips
> Assistant United States Attorney
> 1650 Carillon Building
> 227 West Trade Street
> Charlotte, NC 28202
> AnnClaire.Phillips@usdoj.gov

This, the 18th   Day  of November, 2012.

 /s/ Randolph M. Lee

```
                 UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                      CHARLOTTE DIVISION

UNITED STATES OF AMERICA,      )    DOCKET NO. 3:04-cr-252
                               )
              Plaintiff,       )
         vs.                   )
                               )
PHILLIP DUCTAN,                )
                               )
              Defendant.       )
_____ )
```

TRANSCRIPT OF ELECTRONICALLY RECORDED
MOTION TO WITHDRAW
BY ATTORNEY RANDOLPH M. LEE
BEFORE THE HONORABLE DAVID S. CAYER
UNITED STATES MAGISTRATE JUDGE
NOVEMBER 26, 2012

<u>APPEARANCES</u>:

On Behalf of the Government:

        ANN CLAIRE PHILLIPS, ESQ., and
        ERIN ELIZABETH COMERFORD, ESQ.,
        Assistant United States Attorneys
        227 West Trade Street, Suite 1700
        Charlotte, North Carolina 28202

On Behalf of the Defendant as Standby Counsel:

        RANDOLPH MARSHALL LEE, ESQ.,
        P.O. Box 77005
        Charlotte, North Carolina
        28271

    Proceedings digitally-recorded and transcribed by:

            LAURA ANDERSEN, RMR
          Official Court Reporter
        United States District Court
          Charlotte, North Carolina

2

<u>P R O C E E D I N G S</u>

(Transcript of proceedings digitally recorded on November 26, 2012 at 2:18:51 p.m.)

THE COURT:  You may have a seat there, sir.

The last time the defendant was before the Court, the Court found that he had waived his right to appointed counsel, and appointed Mr. Lee as standby counsel.  And now Mr. Lee you're moving to withdraw as standby counsel?

MR. LEE:  I am indeed, Your Honor.

THE COURT:  All right.  And do you want to be heard further on that?  I think what you represented in your motion was that he was not cooperating with you and was not signing off on a discovery plan.

MR. LEE:  Those are true, but he also doesn't want any appointed counsel to represent him.  So I was relating to the Court his preferences.

DEFENDANT DUCTAN:  Before he assassinates my character, this is my first time -- well, actually second time meeting him.  If I may, Your Honor.  Let me see here.  Let me see.  I got one correspondent (sic.) from Mr. Lee that was dated on the 15th of October.  Do you mind if I read it?

THE COURT:  Well, you may hand it up.  I don't need you to read it.  If you want me to see it, just hand it up.

DEFENDANT DUCTAN:  It was the 15th, that was dated the 11th.  If you read it, it states that he was saying that

- 47 -

3

1   he would see me probably the latter part of that following

2   week.  I did not see him for the first time or heard from him

3   until the 18th of November.  So to me, if you're concerned

4   about my case or what have you, I would figure that you would

5   probably make contact with me way prior before then.  So due

6   to --

7            THE COURT:  All right.

8            DEFENDANT DUCTAN:  Excuse me?

9            THE COURT:  All right.

10           DEFENDANT DUCTAN:  Yes.

11           THE COURT:  I've read it.

12           DEFENDANT DUCTAN:  So, you know, and then after --

13  after I met him -- excuse me.  After I spoken with him that

14  day, the first thing that he told me was that you probably

15  want me to withdraw from your case.  There wasn't any, you

16  know, let's talk about your case or, you know, could you tell

17  me anything about it.  Immediately he told me that he was

18  inquiring about withdrawing from my case.  Two days later is

19  when I received the next letter on the 21st stating that that

20  was the case, that he wanted to withdraw from.

21           So, you know, based upon that, I do not feel

22  confident that he would represent me adequately.  To my

23  knowledge, I don't -- I don't feel as though I would be

24  comfortable having him represent me as counsel, so...

25           THE COURT:  Well, let me explain this to you, sir,

4

1  because I think there may be a misunderstanding.

2        At the last hearing --

3        DEFENDANT DUCTAN:  Um-hmm.

4        THE COURT:  -- based upon answers to your

5  questions --

6        DEFENDANT DUCTAN:  Um-hmm.

7        THE COURT:  I concluded that you had waived your

8  right to having an appointed attorney.

9        DEFENDANT DUCTAN:  Um-hmm.

10       THE COURT:  And what I did was appoint Mr. Lee as

11 standby counsel.

12       DEFENDANT DUCTAN:  Exactly.

13       THE COURT:  And what that means is, you're

14 representing yourself.

15       DEFENDANT DUCTAN:  Exactly.

16       THE COURT:  But he is available to you if you want

17 to consult with him.  If you want to get legal advice from

18 him, if you want to get help from him, he's available for

19 that.  You don't have to, but he's available as a resource.

20 Do you understand that?

21       DEFENDANT DUCTAN:  Exactly.

22       THE COURT:  So he would not be representing you.

23 You'd be representing yourself.  But he would be available as

24 standby counsel.  There's a big difference.

25       DEFENDANT DUCTAN:  Exactly.

5

```
1            THE COURT:  So I want to be sure you understand
2   that.
3            DEFENDANT DUCTAN:  Yes.
4            THE COURT:  Now, are you saying you don't want him
5   in the case as standby counsel?
6            DEFENDANT DUCTAN:  No.  At this time I will be
7   seeking private counsel.
8            THE COURT:  You're going to hire your own lawyer?
9            DEFENDANT DUCTAN:  That's correct.
10           THE COURT:  All right.
11           DEFENDANT DUCTAN:  That is my intention.
12           THE COURT:  Have you talked to any attorneys about
13  whether --
14           DEFENDANT DUCTAN:  I have a couple of them that I
15  will be inquiring to.
16           THE COURT:  All right.  Mr. Lee, did you want to say
17  something else?
18           DEFENDANT DUCTAN:  I was going to, but I think
19  prudence dictates that I don't, Your Honor.
20           THE COURT:  Ms. Comerford, does the government have
21  a position on this?
22           MS. COMERFORD:  I'll refer to Ms. Phillips.
23           THE COURT:  All right.
24           MS. COMERFORD:  I'm prosecuting for trial on Monday.
25           MS. PHILLIPS:  Your Honor, I appreciate it.  We have
```

- 50 -

6

1    co-counsel on this case because I have a conflict next week

2    with another trial.

3          The only position of the United States is that it's

4    our understanding that Mr. Ductan had previously retained

5    counsel, Charles Brant out of Atlanta.  Other than that we --

6    the United States is ready to go to trial on Monday if need

7    be.

8          THE COURT:  Well, I just want to be sure you

9    understand the situation that you're in, sir, because you're

10   on the eve of trial here.  And I think it's going to be

11   difficult to get a private attorney to come in and represent

12   you with a trial set in United States District Court for next

13   week.  Now maybe they will, but I think that's -- I think

14   that's going to be difficult.

15         And if for whatever reason the district judge makes

16   you go to trial next week, that puts you in a difficult

17   position if you don't have an attorney and you don't have a

18   standby attorney.

19         DEFENDANT DUCTAN:  Well then I would ask for a

20   continuance on the case.

21         THE COURT:  Well, that's up to the district judge.

22   That's up to the judge that is going to try the case, not me.

23   And I can't speak for that judge, or tell you whether that

24   judge will agree to continue your case or not.

25         DEFENDANT DUCTAN:  Well, I'll just go ahead and try

7

1  and speak to whatever attorney that's available for me.
2  That's what I'll be doing, seeking my private attorney.
3          THE COURT:  Mr. Lee, did you want to say anything
4  else?
5          MR. LEE:  I think for me the conundrum really is,
6  what are the duties of a standby counsel.  I think there was a
7  recent case involving an attorney in front of Judge Whitney
8  who was standby counsel --
9          THE COURT:  You may be seated for now, sir.
10          MR. LEE:  -- who in his duties as standby counsel
11  appeared at the docket call of the trial of the case, was then
12  tapped into trying the case.  The attorney made a motion to
13  continue, I think, and that was not looked upon kindly by the
14  district court judge.
15          My concern is that any standby counsel in this case
16  is going to be in a very difficult position if we're expected
17  to be prepared to try the case.  They don't have the authority
18  to do the things that we need to do.  It's a difficult
19  position, so...
20          THE COURT:  What authority are you concerned about?
21          MR. LEE:  Well, the authority, for instance, to file
22  a motion to continue the case to resolve some of these issues,
23  to obtain discovery, to file pretrial motions.  For instance,
24  in Mr. Ductan's case, this indictment was brought in 2004.
25  There may be a (inaudible) and a pretrial motion to move to

8

1  dismiss the charges due to undue delay in bringing the case.
2  I don't know.

3        But there are a lot of issues like that, and for any
4  attorney to come in and try a case cold without having had a
5  chance to fully, you know, vet the discovery, is putting that
6  attorney in a difficult position.

7        THE COURT:  Well, but I don't think you would be in
8  a position of trying the case in the sense that you would be
9  if you were retained or appointed counsel.

10        MR. LEE:  And I --

11        THE COURT:  Because I ruled at the last hearing that
12  by his conduct at the last hearing he had waived his right to
13  appointed counsel.  So his option is to hire a lawyer or
14  represent himself.

15        MR. LEE:  All right, sir.

16        THE COURT:  Now, if he represents himself and you're
17  in as standby, he's representing himself, you're there to
18  assist him if he seeks your assistance.  If he doesn't seek
19  your assistance, then he's on his own.

20        MR. LEE:  Well, and I appreciate your comments.  My
21  concern again is, and I've tried to find out, you know, what
22  is the duties, the job description for a standby counsel, and
23  I've heard many things from many people.  And that's one of
24  the things that caused me to trigger and file the motion to
25  withdraw.  I'm not -- with the Court's comments, I now

9

1   understand what my position is and I would not be expected to
2   try the case, you know, next week.  But I would just be there
3   as -- as a library -- as a librarian, basically, I guess.
4           THE COURT:  Well, it's -- I guess it can be somewhat
5   of a gray area in this sense.  And I'm speaking from my
6   experience now.
7           MR. LEE:  Yes, sir.
8           THE COURT:  I think if there came a point in the
9   trial when he decided he wanted you to take over, then you'd
10  take over.  But if he didn't want you to participate at all,
11  then you'd be there present if he needed you to participate.
12          MR. LEE:  And let's assume that he does want me to
13  take over.  I am walking into a case mid stream.  I'm opening
14  myself up to malpractice complaints, possibly, bar grievances.
15  I mean, that's a no-win situation.  And I'm not trying to beg
16  off my duty to the court here, having practiced here for 32
17  years.  But again, my concern was not having a job description
18  formally and fully as to what standby counsel does.  I didn't
19  know what else to do, Your Honor.
20          THE COURT:  And as I told him, I can't speak for
21  what the district judge would do.  I don't know how likely it
22  is that even if you were left in the case as standby counsel,
23  that the district judge would force you into that situation.
24          MR. LEE:  Okay.
25          THE COURT:  I don't know.

10

1    MR. LEE:  Well, with that said, and with
2    Mr. Ductan's representations that he's in the process of
3    hiring private counsel, if the Court chooses, I will remain as
4    standby counsel.  I will be available next week during
5    calendar call, and will be -- make myself available for the
6    Court's processes next week.
7    THE COURT:  And Ms. Phillips has he -- am I correct
8    then that the defendant has not seen any of the government's
9    discovery?
10   MS. PHILLIPS:  That is correct, Your Honor.  The
11   defendant has refused to sign a discovery agreement, and
12   that's an issue the United States wanted to bring before the
13   court.
14   We do have discovery available in hard copy.  We
15   filed a motion for production, alternative production of
16   discovery where it's provided through the marshals.  But we'd
17   certainly like to make sure Mr. Ductan has the documents he
18   needs to prepare for trial.
19   THE COURT:  And I think I've entered those orders in
20   other cases.
21   MS. PHILLIPS:  You have, Your Honor.
22   THE COURT:  Well, I'm going to do this -- do you
23   want to say anything else, Mr. Lee?
24   MR. LEE:  Oh, no, sir.  No, sir.
25   THE COURT:  I'm going to grant the motion for

11

1    alternative production of discovery so at least we have that
2    in place.
3          And what that means, sir, is, you're entitled to
4    look at the evidence that the government has.  And normally
5    that would be provided to you through your lawyer.  But in the
6    situation here, the government's proposing an alternative
7    where the material will be provided directly to you.  Now you
8    won't get to keep it --
9          DEFENDANT DUCTAN:  Let me ask you this -- I didn't
10   mean to cut you off --
11         THE COURT:  But let me finish, sir.  But you'll get
12   to look at it.  And I think it's important for your benefit
13   that I do that.
14         Now what did you want to say?
15         DEFENDANT DUCTAN:  Is it your position that you guys
16   are not giving me the opportunity to hire private counsel --
17         THE COURT:  Not at all.
18         DEFENDANT DUCTAN:  -- move forward.
19         THE COURT:  No.  Not at all.
20         DEFENDANT DUCTAN:  -- is that --
21         THE COURT:  No.
22         DEFENDANT DUCTAN:  Is that what you're saying?
23         THE COURT:  I'm not saying that.
24         DEFENDANT DUCTAN:  What I would prefer to do is
25   consult with a private attorney before I move forward.

12

1      THE COURT:  And that's fine.  You may certainly do

2  that.  And if you hire an attorney and an attorney comes in

3  this court and says they're going to represent you, I'm sure

4  the government will work with that attorney in providing

5  discovery.

6      So no, I'm not saying you can't hire a lawyer.  You

7  want to hire a lawyer, you certainly may.

8      DEFENDANT DUCTAN:  I just want to make sure for the

9  record, I do not want to contract with the government at all,

10  as far as counsel's concerned, so...

11      THE COURT:  But I want to go ahead and enter that

12  discovery order, Ms. Phillips, so at least that's covered

13  regardless of what he does about an attorney.

14      MS. PHILLIPS:  Thank you, Your Honor.

15      The only other concern that the United States had

16  that we wanted to convey through the court to Mr. Ductan are

17  that, you know, there have been various expert notices filed

18  in this case related to chemical analysis and fingerprints.

19      I know in the case that Mr. Lee referred to, United

20  States versus Williams, I was one of the government attorneys,

21  and we actually showed up the morning of trial.  Mr. Williams

22  had Peter Adolf as standby counsel, and suddenly decided, you

23  know, in light of the recent flurry of filings, and after

24  going through discovery, that he did want Mr. Adolf to

25  represent him.  So I think that has reared its ugly head

13

1  fairly recently before the courts.

2          THE COURT:  How did that play out then?

3          MS. PHILLIPS:  To put it bluntly, Judge Whitney was

4  not thrilled when Mr. Adolf stated that he wasn't ready to

5  proceed.  Ultimately, a continuance was granted.  But there

6  was some talk of contempt and/or a fine or things of that

7  nature.

8          THE COURT:  As to the lawyer or as to the defendant?

9          MS. PHILLIPS:  As to the lawyer for not being

10 prepared.  So we -- the United States certainly understands

11 Mr. Lee's concerns, you know, have tried to work with him to

12 come up with some sort of creative solution, but just haven't

13 found one.

14         THE COURT:  Well, I'm going to do this, I'll enter

15 the discovery order.

16         Sir, to make it clear, you say you want to hire an

17 attorney, you've got every right to do that.  But you're going

18 to have to move pretty quickly, given what the time

19 constraints are.

20         And there's case law that says that the court can

21 leave an attorney in as a standby attorney just to facilitate

22 the process.  And based on that, I'm going to leave Mr. Lee in

23 as standby attorney, which means, sir, you're free to consult

24 with him in the preparation of your case.  He's there to

25 assist you, should you choose to take advantage of his

14

1   presence in the case.

2           MR. LEE:  While I'm here, if I could clarify.  My

3   role is not that of a scribner.  For instance, I don't have to

4   file frivolous motions as a scribner on behalf of the

5   defendant, do I?

6           THE COURT:  No.  No, you don't.

7           MR. LEE:  Okay.

8           DEFENDANT DUCTAN:  And I don't have to accept your

9   offer with him being standby counsel as well, correct?

10          THE COURT:  Well, the most important thing for you

11  to do, sir, if you're going to hire a lawyer, you really need

12  to get busy hiring a lawyer.

13          And if you're going to represent yourself -- and I

14  don't know whether I went through this with you the last time

15  or not -- but if you're going to represent yourself, you need

16  to realize you're going to be held to the same standard as an

17  attorney, as far as the law, the rules of evidence, the

18  procedures.  You're going to have to present your case on your

19  own.  You will be responsible for cross examining any

20  witnesses that are called by the government.  You will be

21  doing that on your own, unless you either hire an attorney or

22  you decide to allow Mr. Lee to help you.  Do you understand

23  what I'm saying?

24          DEFENDANT DUCTAN:  Yeah.

25          THE COURT:  All right.  Well, I'll enter the

15

1    appropriate order then.

2    (The hearing concluded at 2:34:35 p.m.)

3                          * * * * * *

4    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF NORTH CAROLINA
5    CERTIFICATE OF REPORTER

6

7            I, Laura Andersen, Official Court Reporter, certify
     that the foregoing transcript is a true and correct transcript
     of the electronically-recorded proceedings transcribed under
8    my direction.

9            Dated this the 14th day of February, 2013.

10                               s/Laura Andersen
                                 Laura Andersen, RMR
11                               Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**DOCKET NO.   3:04CR252-RJC-DSC**

| | |
|---|---|
| **UNITED STATES OF AMERICA**  ) | |
| ) | |
| **v.**                        ) | **ORDER** |
| ) | |
| **PHILLIP DUCTAN,**            ) | |
| ) | |
| **Defendant.**   ) | |

THIS MATTER is before the Court on standby counsel Randolph Lee's "Motion to Withdraw," Doc. 146, filed November 18, 2012.  The Court conducted a hearing in this matter on November 26, 2012.  The case is currently set for trial during the December 3, 2012 term before Chief Judge Robert J. Conrad, Jr.

Having fully considered the arguments, the record, and the applicable authority, the Court finds that there is not sufficient basis to allow Mr. Lee to withdraw as standby counsel for Defendant, as discussed below.

Mr. Lee represented that Defendant has refused to cooperate with him and will not sign the standard discovery agreement.[1]  The Court acknowledged Mr. Lee's concerns about remaining as standby counsel.  Defendant stated that he wishes to hire private counsel and is speaking with several attorneys.  The Court warned Defendant that it may be difficult for him to retain counsel on what is now the eve of trial.  The Court also clarified the role of standby counsel for Defendant.  Defendant's response was that he does not want to  "contract with the Government."  The Court finds, in its discretion, that it is in Defendant's best interests for Mr. Lee to remain as standby counsel.  See McKaskle v. Wiggins, 465 U.S. 168, 184 (1984)("A defendant's Sixth Amendment

---

[1]The Court has entered an Order allowing alternative production of discovery.

rights are not violated when a trial judge appoints standby counsel-even over the defendant's objection-to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals. Participation by counsel to steer a defendant through the basic procedures of trial is permissible even in the unlikely event that it somewhat undermines the pro se defendant's appearance of control over his own defense.").

Based on the above facts, the Court finds that there is not sufficient basis to allow standby counsel to withdraw. Therefore, Mr. Lee's "Motion to Withdraw," Doc. 146, is **DENIED**.

The Clerk is directed to send copies of this Order to counsel for the parties; and to the Honorable Robert J. Conrad, Jr.

**SO ORDERED.**

Signed: November 26, 2012

David S. Cayer
United States Magistrate Judge

2

```
                   UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                        CHARLOTTE DIVISION


UNITED STATES OF AMERICA,     )  DOCKET NO. 3:04-CR-252
                              )
          Plaintiff,          )
                              )
          vs.                 )  JURY VOIR DIRE
                              )
PHILLIP DUCTAN,               )
                              )
          Defendant.          )
_____)



                  TRANSCRIPT OF JURY VOIR DIRE
            BEFORE THE HONORABLE ROBERT J. CONRAD, JR
               UNITED STATES DISTRICT COURT JUDGE
                        DECEMBER 4, 2012




APPEARANCES:

On Behalf of the Government:

          DANA OWEN WASHINGTON, ESQ.,
          ERIN COMERFORD, ESQ.,
          Assistant United States Attorneys
          227 West Trade Street, Suite 1700
          Charlotte, North Carolina 28202

On Behalf of the Defendant:

          PHILLIP DUCTAN, PRO SE

STANDBY COUNSEL:
          RANDOLPH MARSHALL LEE, ESQ.,
          P.O. Box 77005
          Charlotte, North Carolina 28271


                  LAURA ANDERSEN, RMR
                  Official Court Reporter
                United States District Court
                 Charlotte, North Carolina
```

1        P R O C E E D I N G S

2   DECEMBER 4, 2012.  MORNING SESSION. 9:39 a.m.:

3        THE COURT:  All right.  We're here in the matter of

4   United States v Phillip Ductan for jury selection.

5        Mr. Ductan, I understand that the Marshals made

6   inquiry with respect to your appearance today, and the fact

7   that you were in an orange jumpsuit and asked whether you

8   wanted to appear in different clothing and you had indicated

9   that you did not.  Am I -- am I --

10        THE DEFENDANT:  That's incorrect.  I haven't had the

11   opportunity to make arrangements to appear in different

12   clothing.  That's the only reason why.

13        THE COURT:  All right.  And do you wish for us to

14   find clothing for you and let you wear something other than

15   the orange jumpsuit or do you want to proceed --

16        THE DEFENDANT:  I would prefer to bring my own

17   attire.

18        THE COURT:  All right.  But we have a jury that's

19   waiting to come in and so, I think your choice --

20        THE DEFENDANT:  Well --

21        THE COURT:  I think --

22        THE DEFENDANT:  -- defense is not -- defense is not

23   prepared right now to move forward with any proceedings.

24        THE COURT:  Well, right now we're talking about

25   clothing.  And your choice is to appear as you are, or for us

3

1   to find clothing for you to wear in lieu of what you're

2   wearing now.  As between those two things, what do you prefer

3   to do?

4           THE DEFENDANT:  At this time I have no comment.

5           THE COURT:  No comment?

6           THE DEFENDANT:  No.

7           THE COURT:  All right.  Well, I think in light of

8   that response, we will just call the jury and begin the jury

9   selection process.

10          THE DEFENDANT:  If I could -- if I could, on the

11  record.  Am I in a contract court or a criminal court?

12          THE COURT:  All right.  Let me -- one of the ground

13  rules, Mr. Ductan, that you're going to have to abide by, if

14  you want to --

15          THE DEFENDANT:  On the record, am I in a contract

16  court or a criminal court?

17          THE COURT:  You are not allowed to interrupt me, and

18  so --

19          THE DEFENDANT:  Am I in a contract court or a

20  criminal court?

21          THE COURT:  Mr. Ductan, I would love to have you

22  participate in these proceedings.

23          THE DEFENDANT:  Am I in a contract court or a

24  Criminal Court on the record?

25          THE COURT:  And I have said to you several time that

- 65 -

4

1  you cannot interrupt me while we're conducting business.  I

2  will give you an opportunity to make my remarks you wish to

3  make at the appropriate time.

4          THE DEFENDANT:  On the record, I am the beneficiary

5  of the trust.  And I'm appointing you as the trustee for the

6  trust.  And I'm asking you to discharge the charges for the

7  trust.

8          THE COURT:  And I'm going to deny that request.  And

9  I'm going to instruct you, Mr. Ductan, not to speak unless

10  you've been asked to speak or given the opportunity to --

11          THE DEFENDANT:  Sir, on the record -- on the record,

12  I sent you guys on October 4th, yourself, Mr. Conrad, and

13  Ms. Phillips, a affidavit requesting the proof of claim?

14          Ms. Phillips, (Sic) do you have a proof of claims --

15          THE COURT:  All right.

16          THE DEFENDANT:  -- against me?

17          THE COURT:  I'm finding Mr. Ductan in contempt of

18  court --

19          THE DEFENDANT:  Ms. Phillips, do you have --

20          THE COURT:  Mr. Ductan --

21          THE DEFENDANT:  -- do you have a proof of claim

22  against me?

23          THE COURT:  Mr. Ductan, you need to address me.

24          THE DEFENDANT:  Mr. Conrad.

25          THE COURT:  Judge Conrad --

5

1        THE DEFENDANT:  Do you have any claims against me?

2   Do you have any claim against my natural body?

3        THE COURT:  I am finding Mr. Ductan in contempt of

4   court.  I've tried several times --

5        THE DEFENDANT:  Do you have claims against me?

6        THE COURT:  Tried several times to get him to obey

7   the directives of the Court.

8        THE DEFENDANT:  Do you have any claims against me?

9        THE COURT:  At this time I would ask the marshals to

10  remove Mr. Ductan from this proceeding.

11       THE DEFENDANT:  Do you have any claims against me,

12  Ms. Phillips?  Does anybody in this court have any claims

13  against me?  Does anybody have any claims against me?  No one

14  has any claims against me?  I object to this whole proceeding.

15       (Defendant removed from the courtroom by the

16  marshals.)

17       (A brief recess was taken in the proceedings at

18  9:47 a.m.)

19       (Court resumes at 10:07 a.m.)

20       THE COURT:  What I'm observing, for the record, is a

21  transmission where I can see holding cell 104.  I can see

22  Mr. Ductan in that holding cell, and I'm being advised by the

23  U.S. Marshal that they can see and hear the proceedings in

24  Court; is that correct?

25       MARSHAL:  If you can maximize the screen and turn

6

1    the volume up, they can see and hear.

2           THE COURT:  All right.  So what we're going to do

3    is, Mr. Ductan has elected by his behavior not to participate

4    in this jury selection process.  We're going to call the jury

5    panel, select the jury, and then select the jury in the

6    Mescall case.  And so at this time, Madam Clerk, if you would

7    call the jury administrator and get the jury panel here.

8           The plan would be to pick the Ductan jury, then pick

9    the Mescall jury, and then begin the trial of Ductan.

10          MS. COMERFORD:  Thank you, Your Honor.

11          (Recess at 10:08 until 10:12.)

12          (The prospective jury panel is brought into the

13   courtroom.)

14          THE COURT:  Good morning, everyone.

15          PROSPECTIVE JURY:  Good morning.

16          THE COURT:  I want to thank you for being here and

17   for being here on time.  I wish I could say the same thing

18   about the court.  We started a little late this morning and I

19   want to apologize to everybody for that.  Because one of the

20   things that's very important in our process is your time.  We

21   thank you for being here.  We thank you for your willingness

22   to serve as jurors.  Our criminal justice system could not

23   function without citizens being willing to serve as jurors.

24          And so this is a bad example to set for you on the

25   first day of your service to start late.  But there were legal

- 68 -

7

1   reasons why we did that, had nothing to do with the case.  And

2   it doesn't reflect the seriousness with which the court takes

3   its responsibility to use your time efficiently.

4        So if you would forgive us for the delay and know

5   that it is our every intention to act with dispatch when we're

6   using your time.

7        We're here today to select juries in a couple of

8   different matters.  And the first matter that is scheduled for

9   jury selection, is the case of United States of America v

10  Phillip Ductan.  Now before I go any further, I want to make

11  sure that everybody can hear me.  And so those prospective

12  jurors who are sitting in the last row in the spectator

13  section of the courtroom, if you can hear me, would you raise

14  your hand?

15       PROSPECTIVE JURY:  (Indicating.)

16       THE COURT:  Great.  Then it appears that even though

17  it's a large courtroom with some acoustical challenges, it

18  appears that everybody can hear me at this time.

19       We're going to go through what's called jury

20  selection process.  As part of that process the court is going

21  to ask a number of questions of you, sometimes individually.

22  And those questions are -- the purpose of those questions is

23  not to unnecessarily pry into your private affairs, or be

24  embarrassing in any way.  They are, instead, designed to

25  solicit information that is helpful to the court and to the

8

1    parties in selecting the appropriate jury in the case.  And so

2    I think that you will understand that more as we go forward.

3          It's anticipate that this case may take up to two

4    days to try.  In this case the government has alleged that the

5    defendant, Phillip Ductan, knowingly and intentionally

6    conspired with others to possess with intent to distribute,

7    marijuana during the time period April through September of

8    2004.

9          It is also alleged that Mr. Ductan possessed

10   marijuana with intent to distribute it on June 3rd, 2004, and

11   that he possessed a firearm in furtherance of the alleged drug

12   trafficking activity on that date.  And that he possessed that

13   firearm after having previously been convicted of a felony.

14         Those are the charges in the indictment.  And I

15   would ask that at this early juncture, whether, just based

16   upon that limited information that I've given you, whether

17   anybody believes that they've heard anything about this case

18   before they came into court today.  If you have, would you

19   raise your hand?

20         PROSPECTIVE JURY:  (No response.)

21         THE COURT:  I don't see any hands raised, and this

22   is a good opportunity for me to instruct you that the verdict

23   that the jury reaches in this case must be based solely on the

24   evidence presented in the courtroom here during this trial,

25   and the instructions that the court gives to you during the

9

1   trial.  Anything that you may have seen or heard outside the

2   courtroom you are to completely disregard, base your verdict

3   solely on the evidence and the instructions of the court that

4   you hear during this trial.

5            Anybody have any problem doing that?

6            PROSPECTIVE JURY:  (No response.)

7            THE COURT:  Let me cover one more thing with you,

8   and that is that Mr. Ductan is charged with a federal felony,

9   and that charge is merely an allegation.  It is up to the

10  government to prove each element of each charge beyond a

11  reasonable doubt.  That burden stays with the government

12  throughout the case.  The defendant has no burden whatsoever

13  to prove his innocence to you.  He has no duty to put on

14  evidence or to testify.  The constitution affords a criminal

15  defendant the right to remain silent.  No burden whatsoever.

16  The burden remains entirely on the government throughout the

17  whole proceeding.

18            Do each of you understand that -- those

19  constitutional principles?

20            PROSPECTIVE JURY:  (No response.)

21            THE COURT:  Will each of you commit to applying

22  those principles in this case?

23            PROSPECTIVE JURY:  (Nodding head.)

24            THE COURT:  Very well.  Mr. Ductan also has the

25  right to an attorney, and he can also choose to represent

1   himself if he wishes to.  And in this case Mr. Ductan has

2   elected to represent himself.  You should in no way consider

3   that fact in determining whether the government has met its

4   burden on each of the charges alleged to prove the elements of

5   those charges beyond a reasonable doubt.  Whether someone is

6   represented by counsel or whether he represents himself, has

7   nothing to do with the burden of guilt which always remains

8   with the government.  Do each of you understand that?

9           PROSPECTIVE JURY:  (No response.)

10          THE COURT:  Mr. Ductan also has a right to be

11   present at all proceedings in this case.  But again, like the

12   matter of representation, that's a matter of choice.  And

13   Mr. Ductan has elected not to be present this morning for jury

14   selection.  And so we're going to continue with jury selection

15   in his absence.

16          Again, you should not consider his absence in any

17   way in reaching any verdict in the case.  You are to judge the

18   facts and apply the law that the court gives to you -- to the

19   facts, to reach your verdict.

20          The fact that the defendant is not present at this

21   time should in no way influence you in reaching your verdict.

22   Do you all understand that?

23          PROSPECTIVE JURY:  (No response.)

24          THE COURT:  Very well.

25          Madam Clerk, would you call out 14 names at this

1  time?

2       COURT CLERK:  Ladies and gentlemen, as I call your

3  name, please come up and have a seat in the jury box.  Seat

4  No. 1 is on the front row closest to you.

5       Tracy Wooten, Seat No. 1.  Michael Gaddy, Seat No.

6  2.  Tyler Sheppard, Seat No. 3.  Nonna Belovs, Seat No. 4.

7  Ryan Hutcheson, Seat No. 5.  Whitney Lucas, Seat No. 6.

8       Seat No. 7, again, is the seat closest to you.  Seat

9  No. 7 is on the back row.

10       James Scanlon, Seat No. 7.  Margaret Johnson, Seat

11  No. 8.  Constance Bobbit, Seat No. 9.  Kimberly Barnett, Seat

12  No. 10.  Kevin Foley, Seat No. 11.  Kim Butler, Seat No. 12.

13  Thomas Sidney Seat No. 13, on the front row.  Snyder.  I'm

14  Bowyer on the back row.

15       THE COURT:  Good morning.  Were you all able to hear

16  the questions I addressed to the entire panel earlier?

17       PROSPECTIVE JURY:  (Nodding head.)

18       THE COURT:  Let me do this first.  Let me ask

19  government counsel if you would introduce yourself to the

20  jury, anybody that may be working with you, and any witnesses

21  who you may call in this case.

22       MS. COMERFORD:  Yes, Your Honor.

23       Erin Comerford representing the United States of

24  America along with co-counsel Dana Washington.  Good morning.

25       Lead case agent in this matter against Phillip

- 73 -

1  Ductan is Cathy Bowles, DEA task force officer.  I anticipate

2  you may also hear from witnesses by the names of Stephen

3  Whitesell with Charlotte-Mecklenburg Police Department or

4  CMPD, Mandrell Dunn a civilian witness, Robert Melton with

5  CMPD, Sean Blee with CMPD, Luke Sell, an officer with CMPD,

6  Gerod King, an officer with ATF, Nancy Kerns with CMPD, Kelly

7  Little with CMPD, and Andrew Oprysko with CMPD are the

8  anticipated witnesses.

9              THE COURT:  Thank you.

10             Members of the Jury, do any of you believe that you

11 know Ms. Comerford, Mr. Washington, or Ms. Bowles?

12             PROSPECTIVE JURY:  (Shaking head.)

13             THE COURT:  Or do any of the names that were read

14 out to you prospective witnesses, did any of those names

15 trigger in your mind maybe a belief that you know any of those

16 people?

17             PROSPECTIVE JURY:  (Shaking head.)

18             THE COURT:  I have mentioned the defendant's name a

19 couple of times so far.  Does the name Phillip Ductan familiar

20 to you in any way?

21             PROSPECTIVE JURY:  (Shaking head.)

22             THE COURT:  Mr. Lee, would you introduce yourself to

23 the jury and indicate your role in these proceedings.

24             MR. LEE:  Good morning.  My name is Randy Lee.  I've

25 been appointed by the Court as standby counsel for Mr. Ductan.

13

1    And I will have a very passive role probably during the course

2    of this trial.  Does anybody recognize me or know me in the

3    box or in the courtroom?

4            PROSPECTIVE JURY:  (No response.)

5            MR. LEE:  Thank you, sir.

6            THE COURT:  Thank you, Mr. Lee.

7            And again let me remind you at this point that the

8    defendant, a defendant in a criminal case has the right to

9    counsel.  He also has the right to self representation.  Your

10   decision on the issues presented in the case, especially

11   whether the government has proven beyond a reasonable doubt

12   that the defendant is guilty of any of the charges in the

13   indictment should not be influenced by the defendant's choice

14   to represent himself.  You are to consider the evidence

15   presented during the trial in reaching a verdict.  Do you

16   understand that?

17           PROSPECTIVE JURY:  (Nodding head.)

18           THE COURT:  Have any of you served on a jury in the

19   past?  If you have, would you raise your hand?

20           PROSPECTIVE JURY:  (Indicating.)

21           THE COURT:  Ms. Wooten, here in seat number one,

22   tell me how long ago did you serve on a jury?

23           PROSPECTIVE JUROR:  It's been two years ago.  It was

24   Gaston County.

25           THE COURT:  And do you remember whether that was a

14

1   criminal or a civil case?

2           PROSPECTIVE JUROR:  Criminal.

3           THE COURT:  And without telling us what your verdict

4   was, was that jury able to reach a verdict?

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  Have you served on any other juries?

7           PROSPECTIVE JUROR:  (Shaking head.)

8           THE COURT:  Okay.  Mr. Sheppard, did you raise your

9   hand?

10          PROSPECTIVE JUROR:  Yes, sir.

11          THE COURT:  How long ago did you serve on a jury?

12          PROSPECTIVE JUROR:  Just a Little over two years ago

13  and it was civil.

14          THE COURT:  And do you remember whether it was state

15  or federal court?

16          PROSPECTIVE JUROR:  It was for Anson County.

17          THE COURT:  Anson County?

18          PROSPECTIVE JUROR:  Yes, sir.

19          THE COURT:  Civil case.  And without telling us your

20  verdict, were you able to reach a verdict in that case?

21          PROSPECTIVE JUROR:  Yes, sir.

22          THE COURT:  Thank you.  Anyone else on the first

23  row?

24          PROSPECTIVE JURY:  (No response.)

25          THE COURT:  How about the second row?

15

1          PROSPECTIVE JUROR:  (Indicating.)

2          THE COURT:  Ms. Bowyer.

3          PROSPECTIVE JUROR:  Yes.  About 30 years ago in

4    Gaston County.

5          THE COURT:  Thirty years ago?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  We're just getting back to you now?

8          And do you remember whether the case 30 years ago

9    was a criminal or a civil case?

10          PROSPECTIVE JUROR:  It's been a long time.

11          THE COURT:  Long time.

12          PROSPECTIVE JUROR:  I think it was criminal, Gaston.

13          THE COURT:  Without telling us what your verdict

14    was, if you reached a verdict, were you able to reach a

15    verdict in that case?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Who else in the back row?

18          PROSPECTIVE JUROR:  (Indicating.)

19          THE COURT:  Mr. Foley?

20          PROSPECTIVE JUROR:  (Nodding head.)

21          THE COURT:  How long ago?

22          PROSPECTIVE JUROR:  Seven years, and it was in

23    Detroit, Michigan.

24          THE COURT:  Do you remember whether it was in state

25    or federal court?

16

1           PROSPECTIVE JUROR:  Federal, criminal.

2           THE COURT:  And without telling us what your verdict

3   was, were you able to reach a verdict in that case?

4           PROSPECTIVE JUROR:  I was dismissed because of

5   conflicts.

6           THE COURT:  Oh, okay.  So you never actually

7   deliberated in the case?

8           PROSPECTIVE JUROR:  (Shaking head.)

9           THE COURT:  Did you have an opportunity to serve on

10  any other jury in addition to that --

11          PROSPECTIVE JURY:  No.

12          THE COURT:  -- service?

13          Do you recall what the nature of the conflict was?

14          PROSPECTIVE JUROR:  It was a case that was directly

15  associated with an incident that happened in my family, sir.

16          THE COURT:  I see.  All right.  Who else in that

17  back row has served on a jury before?

18          PROSPECTIVE JURY:  (No response.)

19          THE COURT:  All right.  Have any of you had any

20  experience with law enforcement that you believe was either

21  positive or negative, an experience in the past that would

22  affect your ability to be fair and impartial where there

23  appears to be a number of law enforcement witnesses?  Any of

24  you had an experience like that in your past?

25          PROSPECTIVE JURY:  (No response.)

17

1          THE COURT:  If you did, would you raise your hand?

2          PROSPECTIVE JUROR:  (Indicating.)

3          THE COURT:  Mr. Scanlon.

4          PROSPECTIVE JUROR:  Um-hmm.  I mean, you want the

5    specifics?

6          THE COURT:  Yes.

7          PROSPECTIVE JUROR:  Okay.  I had a gun drawn on me

8    erroneously.  I just happened to be at an ATM when the alarm

9    was going off and the gun was drawn.  I felt there was a bad

10   experience and then I felt the cop gave me a running the red

11   light ticket unfairly.  He harassed me.

12         THE COURT:  And at the ATM incident, a law

13   enforcement person drew a weapon on you?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  And you remember what type of law

16   enforcement?

17         PROSPECTIVE JUROR:  It was town cops.

18         THE COURT:  Okay.  And those two life experiences,

19   do you believe they would affect your ability to listen to the

20   testimony of a law enforcement witness and give it neutral

21   consideration?

22         PROSPECTIVE JUROR:  Just depends what they have to

23   say, perhaps.

24         THE COURT:  Would you be inclined to give that

25   testimony more or less weight solely because of that person's

18

1   status as a law enforcement official?

2          PROSPECTIVE JUROR:  I can't say.  It would just have

3   to be on a case by case basis.  I don't have any particular

4   prejudices against the cops in question.  I don't know them.

5          THE COURT:  I may come back to you.  You all had no

6   idea what kind of questions I would ask you.  This is an

7   important one.  I may come back to you at a later point after

8   you've had some time to think about it as we discuss other

9   questions.

10         But the question is one not only for Mr. Wooten

11  (sic), it's for the entire jury panel, and the Court is going

12  to give you instructions on judging the credibility of

13  witnesses at a later point in these proceedings.  And one of

14  the things I'm going to tell you is that you are the sole

15  judges of the credibility of the witnesses.  You can believe

16  all that a witness says, none of it, you can believe parts and

17  disbelieve parts.  It's up to you.

18         But the question I want to ask at the outset in this

19  case, where it does appear that there will be a number of law

20  enforcement witnesses, is whether anybody would tend to give

21  that testimony more or less credibility solely because of that

22  person's status as a law enforcement official?  Or would you

23  be able to consider that testimony like testimony of any other

24  witness, give it such credibility as you think it deserves?

25         PROSPECTIVE JURY:  (No response.)

1      THE COURT:  Is there any one who believes that it
2  would be the former that you would give it more or less weight
3  solely because of the person's status as a law enforcement
4  officer?  Would anybody be inclined to do that?

5      PROSPECTIVE JUROR:  (Indicating.)

6      THE COURT:  Mr. Snyder.

7      PROSPECTIVE JUROR:  Since you mentioned this, I did
8  a ride with a police trip as part of a leadership of Charlotte
9  program, probably 15 years ago.  I gained a lot of respect for
10 the police force at that time.

11     THE COURT:  And so the question would be, I guess,
12 notwithstanding that life experience, can you judge a
13 witness's testimony like that of any other witness even though
14 he might he or she might be a law enforcement?

15     PROSPECTIVE JUROR:  I believe so.

16     THE COURT:  All right.  And so again, like
17 Mr. Wooten, I may come back to you and ask you at a later
18 point whether you can make that commitment because each party
19 deserves a jury that's capable of treating witnesses in a
20 neutral fashion, judging their credibility and giving it such
21 weight as they think it deserves without any bias other than
22 credibility determination.

23     Have any of you, a member of your family or a close
24 friend, been involved in any court in a criminal matter either
25 as a defendant, a witness or a victim?

20

1          PROSPECTIVE JURY:  (Indicating.)

2          THE COURT:  Mr. Foley.

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  How long ago was that?

5          PROSPECTIVE JUROR:  Ten years.

6          THE COURT:  And what is the nature of that?

7          PROSPECTIVE JUROR:  It was a criminal sexual conduct

8    case.

9          THE COURT:  And who -- and what capacity did you

10   participate in that matter?

11         PROSPECTIVE JUROR:  It was my niece.

12         THE COURT:  And were you called as a witness by

13   either side?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  Did you have any role to play in that

16   matter?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Was she a defendant, a witness, or a

19   victim?

20         PROSPECTIVE JUROR:  A victim.

21         THE COURT:  And could you be able to set that life

22   experience aside, listen to the instructions of the court and

23   weigh the evidence fairly?  Could you do all that in this

24   criminal proceeding?

25         PROSPECTIVE JUROR:  I believe so.

1    THE COURT:  In other words, what I'm asking you is,

2  could you give both the government and the defendant a fair

3  trial as a neutral juror?  Could you do that?

4    PROSPECTIVE JUROR:  Possibly not.  I still carry a

5  chip on my shoulder about that.

6    THE COURT:  And the chip on your shoulder is that,

7  do you believe that your niece was treated fairly or unfairly

8  in the criminal proceeding?

9    PROSPECTIVE JUROR:  I don't feel that justice was

10 served.

11   THE COURT:  And you believe that that may linger

12 with you as a possible juror in this case?

13   PROSPECTIVE JUROR:  Yes, sir.

14   THE COURT:  All right.  Anyone else?

15   PROSPECTIVE JURY:  (No response.)

16   THE COURT:  Have any of you, a member of your family

17 or close friend, ever been charged with a criminal offense

18 other than a minor traffic offense?

19   PROSPECTIVE JURY:  (No response.)

20   THE COURT:  Now the indictment -- the indictment is

21 allegation by the government.  Its purpose is to inform the

22 defendant of the nature of the charges and to bring him to

23 court for you to determine whether the government has proved

24 each element of the case beyond a reasonable doubt.  The

25 indictment is not evidence of any kind.  But it does allege

22

1   violations of the narcotics laws and firearms laws of our

2   country.  And so the first question I have is, do any of you

3   possess such strong opinions about drugs or the distribution

4   of drugs that you believe it would affect your ability to be a

5   fair and impartial juror in a case alleging drug violations?

6           PROSPECTIVE JURY:  (No response.)

7           THE COURT:  Did -- if you do, would you raise your

8   hand?

9           PROSPECTIVE JURY:  (No response.)

10          THE COURT:  Are any of you a member of an advocacy

11  group that takes any position with respect to the drug laws of

12  our country?

13          PROSPECTIVE JURY:  (No response.)

14          THE COURT:  Have any of you or any close -- or any

15  family member, had a problem with addiction to drugs or other

16  serious issue with drug usage or drug dealing?

17          PROSPECTIVE JURY:  (No indicating.)

18          THE COURT:  Ms. Wooten?

19          PROSPECTIVE JUROR:  (Nodding head.)

20          THE COURT:  And was it yourself or a member of your

21  family?

22          PROSPECTIVE JUROR:  Member of the family.

23          THE COURT:  And does the member of your family have

24  a drug addiction?

25          PROSPECTIVE JUROR:  Still does.

23

1          THE COURT:  Is there anything about that family

2     issue that would affect your ability to be a fair and

3     impartial juror in a case that alleges drug trafficking?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  You believe it would affect your ability

6     to be fair and impartial?

7          PROSPECTIVE JUROR:  (Nodding head.) Yes.

8          THE COURT:  You don't believe you could give both

9     sides a fair hearing?

10         PROSPECTIVE JUROR:  (Shaking head.)

11         THE COURT:  All right.  Anyone else?

12         PROSPECTIVE JUROR:  (Indicating.)

13         THE COURT:  Mr. Butler.

14         PROSPECTIVE JUROR:  Ex-wife.  Alcoholic.

15         THE COURT:  And could you set aside that family

16    situation and be a fair and impartial juror in this case?

17         PROSPECTIVE JUROR:  Yeah, I think so.

18         THE COURT:  Do any of you possess any strong opinion

19    about guns or gun ownership that would affect your ability to

20    be fair and impartial?

21         PROSPECTIVE JUROR:  (No response.)

22         THE COURT:  Do any of you belong to the NRA or any

23    other group that takes a position with respect to the gun laws

24    of our country?

25         PROSPECTIVE JURY:  (No response.)

- 85 -

24

1        THE COURT:  Do any of you own guns in your home?

2        PROSPECTIVE JURY:  (Indicating.)

3        THE COURT:  Mr. Gaddy, what type of weapon or

4  weapons?

5        PROSPECTIVE JUROR:  .22.

6        THE COURT:  I'm sorry.  Or weapon.

7        PROSPECTIVE JUROR:  .22 semi-automatic rifle and a

8  couple shotguns.

9        THE COURT:  Ms. Wooten, did you raise your hand?

10       PROSPECTIVE JUROR:  Yes.

11       THE COURT:  What kind of weapon do you have in the

12  home?

13       PROSPECTIVE JUROR:  Shotguns.

14       THE COURT:  Mr. Sheppard.

15       PROSPECTIVE JUROR:  A couple of shotguns.  Deer

16  rifle and a .22 pistol.

17       THE COURT:  Who else in the front row?

18       PROSPECTIVE JUROR:  (Indicating.)

19       THE COURT:  Ms. Belovs.

20       PROSPECTIVE JUROR:  Um-hmm.  Yes.  My husband own

21  guns but I don't know what they are.

22       THE COURT:  You don't know what kind?

23       PROSPECTIVE JUROR:  No.

24       THE COURT:  Do you know if they're long guns,

25  handguns?

25

1              PROSPECTIVE JUROR:  Probably both.  I don't know.

2              THE COURT:  Okay.  Thank you.  Anyone else in the

3    first row?

4              PROSPECTIVE JUROR:  (Indicating.)

5              THE COURT:  Mr. Snyder.

6              PROSPECTIVE JUROR:  My wife has a .22 pistol.

7              THE COURT:  Back row?

8              PROSPECTIVE JUROR:  (Indicating.)

9              THE COURT:  Ms. Bowyer.

10             PROSPECTIVE JUROR:  My husband, hunting guns, a

11   rifle, mostly hunting guns, rifles.

12             THE COURT:  Thank you.  Mr. Foley.

13             PROSPECTIVE JUROR:  Shotguns and rifles.

14             THE COURT:  Anyone else in the back row?

15             Or did I skip you, Mr. Butler?

16             PROSPECTIVE JUROR:  Yeah.  My wife has a .357.

17             THE COURT:  Thank you.  Ms. Johnson.

18             PROSPECTIVE JUROR:  Yes.  My husband owns a 40-inch

19   shotgun.

20             THE COURT:  Anybody else in the back row?

21   Mr. Scanlon.

22             PROSPECTIVE JUROR:  .22 rifle.

23             THE COURT:  All right.  Now if you're selected to

24   sit in this case, you will be asked to decide what the facts

25   are.  You will decide those facts from the evidence that is

26

1    presented in the case.  And then I will instruct you on the

2    law that you are to apply to the facts that you find.  And if

3    the law that I give to you is different from what you thought

4    the law was or from what you think the law should be, can you

5    set aside your own notions of the law and follow the

6    instructions of the court?  Can each of you do that?

7              PROSPECTIVE JURY:  (Nodding head.)

8              THE COURT:  Now one of the things that is the

9    Judge's responsibility, not the jury's, is that should there

10   be a verdict in the case, the issue of punishment is something

11   that the Court deals with.  It's not something that the jury

12   should consider in any way in determining whether the

13   government has met its burden to prove the charge beyond a

14   reasonable doubt.

15             Can each of you commit to putting aside the issue of

16   punishment in determining the guilt or innocence of the

17   defendant?  Can each of you do that?

18             PROSPECTIVE JURY:  (Nodding head.)

19             THE COURT:  Other than what we've already discussed,

20   is there any member of the panel who has any special

21   disability or problem that would make serving as a member of

22   this jury difficult or impossible?

23             PROSPECTIVE JUROR:  (Indicating.)

24             THE COURT:  Mr. Gaddy.

25             PROSPECTIVE JUROR:  The court time ends at 6:00, is

27

```
 1   what I was told, but I have to pick my daughter up at daycare.
 2              THE COURT:  What time do you have to pick your
 3   daughter up at daycare?
 4              PROSPECTIVE JUROR:  5:00.
 5              THE COURT:  All right.  Would it be possible for you
 6   to make arrangements for a couple of days for a later pick up
 7   if necessary?
 8              PROSPECTIVE JUROR:  I can, yes.
 9              THE COURT:  Anyone else?
10              PROSPECTIVE JUROR:  (Indicating.)
11              THE COURT:  Ms. Lucas.
12              PROSPECTIVE JUROR:  Yes.  My children get out of
13   school, one at 2:30, one at 3:45.  My husband is out of town
14   on business.  I can try and make arrangements, but I don't
15   know I can get people to keep my kids for the length of time
16   it would take me to get home and they're 10 and 13.  I'm not
17   comfortable for leaving them home alone for three or four
18   hours by themselves.
19              THE COURT:  Anyone else?  Mr. Sheppard.
20              PROSPECTIVE JUROR:  In reference to a minute ago, I
21   know you mentioned someone in your family or drug using.
22   There's a second cousin that happens to be my neighbor and
23   she's an addict, struggles, has two daughters, and they have
24   two children of which individually know, and it's kind of
25   close to home, but it's not immediate family.
```

28

1         THE COURT:  So the question would be, would you be

2   able to set that aside and give both sides a fair shake in

3   this trial?

4         PROSPECTIVE JUROR:  I try my best.

5         THE COURT:  Could you listen to the evidence and

6   render a verdict on the evidence and not on as a result of any

7   family issues outside this courtroom?

8         PROSPECTIVE JUROR:  I believe so.

9         THE COURT:  All right.  Anyone else?

10         PROSPECTIVE JUROR:  (Indicating.)

11         THE COURT:  Ms. Johnson.

12         PROSPECTIVE JUROR:  Yes.  I just -- my brother was

13   on drugs, he's on dialysis from using drugs and I just put him

14   to rest yesterday.

15         THE COURT:  I'm sorry.

16         PROSPECTIVE JUROR:  My mind would not be for the

17   court.

18         THE COURT:  You would be what?

19         PROSPECTIVE JUROR:  I just don't think I can handle

20   it.

21         THE COURT:  There's some emotion that stays with you

22   from the recent --

23         PROSPECTIVE JUROR:  Yeah.  I just buried him

24   yesterday.

25         THE COURT:  Well, I'm sorry for your loss.

29

```
1           PROSPECTIVE JUROR:  Thank you.

2           THE COURT:  But you believe that that would affect

3    your ability to be fair and impartial in this case?

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  All right.  Anyone else?

6           PROSPECTIVE JUROR:  (Indicating.)

7           THE COURT:  Mr. Scanlon.

8           PROSPECTIVE JUROR:  I have a work-related issue

9    where I have a very tight deadline to complete a project, has

10   to be completed by December 14.  Only became my potential last

11   week.  I tried to make arrangements beforehand to maybe defer

12   my summons, if possible.  I don't think that's possible.  But

13   it would really benefit my company, the client, and my career

14   if I could be allowed to complete this project.

15          THE COURT:  All right.  Thank you.  Let me ask you

16   this:

17          Can each of you decide this case based upon the

18   facts that you find, and the law that the court gives to you

19   and not based on any notions of bias, prejudice or sympathy

20   for either side?  Can reach of you do that?

21          PROSPECTIVE JURY:  (Nodding head.)

22          THE COURT:  Do any of you have any moral, religious,

23   philosophical or other reason why you would find it difficult

24   to sit in judgment of the conduct of another person?

25          PROSPECTIVE JURY:  (No response.)
```

1    THE COURT:  What I'm going to do at this point is

2    ask a number of individual questions.  Again, they're not

3    designed to pry unnecessarily into your private affairs or to

4    make you uncomfortable in any way.  But rather to get the

5    information we need to pick the appropriate jury.  I'm going

6    to ask you where you live.  By that I mean the city, not

7    necessarily the street address.  How long you've lived there?

8    Whether you rent or own your house?  Ask you about your

9    educational background, your occupation and marital status.

10    And so Ms. Wooten, since you are in that first seat

11    I'll start with you.  Can you tell us where you live; how long

12    you've lived there; whether you rent or own your home?

13    PROSPECTIVE JUROR:  I live in Mount Holly.  I've

14    lived there for 25 years.  And I do own my home.

15    THE COURT:  And what is your educational background?

16    By that I mean, the last year of school and any degree you may

17    have earned.

18    PROSPECTIVE JUROR:  I have a two-year degree.  I'm a

19    medical assistant.

20    THE COURT:  Okay.  Is that how you're employed?

21    PROSPECTIVE JUROR:  Yes.

22    THE COURT:  What do you -- what's the nature of your

23    job?

24    PROSPECTIVE JUROR:  I work for a neurosurgeon.

25    THE COURT:  How long have you done that?

1          PROSPECTIVE JUROR:  Fifteen years.

2          THE COURT:  And your marital status?

3          PROSPECTIVE JUROR:  I'm married.

4          THE COURT:  Do you have any children?

5          PROSPECTIVE JUROR:  I do, two older boys, 23 and 25.

6          THE COURT:  All right.  Thank you.

7          Mr. Gaddy, how about you?  Where do you live?

8          PROSPECTIVE JUROR:  I live in Monroe.

9          THE COURT:  How long have you lived there?

10         PROSPECTIVE JUROR:  Six years.

11         THE COURT:  Do you rent or own your home?

12         PROSPECTIVE JUROR:  Own my home.

13         THE COURT:  Your educational background.

14         PROSPECTIVE JUROR:  Just a high school diploma.

15         THE COURT:  And your occupation.

16         PROSPECTIVE JUROR:  Administrative technical

17  support.

18         THE COURT:  In what field?

19         PROSPECTIVE JUROR:  In flow of system technologies.

20         THE COURT:  Are you married?

21         PROSPECTIVE JUROR:  I am married.

22         THE COURT:  Do you have any children?

23         PROSPECTIVE JUROR:  I have one daughter, she's eight

24  months old.

25         THE COURT:  Thank you.

1          Mr. Sheppard.

2          PROSPECTIVE JUROR:  I live in Peachland, North

3   Carolina.

4          THE COURT:  How long have you lived there?

5          PROSPECTIVE JUROR:  Pretty much my whole life except

6   for when I was going to college here in UNC Charlotte.  I live

7   with my parents.  I work for my father's general contracting

8   business.

9          THE COURT:  What do you do there?

10         PROSPECTIVE JUROR:  Estimator and CAD operator.

11         THE COURT:  And your educational background?

12         PROSPECTIVE JUROR:  Business major.

13         THE COURT:  And marital status.

14         PROSPECTIVE JUROR:  Single.

15         THE COURT:  Any children?

16         PROSPECTIVE JUROR:  No, sir.

17         THE COURT:  Thank you.

18         Ms. Belovs.

19         PROSPECTIVE JUROR:  I live in Matthews.  I've lived

20  there for seven years.  I own my house.  I'm married.  Three

21  children.  My educational background is MBA.  And I work for a

22  home health agents.

23         THE COURT:  What do you do there?

24         PROSPECTIVE JUROR:  I'm a finance manager.

25         THE COURT:  Thank you.  Mr. Hutcheson.

33

1            PROSPECTIVE JUROR:  I live in south Charlotte, 15

2    years.  Own my own home.  Married.  Two boys, seven and four.

3    Masters of accounting.  Chief financial officer in the NASCAR

4    industry.

5            THE COURT:  Thank you.

6            Ms. Lucas.

7            PROSPECTIVE JUROR:  I live in Waxhaw.  And I've been

8    there five and a half years.  We own our own home.

9            THE COURT:  Your educational background.

10           PROSPECTIVE JUROR:  I have a Master's degree in

11   special education and I work in the field with children with

12   developmental delays.

13           THE COURT:  And your marital status?

14           PROSPECTIVE JUROR:  I'm married.

15           THE COURT:  Any children?

16           PROSPECTIVE JUROR:  Yes, ages 10 and 13.

17           THE COURT:  Thank you.

18           Mr. Snyder.

19           PROSPECTIVE JUROR:  I lived in Charlotte for 23

20   years.  Own my home.  Married.  Two children.  32 and 34.

21   Self-employed.

22           THE COURT:  In what field?

23           PROSPECTIVE JUROR:  I make things out of glass.  And

24   I have a Bachelor of Arts degree.

25           THE COURT:  And your BA is in?

1          PROSPECTIVE JUROR:  Mathematics.

2          THE COURT:  Mr. Scanlon, where do you live?

3          PROSPECTIVE JUROR:  I live in Charlotte.  I've lived

4   here since 2008, so going on five years.  Currently I have a

5   mortgage, so I own my home.  I work as a GIS analyst.  I do a

6   lot of photography and technical writing which is what I would

7   be doing now.  But I have no children, but I am married.

8          THE COURT:  Your educational background.

9          PROSPECTIVE JUROR:  I have a Bachelor of Science and

10  environmental planning.

11         THE COURT:  Thank you.

12         Ms. Johnson.

13         PROSPECTIVE JUROR:  I live in Charlotte and I rent.

14  And I've been at my place for one year.  And I have three

15  kids, a husband, and I used to be a nurse assistant, but now I

16  take care of my husband because he's a veteran been for 22

17  years, so now he has some health issues.

18         THE COURT:  All right.  Thank you.

19         Ms. Bobbit.

20         PROSPECTIVE JUROR:  I live in Cornelius.  I'm

21  married.  I have three adult children and four grandchildren,

22  and I finished partial college and I've lived in Cornelius for

23  18 years.

24         THE COURT:  And --

25         PROSPECTIVE JUROR:  We own the home.

1              THE COURT:  How are you employed?

2              PROSPECTIVE JUROR:  Twenty-four hours a day at home.

3              THE COURT:  All right.

4          Thank you.

5          Ms. Barnett.

6              PROSPECTIVE JUROR:  I live in South Charlotte.  I

7      rent.  I've lived here for 10 years in South Charlotte, rented

8      the whole time.  I finished two years of college.

9              I'm divorced.  I have two grown children, 29 and 26.

10     And I work as an accountant for a restaurant company.

11             THE COURT:  Thank you.

12         Ms. Foley.

13             PROSPECTIVE JUROR:  I live in Cornelius; married;

14     two children; self-employed as a renovation contractor; and I

15     rent my home; and I've been here for four years.

16             THE COURT:  Any children?

17             PROSPECTIVE JUROR:  Two children.

18             THE COURT:  What are their ages?

19             PROSPECTIVE JUROR:  Twenty-three and 20.

20             THE COURT:  Thank you.  Mr. Butler.

21             PROSPECTIVE JUROR:  I live in Charlotte; four years

22     of college.  I own my own home; married; two children.  I'm a

23     flight attendant.

24             THE COURT:  What did you study in college?

25             PROSPECTIVE JUROR:  Business.

1          THE COURT:  Thank you.

2          Ms. Bowyer.

3          PROSPECTIVE JUROR:  I live in Cherryville pretty

4    much all my life.  I'm married.  We own our own home.  I have

5    two stepchildren, 21 and 15.  Employed with construction --

6    general contractor construction company, been there about five

7    years.  I think that's it.

8          THE COURT:  All right.  Thank you.

9          Now I had indicated that Mr. Scanlon and Mr. Snyder,

10   earlier in the questioning that I'd come back to you on the

11   question of whether you could set aside certain life

12   experiences and be a fair and impartial juror in this case,

13   being able to give both sides a fair shake.

14         And do either one of you have any different thoughts

15   on what we've already discussed?  Mr. Snyder.

16         PROSPECTIVE JUROR:  Just to say I feel like I could

17   be fair, not prejudiced by any experiences in the past.

18         THE COURT:  Thank you.

19         Mr. Scanlon?

20         PROSPECTIVE JUROR:  I can put it aside.

21         THE COURT:  Pardon me?

22         PROSPECTIVE JUROR:  I can put it aside.

23         THE COURT:  Are there any other questions that you

24   wish me to consider?

25         MS. COMERFORD:  May I have one moment, Your Honor?

1        (Pause.)

2        MR. WASHINGTON:  We have one, Judge.

3        THE COURT:  Now a couple jurors, I believe Mr. Gaddy

4   and Ms. Lucas indicated some need to deal with child care

5   arrangements in picking up children.  If the trial were to

6   start this afternoon, would you be able to make those

7   arrangements today and tomorrow?

8        Mr. Gaddy?

9        PROSPECTIVE JUROR:  I can.

10        THE COURT:  Ms. Lucas.

11        PROSPECTIVE JUROR:  I know I can for today.  I'm not

12   100 percent sure for tomorrow.

13        THE COURT:  Thank you.

14        May I see the attorneys at sidebar?

15        Mr. Lee, would you join us?

16        (Bench conference as follows:)

17        THE COURT:  Are you -- I should have given you time

18   to do this.  Are you in a position to argue for cause

19   challenges and any peremptory strikes or do you need more

20   time?

21        MR. WASHINGTON:  If we could have just a minute.

22        THE COURT:  Sure.  Sure.

23        Any for cause challenges?

24        MR. WASHINGTON:  Judge, we would move for cause to

25   strike Juror No. 8, Ms. Margaret Johnson.  Indicated that her

38

1  brother recently passed away --

2          THE COURT:  I'll grant that.

3          MR. WASHINGTON:  -- from cases of drug use.

4          We would also move for cause Juror No. 7.

5          Mr. James Scanlon.  He indicated he's got compelling

6  work to do elsewhere.  Seemed very agitated in the jury box.

7          THE COURT:  I'm not going to strike him for cause.

8          MR. WASHINGTON:  Very well, sir.  We would strike

9  Juror No. 11, Kevin Foley.  I think he said that he could not

10 be fair because of the incident.

11         THE COURT:  I think he said that.  Grant that.

12         MR. WASHINGTON:  That's it for cause challenges,

13 Judge.

14         THE COURT:  Any for cause?

15         MR. WASHINGTON:  Yes.  Strike No. 7, Mr. James

16 Scanlon.  And no other strikes, Your Honor.

17         THE COURT:  All right.  So it looks like we have 6,

18 7, 8, 9, 10, 11 altogether.  So I guess we'll put five -- call

19 six more.  Put them in the box.  We need another juror and one

20 alternate.  So we'll call another six names.  Go a second

21 round on this.

22         MR. WASHINGTON:  Thank you.

23         THE COURT:  I had in mind to strike for cause No. 1,

24 Mrs. Wooten.  She didn't ask for it, but I think there was

25 some difficulty with her being impartial.  And so I'm going to

39

1   strike her for cause.  We actually have 10.  Yeah.  We have

2   ten jurors.  We need two jurors and one alternate.  I think

3   I'll still call six.  I think we should be able to get to a

4   full jury with that number of people if not.

5            MR. WASHINGTON:  Will you be filling in vacant

6   seats?  How practically do you do that?

7            THE COURT:  We do it numerically, 2 through 6 and

8   then 9 through 14 will be our first 10 jurors.

9            MR. WASHINGTON:  Sure.  Okay.

10           THE COURT:  So we're looking for jurors number 11,

11  12 and alternate one.

12           (The bench conference was concluded.)

13           THE COURT:  All right.  I am going to thank you but

14  excuse the following jurors.  And by doing that what I would

15  ask you to do is not immediately but at the end of this part

16  of the proceeding, if you hear your name called out, if you

17  would just return to the spectator section of the courtroom.

18           Juror No. 1, Ms. Wooten, No. 7, Mr. Scanlon, No. 8,

19  Ms. Johnson, No. 11, Mr. Foley.  When we ask you to return to

20  your seats, if you would return to the spectator section of

21  the courtroom.

22           Everybody else who did not hear their name called

23  out, if you, when you go back to the spectator section of the

24  courtroom, if you would return to seats in the first two

25  benches in the spectator section of the courtroom.  If you

40

1    would all do that at this time.

2              (The jurors were escorted from the jury box.)

3              THE COURT:  Madam Clerk, would you call out six new

4    names.

5              COURT CLERK:  Cheryl Waymer, seat No. 1.  Susan

6    Seaton, seat No. 2.  William Moss, seat No. 3.  Morgan Reeder,

7    seat No. 4.  Edwin Cruz, seat No. 5.  Sybil Reeves, seat No.

8    6.

9              THE COURT:  Good morning.

10             PROSPECTIVE JURY:  Good morning.

11             THE COURT:  Were each of you able to hear the

12   questions asked of the previous panel?

13             PROSPECTIVE JURY:  (Nodding head.)

14             THE COURT:  Started out by talking about certain

15   principles, constitutional principles that govern what we do,

16   the presumption of innocence; the burden being on the

17   government to prove each element beyond a reasonable doubt;

18   the fact that the defendant has no burden whatsoever to put on

19   evidence or to testify; and that you should not hold that

20   against him if he elects not to do that.

21             Can each of you apply those principles to this case?

22             PROSPECTIVE JURY:  (Nodding head.)

23             THE COURT:  Had any of you heard about this case

24   before you came here this morning?

25             PROSPECTIVE JURY:  (Shaking head.)

41

1          THE COURT:  Did any of you know any of the people

2    who were introduced to you?

3          PROSPECTIVE JURY:  (Shaking head.)

4          THE COURT:  Have any of you served on a jury before?

5          PROSPECTIVE JURY:  (Indicating.)

6          THE COURT:  Any of you had an experience with law

7    enforcement, either positive or negative that would make it

8    difficult for you to be fair and impartial in a case where

9    there's law enforcement testimony expected on one side on or

10   the other?

11         PROSPECTIVE JURY:  (No response.)

12         THE COURT:  Could each of you treat the testimony of

13   a law enforcement witness like that of any other witness?

14         PROSPECTIVE JURY:  (Nodding head.)

15         THE COURT:  Would any of you be inclined to give

16   that testimony more or less weight solely because of a

17   person's status as a law enforcement official?

18         PROSPECTIVE JURY:  (Shaking head.)

19         THE COURT:  Have any of you, a member of your -- or

20   a member of your family been involved in a criminal matter in

21   court either as a defendant, a witness or a victim?

22         PROSPECTIVE JURY:  (Indicating.)

23         THE COURT:  Ms. Reeves, can you tell me about that.

24         PROSPECTIVE JUROR:  Niece, sexually assaulted by her

25   father.  He was convicted.

42

1        THE COURT:  He was convicted.  Did you have to

2   testify or otherwise play any role in that proceeding?

3        PROSPECTIVE JUROR:  No, but that was 25 years ago.

4        THE COURT:  Could you set that aside and be a fair

5   and impartial juror in this case?

6        PROSPECTIVE JUROR:  Yes.

7        THE COURT:  Anyone else?

8        PROSPECTIVE JURY:  (Shaking head.)

9        THE COURT:  Anyone ever been charged with a criminal

10   offense other than a minor traffic offense?

11        PROSPECTIVE JURY:  (No response.)

12        THE COURT:  Anybody have strong feelings either

13   about drugs or firearms that would make it difficult to be a

14   fair and impartial juror in a case alleging drug trafficking

15   and violations of firearms law?

16        PROSPECTIVE JUROR:  (Indicating.)

17        THE COURT:  Ms. Seaton.

18        PROSPECTIVE JUROR:  I might.  My family was victim.

19   We were coming home from a restaurant and a car blocked us in

20   the driveway, I had my daughter and my friend, my husband got

21   pistol whipped.  It was all drugs and illegal weapons, so.

22        THE COURT:  Did that matter get investigated and

23   prosecuted?

24        PROSPECTIVE JUROR:  Yeah.  We were gonna testify for

25   the prosecution but he ended up taking a plea.

43

1            THE COURT:  I see.  How long ago was that?

2            PROSPECTIVE JUROR:  I think it was December of 2005.

3            THE COURT:  And so, I mean, you had some time to

4    think about it while you were in the spectator section.

5            PROSPECTIVE JUROR:  Yeah.

6            THE COURT:  I asked similar questions of the

7    previous panel.  Is that something that can be set aside and

8    you would be able to be fair and impartial to both sides or

9    does that linger in a way that would affect your ability to be

10   fair and impartial?

11           PROSPECTIVE JUROR:  In all fairness, I might see red

12   when I see the alleged -- I mean, if it were to be illegal

13   guns, and I now it's drug distribution, I might favor the

14   prosecution.

15           THE COURT:  I would instruct you and others as

16   members of the jury to render a verdict solely on the facts

17   that you find, and the law that I give to you.  But what I

18   hear you telling me is that that fact finding ability may be

19   impaired by your past experience?

20           PROSPECTIVE JUROR:  Could be, I guess.  It just

21   depends on how the alleged carries himself.

22           THE COURT:  And Mr. Ductan is charged with an

23   offense.  The law presumes that he's innocent.  Doesn't have a

24   burden to do anything.  Could you give him that constitutional

25   presumption of innocence and not hold it against him if he

44

1    were not to present evidence, not to testify?

2         PROSPECTIVE JUROR:  I would hope so, but.

3         THE COURT:  And you all are not professional jurors.

4    Our system doesn't operate that way.  And these questions are

5    new, but each side is entitled to a commitment from jurors

6    that they would set aside biases or prejudices and render a

7    verdict solely on the evidence and the law that the Court

8    instructs you on.

9         Would you be able to do that or would you -- would

10   you be able to make that commitment, I guess, is the question.

11        PROSPECTIVE JUROR:  Logically, I hope I could.  I

12   don't know what I would do.

13        THE COURT:  All right.  Thank you.  Anybody belong

14   to any groups that take a public position with respect to

15   drugs or firearms?

16        PROSPECTIVE JUROR:  (Indicating.)

17        THE COURT:  Mr. Moss.

18        PROSPECTIVE JUROR:  I belong to the NRA.

19        THE COURT:  How long have you been a NRA member?

20        PROSPECTIVE JUROR:  Twenty-five years maybe,

21   something like that.

22        THE COURT:  Anything about that association that

23   would make it difficult for you to be fair and impartial in

24   any way to either side?

25        PROSPECTIVE JUROR:  No, sir.

45

```
1              THE COURT:  Do any of you own guns in the house?

2              PROSPECTIVE JUROR:  (Indicating.)

3              THE COURT:  Possess guns in the house, Ms. Seaton?

4              PROSPECTIVE JUROR:  My husband has two duck hunting

5    shotguns.

6              THE COURT:  Mr. Moss.

7              PROSPECTIVE JUROR:  I have some shotguns, some

8    rifles and handguns.

9              THE COURT:  Anyone else in the first row,

10   Ms. Reeves?

11             PROSPECTIVE JUROR:  My husband has a .22 shotgun.

12             THE COURT:  Now as I said, you're the judges of the

13   facts.  I will give the law to you that you are to apply to

14   the facts.  And if the law that I give to you is different

15   from what you think it is or should be, can you put aside your

16   own notions of the law and follow the instructions of the

17   Court?  Can each of you do that?

18             PROSPECTIVE JURY:  (Nodding head.)

19             THE COURT:  And could you put aside the issue of

20   punishment and deciding whether the government has met its

21   burden of proof?

22             PROSPECTIVE JUROR:  (Nodding head.)

23             THE COURT:  Is there any member of the panel who has

24   any special disability or problem that would make serving as a

25   member of this jury difficult or impossible?
```

46

1            PROSPECTIVE JURY:  (Shaking head.)

2            THE COURT:  Do any of you have any moral, religious,

3   philosophical or other reason why you could not sit in

4   judgment of the conduct of another person?

5            PROSPECTIVE JUROR:  (Indicating.)

6            THE COURT:  Mr. Cruz.

7            PROSPECTIVE JUROR:  Yeah.  I have a strong feeling

8   against drug use and drug enterprise.

9            THE COURT:  And of course this is not a referendum

10   on the effect of drugs on our society.  It's a criminal case

11   in which the government has alleged certain crimes have been

12   committed, alleged defendant did it, has the burden of proving

13   that to the unanimous satisfaction of the jury.  The burden is

14   beyond a reasonable doubt.

15            The question that I have for you is notwithstanding

16   your strong feelings, would you be able to be fair and

17   impartial to both sides in that process?

18            PROSPECTIVE JUROR:  Probably.

19            THE COURT:  Anyone else?

20            PROSPECTIVE JURY:  (No response.)

21            THE COURT:  Let me ask each of you then the

22   individual questions, starting with Ms. Wagner.

23            PROSPECTIVE JUROR:  Waymer.

24            THE COURT:  Waymer -- Waymer.  I've got it.  Thank

25   you.

47

1            Where do you live; how long have you lived there;

2    and do you rent or own your home?

3            PROSPECTIVE JUROR:  I live in Charlotte.  I've lived

4    there for 12 years.  We own our home.  I am married.  We have

5    two children.  They're both daughters.

6            THE COURT:  I should of had you sitting here,

7    shouldn't I?

8            Your educational background and employment?

9            PROSPECTIVE JUROR:  I have a Bachelor's in

10   accounting.  I own my own business.  I'm a caterer and event

11   planner.

12           THE COURT:  You're a caterer and event planner.

13   Thank you.

14           Ms. Seaton.

15           PROSPECTIVE JUROR:  I live in Charlotte.  I've lived

16   in my house 33 years.  I have three grown girls.  They're all

17   in Charlotte.  I have my four-year degree college.

18           THE COURT:  What is your degree in?

19           PROSPECTIVE JUROR:  History and minor in English.

20           THE COURT:  And your occupation?

21           PROSPECTIVE JUROR:  Nothing right now.

22           THE COURT:  Have you done something in the past?

23           PROSPECTIVE JUROR:  Not -- I quit work when I had my

24   children.

25           THE COURT:  I see.  Thank you.

48

1          Mr. Moss.

2          PROSPECTIVE JUROR:  Yes, I live in Union County.  I

3   have high school and some college.  And I'm a contractor,

4   general contractor and a home inspector.  I am married and I

5   have two step children and some grandchildren.

6          THE COURT:  And you rent or own your home?

7          PROSPECTIVE JUROR:  Own my home.

8          THE COURT:  And the ages of your step children?

9          PROSPECTIVE JUROR:  Twenty-seven and 32.

10          THE COURT:  Grown?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Thank you.

13          Ms. Reeder.

14          PROSPECTIVE JUROR:  I live in Monroe.  I've lived

15   there all my life, except for college.  I live with my

16   parents.  I'm single.  I have an Associate's degree in nursing

17   and I work at CMC.

18          THE COURT:  And your marital status?  You said

19   single?

20          PROSPECTIVE JUROR:  Um-hmm.

21          THE COURT:  Any children?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  Mr. Cruz.

24          PROSPECTIVE JUROR:  I live in Gaston County.  I'm

25   a -- I have a degree in engineering.  I work for a drug

49

1  testing company.  And I do computer programming.  I'm married.

2  No children.

3            THE COURT:  Thank you.  And Ms. Reeves.

4            PROSPECTIVE JUROR:  I've been in Charlotte for 54

5  years except for college.  Married.  Own my home.  Daughter in

6  college.  Degree in religion and philosophy and semester of

7  Divinity School at Duke.

8            THE COURT:  What do you do now?

9            PROSPECTIVE JUROR:  I just retired as a school

10 teacher at Charlotte Christian and I'm subbing.

11           THE COURT:  Any additional questions attorneys wish

12 me to consider?

13           MS. COMERFORD:  Just one moment, Your Honor.

14           (Pause.)

15           MS. COMERFORD:  Not at this time Your Honor.

16           THE COURT:  Very well.  When you're ready to come to

17 sidebar, let me know.

18           MR. WASHINGTON:  Thank you, Judge.

19           (Bench conference as follows:)

20           THE COURT:  Any for cause?

21           MR. WASHINGTON:  Yes, Your Honor.  The government

22 moves to strike Juror No. 2.  Ms. Susan Seaton for cause.  She

23 indicated --

24           THE COURT:  Granted.

25           MS. COMERFORD:  Okay.  Your Honor, we strike Juror

50

1   No. 5, Mr. Edwin Cruz.  He said he cannot be fair.

2        THE COURT:  Granted.

3        MS. COMERFORD:  We have no other strikes.

4        THE COURT:  I worry about Juror No. 1's coughing and
5   sneezing.

6        MS. COMERFORD:  I should have asked to inquire is
7   she well enough to sit.  Sounds like just her voice.

8        THE COURT:  I can inquire again.  What if she says,
9   yes.  I still worry about her getting other jurors sick and
10  so -- if I were to strike her for cause because of illness, we
11  would have two jurors left and an alternate.  But I don't want
12  to strike her for cause without agreement from the government,
13  so.  I can ask her some follow-up questions.

14       MS. COMERFORD:  Could you, Judge.

15       THE COURT:  Let me do that and if you want her
16  struck for cause, if you would just signal from the bench
17  you're making a sidebar request.

18       MS. COMERFORD:  Okay.

19       THE COURT:  Okay.

20       MS. COMERFORD:  Thank you.

21       (The bench conference was concluded.)

22       THE COURT:  The only remaining question the Court
23  has, because I love listening to Ms. Waymer talk.  I'm just
24  worried about your coughing.

25       PROSPECTIVE JUROR:  Yes.

1          THE COURT:  And whether you think you're healthy

2     enough to sit for a couple of days as a juror.

3          PROSPECTIVE JUROR:  Do I think I'm healthy enough?

4     I should be okay.  I think it's -- I don't feel very great,

5     but I should be okay.

6          THE COURT:  Okay.  Well, I want to thank you for the

7     spirit that you show and your willingness to serve as jurors.

8     And all the jurors, I can't say enough times how grateful the

9     court is for your willingness to serve and how much it means

10    to our criminal justice system that you do.

11         MR. WASHINGTON:  We do not need to approach sidebar.

12         THE COURT:  All right.  Then what I'm going to do is

13    ask Juror No. 2, Ms. Seaton, No. 5, Ms. Cruz, and No. 6

14    Ms. Reeves, if you would return to your seats in the spectator

15    section at this time.

16         (The jurors was excused from the jury box.)

17         THE COURT:  Ms. Waymer, Mr. Moss, and Ms. Reeder, if

18    you would stand aside over to your left at this time I will

19    give you further instructions soon.

20         Madam Clerk, would you call out the jury in the case

21    of United States versus Phillip Ductan.

22         COURT CLERK:  When I call your name, please come up

23    have a seat in the jury box.  Michael Gaddy, Juror No. 1.

24    Please come up and have a seat in chair number one.

25         Tyler Sheppard, Juror No. 2.  Nonna Belovs, Seat

52

1    No. 3.  Brian Hutcheson, Seat No. 4.  Whitney Lucas, Seat

2    No. 5.  Constance Bobbitt, Seat No. 6.  On the back row

3    Kimberly Barnett, Seat No. 7.  Kim Butler, Seat No. 8.  Thomas

4    Snyder, Seat No. 9.  Sabrina Bowyer, Seat No. 10.  Cheryl

5    Waymer, Seat No. 11.  William Moss, Seat No. 12.  Morgan

6    Reeder, Seat No. 13, on the front row.

7           THE COURT:  We're going to take a morning break

8    shortly.  We're going to break for 15 minutes and then I'll

9    ask everybody to come back after the break for the jury

10   selection in the second case that is being chosen today.

11          And if you all who are sitting in the box right now,

12   if you could remember that you are the Ductan jury, I'll have

13   instructions for you at a later time this morning or early

14   afternoon.  You all need to come back just like everybody else

15   after our 15 minute break.

16          So we'll take a 15-minute break.  At the end of that

17   break if you would assemble in the jury assembly room and

18   we'll have further instructions for you at that time.

19          (Recess at 11:20 a.m.)

20                       *  *  *  *  *  *

21

22

23

24

25

53

1  UNITED STATES DISTRICT COURT
   WESTERN DISTRICT OF NORTH CAROLINA
2  CERTIFICATE OF OFFICIAL REPORTER

3           I, Laura Andersen, Federal Official Court Reporter,

4  in and for the United States District Court for the Western

5  District of North Carolina, do hereby certify that pursuant to

6  Section 753, Title 28, United States Code that the foregoing

7  is a true and correct transcript of the stenographically

8  reported proceedings held in the above-entitled matter and

9  that the transcript page format is in conformance with the

10 regulations of the Judicial Conference of the United States.

11          Dated this the 13th day of May, 2014.

12

13

14
                        S/Laura Andersen
15                      Laura Andersen, RMR
                        Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

```
UNITED STATES OF AMERICA,    )  DOCKET NO. 3:04-CR-252
                             )
            Plaintiff,       )
                             )
            vs.              )  VOLUME I OF II
                             )
PHILLIP DUCTAN,              )
                             )
            Defendant.       )
_____)
```

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR
UNITED STATES DISTRICT COURT JUDGE
DECEMBER 4, 2012


APPEARANCES:

On Behalf of the Government:

          DANA OWEN WASHINGTON, ESQ.,
          ERIN COMERFORD, ESQ.,
          Assistant United States Attorneys
          227 West Trade Street, Suite 1700
          Charlotte, North Carolina 28202

On Behalf of the Defendant:

          PHILLIP DUCTAN, PRO SE

Appearing as Standby Counsel:

          RANDOLPH MARSHALL LEE, ESQ.,
          P.O. Box 77005
          Charlotte, North Carolina 28271


                LAURA ANDERSEN, RMR
               Official Court Reporter
             United States District Court
               Charlotte, North Carolina

1                        I N D E X

2              DECEMBER 4, 2012; VOLUME I

3    Jury Impaneled                                    11
     Court's Preliminary Instructions                  11
4    Opening Statement:
          Ms. Comerford           * * * * * *          17
5

6    GOVERNMENT WITNESSES:                             PAGE

7    STEPHEN WHITESELL
          Direct Examination By Ms. Comerford          20
8
     MANDRELL DUNN
9         Direct Examination By Mr. Washington         35

10   ROBERT T. MELTON
          Direct Examination By Mr. Washington         45
11
     SHAWN BLEE
12        Direct Examination By Ms. Comerford          53

13   LUKE SELL
          Direct Examination By Mr. Washington         60
14        Cross Examination By Defendant Ductan        67

15   CATHERINE BOWLES
          Direct Examination By Ms. Comerford          70
16        Cross Examination By Defendant Ductan        94

17   ANDREW OPRYSKO
          Direct Examination By Ms. Comerford          105
18        Cross Examination Defendant Ductan           116

19   GEROD KING
          Direct Examination By Mr. Washington         117
20
     KELLY LITTLE
21        Direct Examination By Ms. Comerford          122
                         * * * * * *
22   GOVERNMENT RESTS                                  128
                         * * * * * *
23   DEFENDANT WITNESS:
     CATHERINE BOWLES
24        Direct Examination By Defendant Ductan       128
                         * * * * * *
25

3

1                      E X H I B I T S

GOVERNMENT EXHIBITS:

2   NUMBER                                           ADMITTED

    1 ...................................................28
    2 ...................................................28
3   3 ...................................................28
    4 ...................................................30
4   4a ..................................................30
    4b ..................................................30
5   4c ..................................................44
    5a ..................................................47
6   5b ..................................................65
    6 ...................................................50
7   7 ...................................................51
    8 ...................................................57
8   9 ...................................................58
    10 ..................................................59
9   11 ..................................................66
    12 ..................................................67
10  13 ..................................................86
    14a .................................................82
11  14b .................................................82
    14c .................................................82
12  15a .................................................79
    15c .................................................77
13  15d .................................................77
    16a .................................................84
14  16b .................................................84
    16c .................................................84
15  16d .................................................84
    18a .................................................93
16  18b .................................................93
    19 ..................................................92
17  20 .................................................112
    21 .................................................115
18  23 ..................................................26
    24 ..................................................37
19  30 ..................................................27
    31 ..................................................26
20  33 ..................................................90
    34 ..................................................83
21  35 ..................................................89

22

23                    *  *  *  *  *  *

24

25

4

1                    P R O C E E D I N G S

2  DECEMBER 4, 2012.  AFTERNOON SESSION.  1:51 p.m:

3            (Defendant present.)

4            THE COURT:  We're back on the record in the United

5  States v Phillip Ductan matter.  The jury's been selected.

6  That process was made available to Mr. Ductan in the holding

7  cell after the Court found him in contempt.

8            Mr. Ductan, I brought you back up to invite you back

9  to join us for this trial, purge yourself of contempt, and

10  show that you're capable of participating in the trial.  We

11  would love to have you participate.  You've indicated you want

12  to represent yourself.  It's really hard to do that from the

13  holding cell.  And so I'm hoping that this afternoon that

14  you're willing to make a commitment to obey the Court's

15  directives and participate in trial.  That's my hope.  What do

16  you say in response?

17            DEFENDANT DUCTAN:  In response to that I would just

18  say that I would like to consult with counsel before moving

19  forward.

20            THE COURT:  Okay.  We discussed this earlier.  Is

21  your attorney here ready to represent you?

22            DEFENDANT DUCTAN:  No, not at this present time.

23            THE COURT:  All right.  And so your choice was, at

24  the beginning of the day, to have an attorney here, retained,

25  ready to represent you, or to represent yourself and --

5

1        DEFENDANT DUCTAN:  Just given the conditions at the
2   facility, it's been real hard for me to make contact.  Been in
3   lock down for the past couple of days, and my timeframe
4   getting back I haven't been able to make contact.
5        THE COURT:  And so your choice right now is to
6   represent yourself going forward.  Are --
7        DEFENDANT DUCTAN:  No, sir.  No, sir.
8        THE COURT:  Pardon me?
9        MR. LEE:  No, sir.
10       THE COURT:  What do you mean no, sir?
11       DEFENDANT DUCTAN:  I do not want to represent
12   myself.  I would like to seek private counsel.
13       THE COURT:  But we have a jury ready to come in and
14   you don't have an attorney and so you were told that you could
15   have an attorney represent you but you had to --
16       DEFENDANT DUCTAN:  Well, I would need the timeframe
17   to do that, sir.
18       THE COURT:  In the absence of the ability to retain
19   counsel here to represent you, do you wish to have your
20   standby counsel represent you?
21       DEFENDANT DUCTAN:  Excuse me, sir?
22       THE COURT:  Mr. Lee is here as standby counsel, and
23   that would appear to be --
24       DEFENDANT DUCTAN:  I wouldn't mind consulting him.
25   But in terms of representing me --

6

1        THE COURT:  I'll give you some time to consult with

2   Mr. Lee at this time.  You'll have an opportunity right now to

3   consult with him.

4        Mr. Lee, if you would come forward, I would

5   appreciate it.

6        MR. LEE:  Yes, sir.

7        THE COURT:  Either Mr. Lee or Mr. Ductan, let me

8   know when you're ready to proceed.

9        (Pause.)

10       MR. LEE:  Your Honor, I have conferred with

11  Mr. Ductan and he informs me that he means no disrespect to

12  the Court, but as I understand his position is steadfast that

13  he would like the time within which to get his family here.

14  Would like the time by which he can obtain private counsel and

15  get private counsel here.  And I also understand that he means

16  no disrespect towards me either, but he would rather I not

17  assume the duties as trial counsel.

18       Is that a fair representation, Mr. Ductan?

19       DEFENDANT DUCTAN:  Yes.

20       MR. LEE:  Speak into the --

21       DEFENDANT DUCTAN:  Yes, sir.

22       THE COURT:  Well, he appears to me he's choosing

23  self-representation then because we're ready to go.  And there

24  have been a number of hearings giving Mr. Ductan plenty of

25  opportunities to retain counsel and have him here ready to go,

7

1  and I don't see that person.

2          And so we have a jury that's been selected, about to

3  be impaneled, and we're ready to go.  And so the choices for

4  Mr. Ductan are to have you represent him, or self

5  representation, or retained counsel if he shows up in the next

6  five minutes.

7          MR. LEE:  I think Mr. Ductan's choice is

8  self-representation, Your Honor.  Is that a fair

9  representation, Mr. Ductan?

10          DEFENDANT DUCTAN:  No, it is not.

11          MR. LEE:  Okay.  I'm sorry.

12          THE COURT:  So, Mr. Ductan, in light of your

13  position, are you willing to go forward and participate in

14  this trial and obey the Court's directives?  Earlier today

15  there was a real problem with you interrupting and not

16  allowing me to finish a thought.  I can't have that in a jury

17  trial.  There's just no way to get from point A to point B

18  with that kind of atmosphere.  And so you're welcome to stay

19  with us if you wish to, with Mr. Lee as standby counsel.  Is

20  that your wish?

21          DEFENDANT DUCTAN:  I do want to be a part of it,

22  but, you know, I'm not in a position right now -- do not want

23  to be represented in this format.

24          THE COURT:  All right.  So I think what we'll do is

25  call the jury, begin the trial.  And at any point within the

8

1   trial, Mr. Ductan, if you wish Mr. Lee to go from standby

2   counsel to representing you, tell Mr. Lee and we'll deal with

3   that.  Otherwise the responsibilities for your representations

4   lie with you and you can either exercise it or not.

5          DEFENDANT DUCTAN:  Let me consult with Mr. --

6          THE COURT:  Very well.

7          (Pause.)

8          MR. LEE:  One more moment please, Your Honor.

9          MR. WASHINGTON:  When we work out the issue with

10  counsel, the government does have one issue it needs to

11  address before the jury is brought in.

12         THE COURT:  All right.  Thanks.

13         (Pause.)

14         DEFENDANT DUCTAN:  Yes, Your Honor I do not want to

15  waive my Sixth Amendment right to private counsel, and at the

16  same time, you know, I'm concerned with prejudice issue in

17  terms of how I would be perceived in the light that I'm looked

18  upon right now.

19         THE COURT:  I think I've -- I think you've made your

20  record clear with respect to your request for retained

21  counsel.  The Court's made its decision clear with that.  So I

22  don't believe you'll be waiving any right to retained counsel

23  by proceeding at this point either being self-represented or

24  having Mr. Lee go from standby counsel to appointed counsel.

25  And so whichever way you choose to go, I don't think you've

9

1  waived your appellate rights to pursue your appellate remedy

2  for the Court's denial of your right to delay this trial to

3  get retained counsel.

4          DEFENDANT DUCTAN:  I would like the Court to

5  consider granting me a continuance for the -- so I could at

6  least properly, you know, prepare a couple days or something.

7  I haven't -- I just got the evidence yesterday.  And I know

8  there was more evidence that, you know, that was available

9  that I need to take a look at in order to proceed.  I would

10  just ask that the Court, you know, find it at least allow me

11  that to be able to prepare.

12          THE COURT:  And I'll receive that as a motion to

13  continue and deny it.  The jury's here.  We're ready for

14  trial.  We're going forward today.  The question is whether

15  you wish to proceed representing yourself or having Mr. Lee go

16  from standby to appointed counsel.  That's the question for

17  you right now.

18          DEFENDANT DUCTAN:  It just seems like an unjust

19  situation, you know, basically being forced into a situation

20  that --

21          THE COURT:  But whether you believe it to be unjust

22  or not, that is the choice you have to make, and so you need

23  to make that choice right now.

24          DEFENDANT DUCTAN:  Could I have a few minutes,

25  please?

10

1          THE COURT:  You may have a couple minutes, yes.

2          (Pause.)

3          (The following occurs at 2:06 p.m.)

4          THE COURT:  Mr. Washington, I'll be glad to hear

5    from you on whatever issue you wish to bring to my attention.

6          MS. COMERFORD:  Your Honor, if I could speak to that

7    point.  The government will orally move to dismiss Count Four

8    without prejudice, the Court will allow proceeding in this

9    trial in Counts One, Two, and Count Three.

10          THE COURT:  Very well.

11          MS. COMERFORD:  Just taking a dismissal in Count

12   Four.

13          THE COURT:  I'll grant that motion.

14          MS. COMERFORD:  Thank you, Your Honor.

15          Also at the appropriate time we have run a redacted

16   criminal history for the confidential informant, and I've also

17   printed off every court filing.  To the extent that Mr. Ductan

18   chooses to represent himself -- these have been sent already

19   to Mr. Lee, but to the extent that he might not have had

20   access to them, they are all in hard copy for him.  If I could

21   pass those to the defense table.

22          THE COURT:  You may.

23          MS. COMERFORD:  (Handing paper writing to the

24   defendant.)

25          DEFENDANT DUCTAN:  I'll be invoking my Sixth

11

1    Amendment right to retained counsel.

2            THE COURT:  Well, you've done that.  We've dealt

3    with that before.  Are we ready for the jury?

4            MS. COMERFORD:  The government's ready, Your Honor.

5            MR. LEE:  I'll stand by, Your Honor.

6            THE COURT:  Mr. Lee, if you would stay involved as

7    standby counsel, the Court appreciates.

8            MR. LEE:  Yes, sir.  I'll be right here on the front

9    bench.

10           THE COURT:  Thank you.  And let me warn Mr. Ductan

11   that behavior that we saw earlier today won't be tolerated.

12   So I hope that you will conduct yourself in a way that allows

13   you to stay with us.

14           Call the jury in.

15           (The jury was returned to the courtroom at 2:12

16   p.m.)

17           THE COURT:  Good afternoon.

18           Madam Clerk, would you impanel the jury.

19           (Twelve jurors were selected and passed by the

20   Government and the Defendant.  One alternate juror was

21   selected and passed by the Government and the Defendant.  All

22   thirteen jurors were duly impaneled.)

23           THE COURT:  Members of the jury, now that you've

24   been sworn and impaneled, I will give you some preliminary

25   instructions to guide in your participation in this trial.

12

1    It will be your duty to find from the evidence what

2  the facts are.  You and you alone will be the judges of the

3  facts.  You will then have to apply to those facts the law as

4  the Court will give it to you.

5    Nothing the Court may say or do during the course of

6  the trial is intended to indicate, or should be taken by you

7  as indicating what your verdict should be.

8    The evidence from which you will find the facts will

9  consist of the testimony of witnesses, documents and other

10  things received into the record as exhibits, and any facts

11  that the parties agree to or stipulate to or that the Court

12  may instruct you to find.

13    Certain things are not evidence and must not be

14  considered by you as evidence, and they include statements,

15  arguments, and questions by the parties.  Objections to

16  questions are not evidence.  Parties have an obligation to

17  make objections when they believe evidence being offered is

18  improper under the rules of evidence.  You should not be

19  influenced by the objection.  If it is sustained you should

20  ignore the question.  And if it is overruled, you should treat

21  the answer like any other answer.

22    And if you are instructed that some item of evidence

23  is received for a limited purpose only, you must follow that

24  instruction.  And any testimony that the Court has excluded or

25  told you to disregard is not evidence.

13

And as we said earlier, anything you may have seen or heard outside the courtroom is not evidence. You are to decide the case solely on the evidence presented here in the courtroom.

Now as you know, this is a criminal case and there are three basic rules about a criminal case that you must keep in mind.

First, the defendant is presumed innocent unless and until proven guilty. The indictment against the defendant brought by the government is only an accusation nothing more. It is not proof of guilt or anything else. The defendant therefore starts out with a clean slate.

Second, the burden of proof is on the government until the very end of the case. The defendant has no burden to prove his innocence or to present any evidence or to testify.

Since the defendant has a right to remain silent, the law prohibits you from drawing any inference against him if he does not testify.

Third, the government must prove the defendant's guilt beyond a reasonable doubt.

I will give you further instructions on that point later, but bear in mind that in this respect a criminal case is different from a civil case.

Now during jury selection I told you that the

14

1  government has alleged the defendant conspired with others not

2  on trial today to possess with intent to distribute marijuana

3  in or about April 2004 through September 2004 in Mecklenburg

4  County and elsewhere.

5          And the government has also alleged by bill of

6  indictment that the defendant possessed with intent to

7  distribute marijuana on June 3rd, and that he possessed a

8  firearm in furtherance of that offense on that date.

9          I will give you detailed instructions on the law and

10  a copy of the indictment at the end of the case, and these

11  instructions will control your deliberation and decision.

12          Now as I said earlier, you are the sole judges of

13  the credibility of the witnesses and the weight their

14  testimony deserves.  While there is no absolute or arbitrary

15  guide or measure by which you shall determine the truthfulness

16  or untruthfulness of a witness, there are certain factors you

17  may wish to consider in making that credibility determination.

18  And these factors include whether the witness has any motive

19  or reason for being truthful or untruthful; the witness's

20  interest, if any, in the outcome of the case; whether there

21  has appeared from the witnesses' attitude or conduct, any

22  bias, prejudice, or feeling which may cause that person's

23  testimony to be influenced; whether the testimony bears the

24  earmarks of truthfulness; and to what extent, if any, it is

25  corroborated or confirmed by other testimony which is not

15

1    questioned, or by known or admitted facts.

2          You may also consider the intelligence or mental

3    capacity of a witness; and the witness's opportunity to have

4    accurate knowledge of the matters to which the person

5    testifies.

6          I instruct you that you may believe all that a

7    witness says, or none, or believe part and disbelieve part.

8          Do not form any opinion until all the evidence is

9    in.  Keep an open mind until you start your deliberations at

10   the end of the case.

11         Now you as jurors must decide the case based on the

12   evidence presented here in this courtroom.  This means that

13   during the trial you must not conduct any independent research

14   about the case, matters in the case, any individual groups

15   involved or any legal concepts.

16         Your duty to follow this instruction is a serious

17   responsibility and a failure to follow it may result in being

18   found in contempt of court.  So until you retire to

19   deliberate, you may not discuss this case with anyone, even

20   your fellow jurors.  If anyone should try to talk to you about

21   it, bring it to the Court's attention promptly.

22         And during your participation in the trial and

23   during your deliberations, you must not communicate with or

24   provide any information to anyone by any means about this

25   case.

16

1  You may not use, for example, any electronic device or media,

2  such as a telephone, cellphone, smart phone, iPhone,

3  Blackberry or computer; you may not use the Internet, any

4  internet service, or any text or instant messaging service; or

5  any internet chat room, blog, or website such as Facebook, My

6  Space, Linked In, You Tube or Twitter, to communicate to

7  anyone any information about this case, or to conduct any

8  research about this case while you are serving as jurors.

9        Now the trial is about to begin.  It will begin with

10  the government making an opening statement, which is simply a

11  forecast of the evidence.  Next, the defendant may, if he

12  wishes, but does not have to make an opening statement.  I

13  remind you that opening statements are neither evidence nor

14  argument.

15        After the opening statements the government will

16  present its witnesses, and counsel for the defendant may cross

17  examine -- or the defendant may cross examine those witnesses.

18  And following the government's case, the defendant may, if he

19  wishes, present witnesses whom the government may cross

20  examine.  And after all the evidence is in and I've given you

21  general instructions, the parties will present their closing

22  arguments, the Court will give you final instructions on the

23  law and then you will begin to deliberate on the case.

24        So that's the process that we will follow going

25  forward.  Is the government ready to make its opening

17

1  statement?

2           MS. COMERFORD:  Yes, Your Honor.

3           THE COURT:  You may do so.

4           MS. COMERFORD:  May it please the Court.

5  Mr. Ductan, ladies and gentlemen of the jury.  Good afternoon.

6           Let me take you back to June 3rd of 2004.  On that

7  day, the Defendant, Phillip Ductan, sat and he rocked on a

8  rocking chair on the front porch of the Cracker Barrel located

9  off the I-85 service road here in the Western District of

10  North Carolina, Charlotte.  He rocked and he waited.  He had

11  driven up that day from the State of Georgia with a load of

12  marijuana.  And he communicated with the person he believed to

13  be his buyer of that marijuana throughout the day to let him

14  know his location and when he would arrive.  They agreed on

15  this Cracker Barrel as the meet-up point.

16           Now what Mr. Ductan did not know is that the person

17  who was his buyer was a confidential informant, a Mr. Mandrell

18  Dunn who you'll hear from the witness stand today.  A

19  confidential informant who had committed his own drug

20  trafficking crime in his history and had entered into an

21  agreement with the government to assist the Vice Narcotics

22  Department of the Charlotte-Mecklenburg Police Department and

23  work to find drug dealers and to arrest them.

24           So the confidential informant had stayed in

25  communication with Mr. Ductan.  Along with the confidential

18

1   informant was an undercover Officer Stephen Whitesell who you
2   will also hear from today.  And eventually around 7:40 that
3   evening, the undercover Stephen Whitesell, and the
4   confidential informant walked and joined Mr. Ductan over at
5   that rocking chair area at the Cracker Barrel.  They went in
6   and used the restroom very quickly.  And then Mr. Ductan
7   escorted them to the blue Ford Expedition that he had arrived
8   in, was parked in the Cracker Barrel parking lot.

9           At that place -- at that Ford Expedition, Mr. Ductan
10  got in the back seat on the passenger side.  The confidential
11  informant got into the back seat on the driver's side, and
12  Stephen Whitesell, the undercover officer stood in the doorway
13  where he could see what was going on.

14          At that time Mr. Ductan displayed a pound of
15  marijuana in a green backpack to both the confidential
16  informant and the undercover officer.  At that time this was
17  provided as a sample and it was time to go and get the money
18  and finish up the deal.

19          At that time the confidential informant and the
20  undercover officer walked away and there's a signal given to
21  have the arrest happen.

22          Now also in that blue Ford Expedition are the two
23  co-conspirators.  As the Judge mentioned, there are two other
24  co-conspirators not being tried in this case.  But you need to
25  know their names, Landis Richardson was in the driver's seat.

19

```
1   He was pulled out, as well, and he had a loaded handgun under
2   his left leg.
3         You should know also that Mark Lowery was in the
4   front seat during the time that that drug transaction
5   occurred.  He was pulled out and off of him came a set of
6   keys.  And that set of keys opened up a tan Chevrolet Tahoe
7   that contained the rest of the marijuana for that drug deal.
8   And you'll hear that there was about, just over 6 kilos of
9   marijuana found in that tan Chevy Tahoe later that day.
10        You'll hear also from Officer Melton of the
11  Charlotte-Mecklenburg Police Department.  He'll tell you that
12  just as the takedown was starting, he, from a back vantage
13  point behind the vehicle where it was parked from that blue
14  Ford Expedition, saw Mr. Phillip Ductan walk away from the
15  blue Ford Expedition into a grassy berm behind -- a median
16  behind the car and set down a firearm and tried to keep
17  walking.
18        You'll see that firearm.  You'll hear from Officer
19  Melton about arresting Mr. Ductan at that time.  And you'll
20  hear additional evidence.  But those are the key points that I
21  want to share with you now.
22        After you hear all the evidence and I'm going to ask
23  you to consider the indictment as the Judge has instructed
24  you.  And we're going to ask you to find him guilty of Count
25  One, which is a conspiracy to possess the marijuana with
```

DIRECT - WHITESELL

1  intent to distribute it, along with Landis Richardson and

2  along with Mr. Mark Lowery.  That conspiracy or that agreement

3  is what you consider in Count One.  We ask you to find him

4  guilty at the end of the evidence.

5       In Count Two we'll ask you to find him guilty of his

6  possession of the marijuana with the intent to distribute.

7       And lastly we'll ask that you find him guilty in

8  Count Three, and that is the count that alleges that he

9  possessed a firearm in furtherance of this drug trafficking

10 crime, that is the possession with intent to distribute that

11 marijuana.  Thank you for your attention today.

12      THE COURT:  Mr. Ductan, do you wish to make an

13 opening statement?

14      DEFENDANT DUCTAN:  No.

15      THE COURT:  Call your first witness.

16      MS. COMERFORD:  Your Honor, the government calls

17 Stephen Whitesell.

18           STEPHEN WHITESELL, GOVERNMENT WITNESS, SWORN

19                    DIRECT EXAMINATION

20 BY MS. COMERFORD:

21 Q    Good afternoon.

22 A    Good afternoon.

23 Q    If you'll please start by stating your name for Madam

24 Court Reporter.

25 A    Detective Stephen Whitesell with the

DIRECT - WHITESELL

1   Charlotte-Mecklenburg Police Department.

2   Q     And how long have you worked at the Charlotte-Mecklenburg

3   Police Department?

4   A     Twenty-two years.

5   Q     Any law enforcement experience prior to that?

6   A     No, ma'am.

7   Q     What is your current assignment in the

8   Charlotte-Mecklenburg Police Department?

9   A     I'm a division -- Patrol Division Detective down in South

10  Patrol Division.

11  Q     What was your assignment back on or about June 3rd of

12  2004?

13  A     I was a detective in the Vice Narcotics Division.

14  Q     How long had you been a detective with Vice and

15  Narcotics?

16  A     Just a couple months.

17  Q     Did you participate in the investigation against

18  Defendant Ductan that took place on June 3rd of 2004?

19  A     Yes, I did.

20  Q     What was your role during that investigation?

21  A     I was a undercover officer working plain clothes, had a

22  beard, earrings, I was portraying a person that was going to

23  be purchasing a large quantity of marijuana.

24  Q     When and where did your duties begin on June 3rd?

25  A     It was about 6:30 p.m. I was called to the West Service

DIRECT - WHITESELL

1  Center over on Wilkinson Boulevard to meet a confidential

2  informant by the name of Mandrell Dunn.  And arrangements had

3  been made for me to purchase 20 pounds of marijuana for

4  $12,000.

5  Q    Were you able to hear those conversations with

6  Mandrell -- between Mandrell Dunn and Phillip Ductan?

7  A    No, I wasn't.

8  Q    Were you able to hear any of the conversations up to the

9  meet up between Mandrell Dunn and Defendant Ductan?

10  A    Yes, there were two conversations that I heard over the

11  telephone.  It was Mandrell Dunn's telephone on speaker phone.

12  Q    And what were those calls regarding?

13  A    A subject named "Black" -- who was later identified as

14  Phillip Ductan -- told us at about 7:15 p.m. that he was about

15  18 miles away from the Cracker Barrel at I-85 and Billy

16  Graham -- Billy Graham Parkway here in Charlotte.  And that he

17  would -- he was gonna meet us there.

18  Q    The person that was referred to as "Black," who was he

19  later identified to be?

20  A    Phillip Ductan.

21  Q    Based on the information about his location, what steps

22  did you take?

23  A    I notified the takedown team that was already over at the

24  Cracker Barrel, that he was about 18 miles away, and we were

25  gonna start heading over towards the Cracker Barrel.

DIRECT - WHITESELL

1  Q    Were there other communications from the person known as
2  "Black" later identified as Phillip Ductan that day, before
3  the meet up?
4  A    Yes, he said on the phone that he was in the same kind of
5  car that I was in, only blue.  I was in a gray Ford Explorer.
6  Q    The person known as "Black" who you later identified as
7  Phillip Ductan, is he here in the courtroom right now?
8  A    Yes, he is.
9  Q    Could you identify him for the jury?
10 A    He's the gentleman seated over here at the defense table
11 with the orange jumpsuit on.
12         MS. COMERFORD:  If the record could reflect, Your
13 Honor, that the witness has identified the defendant.
14         THE COURT:  It will.
15 Q    Regarding that last communication from Phillip Ductan,
16 what steps did you take?
17 A    I started -- I called the takedown team.  I called
18 Detective Bowles who was the case agent.  Let them know
19 that -- be looking for a blue Ford Explorer and that we were
20 on our way up to the Cracker Barrel.
21 Q    When you arrived at the Cracker Barrel, what was going on
22 there?
23 A    When we arrived, we backed into a parking spot up near
24 the road -- up near what's now called Scott Futrell, but it
25 was I-85 Service Road at the time -- and Mandrell Dunn began

DIRECT - WHITESELL

1  looking for the defendant he knew as "Black".  Once he saw
2  him, he said he saw him in a rocking chair, and so Mandrell
3  Dunn said he was gonna get out of the car.  I got out of the
4  car and followed him.  We went up on the porch and the
5  defendant was in a rocking chair, had a black T-shirt on and
6  some blue jeans and we greeted each other, I was introduced.
7  Q    And what happened next?
8  A    Well, it been awhile since the briefing, and me and the
9  informant had to use the restroom, so we went inside the
10 Cracker Barrel.  While we were in the bathroom we saw a guy
11 with dreadlocks that was later identified as Mark Lowery who
12 was with the defendant.  We didn't know it at the time.  Then
13 we walked back outside, sit down in rocking chairs.  We spoke
14 about seeing the marijuana, and the defendant told us to come
15 on with him.  So we got up and walked over to a blue Ford
16 Expedition.
17 Q    Who is we?
18 A    Me, Mandrell Dunn and the defendant.
19 Q    When you arrived at the blue Expedition, can you explain
20 how it appeared to the jury and where you all positioned
21 yourselves?
22 A    It was directly out to the right from the front porch.
23 So we walked along the front porch directly to the Ford
24 Expedition, it was backed in.  There was a black male seated
25 in the driver's seat later identified as Landis Richardson.

DIRECT - WHITESELL

1  The light-skinned black male with the dreadlocks was seated in
2  the right front passenger seat, that was the guy I saw in the
3  bathroom.  And Phillip Ductan the defendant, got in on the
4  back right side.  He got in the back right side, he motioned
5  for us to get in on the driver's side in the back seat.
6  Mandrell Dunn opened the door -- actually I opened the door,
7  Mandrell Dunn put his knee on the seat.  I was standing
8  outside the vehicle and was watching what was going on inside.
9  Q    What did you observe happen inside?
10 A    I saw Phillip Ductan pull out a green backpack and pull
11 out a -- it was about a pound of marijuana, it was in a
12 vacuumed sealed baggie, and hand it to Mandrell Dunn.
13 Mandrell Dunn handed it back to me for me to look at, and I
14 said that looks pretty good.  And he handed it back to Phillip
15 Ductan.  I said, let's look at the money.  And I gave the
16 signal for everybody to come in.
17 Q    Is that when the defendants were arrested?
18 A    Yes, ma'am.
19 Q    Detective Whitesell, I'll show you, if you'll look on
20 your screen -- and that is adjustable if there's any type of
21 glare -- what's been marked previously for identification
22 purposes as Government's Exhibit No. 23.
23          THE COURT:  Twenty-three?
24          MS. COMERFORD:  Twenty-three.
25 Q    Do you recognize this?

DIRECT - WHITESELL                    26

1   A    Yes.

2   Q    What is it?

3   A    That's a picture of Phillip Ductan the day that we

4   arrested him, the day I did the drug deal with him.

5   Q    And is that a fair and accurate representation of how he

6   appeared on June 3rd of 2004?

7   A    Yes, ma'am.

8         MS. COMERFORD:  Your Honor, at this time we'd move

9   to admit and publish.

10        THE COURT:  Let it be admitted.  You may publish.

11        (Government's Exhibit No. 23 was received into

12   evidence and published.)

13  Q    Detective Whitesell, I'll show you next what's been

14  marked for identification purposes as Government's Exhibit No.

15  31.  Do you recognize it?

16  A    Yes, I do.

17  Q    What is it?

18  A    That's Landis Richardson that's seated in the driver's

19  seat of the Ford Expedition.

20  Q    Is this a fair and accurate representation of how he

21  appeared on June 3rd, 2004?

22  A    Yes, it is.

23        MS. COMERFORD:  Your Honor, I would move to admit

24  and publish.

25        THE COURT:  Thirty-one, you may.

- 141 -

DIRECT - WHITESELL                27

1      (Government's Exhibit No. 31 was received into
2  evidence and published.)
3  Q    And I'll show you next, Detective Whitesell, what's been
4  marked for identification purposes as Government's Exhibit 30,
5  3-0, do you recognize it?
6  A    Yes, I do.  That's defendant Mark Lowery that was in the
7  right front passenger seat of the Ford Expedition, the guy
8  that we had seen in the bathroom prior to the deal.
9  Q    Is this a fair and accurate depiction of how he appeared
10 on June 3rd of 2004?
11 A    Yes, it is.
12      MS. COMERFORD:  Your Honor, the Government would
13 move to admit and publish to the jury.
14      THE COURT:  You may.
15      (Government's Exhibit No. 30 was received into
16 evidence and published.)
17 Q    Detective Whitesell, I'll show you next what's been
18 marked as Government's Exhibit 1, Government's Exhibit 2, and
19 Government's Exhibit 3.  Do you recognize them?
20 A    Yes, I do.
21 Q    Showing you 1.  How do you recognize that?
22 A    Exhibit 1 is the Expedition they were all three in -- all
23 three defendants were in.
24 Q    Is this a fair and accurate depiction of how the blue
25 Expedition appeared on the day that the drug transaction

DIRECT - WHITESELL

1    occurred within it?

2    A    Yes, it is.

3    Q    Showing you Government's 2.  What is it?

4    A    That is the view that I had from outside of the vehicle,

5    I want to say on the driver's side, the left side, the back

6    door, the back passenger door.

7    Q    Is this a fair and accurate representation of how the

8    interior of the back seat appeared during the drug deal?

9    A    Yes, it is.

10   Q    And showing you 3, what is that?

11   A    That is that backpack that I described earlier, the green

12   backpack that contained the 1 pound of marijuana that was

13   shown to me and Mandrell Dunn by Phillip Ductan.

14   Q    Does this fairly depict how it appeared on that day?

15   A    Yes, it does.

16        MS. COMERFORD:  Your Honor, the Government would

17   move to admit and publish 1, 2 and 3 to the jury.

18        THE COURT:  You may.

19        (Government's Exhibit numbers 1, 2 & 3 were received

20   into evidence and published.)

21   Q    Detective Whitesell, was there an attempt to capture

22   video or audio of this particular transaction?

23   A    Yes, there was.  I was wearing an undercover body wire

24   and Detective J.J. Teague was in a platform -- surveillance

25   platform that was taking the -- observing the incident.

DIRECT - WHITESELL

1  Q    How well did that body wire record what happened out at
2  the car that day?
3  A    It was in and out.  The closer I was to J.J. the better
4  it recorded.  There were some spots where you couldn't hear
5  what was going on, but you could still see what was going on.
6  Q    Was there video captured of the event from the parking
7  lot vantage point?
8  A    Yes, there was.
9       MS. COMERFORD:  I'm going to show you -- if I may
10 approach, Your Honor?
11      THE COURT:  You may.
12 Q    Show you what's been marked as Government's Exhibit 4.
13 Do you recognize this?
14 A    Yes, I do.
15 Q    What is it?
16 A    That's the video that was taken that day.
17 Q    Have you had an opportunity to review it?
18 A    Yes, I have.  My initials are on the DVD showing that I
19 reviewed it yesterday.
20 Q    And was it a fair and accurate representation of -- in
21 what it showed, was it a fair and accurate representation of
22 what occurred on June 3rd of 2004 during your transaction with
23 Mr. Ductan?
24 A    Yes, ma'am, it is.
25 Q    Have you also had an opportunity, Detective Whitesell, to

DIRECT - WHITESELL

1  view what's been marked for identification purposes as

2  Government's Exhibit 4a and 4b, clips from this very video?

3  A    Yes, I have.

4  Q    Are they fair and accurate?

5  A    Yes, they are.

6         MS. COMERFORD:  Your Honor, at this time the

7  Government would move 4, 4a and 4b into evidence.

8         DEFENDANT DUCTAN:  Objection, Your Honor.  I haven't

9  had the opportunity to look at the video.

10        THE COURT:  Overruled.  Let it be admitted.

11        MS. COMERFORD:  Permission to publish.

12        THE COURT:  You may.

13        (Government's Exhibits No. 4, 4a and 4b were

14  received into evidence and published.)

15        (Video playing.)

16        (Video stopped.)

17  Q    Detective Whitesell, who are we seeing the back of here?

18  A    That's the back of my shirt and the back of my head

19  walking up in front of the Cracker Barrel.

20        MS. COMERFORD:  Thank you.  Hit play.

21        (Video playing.)

22        MS. COMERFORD:  If you'll pause again.

23        (Video stopped.)

24  Q    Who do we see captured in this still frame?

25  A    In this still frame you see Defendant Phillip Ductan

DIRECT - WHITESELL

1  who's wearing the black shirt with the gold chain around his

2  neck.  And the light-skinned black male in the blue shirt is

3  Mandrell Dunn the confidential informant.

4  Q    What happened after this greeting?

5  A    Mandrell Dunn and I went inside and used the restroom.

6  That's where we saw Mark Lowery.  And shortly thereafter we

7  came out and sit next to Phillip Ductan in the rocking chairs

8  next to the Cracker Barrel.

9  Q    If we could publish 4b for the jury.

10              (Video playing.)

11  Q    What's happening here, Detective Whitesell?

12  A    This is after we came out and we're sitting in the

13  rocking chairs, me and Mandrell Dunn, with Phillip Ductan.  We

14  asked to see the marijuana.  And now Phillip Ductan is leading

15  us over to the parked Ford Expedition where he showed us the 1

16  pound of marijuana.

17  Q    What are we seeing here in the back?

18  A    We're seeing me walk to the back left passenger door,

19  open it up.  I'm standing at the back of the -- by that door.

20  Mandrell Dunn just stuck his knee on the seat.  And Phillip

21  Ductan is now showing us the 1 pound of marijuana and telling

22  us that the rest is in the back of the truck.

23              (Video stopped.)

24  Q    Was it seconds after that, that the arrest occurred?

25  A    That's correct.  I gave the signal, took my hat off.

 1              DEFENDANT DUCTAN:  Objection, Your Honor.  That's

 2   hearsay.  There's no audio that that actually transpires.  So

 3   we never know exactly what actually --

 4              THE COURT:  Overruled.

 5              MS. COMERFORD:  Your Honor, nothing further for this

 6   witness.

 7              THE COURT:  Mr. Ductan, do you have any cross

 8   examination of this witness?

 9              DEFENDANT DUCTAN:  Well, unfortunately, Your Honor,

10   I wasn't able to have any of my documents here today.

11              THE COURT:  Do you have any cross examination of

12   this witness?

13              DEFENDANT DUCTAN:  Excuse me?

14              THE COURT:  Do you wish to cross examine this

15   witness?

16              DEFENDANT DUCTAN:  I would ask side counsel to cross

17   examine.

18              THE COURT:  Let's take a short break.  Members of

19   the jury, from time to time during a trial there's things that

20   come up that we need to resolve, and sometimes we can do it at

21   sidebar, sometimes we have to ask you to go back in the

22   deliberation room for a short period of time.  This is one of

23   those occasions if you go back to the deliberation room we'll

24   bring you back in as soon as we can.

25              (The jury was escorted from the courtroom at

33

1  2:42 p.m.)

2          THE COURT:  All right.  So Mr. Ductan, you have to

3  make a decision.  He's in or he's out -- either as side --

4          DEFENDANT DUCTAN:  He should -- sorry.  I didn't

5  mean to speak over --

6          THE COURT:  No.  You either have to say Mr. Lee is

7  your attorney representing you or he's just side counsel.

8          DEFENDANT DUCTAN:  One of the major issues, sir --

9          THE COURT:  No.  Listen.  Mr. Ductan --

10          DEFENDANT DUCTAN:  I don't have any notes here.  I

11  don't have anything.  I mean, I could have put something

12  together, you know, at the cell, but I don't have anything.

13          THE COURT:  There's a time and place for that.

14          Right now you have to decide whether Mr. Lee is

15  going to represent you in this trial or just be side counsel.

16  You have to make that decision and you can't go back and

17  forth, and so --

18          DEFENDANT DUCTAN:  I would just like to --

19          THE COURT:  I'm not here to talk to you about

20  anything else; that decision.  You need to let me know if you

21  want him representing you, or you want to represent yourself.

22          DEFENDANT DUCTAN:  Just wanted the Courtesy to be

23  able to represent myself --

24          THE COURT:  No, we're not talking about courtesy.

25  We're not talking about anything else.  It's that decision and

34

1   that decision only.  You need to make it now and live with it.

2   We're not going to go back and forth.

3           (Pause.)

4           THE COURT:  So what is your decision, Mr. Ductan?

5           DEFENDANT DUCTAN:  (Mumbling.)

6           THE COURT:  I couldn't hear what you just said.

7           DEFENDANT DUCTAN:  It's an unfair trial going on

8   right --

9           THE COURT:  Right.  I know you think that.  But the

10  decision you have to make is whether you want Mr. Lee to

11  represent you or not.  What is your answer to that?

12          DEFENDANT DUCTAN:  (Conferring with Mr. Lee.)

13          THE COURT:  Mr. Ductan?

14          DEFENDANT DUCTAN:  (No answer.)

15          THE COURT:  Sir.

16          DEFENDANT DUCTAN:  Yeah.

17          THE COURT:  Do you want Mr. Lee to represent you or

18  not?

19          DEFENDANT DUCTAN:  I would like to be able to have

20  private counsel, I just --

21          THE COURT:  All right.  Call the jury.

22          (The jury was returned to the courtroom at

23  2:45 p.m.)

24          THE COURT:  Mr. Ductan, do you wish to cross examine

25  this witness?

DIRECT - DUNN

1    DEFENDANT DUCTAN:  No, sir.

2    THE COURT:  You may step down.

3    Call your next witness.

4    MR. WASHINGTON:  Your Honor, the United States calls

5   Mandrell Dunn.

6    MANDRELL DUNN, GOVERNMENT'S WITNESS, SWORN

7    DIRECT EXAMINATION

8   BY MR. WASHINGTON:

9   Q    Good afternoon.

10   A    Good afternoon.

11   Q    Sir, could you please state your full name for the

12   record?

13   A    Mandrell.

14   Q    And could you spell your last name for the Court

15   reporter?

16   A    D-u-n-n.

17   Q    How old are you?

18   A    Thirty-six.

19   Q    And what city do you live in?

20   A    Charlotte, North Carolina.

21   Q    How long have you lived in Charlotte?

22   A    Twenty years.

23   Q    Sir, are you employed?

24   A    Yes.

25   Q    What kind of work do you do?

1   A    I do dispatch for Agero (phonetic spelling) Motor Club.

2   Q    Is there a time in your life when you were involved with

3   selling drugs?

4   A    Yes.

5   Q    Were you also involved in using drugs?

6   A    Yes.

7   Q    What types of drugs were you selling?

8   A    Cocaine and marijuana.

9   Q    What types of drugs were you using?

10  A    Marijuana.

11  Q    During what time period were you using drugs?

12  A    From '92 to 2000.

13  Q    Okay.  What time period were you selling drugs?

14  A    From '93 to 2003.

15  Q    Now, were you convicted in the State of North Carolina in

16  1998 for selling drugs?

17  A    Yes.

18  Q    And were you convicted again in federal court in 2003 --

19  A    Yes.

20  Q    -- for being in a drug conspiracy?

21  A    Yes.

22  Q    Did you plead guilty on either of those occasions?

23  A    Yes.

24  Q    Both?

25  A    Yes.

37

DIRECT - DUNN

1    Q    Now in 2003 when you were convicted in federal court,

2    that was for conspiracy to sell cocaine?

3    A    Yes.

4    Q    Is that right?

5         Did you enter into a plea agreement with the United

6    States?

7    A    Yes.

8    Q    I'm going to show you what we've marked as Government's

9    Exhibit 24.  It's going to come up on the screen in front of

10   you.  Okay.  Can we go to the last page.

11        Is that your signature --

12   A    Yes.

13   Q    -- on page 8, where it says "Mandrell"?

14   A    Yes.

15   Q    And what is this document?

16   A    My plea agreement.

17   Q    This is an agreement that you entered into with the

18   United States when you pled guilty?

19   A    Yes.

20   Q    And you recognize your signature on it?

21   A    Yes.

22             MR. WASHINGTON:  Your Honor, we move to admit

23   Government's Exhibit 24.

24             THE COURT:  Let it be admitted.

25             (Government's Exhibit No. 24 was received into

- 152 -

DIRECT - DUNN                    38

```
 1   evidence and published.)
 2              MR. WASHINGTON:  Move to publish at this time.
 3              THE COURT:  You may.
 4   Q    Now, was part of that agreement a requirement that you
 5   assist the United States?
 6   A    Yes.
 7   Q    And in what way were you supposed to assist the United
 8   States?
 9   A    Assist the United States by finding people that was still
10   selling drugs.
11   Q    Did you do that?
12   A    Yes.
13   Q    I'd like to direct your attention back to April of 2004.
14   Did there come a time when you met an individual known to you
15   as "Black"?
16   A    Yes.
17   Q    How did you meet Black?
18   A    I met him at a mutual friend's house in Atlanta -- not
19   Atlanta -- Georgia -- Dawsonville, Georgia.
20   Q    Okay.  And did you have discussions with him at that
21   time?
22   A    No.
23   Q    Okay.
24   A    Just exchanged numbers.
25   Q    Okay.  Did you speak with him afterwards?
```

- 153 -

DIRECT - DUNN

```
1    A    Yes.

2    Q    How did you speak with him, in person or over the phone?

3    A    Over the phone.

4    Q    What did you talk about?

5    A    We just talked about dogs a little bit, and then he asked

6    me if I could move some marijuana.

7    Q    Did he ask you if you sold --

8    A    Yes.

9    Q    -- sold drugs?

10   A    Um-hmm.

11   Q    And what did you tell him?

12   A    Yes.

13   Q    So when he offered to sell you some marijuana, what did

14   you tell him?

15   A    I told him I could move it, distribute it, sell it.

16   Q    What did you do with that information?

17   A    I informed undercover agent I was working with.

18   Q    Do you remember his name?

19   A    Officer Grimsly (phonetic spelling).

20   Q    Okay.  And were you really planning to buy that marijuana

21   for yourself and sell it?

22   A    No.

23   Q    Did he give you a price?

24   A    Yes.

25   Q    What was the price?
```

1   A   Five fifty.

2   Q   What's that?

3   A   Five Hundred Fifty Dollars per pound.

4   Q   How many pounds did you discuss buying from him?

5   A   Fifty to 100.

6   Q   So did you agree to buy it from him for that price?

7   A   Yes.

8   Q   Did you make plans to actually meet and conduct the deal?

9   A   Yes.

10  Q   Where was that deal going to take place?

11  A   Going to take place off Billy Graham Highway in

12  Charlotte, North Carolina off 85, Cracker Barrel Restaurant.

13  Q   How many times do you think you talked with him about

14  this marijuana deal before you actually met with him?

15  A   Between four and five times.

16  Q   Did the amount ever change from 50 to 100 kilos to

17  anything else?

18  A   Yeah, right before he was supposed to bring it, it

19  changed to 20.

20  Q   It changed to 20 -- what changed to 20?

21  A   The amount changed to 20 pounds of marijuana.

22  Q   Okay.  That's how much he was gonna bring?

23  A   Um-hmm.

24  Q   Did he tell you how he would be bringing it to Charlotte?

25  A   He just said he was gonna drive it up.

DIRECT - DUNN

1   Q    Okay.  Let's talk a little bit about June 3rd, 2004 when
2   this deal actually happened.  Did you have phone conversations
3   with him on that day?
4   A    Yes.
5   Q    What did you talk about?
6   A    On the day we discussed what time he was gonna arrive in
7   Charlotte, and what meeting spot.
8   Q    Did he tell you what kind of car he was gonna be in?
9   A    He said he would be in like an SUV.
10  Q    Did he tell you if he was gonna be with anybody else?
11  A    He said he might have one person.
12  Q    Did you relay that information to the police detectives?
13  A    Yes.
14  Q    Do you remember what time of day this happened?
15  A    Afternoon.
16  Q    And did he ever call during the day for any reason?
17  A    He just said he was on his way.
18  Q    Did he ever tell you where he was or how far away or
19  anything like that?
20  A    Called me and said he was like 30 minutes away, at one
21  point.
22  Q    So did there come a time that day when you actually saw
23  him at the Cracker Barrel?
24  A    Yes.
25  Q    Tell me what happened.

DIRECT - DUNN

1   A    We pulled up at the Cracker Barrel, he was already there.
2   We went in, used the bath --
3   Q    Hold on.  Was he with anybody when you first saw him?
4   A    No.
5   Q    Okay.  Go on.
6   A    So we pulled up at the Cracker Barrel.  We seen him
7   already there, sitting down.
8   Q    Who is "we," you and who?
9   A    Me and Officer -- was it Whitesell?
10  Q    Okay.
11  A    So we proceeded to talk to him for a second, then we went
12  and used the bathroom.  Then we walked back out and proceeded
13  to talk to Black again, and asked him to show us the
14  marijuana, so we proceeded to his SUV.  That's when I got in
15  and he showed me a little bag, a pound of marijuana.  And
16  after that he said, okay, and I said, we was gonna go get the
17  money to do the transaction.
18  Q    When he showed you the marijuana, were you inside the
19  car?
20  A    Yes.
21  Q    You were inside?
22  A    Um-hmm.
23  Q    Where was Whitesell?
24  A    On the outside of the door.
25  Q    Okay.  So did you actually see the bag --

1   A    Yes.

2   Q    -- of marijuana?

3        Now that wasn't 20 kilos in that bag, was it?

4   A    No, it was one pound.

5   Q    Did you ask him about the rest of it?

6   A    I just -- I thought it was in the back, so I just

7   informed him that I was going to get the money.

8   Q    Okay.  And is that when you -- you kind of climbed out?

9   A    Yes, that's when we walked away.

10  Q    Okay.  Now, are you able to recognize the person you saw

11  back in 2004 as "Black" here today?

12  A    No, I really can't recognize him.

13  Q    Okay.  I would like to show you what's been marked as

14  Government's Exhibit 23.  Does that look familiar?

15  A    Yes.

16  Q    Who is that?

17  A    That's the individual named "Black" we did the deal with.

18  Q    Okay.  And let me show you Exhibit 4c.  Do you recognize

19  anybody in 4c?

20  A    Yes.  That's me and the individual.

21  Q    What are you wearing?

22  A    Blue sweatshirt.

23  Q    Okay.  What's Black wearing?

24  A    Black shirt, gold chain.

25  Q    Okay.

DIRECT - DUNN

1      MR. WASHINGTON:  Your Honor, we would move to admit
2   Government's Exhibit 4c.
3      THE COURT:  Let it be admitted.
4      (Government's Exhibit No. 4c was received into
5   evidence and published.)
6   Q   Let me show you Government's Exhibit 3.  Do you recognize
7   that?
8   A   Yes, that's the bag it was in.
9   Q   The bag that what was in?
10  A   The pound of marijuana.
11  Q   Okay.  Now, you testified in a related matter back in
12  2005; is that right?
13  A   Yes.
14  Q   And 2006?
15  A   Yes.
16  Q   And as a result of your testifying at those related
17  matters, the sentence that you were facing was reduced, wasn't
18  it?
19  A   Yeah.
20  Q   Now you're not facing any federal charges now, are you?
21  A   No.
22  Q   And you're here because we served you with a subpoena to
23  come in here?
24  A   Yeah, I'm here because I had to come.
25  Q   That's right.  So there's no benefit left for you to

DIRECT - MELTON

1  receive at this point?

2  A    No.

3        MR. WASHINGTON:  No further questions.

4        THE COURT:  Mr. Ductan, any cross examination of

5  this witness?

6        DEFENDANT DUCTAN:  (Conferring with Mr. Lee.)

7        No further questions, Your Honor.

8        THE COURT:  No questions?

9        DEFENDANT DUCTAN:  No.

10        THE COURT:  You may step down.

11        Call your next witness.

12        MR. WASHINGTON:  Your Honor, the United States calls

13  Robert Melton.

14        MS. COMERFORD:  Your Honor, may we release Mr. Dunn

15  at this time?

16        THE COURT:  Do you have him under subpoena?

17        MR. WASHINGTON:  Yes.

18        THE COURT:  Any objection to him being released?

19        DEFENDANT DUCTAN:  (Shaking head.)

20        THE COURT:  He may be released.

21        MS. COMERFORD:  Thank you, Your Honor.

22        ROBERT T. MELTON, GOVERNMENT WITNESS, SWORN

23                    DIRECT EXAMINATION

24  BY MR. WASHINGTON:

25  Q    Sir, could you please state your full name for the

DIRECT - MELTON

1  record?

2  A    R.T. Melton.

3  Q    And where are you employed?

4  A    Charlotte-Mecklenburg Police Department.

5  Q    How long have you worked for the Charlotte-Mecklenburg

6  Police Department?

7  A    Twenty-three years.

8  Q    What's your current assignment?

9  A    Patrol Division Independence.

10 Q    Now I'm directing your attention back to June 3rd of

11 2004.  Were you working for Charlotte-Mecklenburg Police

12 Department at that time?

13 A    Yes, sir I was.

14 Q    And in what capacity?

15 A    June 3rd of what year again, sir?

16 Q    2004.

17 A    I was working Vice and Narcotics Division.

18 Q    All right.  Did you participate in an investigation on

19 June 3rd, 2004 involving Defendant Ductan at the Cracker

20 Barrel?

21 A    Yes, sir I did.

22 Q    And what was your role on that day?

23 A    I was perimeter surveillance.

24 Q    So were you able to actually observe the transactions

25 that were going on?

DIRECT - MELTON

1   A    Not the actual transaction, no, sir.

2   Q    Okay.  So what involvement, if any, did you have in the

3   investigation on that day?

4   A    I was the perimeter, like I say, surveillance.  I was on

5   the side of -- on the parking lot of the gas station.  Mainly

6   just for surveillance and security as the transaction took

7   place.

8   Q    Okay.  I'm gonna show you what's been marked for

9   identification as Government's Exhibit 5a.  Do you see that in

10  front of you, sir?

11  A    Yes, I do.

12  Q    And do you recognize what's depicted there?

13  A    Yes, sir.  The Cracker Barrel and the gas station there.

14  Q    Okay.  And does that appear to be a fair and accurate

15  representation of those areas?

16  A    Yes, sir it does.

17  Q    As you know them to appear?

18           MR. WASHINGTON:  All right.  I'd move the admission

19  of Government Exhibit 5a.

20           THE COURT:  Let it be admitted.

21           MR. WASHINGTON:  May we publish?

22           THE COURT:  You may.

23           (Government's Exhibit No. 5a was received into

24  evidence and published.)

25  Q    Okay.  Can you -- using this screen -- and now, if you

DIRECT - MELTON

1   touch it, it will make a mark on there.  Can you show roughly

2   where you were?

3   A    (Indicating.)  Approximately in that area of the PVA of

4   the parking area.

5   Q    Okay.  So there's a little red mark right near the gas

6   station.

7   A    Make it a little bit bigger.

8   Q    Okay.  Can you touch and show approximately where any

9   vehicles involved with this incident were?

10  A    (Indicating.)  Approximately in that position.

11  Q    Okay.  Now did there come a time when you went from the

12  gas station over to where the incident was occurring?

13  A    Yes, sir I did.

14  Q    Can you describe for the jury where you went and what

15  happened?

16  A    I was in an unmarked vehicle in the gas station parking

17  lot.  As the takedown team went towards the vehicle where I

18  noted there in the trees and the bushes there, I proceeded

19  kind of diagonally toward that location.  I don't know if you

20  can -- to the backside of that grassy area where the bushes

21  are.

22  Q    So you just put a new dot there.  Is that where you

23  proceeded to?

24  A    Sort of in that vicinity, yes, sir.

25  Q    Okay.  Then what happened?

49

DIRECT - MELTON

1  A    From that -- I exited my vehicle.  I observed a black

2  male towards the passenger side of a blue vehicle come out

3  from the bushes there.

4  Q    What if anything did he do after he came out of the

5  bushes?

6  A    At that point the male that I saw come from the passenger

7  side of that vehicle, kind of stoop down and he placed a

8  weapon on the grass area there, and kind of proceeded on.  At

9  that point is when I placed him on the ground in that grassy

10 area where the -- it's kind of underneath the trees.

11 Q    Okay.  So did you actually apprehend him at that point?

12 A    Yes, sir I did.

13 Q    And did you place him on the ground?

14 A    Placed him on the ground.  Placed him in handcuffs.  Then

15 escorted him back to a marked police unit.

16 Q    Okay.  Did you see what he had placed on the ground?

17 A    Yes, sir.  It was a weapon.

18 Q    Okay.  Can I show the witness Government's Exhibit 6?

19 Does that look familiar to you?

20 A    Yes, sir it does.

21 Q    How does it look familiar to you?

22 A    It's the chrome weapon that I saw.  That's what stood out

23 more than anything was, it was a nickel chrome plated weapon.

24 It was in the holster, what I saw him place on the ground as I

25 saw him exit from that side of the vehicle.

DIRECT - MELTON                          50

1          MR. WASHINGTON:  I'm sorry.  We move to admit
2    Government's Exhibit 6.
3          THE COURT:  Let it be admitted.
4          MR. WASHINGTON:  Can we publish?
5          THE COURT:  You may.
6          (Government's Exhibit No. 6 was received into
7    evidence and published.)
8    Q    Now there also appears to be a SUV near that firearm.
9    Does that look familiar to you?
10   A    Yes, sir it does.
11   Q    How so?
12   A    The vehicle where I saw the black male on the passenger
13   side as I came up, as the takedown team was kind of
14   simultaneously.  But he came from that side of the vehicle.
15   Q    Okay.  Which vehicle are you talking about, the one where
16   you can see --
17   A    (Indicating.)
18   Q    Okay.  There you go.  Thank you.
19   A    It's the vehicle with the hood up, with the dark colored
20   with the red spot on it.
21   Q    Okay.  The hood wasn't up at the time, was it?
22   A    No, sir it was not.
23   Q    Okay.  Now I'd like to show you Government's Exhibit 7.
24   Does that look familiar?
25   A    Yes, sir it does.

1   Q    How so?

2   A    It's the same weapon that I saw the subject place on the

3   ground with the holster.

4        MR. WASHINGTON:  Okay.  Move to admit Government's

5   Exhibit 7.

6        THE COURT:  Let it be admitted.

7        MR. WASHINGTON:  Move to publish.

8        THE COURT:  You may.

9        (Government's Exhibit No. 7 was received into

10   evidence and published.)

11   Q    Now did you actually recover those items, take them into

12   custody?

13   A    No, sir, I did not.

14   Q    Do you know who did?

15   A    Once I placed handcuffs on the subject, at that time I

16   informed Officer Bowles or Detective Bowles of the weapon that

17   I had located, and kind of left that for her to take into

18   possession as evidence.

19   Q    Okay.  Now, are you able to recognize the defendant from

20   June 3rd, 2004 in the courtroom today?

21   A    Looks a little different from back in 2008.

22   Q    Let me just -- so what's your answer?

23   A    That's the defendant that I took in custody on that date.

24   Q    So you recognize him in court?

25   A    He's different, but the facial features are there.

1  Q    What's different about him?

2  A    His hair, the long beard, and that wasn't like that when

3  I arrested him on that date and time.

4  Q    Okay.  I'd like to show you Government's Exhibit 23.  How

5  about that?  Does that look familiar?

6  A    Yes, sir.

7  Q    Does that look like the individual you saw that day?

8  A    That's the subject I took into custody.

9  Q    Is that the person set down that gun?

10 A    Yes, sir.

11      MR. WASHINGTON:  Thank you.  No further questions.

12      THE COURT:  Any cross?

13      DEFENDANT DUCTAN:  I would have cross examination,

14 but again, I don't have any notes here with me, unfortunately.

15      THE COURT:  All right.  You may step down and be

16 excused.

17      Call your next witness.

18      THE WITNESS:  Thank you, sir.

19      DEFENDANT DUCTAN:  (Mumbling.)

20      MS. COMERFORD:  May we excuse Officer Melton?

21      THE COURT:  Any objection?

22      DEFENDANT DUCTAN:  (No response.)

23      THE COURT:  You may be excused.

24      THE WITNESS:  Thank you, sir.

25      MS. COMERFORD:  May we also excuse Detective

DIRECT - BLEE                                    53

1   Whitesell?  I failed to ask.

2              THE COURT:  Yes.

3              MS. COMERFORD:  Thank you, Your Honor.

4              We would next call Detective Shawn Blee.

5          SHAWN BLEE, GOVERNMENT WITNESS, SWORN

6                  DIRECT EXAMINATION

7   BY MS. COMERFORD:

8   Q    Good afternoon.

9   A    Good afternoon.

10  Q    If you'll please state your name for Madam Court Reporter

11  and the jury.

12  A    My name is Shawn Blee.  Last name spelling B-L-E-E.

13  Q    Where do you work?

14  A    I'm an officer with the Charlotte-Mecklenburg Police

15  Department.

16  Q    How long have you worked with the Charlotte-Mecklenburg

17  Police Department?

18  A    I was hired December 1998.  I'm currently about 14 years

19  along.

20  Q    Any prior law enforcement or military experience apart

21  from your service at CMPD?

22  A    Yeah.  Prior to being hired with Charlotte-Mecklenburg

23  Police Department, I spent four years in the United States Air

24  Force, and my job was as security police.  I spent two years

25  in Turkey, and the rest of the time in Belgium.  Excuse me.

DIRECT - BLEE

1   Q    What is your current assigned with CMPD?

2   A    I currently work on a surveillance unit.  It's a priority

3   offender strategy team which deals with undercover

4   surveillance techniques.

5   Q    What was your assignment back on or about June 3rd of

6   2004?

7   A    Back in 2004 I was part of a Street Drug Interdiction

8   Unit.  That interdiction unit was a mostly community based

9   drug unit where we fielded a lot of complaints from the

10  community.  And those complaints were given to us through our

11  supervisor.  And most of the complaints that we got was about

12  the -- just neighborhood sales of drugs, as well as we would

13  work informants where informants would purchase drugs for us.

14  And we would do a lot of the search warrants when it comes to

15  buying drugs and then doing search warrants to seize those

16  drugs.

17  Q    What role did you play in the investigation that involved

18  the drug sale by Phillip Ductan?

19  A    On that date I was a driver of a raid van.  And what a

20  raid van is, is a van that has a predetermined number of

21  officers in that van.  And that van normally is around in case

22  you go ahead and arrest an individual after an undercover

23  officer gives you that alert to come in and arrest him.  The

24  van would drive up, the officers exit that van and take that

25  person into custody.

DIRECT - BLEE

1   Q     On June 3rd, 2004 did you get such a signal from

2   undercover Officer Whitesell?

3   A     I can.  I was the driver of that van.  There was a

4   listening device in that van.  Detective Whitesell gave us the

5   word to come in.  And at that point I was parked on I-85

6   service road behind a hotel near the Cracker Barrel.  He was

7   meeting in the Cracker Barrel parking lot.  And at that point

8   I drove the undercover van from the hotel, which is in the --

9   right next to the Cracker Barrel and I-85, and from there I

10  drove to the Cracker Barrel parking lot.

11  Q     There in the parking lot what action did you take?

12  A     At that point my job was to make sure the guys got out of

13  the van.  I was also included in the arrest team.  I briefly

14  pulled past the Expedition.  It was a blue Expedition that was

15  parked in the Cracker Barrel parking lot.  It was actually

16  backed into a parking spot.  I drove past the truck and exited

17  the driver's side door of the raid van along with the other

18  officers that were inside the van.  I immediately went to the

19  driver's side of that truck, which was occupied by a black

20  male who I later -- was identified as a Landis Richardson.

21  Q     Let me stop you there.  Can I show you what's been marked

22  as Government's Exhibit No. 31.  Once it comes up on your

23  screen, if you have any glare, that's moveable.

24        Do you recognize this photo?

25  A     Excuse me.  I'm sorry.

- 170 -

DIRECT - BLEE

1   Q    Do you recognize this photo?

2   A    I do.

3   Q    Who is the person depicted?

4   A    The person in this picture was the driver of the

5   Expedition that was parked in the Cracker Barrel parking lot.

6   He was seated in the driver's seat of that vehicle.

7   Q    Is this a fair and accurate depiction of how he looked on

8   that day when you found him in the driver's seat?

9   A    It is.

10          MS. COMERFORD:  Your Honor, move to admit and

11  publish.

12          THE COURT:  It's already been admitted and

13  published.

14          MS. COMERFORD:  Thank you, Your Honor.

15  Q    When you encountered this gentleman in the driver's seat,

16  what steps did you take?

17  A    I approached Mr. Richardson in the driver's seat.  I was

18  armed and I gave him the verbal commands to put his hands in

19  the air.  This is done for officer safety reasons.  Normally

20  when you're talking about doing, you know, an operation

21  involving drugs --

22          THE COURT:  All right.  Stop.  Listen to the

23  question.  Answer the question.  And then listen to the next

24  question.

25  Q    (Ms. Comerford) What exactly happened when you arrived at

DIRECT - BLEE

1  the driver's door and encountered Mr. Richardson?

2  A    I gave him commands to place his hands in the air.  At

3  that point Detective Bowles came over and assisted me and

4  unlocked the door.  And at that point I was pulling

5  Mr. Richardson out of the car.  As I was pulling him out of

6  the car, I observed a gun under his left leg, between his leg

7  and the seat.  At that point I yelled "gun," to alert the

8  other officers that were involved in the takedown of the

9  vehicle, that I observed the gun in the car.  Got him out of

10  the car on the ground and in handcuffs, and Detective Bowles

11  was assisting me at that point.

12  Q    I'm going to show you what's been marked for

13  identification purposes as Government's Exhibit 8.  Do you

14  recognize this photo?

15  A    I do.

16  Q    What are we seeing here?

17  A    This is the blue Ford Expedition SUV that was the vehicle

18  parked in the Cracker Barrel parking lot.

19  Q    Does this fairly depict how it appeared on June 3rd,

20  2004?

21  A    Yes, ma'am.

22        MS. COMERFORD:  Your Honor, permission to admit and

23  publish Government's Exhibit 8.

24        THE COURT:  Let it be admitted.  You may publish.

25        (Government's Exhibit No. 8 was received into

1   evidence and published.)

2   Q    Is this the vantage point you had as you stood facing

3   Mr. Richardson?

4   A    That's correct.

5   Q    I'll show you next what's been marked for identification

6   purposes as Government's Exhibit 9.  Do you recognize that?

7   A    Yes.  That is the driver's side of the Blue Ford

8   Expedition.  That is the area Mr. Landis Richardson occupied

9   in the seat.  And the gun is the gun that was located under

10  his leg -- between his leg and the seat as I was pulling him

11  out of the car.

12  Q    Is this a fair and accurate representation of how the

13  front seat appeared before you moved the gun but after

14  Mr. Richardson was taken out of the vehicle?

15  A    Yes, ma'am.

16          MS. COMERFORD:  Your Honor, we would move to admit

17  Government's Exhibit 9.  Permission to publish.

18          THE COURT:  Let it be admitted.  You may publish.

19          (Government's Exhibit No. 9 was received into

20  evidence and published.)

21  Q    And I'll show you next what's been marked for

22  identification purposes as Government's Exhibit 10.  Do you

23  recognize that?

24  A    Yes.  That's the same driver's seat and the handgun on

25  that driver's seat where Mr. Landis Richardson was removed

DIRECT - BLEE                                   59

1   from.

2   Q    Is this a fair and accurate depiction of how the handgun

3   was found before it was moved?  How it was photographed?

4   A    It is.

5   Q    Permission to --

6            MS. COMERFORD:  Your Honor, we would move to admit

7   permission to publish.

8            THE COURT:  Let it be admitted.  You may publish.

9            (Government's Exhibit No. 10 was received into

10  evidence and published.)

11  Q    Did you seize this weapon?

12  A    I did not.

13  Q    Did your arrest of Mr. Richardson end your involvement

14  with the investigation?

15  A    I'm sorry?

16  Q    Did your arrest of Mr. Richardson end your direct

17  involvement with this investigation?

18  A    It did.  Yes, ma'am.

19           MS. COMERFORD:  Nothing further at this time, Your

20  Honor.

21           THE COURT:  Mr. Ductan, any cross?

22           DEFENDANT DUCTAN:  Again, I don't have any notes

23  with me, but I would like to, in the future, definitely.

24           THE COURT:  You may step down.

25           Call your next witness.

DIRECT - SELL

1    THE WITNESS:  Thank you, Your Honor.

2    MS. COMERFORD:  Permission to excuse this witness,

3  Your Honor?

4    THE COURT:  You may be excused.

5    THE WITNESS:  Thank you, Your Honor.

6    MR. WASHINGTON:  United States calls Luke Sell.

7    LUKE SELL, GOVERNMENT WITNESS, SWORN

8    DIRECT EXAMINATION

9  BY MR. WASHINGTON:

10  Q    Good afternoon, sir.

11  A    Hi.

12  Q    Would you please state your full name for the record?

13  A    Luke G. Sell.

14  Q    Where are you employed?

15  A    Charlotte-Mecklenburg Police Department.

16  Q    What do you do at the Charlotte-Mecklenburg Police

17  Department?

18  A    Currently I am a sergeant with the gang unit.

19  Q    And how long have you worked for CMPD?

20  A    Approximately 17 years.

21  Q    Now I'd like to direct your attention back to June 3rd of

22  2004.  Were you working for CMPD at that time?

23  A    I was.

24  Q    And what assignment did you have at that time?

25  A    I was working for, at the time what we called the "Street

1  Drug Interdiction Team" in the Westover and Freedom Divisions.

2  Q    Okay.  Now did you participate in an investigation at the

3  Cracker Barrel in Charlotte on June 3rd, 2004?

4  A    I did.

5  Q    And what was your role during that investigation?

6  A    Our unit was assigned to participate in the takedown or

7  the assistance of the arrest of any individuals that should we

8  need to arrest or should an emergency arise, that we come in

9  and we help do the takedown arrest or scene security.

10 Q    Were you in a position where you had eyes on the

11 transactions that were going on?

12 A    No, sir.  We were -- we were about -- probably about a

13 half a block away in distance.  We were behind a hotel sitting

14 in a van.

15 Q    All right.  So did there come a time when you had some

16 active involvement?

17 A    There was.

18 Q    Would you tell the jury what happened?

19 A    We got the takedown signal and we were told to come in

20 and takedown the car and do the arrest.  I went to the

21 passenger, front seat passenger side of the car and removed

22 the passenger from the vehicle and placed him in handcuffs.

23 Q    Okay.  Now you said you removed the passenger.  What

24 happened after you did that?

25 A    Once I had made -- put him in handcuffs.  We searched him

DIRECT - SELL

1  for any weapons or any contraband that he may have in his

2  pockets or on his person.

3  Q    And did you find anything?

4  A    We found a cellphone and a set of keys with a remote

5  similar to what most of us have on our cars.

6  Q    I'd like to show you what's marked for identification as

7  Government's Exhibit 30.  Do you recognize Government's

8  Exhibit 30?

9  A    Yes, I do.

10  Q    What is it?

11  A    I recognize him as the gentleman we arrested that day,

12  Mark Lowery.

13  Q    Okay.  Now, what did do you -- what if anything did you

14  do with the items that you removed from Mr. Lowery?

15  A    I informed Detective Bowles what we had found and gave

16  her the key fob or the key remote and the cellphone.

17  Q    Did you guys do anything with those items, either of

18  those items?

19  A    We did.  We had one of our vehicles out there.  I drove

20  the vehicle, Detective Bowles was in the passenger seat, and

21  we rode through several parking lots in the area pushing the

22  remote.

23  Q    What were you pushing the remote for?

24  A    An attempt to find the vehicle or another vehicle that

25  might be involved in the activity that we had the keys, but we

1  didn't have a vehicle.  So we were in an attempt to look for a
2  vehicle.
3  Q    Were you successful?
4  A    We were.
5  Q    What happened?
6  A    We drove around to the backside of the Red Roof Inn at
7  Billy Graham on the 85 side, and as we got into the back
8  corner, near the back corner of the parking lot, Detective
9  Bowles hit the remote and the lights turned on inside the
10 vehicle.
11 Q    Okay.  What type of vehicle was it?
12 A    It was a tan SUV.
13 Q    All right.  What happened after that?
14 A    We began to search the vehicle.  Detective Bowles opened
15 up the vehicle and smelled -- I smelled what was a really,
16 really strong smell of marijuana and we --
17 Q    Now at this time in your career had you smelled marijuana
18 before?
19 A    I had.
20 Q    Was it a smell of burning marijuana?
21 A    No, it's a different smell from a burning marijuana.
22 It's a -- it's a raw smell, or a green, what we call a "green
23 smell."  A green smell of marijuana.
24 Q    So did you smell that?
25 A    I did.

DIRECT - SELL

1   Q    At that car?

2   A    I did.

3   Q    Okay.  And it smelled the way that you had smelled

4   marijuana before?

5   A    Yes, sir.

6   Q    All right.  So what happened at that point?

7   A    I began to search the front seat area and Detective

8   Bowles was covering the back, back seat area.

9   Q    Okay.  Did you find anything?  Did you find the source of

10  that smell?

11  A    We did.  I looked in the back seat.  And under a blanket

12  was a large amount of marijuana.

13  Q    Okay.  Did you recover those items?

14  A    We did.

15  Q    I would like to show you what's marked as Government's

16  Exhibit 5b.  Do you recognize what is depicted in 5b?

17  A    I do.

18  Q    What is depicted there?

19  A    This was the area that we were working that day where the

20  takedown occurred as well as where we located the vehicle.

21  Q    Okay.  And does it fairly and accurately depict that

22  scene as it appeared on that day?

23  A    It does.

24       MR. WASHINGTON:  I would move admission of

25  Government's Exhibit 5b.

- 179 -

DIRECT - SELL

1    THE COURT:  Let it be admitted.

2    MR. WASHINGTON:  And would move to publish, Your

3    Honor.

4    THE COURT:  You may.

5    (Government's Exhibit No. 5b was received into

6    evidence and published.)

7    Q    Okay.  So can you show us, if you're able, approximately

8    where the takedown took place?

9    A    The takedown, if you see what's labeled the "gas

10   station," then you see what's labeled the "Cracker Barrel."

11   There's a line of trees that splits those two parking lots.

12   And right in that area there's a white car on one side and on

13   the opposite side closest to the Cracker Barrel and those

14   trees was right in that general area.

15   Q    Okay.  And can you show us approximately where the

16   vehicle that you later located was?

17   A    Yeah.  If you look at what's labeled the "Red Roof Inn."

18   Q    Now if you put your finger on there it will actually make

19   a little dot like a John Madden thing.

20   A    Okay.  Approximately right -- right in there.

21   Q    Okay.  And that was a tan Tahoe?

22   A    Yes, sir.

23   Q    Okay.  It was right about where you put that red dot?

24   A    Yes.  Right in that area.  Maybe a couple places to the

25   left or to the right.

DIRECT - SELL

1   Q    But roughly in that area?

2   A    Yes, sir.

3   Q    Okay.  Let me show you what's been marked as Government's

4   Exhibit 11 for identification.

5        Do you recognize that?

6   A    Yes.

7   Q    What is it?

8   A    Appears to be the vehicle that we got out with that

9   evening.

10  Q    Okay.

11  A    Or afternoon.

12           MR. WASHINGTON:  Move to admit Government's Exhibit

13  11.

14           THE COURT:  Let it be admitted.

15           MR. WASHINGTON:  Publish?

16           THE COURT:  You may.

17           (Government's Exhibit No. 11 was received into

18  evidence and published.)

19  Q    Next I'll show you Government's Exhibit 12 for

20  identification.  Does that look familiar to you?

21  A    It does.

22  Q    What does it appear to be?

23  A    The drugs that were in the back seat of the vehicle.

24  Q    Okay.  And do you remember these items laid out there

25  like that that night?

CROSS - SELL

```
1   A    Yes, sir.

2   Q    Okay.

3          MR. WASHINGTON:  Move to admit Government's Exhibit

4   12.

5          THE COURT:  Let it be admitted.

6          MR. WASHINGTON:  May we publish, Your Honor?

7          THE COURT:  You may.

8          (Government's Exhibit No. 12 was received into

9   evidence and published.)

10         MR. WASHINGTON:  I have no further questions.  Thank

11  you very much.

12         THE COURT:  Mr. Ductan, any cross?

13         DEFENDANT DUCTAN:  Yes.

14                    CROSS EXAMINATION

15  BY DEFENDANT DUCTAN:

16  Q    Excuse me.  Could you state your name for me?

17  A    Luke Sell.

18  Q    Lucas Sell.  You said when the ram team came out you

19  apprehended the suspect.  What was the suspect's name again?

20  A    The gentleman that I removed from the vehicle was a Mark

21  Lowery.

22  Q    And you said you removed a set of keys from Mr. Lowery?

23  A    I did.

24  Q    Upon you and Officer Bowles' surveillance of the area,

25  you guys were able to locate the vehicle; is that correct?
```

CROSS - SELL

1   A    That's correct.

2   Q    Upon going in the vehicle you stated that you were able

3   to smell a pungent smell of marijuana, correct?

4   A    I smelled a strong odor of marijuana, yes, sir.

5   Q    Okay.  And when you guys were in the vehicle, obviously

6   you located a bag that had marijuana in there, correct?

7   A    There was marijuana located, yes, sir.

8   Q    Okay.  Did you guys find anything else in the vehicle?

9   A    I believe there was a gun found and some miscellaneous

10  paperwork.

11  Q    Paperwork?

12  A    Yes, sir.

13  Q    Oh okay.  What type of paperwork, if you don't mind me

14  asking?

15  A    I don't recall all of the paperwork.  But there was

16  paperwork with Mark Lowery's name on it.

17  Q    Oh, okay.  Mark Lowery.  Okay.  So in your determination,

18  that would indicate that that vehicle belonged to Mr. Lowery,

19  correct?

20  A    I couldn't make an assumption about the ownership of the

21  vehicle.  But -- I'm not sure who owned the vehicle.  But

22  there was paperwork that I found with Mark Lowery's name on

23  it.

24  Q    But did you find Mr. Lowery's name on the paperwork,

25  correct?

CROSS - SELL

1    A    Yes, sir.

2    Q    Did you guys make a determination to find out exactly who

3    owned the vehicle?

4    A    I did not, sir.  I'm sure that was -- that was done, but

5    I don't have that information.

6    Q    Did that ever come back to you?  Did you guys ever figure

7    out who that vehicle actually belonged to?

8    A    I'm sure it did.  And I don't recall what the vehicle

9    came back to or who the vehicle came back to.  But I'm sure

10   there was an attempt made.

11   Q    That's strange you would find paperwork with Mr. Lowery's

12   name, but you guys didn't determine who the vehicle actually

13   belonged to; is that what you're saying?

14   A    Can you --

15   Q    I'm saying, you guys looked inside the vehicle.  You

16   found paperwork that had Mr. Lowery's name.  Do you recall

17   what type of paperwork it was?

18   A    I don't recall.  I just -- according to my notes it was

19   just miscellaneous paperwork with Mr. Lowery's name on it.

20   Q    Mr. Lowery's name on it.  Okay.  Then upon the marijuana

21   that was found in there, Exhibit 12, did you all do any

22   fingerprint analysis of the bags, individual bags?

23   A    I'm not aware of anything that was done.  This

24   unfortunately or fortunately was -- fortunately or

25   unfortunately was not my case.  I was assisting with the

DIRECT - BOWELS

1  takedown.  So I'm -- I don't know if it was done or not, sir.

2  Q    Okay.  Ms. Bowles never came back to you and told you

3  that you guys determined who that vehicle actually belonged

4  to?

5  A    I wasn't the officer in charge of the case.

6             DEFENDANT DUCTAN:  No further questions.

7             THE COURT:  Any redirect?

8             MR. WASHINGTON:  No, Your Honor.

9             THE COURT:  You may step down.

10             Any objection to this witness being excused?

11             DEFENDANT DUCTAN:  That's all for right now.

12             THE COURT:  You may step down be excused.

13             Call your next witness.

14             MS. COMERFORD:  Thank you, Your Honor.  The

15  Government calls Cathy Bowles.

16             CATHERINE BOWLES, GOVERNMENT WITNESS, SWORN

17                   DIRECT EXAMINATION

18  BY MS. COMERFORD:

19  Q    Good afternoon.

20  A    Hi.

21  Q    If you will please state your full name for Madam Court

22  Reporter.

23  A    I'm Catherine Bowles, and I'm employed with the

24  Charlotte-Mecklenburg Police Department, currently assigned to

25  the DEA Task Force, which is the Drug Enforcement

DIRECT - BOWELS

1  Administration Task Force.

2  Q    And Detective Bowles, what was your assignment on June

3  3rd of 2004?

4  A    I was assigned to the Drug Enforcement Administration

5  Task Force at that time.

6  Q    In your role with the DEA, did you participate in an

7  investigation at the Cracker Barrel?

8  A    Yes, I did.

9  Q    What was your assignment within that investigation?

10  A    I was the case agent of that investigation.  And --

11  Q    If you could tell the jury what being the case agent

12  means, generally?

13  A    Generally, as the case agent, you direct other officers

14  and give them positions as where they're supposed to be, and

15  also give them guidance as far as what is supposed to take

16  place.

17  Q    Tell the jury what your duties were, particularly on June

18  3rd of 2004.

19  A    On June 3rd we had received information that a black male

20  would be coming to Charlotte, North Carolina with

21  approximately 20 pounds of marijuana.

22       We also received information that that location where he

23  was supposed to be was the Cracker Barrel on I-85 Service Road

24  near Billy Graham Parkway.

25       So we set -- I gave -- conducted a briefing with the

DIRECT - BOWELS

1  officers giving them their assignments and informing them of
2  the information that we had and where the transaction was
3  supposed to take place.
4  Q    Eventually did you start to make your way to the Cracker
5  Barrel area?
6  A    Yes, I did.  Originally I was in another vehicle with
7  Sergeant Voorhees, another officer that was at the scene.  And
8  we started out at Sam Wilson and I-85, anticipating that the
9  suspect would be coming from Georgia to North Carolina.  We
10 positioned ourselves in an area to observe the vehicle come
11 into Charlotte, North Carolina.
12 Q    What information did you have at that point about what
13 the, if you will, "suspect vehicle" looked like?
14 A    We had received information from the undercover officer
15 that he would possibly be in a blue SUV, an Explorer.
16 Q    What did you observe there on the roadway near the
17 Cracker Barrel?
18 A    Once -- once we moved from Sam Wilson and I-85 back
19 towards the Cracker Barrel, Sergeant Voorhees and I were
20 stopped at a red light.  At that time I noticed a blue SUV
21 behind us, and looked back and observed that it was an
22 Expedition.  At that time Sergeant Voorhees and I paid
23 particular attention to it because my experience is that
24 people get Explorers and Expeditions mixed up when they're
25 describing them.

DIRECT - BOWELS

1   Q    Now that your attention is turned to this blue
2   Expedition, what did you observe?
3   A    At that time I observed the blue Expedition park beside a
4   tan SUV, and I could see that the driver of the SUV -- the tan
5   SUV was leaning in a way as if he were talking to the
6   occupants of the blue Expedition, and their windows were down.
7   It was a warm day.
8   Q    What do you remember about the appearance of the
9   occupants of the blue Expedition?
10  A    The blue Expedition contained two occupants.  They were
11  both black males with short haircuts.
12  Q    What do you remember about any occupants in the tan SUV?
13  A    The occupant of the tan SUV was a black male with long
14  dreads who was later identified as Mark Lowery.
15  Q    I'm going to show you what's already been admitted into
16  evidence as Government's Exhibit 30.  Do you recognize this as
17  the person who you saw driving the tan SUV?
18  A    Yes, I do.  This is Mark Lowery.
19  Q    After you observed the occupants of this tan and blue
20  vehicle interacting, what did you see next?
21  A    The light turned green.  And so Sergeant Voorhees and I
22  kind of stayed back to allow the vehicles to pass us so that
23  we could possibly see the registration displayed on the
24  vehicles.
25       At that time both vehicles passed us and made a left turn

DIRECT - BOWELS

1   away from the Cracker Barrel.  It was observed that there was
2   an out of state tag on the blue Expedition at that time, but
3   wasn't -- I was unable to determine what out of state tag it
4   was.
5   Q    What was your next step in the investigation?
6   A    My next step was to set up as perimeter surveillance and
7   wait for the arrest signal to be given, which is what Sergeant
8   Voorhees and I did.  Once we received information that the
9   arrest signal had been given, we went to the Cracker Barrel to
10  assist the arrest team.
11  Q    Can you describe for the members of the jury what your
12  role was in that arrest or takedown phase of the
13  investigation?
14  A    Yes.  Generally as the case agent you try to stay back
15  and not involve yourself in the arrests.  But on that day the
16  arrest team was in a vehicle, and they passed the suspect
17  vehicle as they were getting to the scene.  So Sergeant
18  Voorhees and I exited the vehicle that we were in and started
19  to go towards the suspect vehicle.
20  Q    What part of that suspect vehicle did you approach?
21  A    I approached the driver's side which contained Landis
22  Richardson.  Upon my arrival at the driver's side, Officer
23  Blee was there and I assisted him with escorting Landis
24  Richardson out of the driver's side.  Upon doing that we
25  observed -- myself, Officer Blee, and I observed a handgun

DIRECT - BOWELS

1   under Landis Richardson's left leg.

2   Q    And let's just be clear.  Would you describe what suspect

3   vehicle we're talking about now?

4   A    Yes.  That's the blue Expedition.

5   Q    You indicated lastly that you observed a firearm under

6   the leg of Mr. Richardson.  What was your next step in the

7   investigation?

8   A    Yes.  That -- I assisted Officer Melton with Phillip

9   Ductan, the defendant.  And I collected a gun from there, in

10  addition to the gun that was found under Landis Richardson's

11  leg.

12  Q    And what else did you do at the scene of the blue

13  Expedition?

14  A    Okay.  I collected all the evidence that was there, which

15  included the book bag and the pound of marijuana that was

16  shown to the undercover and the confidential informant.

17  Collected all the guns, and also took the keys and the

18  cellphone from Officer Sell, who got those off Mark Lowery.

19  Q    What did you do with those keys that were recovered off

20  Mark Lowery?

21  A    Once I realized that there was only a pound of marijuana

22  in the blue Expedition, I knew that we were expecting

23  20 pounds of marijuana to arrive.

24       Once I noticed that there was only a pound of marijuana

25  there, and the keys that Mark Lowery had, I remembered that

DIRECT - BOWELS

1  there was a secondary vehicle that we had seen earlier in the

2  day.

3      So Officer Sell and I took those keys to try and locate

4  that Tahoe or that tan SUV that I had seen earlier in the day.

5  And so we drove around to the surrounding areas, and we went

6  across from where the Cracker Barrel was to the Red Roof Inn

7  and located that tan SUV.

8  Q    What was in the tan SUV?

9  A    We later determined approximately 18 pounds of marijuana,

10  another firearm, and several cellphone chargers and

11  miscellaneous documents from the vehicle.

12      MS. COMERFORD:  Your Honor, may I approach the

13  witness?

14      THE COURT:  You may.

15      DEFENDANT DUCTAN:  Excuse me, Your Honor.  Could I

16  take a look at that?

17      THE COURT:  They'll bring it over to you, yes.

18      MS. COMERFORD:  (Handing exhibit to the defendant.)

19      DEFENDANT DUCTAN:  (Defendant inspecting exhibit.)

20      THE COURT:  Ms. Comerford, for the record, if you

21  would show what exhibits you are showing to Mr. Ductan.

22      MS. COMERFORD:  Yes, Your Honor, and I apologize.  I

23  accidentally handed him 15c instead of 15b.  So I'm now

24  showing him 15b.  And inside 15b, should be 15c.  I believe we

25  have something mislabeled over there.  I'll fix that.

DIRECT - BOWELS

1    THE COURT:  Mr. Ductan, if you would keep 15b and c

2   on the table while you examine it.

3    DEFENDANT DUCTAN:  Nothing in it.

4    THE COURT:  All right.  She's just going to show it

5   to you.

6    MS. COMERFORD:  Permission to approach?

7    THE COURT:  You may.

8   Q    Detective Bowles, I'm handing you what has previously

9   been marked as Government's Exhibit 15d.  And I believe we

10  lost our exhibit stickers, so I'm marking for identification

11  purposes what was just removed as the contents by Mr. Ductan

12  of 15d, and we will mark that as 15c.

13       Do you recognize that?

14  A    Yes.  I recognize this as the book bag that was in the

15  blue Expedition.  It contained the 1 pound of marijuana.

16  Q    And is it in the same or substantially same condition as

17  when you retrieved it from the blue Expedition?

18  A    Yes, it is.

19       MS. COMERFORD:  Permission to publish, Your Honor.

20       THE COURT:  All right.

21       MS. COMERFORD:  We move to admit and permission to

22  publish.

23       THE COURT:  You may.  Let it be admitted.

24       (Government's Exhibits No. 15c and 15d were received

25  into evidence and published.)

DIRECT - BOWELS

1    MS. COMERFORD:  Do you want to capture on the ELMO
2  with the exhibit sticker or are we good?
3    COURT CLERK:  We can do it all later.
4    MS. COMERFORD:   Thank you.
5  Q   Where did this -- where was this backpack seized from?
6  A   It was seized from the blue Expedition in the back seat
7  area.
8  Q   And was there something inside that backpack when you
9  seized it?
10  A   Yes, the pound of marijuana was inside that backpack.
11    MS. COMERFORD:  May I approach?
12    THE COURT:  You may.  Just show the exhibit, then
13  approach with it.
14    MS. COMERFORD:  Your Honor, I am approaching with
15  15e.
16    THE COURT:  E as in --
17    MS. COMERFORD:  B as in boy.
18    THE COURT:  B.
19  Q   As well as I'll hand you what's been marked for
20  identification purposes as 15b, do you recognize that.
21  A   Yes, ma'am, I do.
22  Q   What is it?
23  A   This is the marijuana that was contained inside that book
24  bag.
25  Q   And what is in the packaging?

DIRECT - BOWELS

1  A    It is the marijuana.

2  Q    And has that been marked for identification purposes?

3  A    Yes, it is.

4  Q    As 15a?

5  A    Yes, ma'am.

6  Q    And just to be clear, where was this marijuana seized

7  from?

8  A    It was seized from the blue Expedition inside that book

9  bag.

10  Q    Is this in the same or substantially same condition as

11  when you seized it?

12  A    It's been a little altered because it has been analyzed

13  by the lab, and it's also been reviewed for trial purpose.

14  Q    How can you tell that's the marijuana that came out of

15  the book bag?

16  A    Because it contains the original packaging that I

17  packaged it in.  And I recognize it because it has my writing

18  on it.  And it also has the contents that were originally

19  placed in the package.

20        MS. COMERFORD:  Your Honor, move to admit 15a,

21  permission to publish.

22        THE COURT:  Let it be admitted.  You may publish.

23        (Government's Exhibit No. 15a was received into

24  evidence and published.)

25  Q    Detective Bowles, if I could redirect your attention to

DIRECT - BOWELS

1   the gun that was found on the ground outside the blue

2   Expedition.

3   A    Yes, ma'am.

4   Q    I'm gonna show you what's been marked and previously

5   admitted as Government's Exhibit 6.  Do you recognize that

6   photograph?

7   A    Yes, ma'am, I do.

8   Q    What is it?

9   A    That's the gun that was put down on the ground by Phillip

10  Ductan.

11          MS. COMERFORD:  Permission to approach, Your Honor.

12          THE COURT:  You may.

13  Q    Did you seize that firearm?

14  A    Yes, I did.

15          THE COURT:  Why don't you display it on the ELMO if

16  you wish to display it before presenting it to the witness?

17          Can you adjust the ELMO?

18          MS. COMERFORD:  Permission to proceed, Your Honor?

19          THE COURT:  You may.

20  Q    Detective Bowles --

21          THE COURT:  You can approach the witness.  I just

22  wanted it to be displayed by ELMO.

23          MS. COMERFORD:  Thank you.

24          THE COURT:  If you're going to exhibit any weapon,

25  let's make sure, Mr. Richardson (sic), that it's rendered

DIRECT - BOWELS                              81

1  safe.

2          MS. COMERFORD:  And Your Honor, I believe all

3  weapons have been rendered safe prior to --

4          THE COURT:  We'll double check.

5          COURT SECURITY OFFICER:  (Checking weapon.)

6  Q    Detective Bowles, I'll hand you what's been marked for

7  identification purposes as 14a, 14b, and 14c.

8          Do you recognize this?

9  A    Yes, ma'am I do.

10 Q    And what is it?

11 A    This is the firearm that was placed on the ground by

12 Phillip Ductan.  And this was the holster that it was

13 contained in.  And these are the -- this is the ammunition

14 that was contained in the weapon.

15 Q    I'm handing you also what's been marked as 14d.  Do you

16 recognize that?

17 A    Yes, ma'am I do.

18 Q    What is it?

19 A    This is the packaging that I placed the evidence into

20 when I put it into a secured facility.

21 Q    How are you able to tell the jury that this is the same

22 gun that was left on the ground by Phillip Ductan?

23 A    Because this bag contains my writing on it, and it also

24 has the listed contents of what was in the bag.  And I seized

25 the gun from the scene.

1      MS. COMERFORD:  Thank you.

2          Your Honor, we would move to admit Government's

3  Exhibit 14a, b and c.  Permission to publish.

4      THE COURT:  Let it be admitted.  You may publish.

5          (Government's Exhibits No. 14a, 14b and 14c were

6  received into evidence and published.)

7      MS. COMERFORD:  Would you prefer I publish by ELMO?

8      THE COURT:  You can either parade it or publish by

9  ELMO, whichever is your preference.

10         (The exhibits were published to the jury.)

11  Q   Was anything else seized from Phillip Ductan on the day

12  of the arrest?

13  A   Yes, there were cellphones that were seized from Phillip

14  Ductan.

15  Q   And did you store those cellphones after they were

16  seized?

17  A   Yes, they were stored in a secured facility.

18         MS. COMERFORD:  Permission to approach, Your Honor?

19         THE COURT:  You may.

20         MS. COMERFORD:  (Displaying exhibit to the

21  defendant.)

22  Q   Handing you what's been marked for identification

23  purposes as 34a, do you recognize this envelope?

24  A   Yes, I do.  It's got my writing on it and also states the

25  contents of the -- of what's inside the package.

DIRECT - BOWELS

1   Q    And what are the contents?

2   A    It contains the original packaging for the cellphone and

3   the cellphone that was taken from Phillip Ductan.

4   Q    And has that been marked as Government's Exhibit 34?

5   A    Yes, it is.

6        MS. COMERFORD:  Your Honor, we would move to admit

7   Government's Exhibit 34 at this time; permission to publish.

8        THE COURT:  Let it be admitted.  You may publish.

9        (Government's Exhibit No. 34 was received into

10  evidence and published.)

11  Q    Detective Bowles, I'm going to take you back inside the

12  blue SUV now and show you what's been marked and already

13  admitted as Government's 9.  Do you recognize that photograph?

14  A    There it is.  Okay.  Yes, I do recognize it.

15  Q    Could you remind the jury what we're looking at here?

16  A    Yes.  This is the front seat of the blue Expedition, and

17  that's the gun that was located under Landis Richardson's leg.

18  Q    Did you seize that gun?

19  A    Yes, I did.

20       MS. COMERFORD:  May I approach the witness, Your

21  Honor.

22       THE COURT:  You may.

23       Mr. Johnson, same thing.  If you would make sure the

24  exhibit is safe.

25       COURT SECURITY OFFICER:  (Checking weapon.)

1    MS. COMERFORD:  Permission to approach the witness,
2  Your Honor?
3    THE COURT:  Let's get it centered a little bit.
4    MS. COMERFORD:  (Complies.)
5    THE COURT:  You may approach.
6  Q    Detective Bowles, I approach you with 16c, which moments
7  ago contained 16a, 16b and 16d.  Do you recognize this?
8  A    Yes, ma'am I do.  And I recognize it because it was
9  originally placed in the envelope that I packaged it in to
10  secure it to put it in our secured facility.
11  Q    And is this the gun that was found under Mr. Richardson's
12  leg in the driver's seat of the blue Expedition?
13  A    Yes, it is.
14    MS. COMERFORD:  Move to admit and publish, Your
15  Honor.
16    THE COURT:  You may.
17    (Government's Exhibits No. 16a, 16b, 16c and 16d
18  were received into evidence and published.)
19  Q    You seized the gun that Phillip Ductan set down, and you
20  seized the gun that was inside the blue Expedition.  What was
21  the condition of these guns when you seized them?
22  A    They both were loaded, and they were both -- had the
23  ammunition inside of them, were operational.
24  Q    I want to show you what's been already admitted, I'll
25  show also to the jury, 5b, the aerial map of the Cracker

85

DIRECT - BOWELS

1  Barrel and Red Roof Inn that Detective Self showed us earlier.

2      Was it in the parking lot of the Red Roof Inn that you

3  discovered the tan Chevy?

4  A    Yes, that is correct.

5  Q    And I'm going to show you what's been previously admitted

6  as Government's 11, also for the jury.  Is this the tan Chevy

7  that you've been describing?

8  A    Yes, that's the Chevy.

9  Q    And among the evidence located in the tan Chevrolet

10 Tahoe, does that include a birth certificate with Mark

11 Lowery's name on it?

12 A    It did.

13          MS. COMERFORD:  May I approach the witness?

14          THE COURT:  You may.

15          MS. COMERFORD:  (Displaying exhibit to the

16 defendant.)

17 Q    Detective Bowles, I'll show you what's been marked as

18 Government's 13.  Do you recognize this?

19 A    Yes, I do.

20 Q    What is Government's Exhibit 13?

21 A    It's the birth certificate that was located inside the

22 Chevy Tahoe, and it contains Mark Lowery's name on it.

23 Q    Were there other documents located along with this?

24 A    Yes, there were.

25 Q    Do you know the exact nature of those documents?

86

DIRECT - BOWELS

1   A    It was just miscellaneous documents that were located in

2   the glove compartment of the Chevy Tahoe.

3   Q    Who did they pertain to, if you know?

4   A    Mark Lowery.

5            MS. COMERFORD:  Your Honor, move to admit

6   Government's 13, permission to publish.

7            THE COURT:  Government's 13.  Let it be admitted.

8   You may publish.

9            (Government's Exhibit No. 13 was received into

10  evidence and published.)

11  Q    Detective Bowles, I'll show you next what has -- can the

12  jury see that?

13           THE JURY:  (Affirmatively indicating.)

14           MS. COMERFORD:  For the record we're publishing

15  Government's Exhibit 13 now.

16  Q    And moving along, Detective Bowles, I'll show you what's

17  been previously admitted so we'll also show the jury

18  Government's 12.  Do you recognize this?

19  A    It hasn't popped up yet.

20  Q    And now?

21  A    Yes, I do recognize that.

22  Q    What is it?

23  A    That is the marijuana and the gun that was found in the

24  Chevy Tahoe -- in the back of the Chevy Tahoe.

25  Q    Did you seize this marijuana?

DIRECT - BOWELS

1   A    I did.

2        MS. COMERFORD:  Permission for the witness to step

3   down to the worktable, Your Honor.

4        THE COURT:  She may.

5        MS. COMERFORD:  And we'll meet at the table.

6   Q    Detective Bowles, we've set on the table what's been

7   marked for identification purposes as Government's 17s, this

8   envelope.  Do you recognize it?

9   A    Yes, ma'am, I do.

10  Q    What is it?

11  A    This is the bag that contains the marijuana that was

12  taken from the back of the Tahoe.

13  Q    And if you could remove the contents.

14  A    (Witness complies.)

15       MS. COMERFORD:  And for the record I'll note that

16  you've removed 17b, 17a, 17f, 17d, as in dog, 17q, 17r, 17j,

17  17k, as in kilo, 17i as in India, 17h as in hotel, 17m as in

18  man, 17l as in Lima, 17p as in prince, 17e as in echo, 17n as

19  in Nancy, 17o as in Oscar, 17g as in garage, 17r as in Romeo,

20  and we had a loose exhibit sticker within the bag, that was

21  17c as in Charlie.  So I'm marking the last bag as 17r.  There

22  was already a 17r.

23       How many bags in total?

24  A    There should be 18 bags in total.

25  Q    Could you count them for the jury?

DIRECT - BOWELS

1    A    Yes.  One, two, three, four, five, six, seven, eight,

2    nine, ten, eleven, twelve, thirteen, fourteen, fifteen,

3    sixteen, seventeen, eighteen.

4         MS. COMERFORD:  Thank you.  If you'll return to the

5    witness stand.

6         THE WITNESS:  (Complies.)

7    Q    Detective Bowles, did you count 18 bags when you

8    originally seized the evidence?

9    A    Yes, I did.

10   Q    You indicated these were not the original bags that it

11   was in; is that correct?

12   A    That is correct.  They are not.

13   Q    Describe how you found the 18 bags of marijuana for the

14   jury, please?

15   A    I originally -- when I found the 18 bags, they were in a

16   black garbage bag.  And they were also in, like, gallon-sized

17   bags when they were originally seized from the Tahoe.

18   Q    Where in the Tahoe was it located?

19   A    It was in the back of the Tahoe.

20   Q    And what else was seized from the Tahoe at that time?

21   A    There was a Gold's Gym bag that was seized from the Tahoe

22   which contained a pair of shoes, a gun, and two cellphone

23   chargers.

24        MS. COMERFORD:  And Your Honor, there will be one

25   additional witness that will deal with this evidence.  I'm

DIRECT - BOWELS

1   happy to leave it there or remove it from the courtroom.

2            THE COURT:  Do you have anymore questions of this

3   witness?

4            MS. COMERFORD:  I do have more questions of this

5   witness, Your Honor, not as it pertains to the marijuana.

6            THE COURT:  All right.

7   Q    You indicated that there was a gym bag.  Did you seize

8   that?

9   A    Yes, I did.

10           MS. COMERFORD:  If I may approach the witness?

11           THE COURT:  You may.

12           MS. COMERFORD:  Showing Mr. Ductan what's been

13   marked for exhibit as Government Exhibit 35.

14   Q    And Detective, I'll hand you what's been marked as

15   Government's Exhibit 35.  Do you recognize it?

16   A    Yes, I do.  This is the Gold's Gym bag that I took from

17   the back of the Chevy Tahoe.

18   Q    How do you know that's the Gold's Gym bag you took from

19   the tan Chevy Tahoe?

20   A    Because it's marked with a labeling that has my writing,

21   and it also describes the contents.

22           MS. COMERFORD:  Move to admit; permission to

23   publish.

24           THE COURT:  You may.  Let it be admitted.  You may

25   publish.

DIRECT - BOWELS

1      (Government's Exhibit No. 35 was received into
2  evidence and published.)
3          MS. COMERFORD:  Your Honor, I apologize.  Permission
4  to re-approach.
5          THE COURT:  You may.
6  Q    What else was found in this bag?
7  A    There were a pair of shoes and two cellphone chargers.
8  Q    And one of those cellphone chargers was significant to
9  the investigation; is that correct?
10 A    That is correct.
11 Q    Is that located still in the bag?
12 A    Yes, it is.
13 Q    And could you remove that please?
14 A    Yes.
15 Q    I'm showing you what's been marked as Government's
16 Exhibit 33.  What is it?
17 A    This is a cellphone charger that was located in the gym
18 bag.
19          MS. COMERFORD:  Your Honor, at this time we'd move
20 Government's Exhibit 33 into evidence.  Permission to publish.
21          THE COURT:  Let it be admitted.  You may publish.
22          (Government's Exhibit No. 33 was received into
23 evidence and published.)
24 Q    Detective Bowles, you indicated this black bag was
25 located in the tan Chevy Tahoe.

DIRECT - BOWELS

1  A    Yes, ma'am.

2  Q    And the phone charger inside was somehow significant to

3  the investigation; is that correct?

4  A    That is correct.

5  Q    Could you explain why to the jury?

6  A    Yes.  One of the cellphone chargers that was located in

7  the bag was linked up with Phillip Ductan's cellphone that we

8  collected from his person, and it charged and worked with that

9  cellphone.

10 Q    How many cellphones were seized in the course of this

11 investigation?

12 A    There were three cellphones that were seized.

13 Q    Did you try this power cord with all of the cellphones

14 seized?

15 A    Yes, I did, and it only worked on Phillip Ductan's phone.

16 Q    And if we could return to photograph 12, already

17 admitted, and show to all.

18      Is there a firearm in the background there, Detective

19 Bowles?

20 A    Yes, ma'am there is.

21 Q    I'll show you next what has been marked for

22 identification purposes as Government's 19.  Do you recognize

23 Government's 19?

24 A    Yes, I do.

25 Q    What is it?

DIRECT - BOWELS

1   A    That's the firearm that was located in the Gold's Gym
2   bag.
3   Q    And is this a fair and accurate representation of how it
4   appeared on the date that you seized it?
5   A    Yes.
6           MS. COMERFORD:  Move to admit.  Permission to
7   publish, Your Honor.
8           THE COURT:  Let it be admitted.  You may publish.
9           (Government's Exhibit No. 19 was received into
10  evidence and published.)
11          MS. COMERFORD:  And may I approach the witness?
12          THE COURT:  You may.
13          MS. COMERFORD:  Your Honor, for the record, I've set
14  on the ELMO what is a firearm marked 18a and 18b.  I'm not
15  sure if the Marshals want to secure this weapon as well.
16          THE COURT:  I'd like them to, yes.
17          Marshal, would you check and make sure the weapon is
18  secured?
19          MARSHAL:  (Complies.)  Yes, sir, your Honor.
20          THE COURT:  Thank you.
21          MS. COMERFORD:  Permission to approach?
22          THE COURT:  You may.
23  Q    Detective Bowles, I hand you what's been recently removed
24  from envelope marked 18c.  Do you recognize the contents which
25  are marked for identification purposes as 18a and 18b?

CROSS - BOWLES                               93

1   A    Yes, I do.

2   Q    What is this?

3   A    This is the envelope that contained the firearm that was

4   located in the back of the Tahoe.  This is the firearm and the

5   magazine that were located in the Gold's Gym bag in the back

6   of the Tahoe.

7            MS. COMERFORD:  Thank you.  Your Honor, the

8   government would move to admit 18a and b; permission to

9   publish.

10           THE COURT:  Let it be admitted.  You may publish.

11           (Government's Exhibits No. 18a and 18b were received

12   into evidence and published.)

13   Q    Detective Bowles, what condition was this gun found in?

14   A    It was -- it had the magazine in it, but it was not

15   loaded.

16           MS. COMERFORD:  Your Honor, if I could have just one

17   moment.

18   Q    Detective Bowles, the person who the Sprint cellphone was

19   seized off of, and who you know to have set down the Smith and

20   Wesson firearm you seized, is he here in the courtroom right

21   now?

22   A    Yes, ma'am, he is.

23   Q    Could you identify him for the jury?

24   A    Yes.  He's the black male that's sitting over at the

25   defendant's table with the orange jumpsuit on and the long

CROSS - BOWLES

1   beard.

2          MS. COMERFORD:  Your Honor, if the record would

3   reflect the witness has identified the defendant?

4          THE COURT:  It will.

5          MS. COMERFORD:  Nothing further at this time.

6          THE COURT:  Mr. Ductan, do you have any cross

7   examination?

8          DEFENDANT DUCTAN:  Yeah, just a few -- a few

9   questions.

10                    CROSS EXAMINATION

11  BY DEFENDANT DUCTAN:

12  Q    Ms. Bowles, you indicated prior in your statements

13  that -- upon you surveillancing (sic) the -- was that Dixie

14  Highway -- which highway was that?

15  A    Billy Graham.

16  Q    Billy Graham?  Sorry about that.  Billy Graham.  You

17  noticed there were two occupants in the blue SUV speaking with

18  a black male, a tan SUV, correct?

19  A    That's correct.

20  Q    Okay.  And later on that same individual who was in the

21  tan SUV turned out to be that Mr. Lowery, correct?

22  A    That's correct.

23  Q    All right.  And you also indicated after you and your --

24  and your workmate, actually, you guys were able to survey his

25  vehicle.  You found -- you located his vehicle and the

CROSS - BOWLES

1  contents that was in there you described, it's on the table
2  over here.  And you also stated that you found documentation
3  of this person's birth certificate; is that correct?
4  A    That's correct.
5  Q    Were you ever able to determine exactly who the vehicle
6  belonged to?
7  A    Yes, it did.  It was registered to Mark Lowery.
8  Q    Okay.  It was registered to Mark Lowery.  All right.  And
9  also after you secured the area, you alleged that you secured
10 the firearm off of the defendant, correct, a .38 -- was it a
11 .38 Smith and Wesson?
12 A    I'm sorry.  Could you repeat that?
13 Q    I said after you guys made the raid, correct?  You were
14 able to secure Mr. Landis -- excuse me -- Mr. Richardson,
15 secured Mr. Richardson, obtained the firearm from him?
16 A    Yes, sir.
17 Q    And then you were able to retrieve a firearm off of the
18 defendant, correct, .38 was that?
19 A    Off of the defendant which was you.
20 Q    Okay.  Actually, did you guys do any fingerprint analysis
21 on --
22 A    Yes, sir.
23 Q    -- the weapon?
24 A    We did.
25 Q    And what did you find?

CROSS - BOWLES

1   A    We did not get any fingerprint results.

2   Q    No fingerprint results.

3   A    Correct.

4   Q    But your officer testified that he saw the defendant take

5   the firearm and put it -- and place it on the ground?

6   A    Correct.

7   Q    That's -- and you guys -- your testimony is that you did

8   not find any fingerprints on that --

9   A    Yes, sir.

10  Q    -- particular gun?

11  A    That's correct.

12  Q    Let me also ask you.  After you took the suspects to the

13  interview room, what would be your assumption in terms of

14  interviewing Mr. Lowery?  Did you do -- you conduct an

15  interview with him, correct?

16  A    Yes, sir.

17  Q    Okay.  Did he tell you --

18            THE COURT:  Mr. Ductan, that's --

19            DEFENDANT DUCTAN:  I'm trying --

20            THE COURT:  No.  What was said out of court, try to

21  stay away from --

22            DEFENDANT DUCTAN:  Excuse me?

23            THE COURT:  Whatever was said out of court, try to

24  steer away from that.

25            DEFENDANT DUCTAN:  What do you mean?  I don't

CROSS - BOWLES

1  understand.

2          THE COURT:  You're not allowed to ask what

3  Mr. Lowery told her in the interview.

4          DEFENDANT DUCTAN:  In the interview?  That's very

5  important to the -- that's very important.

6          THE COURT:  Right.

7          DEFENDANT DUCTAN:  I think his statements --

8          THE COURT:  I don't care what you think.  Try to ask

9  your next question.

10         DEFENDANT DUCTAN:  Okay.  I'll try.  Okay.  That's

11 going to be difficult.  It's a very important part.

12         But he did give --

13         MS. COMERFORD:  Objection.

14         DEFENDANT DUCTAN:  -- statements did he not?

15         Excuse me.

16         THE COURT:  Overruled.

17 Q    Ms. Bowles.

18 A    You asked if he gave statements?

19 Q    Yes.  Did not Mr. Lowery make a statement?

20 A    He did.

21 Q    He did.  And upon his statement, did you -- how can I put

22 this -- did you inform him that you located some items out of

23 his vehicle?

24 A    No, I did not.

25 Q    You did not tell him that?

1   A    No, sir.

2   Q    So that you located some narcotics and also a bag

3   containing a firearm, but you didn't let him know that those

4   contents was inside his vehicle?

5   A    No, sir.

6   Q    Is that normal practice if you're apprehending a suspect

7   that you wouldn't indicate to him that you guys found

8   narcotics and firearm?

9   A    It depends on the situation.

10  Q    You didn't feel as though that was important to tell?

11  A    No, sir.

12  Q    That's strange.

13       Upon interviewing Mr. Lowery, how would you perceive his

14  mannerism, in a sense?

15            MS. COMERFORD:  Objection.

16            THE COURT:  Sustained.

17            DEFENDANT DUCTAN:  Ms. Bowles?

18            THE COURT:  No, I'm sorry.  I sustained the

19  objection so ask your next question.

20            DEFENDANT DUCTAN:  Okay.

21  Q    The bag that you guys located in the blue Expedition that

22  you allege that the defendant displayed to the CI and the

23  undercover, did you guys do any fingerprint analysis of that

24  bag?

25  A    No, sir.

CROSS - BOWLES

1  Q    You guys did not?

2  A    No, sir.  Usually a bag of that content will not contain

3  fingerprints.

4  Q    Have you been able to go over all the reports?

5  A    Have I been able to go over --

6  Q    Yes.

7  A    Yes, sir.

8  Q    Do you have some reports indicating that you guys did

9  perform a fingerprint analysis on that.

10  A    Not on --

11  Q    You're not aware of that report?

12  A    Not on the book bag, sir.

13  Q    No, I'm talking about the contents within the book bag.

14  A    Oh, yes, sir.  We did perform --

15  Q    You did perform.  And what was the results of that?

16  A    Of the fingerprint analysis?

17  Q    That's correct.

18  A    There were no fingerprints located on that bag.

19  Q    But it is the officer's testimony that that same contents

20  was displayed to the CI and the undercover officer, correct,

21  by the defendant?

22  A    Yes, but it was contained in the book bag.

23  Q    Well, again, I have to -- on the report -- your report

24  contradicts that statement, because it -- in the report it

25  says that the defendant pulled out and displayed to the CI and

CROSS - BOWLES

1    the undercover; is that correct?

2    A    No, sir.  My report does not reflect.

3        DEFENDANT DUCTAN:  Okay.  Your Honor, I'm gonna have

4    to get that report to refresh her mind, Your Honor.

5        Well, Your Honor, no further questions at this time,

6    Your Honor.

7        THE COURT:  Very well.  Any redirect?

8        MS. COMERFORD:  None, Your Honor.

9        THE COURT:  You may step down.

10        Members of the Jury, I think we'll take our

11    afternoon break at this time.  We've been going at it for a

12    while.  We'll take a 15 minute break.  During that break don't

13    talk about the case at all.  And I would ask you as well to

14    keep an open mind.  You haven't heard all the evidence.  You

15    haven't heard the instructions of the Court.  You haven't

16    heard the closing arguments.  So keep an opened mind.  Don't

17    talk about the case and we'll see you in 15 minutes.

18        (The jury was escorted from the courtroom at 4:23)

19        THE COURT:  Ms. Comerford and Mr. Washington, I note

20    that you've listed one of these witnesses as an expert witness

21    Officer or Kelly Little.

22        MS. COMERFORD:  Yes, Your Honor.

23        THE COURT:  What is the anticipated testimony there?

24        MS. COMERFORD:  Your Honor the anticipated testimony

25    is that he would testify as a expert on the connection between

CROSS - BOWLES

1    the guns and drugs.  As we -- I anticipated having done a

2    prior 924(c) before Your Honor, that we would not tender him

3    as an expert, that I would lay the foundation for his

4    expertise.  And if the Court finds that sufficient --

5            THE COURT:  What is the substance of his testimony?

6            MS. COMERFORD:  Your Honor, the substance of his

7    testimony is that there is a connection between guns and

8    drugs.  That guns are tools of the drug trafficking trade.  He

9    also will provide expert knowledge as to the going rate of

10   marijuana, what the value of this drug stash would be.

11           Also provide expertise as to whether it was a common

12   practice to have a sample on hand and the larger amount of the

13   drug stash removed after the money was offered.  These are

14   some of the things I anticipate.

15           THE COURT:  Well, I mean, I want you to tell me

16   everything that he's going to testify about.  Right now it's a

17   connection between guns and drug trafficking, going rate for

18   marijuana in 2004 in Charlotte and the practice of samples.

19           MS. COMERFORD:  And lastly, Your Honor, what, based

20   on his training and experience, are guns used for within the

21   drug trade.

22           THE COURT:  You said that in the beginning, the

23   connection between guns and drug trafficking.  Is there

24   something different between that and --

25           MS. COMERFORD:  I suppose there's not, Your Honor.

CROSS - BOWLES

1        THE COURT:  All right.  I'll permit him to testify

2   in those areas, but I want you to get right to the point.

3   I've reviewed his CV.  I'll hear if there's any objection.

4   But it appears to me that he's qualified to testify in those

5   areas.  I will let him testify, but get right to the point and

6   don't vary from the areas you've indicated to me he would

7   testify in without prior approval from the Court.

8        MS. COMERFORD:  Yes, Your Honor.

9        THE COURT:  All right.  How much more do you think

10  you have?

11       MS. COMERFORD:  Your Honor, we have three more

12  witnesses.  One of those is the drug analyst, if the Court is

13  concerned about the evidence lingering in front of the jury,

14  I'm happy to call him out of order and call him next.  Then we

15  anticipate calling Gerod King who tested the two loaded

16  firearms for operability.

17       THE COURT:  Would the analyst need access to the

18  bags, I guess, just in terms of what he analyzed?

19       MS. COMERFORD:  To identify, Your Honor.  Yes, sir.

20       THE COURT:  Yeah, I mean, it makes sense while we

21  have the exhibits out to go next.  That seems to make sense to

22  me.

23       DEFENDANT DUCTAN:  Excuse me, Your Honor.  May I

24  make a comment?

25       THE COURT:  No.  Hang on a second.  And so three

CROSS - BOWLES

1  witnesses.  So the analyst, the expert and who else?

2          MS. COMERFORD:  The nexus exhibit, operability

3  expert, and lastly Kelly Little, the expert on the nexus

4  between guns and drugs.  All right.  Thank you.

5          Mr. Ductan, what did you wish to say?

6          DEFENDANT DUCTAN:  I just wanted to say in terms of

7  the evidence there, I know that the prosecution's trying to

8  make an impact, bit is it absolutely necessary --

9          THE COURT:  What we're talking about, she's going to

10  call the analyst next who needs that in front of him to render

11  an opinion and then we'll put it away.

12          DEFENDANT DUCTAN:  I mean, I understand that.  But

13  does she need to have one out there?  Is he going to test all

14  the bags.

15          THE COURT:  It's a fair point.  Unless you

16  stipulated that he testified to all the bags, I think he has

17  to look at them to know that he --

18          DEFENDANT DUCTAN:  He pretty much understands -- he

19  knows what's in the contents of the bag.

20          THE COURT:  That's the thing, Mr. Ductan.  If you

21  stipulate that he examined them all, no, he wouldn't need to

22  look at them all.

23          DEFENDANT DUCTAN:  Is he going to examine them all?

24          MS. COMERFORD:  Your Honor, indeed, a lab report to

25  the effect that he has examined the contents of each bag, yes,

DIRECT - OPRYSKO

1  sir.  So I'll need him to identify for the jury that he tested

2  each one.

3          And also the marijuana, the pound of marijuana -- I

4  don't want to belabor this.  The point is, I think he does

5  need to look at each one unless you were to stipulate that he

6  examined each one and then maybe there wouldn't be a need for

7  it.

8          DEFENDANT DUCTAN:  I would prefer him not to.

9          THE COURT:  All right.  I'll let you do what you

10 need to do in order to lay a foundation.

11         MS. COMERFORD:  I'll keep it as brief as possible.

12         THE COURT:  Once he's done testifying, if we could

13 bag it all up and only use it as necessary going forward.

14         MS. COMERFORD:  Yes, Your Honor.

15         THE COURT:  All right.  Well, let's take a short 10

16 minute break, be ready to go.  If you would have your next

17 witness in the courtroom ready to go at the end of the break.

18 Thank you.

19         (Recess at 4:30 until 4:45.)

20         THE COURT:  Ready for the jury?

21         MS. COMERFORD:  Yes, Your Honor.

22         THE COURT:  Call the jury.

23         (The jury was returned to the courtroom.)

24         THE COURT:  Call your next witness.

25         MS. COMERFORD:  Your Honor, United States calls

DIRECT - OPRYSKO

1  Andrew Oprysko.

2           ANDREW OPRYSKO, GOVERNMENT WITNESS, SWORN

3                      DIRECT EXAMINATION

4  BY MS. COMERFORD:

5  Q    Good afternoon.

6  A    Good afternoon.

7  Q    If you will please state your full name for Madam Court

8  Reporter and the jury.

9  A    Andrew Oprysko.

10 Q    How do you spell the last name?

11 A    O-P-R-Y-S-K-O.

12 Q    Where do you work?

13 A    I work for the Charlotte-Mecklenburg Police Department

14 crime laboratory.

15 Q    What's your job title there?

16 A    I am a criminalist working in the chemistry unit.

17 Q    And how long have you worked as a criminalist at CMPD in

18 the crime lab there?

19 A    I've been there about a year and a half.

20 Q    What are your duties and responsibilities in that role?

21 A    As a criminalist I analyze evidence for the presence of

22 controlled substances, and I also test submitted evidence from

23 fire debris for arson cases for the presence of accelerants.

24 Q    Prior to CMPD where did you work?

25 A    I worked for the New York City Police Department in the

1  crime laboratory.

2  Q    Would you describe for the members of the jury your

3  educational background?

4  A    I have a Bachelor's of Science in forensic science from

5  the University of New Haven.

6  Q    And in your background and experience have you chemically

7  analyzed substances to determine whether they contain a

8  control substance?

9  A    Yes, I have.

10  Q    How many times?

11  A    I've tested somewhere along the lines of 2,800 cases.

12  Each case containing anywhere from one to multiple items.

13  Q    Have you examined evidence for the presence or to see if

14  it is marijuana?

15  A    Yes, I have.

16  Q    Do you know how many times?

17  A    Probably somewhere around half of those cases.  Each case

18  can contain multiple items and/or multiple controlled

19  substances.  So probably about 50 percent of the cases I've

20  done have involved marijuana in some way.

21  Q    Is conducting such an analysis part of your day-to-day

22  duties as assigned at CMPD now?

23  A    Yes, it is.

24  Q    Have you previously been qualified to testify in court as

25  an expert in the field of chemical analysis?

DIRECT - OPRYSKO

1   A    Yes, I have.

2   Q    How many times?

3   A    I testified somewhere around 60 times both in New York

4   and then here in Charlotte.

5         MS. COMERFORD:  Your Honor, at this time the

6   government would tender our witness Mr. Oprysko as an expert

7   in the field of forensic chemistry and the analysis of

8   controlled substances.

9         THE COURT:  He'll be allowed to offer an opinion in

10  that area.

11        MS. COMERFORD:  Thank you, Your Honor.

12  Q    During your employment with CMPD, have both yourself and

13  the laboratory where you work undergone proficiency testing?

14  A    Yes, we have.

15  Q    And is the laboratory where you work accredited?

16  A    Yes, we are.

17  Q    Through what agencies?

18  A    We're accredited -- we have what's called International

19  or ISO Accreditation, and that's provided by the laboratory

20  accreditation board.  American Society of Crime Lab Directors

21  Laboratory Board.

22  Q    When the laboratory receives evidence for testing, what

23  steps are taken to ensure the integrity of that evidence?

24  A    The evidence is submitted by whoever officer is the one

25  that collected it, who bring it to the police laboratory where

1   it's taken into the evidence control section, chain of custody

2   document is created and maintained.  So each time the evidence

3   is transferred, that chain of custody document is updated.

4       In this case I received the evidence from one of the

5   evidence control technicians and I signed for the evidence

6   when I received it, saw her name was on it right before mine.

7   And then before I took it, I made sure that the evidence was

8   intact and that all the paperwork I had matched the markings

9   that were on the bags and the evidence numbers.

10  Q   How do you receive requests for analysis of evidence?

11  A   Requests are submitted typically by the District

12  Attorney's or U.S. Attorney's office and we get the e-mail or

13  a submitted form request.

14  Q   Were you asked to analyze certain evidence in the matter

15  of U.S. versus Phillip Ductan under the complaint number of

16  20040603205201?

17  A   Yes, I was.

18  Q   What evidence were you submitted under that complaint

19  number?

20  A   I got -- there were two different what we call control

21  numbers of evidence.  One of them was -- consisted of just one

22  item of alleged marijuana.  And the second one was 18 items of

23  alleged marijuana.

24          MS. COMERFORD:  May I approach the witness, Your

25  Honor?

DIRECT - OPRYSKO

1      THE COURT:  You may.

2      MS. COMERFORD:  (Displaying exhibit to the

3  defendant.)

4  Q    I hand you what's been previously accepted into evidence

5  as 15a, and what's been marked for identification purposes as

6  15b.  Do you recognize that?

7  A    Yes, I do.

8  Q    What is it?

9  A    That's the evidence that I received in this case under

10  control number 200412277.

11  Q    When did you receive it?

12  A    I'd have to refer to my chain of custody notes to refresh

13  my memory on that.

14  Q    Do you have those with you here today?

15  A    Yes, I do.  Just referring to the received date on my

16  property sheet showing what date I actually signed for this

17  evidence.  It was November 21st of 2012.

18  Q    From who did you receive Government's 15a?

19  A    I received it from the property technician who brought it

20  from the property control section.

21  Q    Is Government's 15a in substantially the same condition

22  as when you received it?

23  A    Yes, it is.

24  Q    What analysis, if any, did you conduct on Government's

25  15a?

1   A    I tested the submitted evidence to check for the presence
2   of controlled substances.  In this case, specifically to see
3   if it contained marijuana.
4   Q    Based on your analysis, what if any opinion did you reach
5   as to what Exhibit 15a is?
6   A    After performing my analysis, that the item did in fact
7   contain marijuana.
8   Q    What was the weight of the marijuana that you received in
9   Government's 15a?
10  A    I would have to refer to my report to refresh my memory
11  on the exact number.  I'm just referring to the printed typed
12  report -- laboratory report that I issued.
13  Q    Did you prepare a report of your conclusions regarding
14  15a?
15  A    Yes, I did.
16  Q    Can I show you what's been marked as Government's Exhibit
17  20 on your screen in front of you?
18  A    Yes, that's my report.
19  Q    Is this the report for the analysis you conducted as to
20  15a?
21  A    Yes, it is.
22  Q    Does it reflect the same complaint number you shared with
23  the jury as relates to 15a?
24  A    Yes, it does.
25  Q    Does it reflect what type of case this was?

DIRECT - OPRYSKO

1   A    Yes, it does.

2   Q    And does Government's 20, as it appears before you,

3   accurately reflect your conclusions as your examination of the

4   marijuana that you were asked to analyze?

5   A    Yes, it does.

6   Q    Is Government's 20 in the same condition as when you

7   prepared it?

8   A    Yes, it appears to be.

9   Q    Is Government's 20 a document that you prepared in the

10  regular course of your day-to-day duties?

11  A    Yes, it is.

12  Q    Do you keep and maintain such reports as these and

13  reports of your findings and conclusions as part of your

14  regular course of business?

15  A    Yes, I do.

16  Q    Has anything happened to affect or alter your conclusions

17  contained in State's (sic) Exhibit 20?

18  A    No.

19       MS. COMERFORD:  Your Honor, at this time I would

20  move to admit and publish Government's 20 to the jury.

21       THE COURT:  Why don't you ask for the opinion first,

22  and then I'll consider that admission request.

23       MS. COMERFORD:  Yes, Your Honor.

24  Q    If I could back you up.

25       Based on your analysis, what was your conclusion about

DIRECT - OPRYSKO

1  what 15a is?

2  A    That it was marijuana.

3  Q    And is that reflected in Government's 20, that

4  conclusion?

5  A    Yes, it is.

6        MS. COMERFORD:  Permission to publish.

7        THE COURT:  You may.  Let it be admitted.  You may

8  publish.

9        MS. COMERFORD:  Thank you.  If I may approach for

10  the evidence, Your Honor?

11        THE COURT:  You may.

12        (Government's Exhibit No. 20 was received into

13  evidence and published.)

14  Q    Is this the portion that reflects your conclusion?

15  A    Yes, it is.

16  Q    Thank you.  You indicated there were two sources of

17  evidence that you analyzed under the complaint number; is that

18  correct?

19  A    Yes, that's correct.

20  Q    What was the second bit of evidence?

21  A    The second evidence that I received in this case was

22  under control number 12280, that was the 18 bags.

23        MS. COMERFORD:  Permission for the witness to step

24  down to the work table, Your Honor.

25        THE COURT:  You may.

DIRECT - OPRYSKO

1  Q    I show you what's been marked for identification purposes

2  as Government's 17s and also Government's 17a through r.  Are

3  you able to recognize that?

4  A    Yes.  I am.

5  Q    How do you recognize it?

6  A    My initials are on the seals of the bags.  And my

7  handwriting is what wrote the control number.

8  Q    And what condition was 17a through r in when you received

9  it?

10  A    When I received it, it was originally packaged in Ziploc

11  bags.  After my analysis I repackaged it in these heat seal

12  packages in the original bags in with the evidence.

13  Q    Is this in the same or substantially same condition as

14  when you received it?

15  A    Yes.  Looks like one had been opened and resealed since

16  that time.  But otherwise, everything is in the same

17  condition.

18          MS. COMERFORD:  Thank you.  You can return to the

19  stand.

20  Q    What analysis did you conduct on the contents of

21  Government's 17a through r?

22  A    I conducted the same analysis I did the first time, which

23  was to test to see if the substance contained any controlled

24  substances.  In this case specifically to see if marijuana was

25  present.

DIRECT - OPRYSKO

1    Q    Based on your analysis, what opinion did you reach as to
2    what Government's Exhibit 17a through r, are?
3    A    That marijuana was present in each of the items.
4    Q    I'll show you on your screen what's been marked for
5    identification purposes as Government's Exhibit 21.  Are you
6    able to see that?
7    A    Yes.
8    Q    Do you recognize it?
9    A    Yes, I do.
10   Q    And what is it?
11   A    That's one of the pages of the report that I issued in
12   this case.
13   Q    Does it reflect a complaint number?
14   A    Yes, it does.
15   Q    Does that correspond to the complaint number associated
16   with complaint number 17a through r?
17   A    Yes, it does.
18   Q    Does Government's Exhibit 21 accurately reflect the
19   conclusions of the marijuana that you were asked to analyze?
20   A    I would need to see the second page.
21   Q    Page 2, please.  Showing you page 2 of Government's 21.
22   A    Yes, it does.
23   Q    And showing you page 3 of 21.
24   A    Yes.
25   Q    Is that your complete report as to a through r of

DIRECT - OPRYSKO

1   Exhibit 17?

2   A    Yes, it is.

3   Q    Is Government's Exhibit 21 in the same condition as when

4   you prepared it?

5   A    Yes, it is.

6   Q    Is Government's Exhibit 21 a document that you prepared

7   in the regular course of your day-to-day duties?

8   A    Yes, it is.

9   Q    Do you keep and maintain these reports of your findings

10  and conclusions as part of your regular course of business?

11  A    Yes, I do.

12  Q    What conclusion did you reach after your analysis?

13  A    That marijuana was present.

14  Q    In each and every bag?

15  A    Yes, in each bag.

16  Q    Has anything happened to affect or alter your conclusions

17  stated in Government's Exhibit 21?

18  A    No, it has not.

19        MS. COMERFORD:  Permission -- we move to admit and

20  permission to publish, Your Honor.

21        THE COURT:  Let them be admitted.  You may publish.

22        (Government's Exhibit No. 21 was received into

23  evidence and published.)

24        MS. COMERFORD:  Publishing to the jury page 2 of

25  Exhibit 21.

CROSS - OPRYSKO

1          Your Honor, nothing further for this witness.

2          THE COURT:  Any cross, Mr. Ductan?

3          DEFENDANT DUCTAN:  Yes.

4                    CROSS EXAMINATION

5   BY DEFENDANT DUCTAN:

6   Q    Mr -- can I have your name again, please, sir?

7   A    I'm sorry.  Could you repeat that?

8   Q    Said, Mr -- I didn't catch your name.  Could I have your

9   name, please, sir?

10  A    Andrew Oprysko.

11  Q    Oprysko?

12  A    Yes.

13  Q    And you're a crime laboratory analyst?

14  A    Yes, I am.

15  Q    In doing your analysis, are you capable of attracting

16  fingerprints off of certain items?

17  A    I myself am not trained in fingerprints.

18  Q    So you didn't perform that when you did your analysis?

19  A    I did not, no.

20          DEFENDANT DUCTAN:  Okay.  All right.  No further

21  questions.

22          THE COURT:  All right.  You may step down.

23          Any objection to this witness being excused?

24          DEFENDANT DUCTAN:  One more thing.  I'm sorry.  I'm

25  sorry.

DIRECT - KING

1   BY DEFENDANT DUCTAN:

2   Q    Mr -- I just want to know, are you an expert?

3   A    Yes.

4   Q    You are considered an expert?

5   A    Yes.  I've been deemed an expert to testify in court.

6   Q    No.  I mean, is that your profession?  Would you be

7   considered an expert analysis or expert in obtaining any kind

8   of information of that type?

9   A    It would depend on --

10  Q    Would you be considered an expert witness, in other

11  words?

12  A    Yes.

13           DEFENDANT DUCTAN:  Okay.  No further questions.

14           THE COURT:  You may step down.  Be excused.

15           THE WITNESS:  Thank you.

16           THE COURT:  Call your next witness.

17           Your next witness.

18           MR. WASHINGTON:  Oh, I'm sorry.  United States calls

19  Special Agent Gerod King.

20              GEROD KING, GOVERNMENT WITNESS, SWORN

21                      DIRECT EXAMINATION

22  BY MR. WASHINGTON:

23  Q    Good afternoon.

24  A    Good afternoon.

25  Q    Sir, could you please state your full name for the

1  record?

2  A    Gerod Warren King.

3  Q    How are you employed?

4  A    The Bureau of Alcohol, Tobacco, Firearms, and Explosives.

5  Q    How long have you worked for that agency?

6  A    Twenty-two years.

7  Q    And in what capacity do you work there?

8  A    I am a senior special agent.

9  Q    Okay.  What does a senior special agent with the ATF do?

10 A    I conduct proactive cases into organized and violent

11 crime, primarily pertaining to firearms, explosives and arson

12 for profit.

13 Q    And are you -- have you ever had occasion to identify

14 firearms?

15 A    Yes.

16 Q    Have you had occasion to examine firearms?

17 A    Yes.

18 Q    And on how many occasions as an ATF agent do you think

19 you have examined firearms?

20 A    Maybe about 10,000.

21 Q    Do you have any specialized training in the field of

22 firearms examination?

23 A    Yes.

24 Q    What specialized training is this?

25 A    I am a ATF interstate nexus expert.

DIRECT - KING

1   Q    Okay.  And what is that?

2   A    That is someone who has received specialized training

3   through the Bureau of Alcohol, Tobacco, Firearms to certify

4   that firearms have traveled in interstate or foreign commerce.

5          MR. WASHINGTON:  Your Honor, we would ask that the

6   defendant (sic) be tendered as an expert in firearms

7   examination.

8          THE COURT:  He'll be allowed to offer an opinion in

9   that area.

10          MR. WASHINGTON:  Thank you, Your Honor.

11   Q    Sir, did you participate in the investigation of a case

12   being tried here today against Mr. Phillip Ductan?

13   A    No, I did not participate in the investigation.

14   Q    Were you asked to do anything with respect to this case?

15   A    Yes.

16   Q    What were you asked to do?

17   A    To examine firearms.

18   Q    Okay.  Now I'd like to show you what's been marked as

19   Government's Exhibit 14a.

20          May I approach, Your Honor?

21          THE COURT:  Yes.  Are you going to examine on

22   operability?

23          MR. WASHINGTON:  Yes, that's it.

24          THE COURT:  You may approach.

25   Q    Special Agent King, what is that?

DIRECT - KING

1  A    This is a revolver that I examined.

2  Q    And what type of examination did you do with that?

3  A    A function check.

4  Q    Okay.  What's that?

5  A    A function check is when we take a firearm and we take a

6  cartridge and we separate the round from the cartridge.  We

7  insert the cartridge into this firearm.  We stick it into a

8  barrel and we squeeze the trigger to see if the hammer would

9  hit the primer.  If it strikes the primer of the cartridge we

10 would get a bang.

11 Q    And in your opinion is that a firearm?

12 A    This is a firearm.

13 Q    Did it function as a firearm?

14 A    It did function as a firearm.

15 Q    What's a firearm?

16 A    A firearm is any weapon, framer, receiver, including

17 starter pistol that can be readily converted to fire a

18 projectile by means of an explosion.

19 Q    And that fit that definition?

20 A    It does.

21 Q    And it worked?  Did you examine any other firearm in this

22 case?

23 A    I did.

24        MR. WASHINGTON:  May I approach, Your Honor?

25        THE COURT:  You may.

1  Q    Did you examine that item?

2  A    Yes.

3        THE COURT:  Examine what item?

4        MR. WASHINGTON:  I'm sorry.  That's Government

5  Exhibit 16a.

6  Q    And it is in front of you?

7  A    Yes, I did.  I did examine it.

8  Q    Okay.  And what type of examination did you do on it?

9  A    Did a function check on it as well.

10 Q    Okay.  And explain how the function check on that one

11 worked.

12 A    Again, when we took this firearm here, this is a pistol.

13 We took it out -- took the magazine out, inserted a cartridge

14 which we had separated the cartridge from the projectile,

15 inserted in the weapon and charged the weapon.  Stuck it in

16 the barrel.  Fired it to see if the firing pin would actually

17 strike the primer.  In this case it did and we got a bang.

18 Q    Okay.  So did it fire a bullet?

19 A    Yes, it did.

20 Q    So do you have an opinion as to whether that is designed

21 to expel a projectile through the use and force of an

22 explosion?

23 A    Yes, it will expel a projectile by use of explosion.

24 Q    Do you have an opinion as to whether or not that is a

25 firearm?

DIRECT - LITTLE

1    A    It is a firearm.

2         MR. WASHINGTON:  Okay.  Thank you very much.

3         No further questions.

4         THE COURT:  Any cross?

5         DEFENDANT DUCTAN:  No.

6         THE COURT:  You may step down.

7         Any objection to this witness being excused?

8         DEFENDANT DUCTAN:  No.  No, sir.

9         THE COURT:  You may be excused as well.

10        Call your next witness.

11        MS. COMERFORD:  Your Honor, the government calls

12   Detective Kelly Little.

13             KELLY LITTLE, GOVERNMENT WITNESS, SWORN

14                   DIRECT EXAMINATION

15   BY MS. COMERFORD:

16   Q    Sir, if you'll please state your full name for Madam

17   Court Reporter.

18   A    Kelly Little.

19   Q    And where do you work?

20   A    Charlotte-Mecklenburg Police Department.

21   Q    How long have you worked at Charlotte-Mecklenburg Police

22   Department?

23   A    Next month will be 13 years.

24   Q    And what previous work in law enforcement did you do

25   prior to joining CMPD?

DIRECT - LITTLE                          123

1   A     I worked for two agencies in Catawba County, I made
2   police department in Catawba County Sheriff's Office for about
3   seven and a half years.
4   Q     What is your current assignment with CMPD?
5   A     I'm assigned to the DEA task force.
6   Q     What in your duties does that include?
7   A     That's a federal drug task force.  We're tasked with
8   investigating large scale international drug trafficking
9   organizations with ties to the Charlotte area.
10  Q     And what parts of your law enforcement background have
11  related to vice and narcotics?
12  A     I'm sorry.
13  Q     What -- what amount of time of your background in law
14  enforcement relate --
15  A     Out of the 20 years total in law enforcement, about 15 --
16  15 and a half years probably directly directed to narcotics
17  investigations.
18  Q     So about 15 years ago you started with vice and
19  narcotics?
20  A     That's correct.
21  Q     Can you tell the jury a little bit about your
22  responsibilities in vice and narcotics?
23  A     I was a vice and narcotics detective.  Our duties are to
24  conduct covert or undercover operations with relation to drug
25  crime, gambling crime, prostitution offenses.

DIRECT - LITTLE

1  Q    How many drug investigations would you say you

2  participated in the whole of your law enforcement?

3  A    In the 20 years, probably a thousand at least.

4  Q    In how many of those would you say that you actually went

5  in as the undercover officer?

6  A    Hundreds of times.

7  Q    When you were operating in an undercover capacity, were

8  you ever present when controlled substances were weighed,

9  packaged, consumed or sold?

10  A    Yes, I have been.

11  Q    When you were operating in an undercover capacity, have

12  you ever encountered firearms?

13  A    Yes.

14  Q    Have you seized marijuana before?

15  A    Yes, I have.

16  Q    How many arrests of marijuana distributors have you made?

17  A    Probably hundreds of times.

18  Q    Have you previously seized firearms during the course of

19  narcotics investigations?

20  A    Yes, I have.

21  Q    Have you ever been present when drug offenders were

22  arrested and weapons were seized from those drug offenders?

23  A    Yes, I have.

24  Q    What types of firearms have you encountered in the

25  context of narcotics investigations?

1  A     Handguns, all kinds, pistols, revolvers, shotguns,

2  rifles, assault rifles.

3  Q     Have you conducted and participated in interviews of

4  people involved in drug distribution?

5  A     Yes, I have.

6  Q     What types of things have you discussed in those

7  interviews?

8  A     Typically discussed the methods of their drug activity,

9  who they deal with, their sources, who they sell to, their

10  customers.  How they package and weigh their drugs.  How much

11  they sell at a time.  The charge -- or the amounts that they

12  charge for those drugs.  Or how much they are paying for them

13  when they buy them.

14  Q     Would you say that you're familiar with how marijuana is

15  bought and sold in Mecklenburg County?

16  A     Yes.

17  Q     Are you familiar with the methods and techniques of

18  marijuana dealers here in the area?

19  A     Yes.

20  Q     Are you familiar with the tools and equipment utilized by

21  drug dealers?

22  A     Yes, I am.

23  Q     Are you aware of the facts of the case of U.S. versus

24  Phillip Ductan?

25  A     Yes.

DIRECT - LITTLE

1   Q    How?

2   A    Through briefing with the case agent Detective Bowles.

3   Q    And based on your training and experience, are you able

4   to provide to the jury an estimate of the going rate for a

5   pound of marijuana in 2004?

6   A    Yes, in 2004 -- of course it depends on how much you buy.

7   The more you buy the cheaper you can get it.  But a typical

8   average price would be anywhere from 5-, 600 on the low end to

9   maybe $1,000 on the high end, per pound.

10  Q    Based on your training and experience, is there a

11  correlation between firearms and drug trafficking?

12  A    Yes.

13  Q    What do you see that correlation as being commonly?

14  A    Well, that firearms are commonly involved or present

15  while drug transactions are being made.

16  Q    Why would they be present?

17  A    Well, they're generally present either on the buyer's end

18  or the seller's end.  Usually to protect their investment from

19  being robbed.  Robbery is a pretty common, pretty popular

20  thing that goes along with drug transactions.  So the primary

21  reason that people would have firearms is to protect

22  themselves from being robbed.

23  Q    Based on your training and experience, is it uncommon for

24  a drug seller to have a smaller sample on hand, but then the

25  bulk of his drug stash stored away from the meet-up location?

DIRECT - LITTLE

1  A    That is -- that's a common -- that's very common for

2  drugs to be stashed in different locations other than an

3  actual meeting location.

4  Q    Why?

5  A    Well, in particular, if you're meeting someone for the

6  first time, there's a major trust issue.  If you're selling or

7  buying drugs to or from someone -- for example, if I'm selling

8  a large amount of drugs to someone I've never met them before,

9  I want to make sure that they're not going to rob me.  I'm not

10 going to show them everything I have at once.  I may show them

11 a sample.  And then look at their money first, make sure their

12 money is right or correct.  And that they brought the amount

13 of money.  That they're not going to take advantage of me or

14 take all of my drugs.

15     Once I get -- once I meet with them, get a little bit

16 more comfortable with them, their comfort level is improved,

17 then we can work out the rest of the drugs.  But let them know

18 where it's at or make other arrangements to get the rest of

19 them to them.

20         MS. COMERFORD:  Nothing further from this witness,

21 Your Honor.

22         THE COURT:  Any cross, Mr. Ductan?

23         DEFENDANT DUCTAN:  No, sir.

24         THE COURT:  You may step down.

25         Any objection to this witness being excused?

128

1          DEFENDANT DUCTAN:  No.

2          THE COURT:  You may be excused as well.

3          Call your next witness.

4          MS. COMERFORD:  Your Honor, that is our final

5  witness.  The government rests.

6          THE COURT:  Very well.  Mr. Ductan, do you intend to

7  put on evidence at this point?

8          DEFENDANT DUCTAN:  Yes, I would.  If you don't mind,

9  I would like to call Detective Bowles back to the stand.

10          THE COURT:  Before Mr. Bowles -- Ms. Bowles takes

11  the stand, any motions that are -- would normally be

12  considered at this time on behalf of the defendant have been

13  considered and denied.

14          And so we'll go forward and Ms. Bowles you're

15  allowed to take the stand at this time.

16     CATHERINE BOWLES, GOVERNMENT WITNESS, PREVIOUSLY SWORN

17                    DIRECT EXAMINATION

18  BY DEFENDANT DUCTAN:

19  Q    Going back to the situation with the two occupants in the

20  Ford Expedition and the tan SUV.  We've already established

21  that the tan SUV belonged to Mr. Lowery, correct?

22  A    That's correct.

23  Q    Okay.  And then upon you gathering evidence from that

24  vehicle, you stated that you found a couple of documents,

25  correct?

DIRECT - BOWLES

1    A    In --

2    Q    Inside of the tan vehicle?

3    A    Yes, sir, I did.

4    Q    That is correct.  And one of those documents is a birth

5    certificate, correct?

6    A    Yes, sir it was.

7    Q    Okay.  If you don't mind, where is Mr. -- where was

8    Mr. Lowery born?

9    A    Where was he born?

10    Q    Yes.

11    A    I'd have to look at the birth certificate again.

12    Q    Could we put that up on the ELMO?

13         Can you see that?

14    A    Yes, sir.  It says "Cumberland, Fayetteville."

15    Q    At the top, what does that say?  Can you read that?

16    A    As far as the name on it?

17    Q    That's correct.

18    A    "Mark Lowery."

19    Q    At the very top of the certificate?

20    A    It says, "North Carolina State Board of Health."

21    Q    Okay.  Also stated earlier that upon you apprehending the

22    suspects, it's normal procedure for you -- you were the lead

23    detective; is that correct?

24    A    That's correct.

25    Q    And it's your job to secure the area and obtain as much

DIRECT - BOWLES

1  evidence and interview the suspects, correct?

2  A    Yes, sir.

3  Q    Did you interview Mr. Landis Richardson?

4  A    Yes, sir, I did.

5  Q    Did Mr. Richardson give a statement?

6  A    Yes, sir he did.

7         MS. COMERFORD:  Objection, Your Honor.

8         THE COURT:  Overruled.

9         THE WITNESS:  Yes, sir.

10        DEFENDANT DUCTAN:  Excuse me?

11 Q    He did give a statement, correct?

12 A    Yes, sir.

13 Q    Okay.  And Mr. Lowery, did he give a statement?

14 A    Yes, sir, he did.

15 Q    What about the defendant?  Did the defendant give a

16 statement?

17 A    No, sir, he did not.

18        MS. COMERFORD:  Objection, Your Honor.

19        THE COURT:  Overruled.

20 BY DEFENDANT DUCTAN:

21 Q    We won't get into the details as to what was actually

22 said with Mr. Lowery.  But did you ever determine what kind of

23 occupation he was working at that time?

24 A    Mr. Lowery?

25 Q    That's correct.

131

DIRECT - BOWLES

1  A    He stated that he worked as a personal trainer.

2              MS. COMERFORD:  Objection, Your Honor.

3              DEFENDANT DUCTAN:  Personal trainer.

4              THE COURT:  I'll, hang on a second.  The question

5  was -- to you, was:

6              "We won't get into the details as to what was

7  actually said with Mr. Lowery.  But did you ever determine

8  what kind of occupation he was working at that time?"

9              It doesn't call for an answer as to what he said.

10 It's whether you know what kind of occupation he has.  Do you

11 know that?

12             THE WITNESS:  Yes.

13             DEFENDANT DUCTAN:  That was -- you said, personal

14 trainer, correct?

15             THE WITNESS:  Yes.  But I did not verify that

16 information.

17             DEFENDANT DUCTAN:  Okay.

18 Q    The Gold's Gym bag that you found in the tan vehicle,

19 that vehicle belonged to Mr. Lowery, correct?

20 A    I don't know if it did or did not.

21 Q    The vehicle, not the bag.  I said the vehicle?

22 A    The vehicle did, yes, sir.

23 Q    The vehicle did belong to Mr. Lowery.

24      And the contents within, you did make the statement that

25 it was --

DIRECT - BOWLES

1    THE COURT:  All right.  You can't make --

2    DEFENDANT DUCTAN:  Well, I'm trying to -- she said

3    that there was cellphone chargers in the bag, correct?

4    THE WITNESS:  Yes, sir.

5  Q   (Defendant Ductan) Just in your day-to-day life, is it

6  unlikely or not possible for cellphones to work in

7  different -- cellphones doesn't necessarily have to be the

8  same exact cellphone in order for the charger to work for

9  another phone?

10  A   Back in 2004 it wasn't very likely for that to happen.

11  And that's why we tried the chargers with the different

12  cellphones.

13  Q   But the likelihood is a possibility, correct?

14  A   No, sir, not at that time.

15  Q   Not at the time.  Okay.

16      Also, did Mr. Lowery ever tell you the reason he was in

17  North Carolina?

18    THE COURT:  We're not going to get into anything

19  what Mr. Lowery told her.

20    DEFENDANT DUCTAN:  Okay.  All right.

21      Well, at this time, Your Honor, I would like to call

22  three other witnesses, but unfortunately they're not here.

23    MS. COMERFORD:  Objection.

24    DEFENDANT DUCTAN:  The Detectives Voorhees --

25    THE COURT:  Hang on a second.

DIRECT - BOWLES

1      DEFENDANT DUCTAN:  Detectives --

2      THE COURT:  Hang on a second.

3      DEFENDANT DUCTAN:  Okay.

4      THE COURT:  Any other questions for this witness?

5      DEFENDANT DUCTAN:  Not at this time.

6      THE COURT:  Any cross examination?

7      MS. COMERFORD:  None, Your Honor.

8      THE COURT:  All right.  You may step down.

9      Do you have any other witnesses that are here?

10     DEFENDANT DUCTAN:  Yes, I would like to call

11 Detective Voorhees and Hollis and Whitesell.

12     THE COURT:  Mr. Whitesell previously testified.  You

13 had an opportunity to cross examine him.

14     DEFENDANT DUCTAN:  Exactly.  I just didn't have my

15 notes here with me.  But it's very important that --

16     THE COURT:  Is Mr. Whitesell --

17     DEFENDANT DUCTAN:  -- cross examine.

18     THE COURT:  Is Detective Whitesell still here?

19     MS. COMERFORD:  Your Honor, we asked if he could be

20 excused, and there was no objection.  I'll check again, but I

21 understand he's been excused and he's not here.

22     THE COURT:  All right.  Well I don't believe any of

23 those officers are here.

24     Do you have any other witnesses that are here that

25 you could call?

134

1    DEFENDANT DUCTAN:  No.  But those witnesses are very
2  important to establish the whereabouts --
3    THE COURT:  If you have a witness that's here, you
4  may call that person.  Do you have a witness that's here?
5    DEFENDANT DUCTAN:  I don't have a witness here.
6    THE COURT:  Do you have any other witnesses that are
7  here that you wish to call?
8    DEFENDANT DUCTAN:  There's no witnesses here, but
9  those officers --
10    THE COURT:  Hang on.
11    Members of the jury, let's take a very short, second
12  afternoon recess and I'll ask you to come back in the
13  courtroom very shortly.
14    Thank you.
15    (The jury was escorted from the courtroom at
16  5:19 p.m.)
17    THE COURT:  Mr. Ductan, I wanted to excuse the jury
18  just because I want to make sure you understand your rights
19  with respect to testifying yourself.
20    You don't have to testify.  And I think you've heard
21  me tell this jury several times that they can't hold that
22  against you.  You have a right not to testify if you don't
23  wish to testify.  On the other hand, if you wish to testify
24  that's your choice.  You have a constitutional right not to
25  testify.  You have a right to testify if that's what you wish

135

```
 1    to do.  And I wanted to make sure that you understood that
 2    choice.
 3              Do you understand that choice?
 4              DEFENDANT DUCTAN:  Yes.
 5              THE COURT:  Have you made a decision as to whether
 6    to testify or not?
 7              DEFENDANT DUCTAN:  I don't want to testify.
 8              THE COURT:  Do you want to or don't?
 9              DEFENDANT DUCTAN:  I will not.
10              THE COURT:  You will not testify?
11              DEFENDANT DUCTAN:  Yeah.
12              THE COURT:  Okay.  You know you have a right to if
13    you want to, but you're exercising your right not to?
14              DEFENDANT DUCTAN:  That's correct.
15              THE COURT:  I'll tell the jury again, that they
16    can't hold that against you.
17              So if you're not testifying, you have no other
18    witnesses here.
19              DEFENDANT DUCTAN:  I understand that I don't have
20    any other witnesses here.  But it's pertinent that I'm able to
21    cross examine those other officers involved.
22              THE COURT:  You had an opportunity to do that with
23    Mr. Whitesell.
24              DEFENDANT DUCTAN:  Mr. Voorhees and Hollis was not
25    here.
```

136

```
 1          THE COURT:  Right.  If they're not here, then they
 2   can't testify.
 3          DEFENDANT DUCTAN:  But I do have a right to be able
 4   to call them.
 5          THE COURT:  You have a right to subpoena them if you
 6   wish to.  If they were subpoenaed and didn't show up I could
 7   deal with it.
 8          DEFENDANT DUCTAN:  Excuse me?
 9          THE COURT:  If you had subpoenaed them and they
10   didn't show up I could deal with it.  But in the absence of a
11   subpoena they wouldn't know to be here.
12          DEFENDANT DUCTAN:  I would like to subpoena those
13   witnesses.
14          THE COURT:  Right.  But you haven't, and now we're
15   at the end of the case and the time for doing that is past.
16          DEFENDANT DUCTAN:  (Mumbling.)  You're making a
17   no-win situation.
18          THE COURT:  So let's --
19          DEFENDANT DUCTAN:  You're not allowing me to be --
20          THE COURT:  I've heard enough from you, Mr. Ductan.
21   We're going to call the jury back.
22          Does the government have any rebuttal evidence?
23          MS. COMERFORD:  None, Your Honor.
24          THE COURT:  What I'll do is let the jury go for the
25   evening, and then have a charge conference at 9:00 tomorrow
```

137

1    morning.

2              I'll hand out proposed jury instructions to both

3    sides, and we'll go over those instructions at 9:00 in the

4    morning.  At which point we'll do closing arguments,

5    instructions and we'll give the case to the jury.

6              All right.  Call the jury.

7              (The jury was returned to the courtroom at

8    5:22 p.m.)

9              THE COURT:  Members of the jury, the government put

10   on its case and rested, and the defense has presented its

11   case.  And so we're at a good point, I think, at 5 -- close to

12   5:30, normally we go to 6:00.  But we're at a pretty good

13   breaking point, and so I'm going to excuse you for the evening

14   and ask that you be back in court -- back in the jury

15   administration -- jury assembly room at 9:20 tomorrow morning

16   ready to come into court.  We'll start promptly at 9:30.

17             So overnight your family and friends may want to

18   know what you were doing today and you might want to talk to

19   them about it.  But it's important to the integrity of this

20   process that you not talk about the case at all with anybody

21   until you begin your deliberations.  And so you'll be excused

22   tonight with that instruction not to talk about the case.

23   Keep an open mind because you haven't heard the closing

24   arguments or the instructions of the Court.

25             And with those two instructions you're free to go.

138

1    I'll see you at 9:30 in the morning tomorrow.

2              (The jury was escorted from the courtroom.)

3              (Court was in recess for the day at 5:25 p.m.)

4                        * * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA,     )   DOCKET NO. 3:04-CR-252
                              )
           Plaintiff,         )
                              )
           vs.                )   VOLUME II OF II
                              )
PHILLIP DUCTAN,               )
                              )
           Defendant.         )
_____)


TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR
UNITED STATES DISTRICT COURT JUDGE
DECEMBER 5, 2012


APPEARANCES:

On Behalf of the Government:

          DANA OWEN WASHINGTON, ESQ.,
          ERIN COMERFORD, ESQ.,
          Assistant United States Attorneys
          227 West Trade Street, Suite 1700
          Charlotte, North Carolina 28202

On Behalf of the Defendant:

          PHILLIP DUCTAN, PRO SE

Appearing as Standby Counsel:

          RANDOLPH MARSHALL LEE, ESQ.,
          P.O. Box 77005
          Charlotte, North Carolina 28271


          LAURA ANDERSEN, RMR
          Official Court Reporter
          United States District Court
          Charlotte, North Carolina

140

1                          I N D E X

2              DECEMBER 5, 2012; VOLUME II

3   DESCRIPTION                                    PAGE

4   CHARGE CONFERENCE                              141
    COURT'S GENERAL INSTRUCTIONS                   156
5   CLOSING ARGUMENTS:
            Ms. Comerford                          165
6           Mr. Ductan                             174
            Mr. Washington                         184
7   COURT'S SUBSTANTIVE INSTRUCTIONS              188
    JURY QUESTION                                  210
8   JURY QUESTION                                  212
    JURY VERDICT                                   214
9   JURY POLLED                                    216

10
                    *  *  *  *  *  *
11                E X H I B I T S
    GOVERNMENT EXHIBITS:
12  NUMBER                                      ADMITTED

13  17a through r ................................. 153

14
                    *  *  *  *  *  *
15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2    DECEMBER 5, 2012.  MORNING SESSION.  9:19 A.M:

3            (Defendant present.)

4            THE COURT:  Good morning, everyone.

5            MS. COMERFORD:  Good morning.

6            MR. WASHINGTON:  Good morning.

7            MR. LEE:  Good morning, Your Honor.

8            THE COURT:  We're here for the charge conference

9    which starts a little late, because -- through no fault of his

10   own -- Mr. Ductan was late getting here.  But I do want to run

11   through the proposed instructions with the parties.

12           And Mr. Lee, I'm glad that you're seated at the

13   table.  I would ask that you help Mr. Ductan page through the

14   instructions --

15           MR. LEE:  Yes, sir.

16           THE COURT:  -- as we do it.

17           The instructions are divided into two parts.  The

18   first part is the general instructions, which I intend to give

19   before closing arguments.  And the second part is the

20   substantive instructions on the three counts.  And there are

21   some -- I think there's some instructions in here which we'll

22   wind up taking out, but I want to walk through each one with

23   you at this time.

24           And so, first couple of pages are the general

25   instructions in which I talk to them about their role in the

142

1   proceedings and their duties as jurors.  I remind them on page

2   3 that the indictment is not evidence, it's just an

3   accusation.  And the duty is for the jury to decide whether

4   the government has proven the elements of the crime beyond a

5   reasonable doubt.

6         And on page 4 I tell the jury that a separate crime

7   is charged in each count, and they have to deal with each

8   count and the evidence pertaining to it separately.

9         I remind the jury on page 5 that the defendant is

10  not on trial for any conduct not charged in the indictment.

11        Page 6 and 7 is something that I believe ought to

12  come out.  I don't think there was any "other act evidence."

13        MR. LEE:  We would concur with the Court's removal

14  of that, Your Honor.  I'm sorry.  I actually should let

15  Mr. Ductan answer for himself; force of habit.

16        DEFENDANT DUCTAN:  That's all right.

17        THE COURT:  Then on page 8 I talk to the jury about

18  what I said so many times so far in the trial, and that is

19  presumption of innocence and the burden of proof being beyond

20  a reasonable doubt.  Define reasonable doubt on page 9, but

21  really not defining it, but leaving it up to the jury's reason

22  and common sense.

23        Explain direct and circumstantial evidence on page

24  10.

25        Remind them again of how important it is not to use

143

1   any of these electronic devices to share any information about
2   the case with anybody else.  I've done it once before, don't
3   have to do it again, but I think it may be a good reminder as
4   they go into deliberations to do that.

5          But I'm going to switch page 11 with -- actually
6   what I'm going to do is, I'm going to take that electronic
7   technology instruction and make it part of my concluding
8   instructions at the end of the case.

9          So when I actually read these instructions to the
10  jury, I'll go from page 10 to page 12 and talk about
11  inferences.

12         Page 13, I don't think we had any transcripts, so I
13  intend to take that out.  I don't think there's any issues of
14  statements by the defendant, false exculpatory statements, or
15  exclusion of statements from the witness stand.  So I intend
16  to take out pages 13 through 16.

17         There may have been some slight hearsay which
18  slipped into the case, but I don't think I actually ever
19  instructed the jury to disregard anything.  And so I'm not
20  going to give the instruction on 16.

21         MR. LEE:  One moment, please.

22         (Pause.)

23         MR. LEE:  Thank you, Your Honor.

24         THE COURT:  And so we're on page 17.  And I'm going
25  to tell the jury that they don't have to accept the testimony

- 258 -

144

1    even if it's uncontradicted.  They need to weigh the testimony
2    and give it such weight as they think it deserves.

3          Talk to them about impeachment on page 18.

4          I think one witness, Mr. Dunn, had a prior
5    conviction.  So I'm going to tell them on page 19 that that is
6    a factor they may consider in determining the credibility of a
7    witness, the fact that he has previously been convicted.

8          And then on page 20 I'm going to tell the jury that
9    the testimony of an informant is to be weighed with great care
10   and caution.  Should never convict the defendant upon the
11   unsupported testimony of such a witness unless you believe
12   that testimony beyond a reasonable doubt.

13         Page 21 I'll give them instructions on expert
14   witness testimony.

15         I'll tell them on 22 that the number of witnesses is
16   not the determining factor.  The fact that more witnesses
17   testified against -- for one party than another should not
18   determine the case.  The case should be determined upon all
19   the evidence and the witnesses the jury chooses to believe.
20   And tell them that neither the government nor the defendant is
21   required to cross examine any witnesses.

22         The instructions on 24 and 25 come out because the
23   defendant has elected not to testify, and so I'm going to give
24   the first paragraph on page 24, explain to them again that he
25   has a constitutional right not to testify and that they can't

145

1    hold that against him.

2         Then I'm going to tell them on 26 that the defendant

3    has a Sixth Amendment right to counsel, but he can also

4    represent himself if he chooses and they shouldn't draw any

5    inferences from that fact.

6         And on 27 I'm going to tell the jury that the

7    defendant was not present at all the proceedings in the case

8    and they should not consider his absence in any way in

9    reaching their verdict.

10        The duty to object instruction I've given once.  I'm

11   not inclined to give it unless either side wants it.

12        MS. COMERFORD:  Your Honor, it is fine with the

13   government.

14        THE COURT:  Mr. Lee, if you would talk to

15   Mr. Ductan, let me know.

16        MR. LEE:  Yes, sir.

17        (Pause.)

18        MR. LEE:  He's reviewing it right now, Your Honor.

19        THE COURT:  Let's move on to some other ones and

20   then we'll come back to that.

21        Questions not evidence.  I'm going to give that

22   instruction on 29.  Tell the jury that they, you know, if they

23   took notes that the notes are not evidence and not a

24   substitute for their own individual memory.

25        Going to take the punishment one out on 31.  I think

146

1    I asked enough questions about that in the selection process.

2            And so those are the general instructions that I

3    intend to give before closing argument.  And then after the

4    closing argument I'm going to give the substantive

5    instructions beginning on page -- part II, page 1.

6            What I'm going to do on this part of the

7    instructions is read the count in the Bill of Indictment, read

8    the statute that is violated, and then talk about the

9    essential elements that the government has to prove beyond a

10   reasonable doubt.

11           And so if we start on page 1, I will begin to read

12   the first count that Mr. Ductan is charged with on page 1 and

13   2.  I'm going to give an "on or about" instruction on page 3.

14   I'm going to read the statute that is alleged to be violated

15   on page 4.  Then give the and/or instruction in terms of the

16   way the statute and the indictment are phrased.  Then on page

17   6 we begin with the essential elements that the Government has

18   to prove beyond a reasonable doubt, and they're listed one,

19   two and three, on page 6.

20           And then the bottom of page 6 through the end of

21   page 7 I talk about specific aspects of conspiracy, including

22   the fact that mere presence at a scene is not sufficient to

23   establish the existence of a conspiracy.

24           Then I start to define terms on page 9, I define

25   possession.  On page 10, define the phrase with intent to

147

 1   distribute.  On page 11, I give the jury instructions as to

 2   the process for determining, if they do, the drug type and

 3   quantity.

 4          Then on page 12 I transition to mental elements.

 5   Although there is a sentence in the second paragraph that

 6   deals with structuring offenses, that's just inadvertent and

 7   is coming out.

 8          Page 14 I'm going to talk about liability for acts

 9   and statements of co-conspirators.  *Pinkerton* liability on

10   page 16 and then I'm done with Count One.

11          Begin the same process with Count Two on page 17.

12   I'm going to read the language of the indictment on 17, read

13   the statute on 18, including the aiding and abetting statute.

14   Give the elements on 19, and then define aiding and abetting

15   on 20 and 21.  Then I'm done with Count Two, and I go to Count

16   Three on page 22.

17          Reading the language of the indictment on 22,

18   reading the statute on 23, and giving the elements beginning

19   on page 24.  Although having heard the evidence I am going to

20   dismiss the use prong of the 924(c) offense.  I don't believe

21   there was any evidence in use that was presented by the

22   government in its case in chief.

23          And so I'm going to grant a Rule 29 with respect to

24   the use prong of Count Three.  And so that would take out on

25   page 23 the word "uses or" -- it would take out on 24,

148

1    subsection (a) dealing with "use."

2          On 25 we go to definitions and I define firearm on

3    25.  And I take out the first three paragraphs of the "use or

4    carry" definition on 26.  And start that -- start that

5    instruction in the fourth paragraph where it starts with, "to

6    prove the defendant carried."  And then I refer the jury back

7    to my previous definition of possess on 27, as well as

8    previous definition of knowingly.

9          And on 29 I tell them they have to be unanimous

10   under theory of conviction under Count Three, either unanimous

11   as to use -- I mean, unanimous as to carry or unanimous as to

12   possessing.  I'm going to strike the use prong of that

13   instruction.

14         Then page 30 through 32 are the concluding

15   instructions and it's here that I'll add the admonition not to

16   use an iPhone or Blackberry or any other electronic media to

17   discuss the case with any other individuals.

18         Any objections, deletions, or additions from either

19   side?

20         MS. COMERFORD:  Nothing from the Government, Your

21   Honor.

22         DEFENDANT DUCTAN:  Take a look at the duty to object

23   for a second.

24         THE COURT:  Okay.  Sure.  Yes, I said I would get

25   back to that.

1          And the question, Mr. Ductan, I already explained

2   this to them once before the evidence began.  I'll be glad to

3   do it again if either side wants me to do it, but if neither

4   side wants it, I'll just strike it.

5          DEFENDANT DUCTAN:  No objection.

6          THE COURT:  Take it out?

7          DEFENDANT DUCTAN:  Yeah.  You can take it out.

8          THE COURT:  All right.  Is 20 minutes enough for

9   closing arguments?

10         MS. COMERFORD:  Yes, Your Honor.

11         THE COURT:  I'll give each side 20 minutes.  You

12  don't have to use all 20 minutes, but you'll have up to 20

13  minutes.

14         MS. COMERFORD:  We'll be splitting the open and

15  close, Your Honor.  I'm not sure if anyone's equipped to give

16  us a five minute warning.

17         THE COURT:  Sure.

18         MS. COMERFORD:  That would be excellent.

19         We also have a question about the verdict form, Your

20  Honor, if we have time.

21         THE COURT:  Yes.

22         MS. COMERFORD:  On the back of the verdict form is

23  Count Three.  Your Honor, Counts One and Two there's just a

24  bit of substantive language, after "as to Count One charging

25  the defendant with conspiracy to possess with intent," and

150

1   then it cites what it's in violation of.

2        THE COURT:  I should say, "I charge the defendant

3   with using or possessing."  I should give that language?

4        MS. COMERFORD:  If you would, Your Honor.  It will

5   make more sense to them.

6        THE COURT:  I'll add that.

7        MR. LEE:  Can I have just a moment, Your Honor,

8   please, to explain?

9        THE COURT:  All right.  There is one more matter

10  needs to be taken up and that is that there is a forfeiture

11  notice in the indictment.  And has the government asked for a

12  jury trial on the forfeiture provisions?

13       MS. COMERFORD:  Your Honor, I know that Bill

14  Brafford is on top of this.  And I did let him know that we

15  were going into closings this morning.  I had not heard back

16  from him by e-mail.

17       THE COURT:  Let me explain this to Mr. Ductan.  And

18  Mr. Lee, if you would help in terms of advising Mr. Ductan.

19       MR. LEE:  Yes, sir.

20       THE COURT:  You have a right to a jury trial on any

21  forfeiture issues in the case.  The government has alleged

22  forfeiture.  You have a right to have that tried to a jury or

23  you can waive a jury trial right and have that dealt with at

24  sentencing if there's a conviction in the case.  I'm not

25  saying there's going to be a conviction, but I have to address

151

1  this with you at this time.

2        And so if there was a conviction and we had a

3  sentencing hearing, you could have the forfeiture issues dealt

4  with by the judge at sentencing, or you could have the

5  forfeiture issues resolved by this jury if they were to return

6  a conviction against you.  We would then go into the

7  forfeiture part of it.

8        It doesn't matter to anybody which you choose, but

9  you have to make that choice before the jury begins

10  deliberating.

11        DEFENDANT DUCTAN:  If you would put on the record as

12  to what exactly is the forfeiture.

13        THE COURT:  It's in the indictment, and the

14  government alleges that the following is subject to

15  forfeiture:

16        "All property constituting or derived from any

17  proceedings (sic) the defendant obtained directly" -- any

18  proceeds -- it says proceedings, but I think the intent is

19  proceeds, "the defendant obtained directly or indirectly as a

20  result of the violations alleged in the Bill of Indictment."

21        And then "all property used or intended to be used

22  in any manner or part to commit or to facilitate the

23  commission of such violations."

24        And then certain property is explicitly named.  One

25  is a Ford Expedition automobile seized on June 3rd.  And the

152

1    second is a Chevrolet Tahoe automobile seized on June 3rd.

2    That's the property alleged.

3            DEFENDANT DUCTAN:  I will go ahead and let the jury

4    make a decision on that.

5            THE COURT:  All right.  Thank you.

6            Anything else before we call the jury?

7            MS. COMERFORD:  Your Honor, there is one important

8    matter.  I'm embarrassed to admit to the Court that with all

9    my running around with the bags of marijuana, I failed to

10   admit the marijuana.  At this time -- and I don't know how the

11   Court would do this, but I'm simply making the request.

12           If the Court would allow the government to reopen,

13   we would do it simply for the limited purpose of moving into

14   evidence what was identified at length by two different

15   witnesses.

16           THE COURT:  So the "a through r" hadn't come in, 17a

17   through r?

18           MS. COMERFORD:  That is what the transcript

19   indicates.  Now if I was a betting woman I probably would have

20   said otherwise.  But the transcript --

21           THE COURT:  I'm sure the defendant objects to that?

22           DEFENDANT DUCTAN:  That's correct.

23           THE COURT:  I'll overrule that objection.  I'll

24   allow the government to reopen for the limited purpose of

25   admitting that evidence.  I don't see any prejudice to the

153

1    defendant.  And so 17a through r will be admitted at this

2    time.

3              (Government's Exhibit No. 17a through r were

4    received into evidence.)

5              MS. COMERFORD:  And just to be clear with the

6    transcript, government's exhibit -- with the one pound of

7    marijuana, 15a is admitted; is that correct?

8              COURT REPORTER:  Yes.

9              MS. COMERFORD:  Thank you.

10             THE COURT:  Anything further from either side?

11             Let me say, Mr. Ductan, if you wish to make a

12   closing argument, the way to do that is to simply stand where

13   you are and make your arguments from --

14             DEFENDANT DUCTAN:  That's fine.

15             THE COURT:  -- counsel table.

16             The other thing, let me raise this with you as well.

17   You've been identified a couple times as the person in the

18   orange jumpsuit.  I think the jury would obviously have seen

19   you in an orange jumpsuit.  I can give the following

20   instruction, if you want me to give it.  I don't have to give

21   it if you don't want it.

22             But I could instruct the jury that the fact that the

23   defendant may be in custody, of course does not mean that the

24   defendant committed the offenses charged or any other offense.

25   Defendants are committed to custody and released from custody

154

1  for a wide variety of reasons.  It is not relevant to your

2  consideration.  The fact that a defendant is or is not in

3  custody should not enter into your deliberations in any way.

4           If you want me to give that instruction, I will.

5           DEFENDANT DUCTAN:  Yes, that's fine.

6           THE COURT:  I will insert that right after I give

7  the instruction on the right not to testify.

8           So I'll give, the defendant is not compelled to

9  testify, defendant's right to represent himself, absent

10  defendant, and then I'll give the custodial instruction.

11           MR. LEE:  If I can have one moment just to -- and

12  I'm not trying to advocate, I'm trying to clear the record.

13           THE COURT:  I'm glad -- take what you need.

14           DEFENDANT DUCTAN:  Your Honor, I would just like to

15  clarify the range in sentencing, is that zero to five; is that

16  correct?

17           THE COURT:  There are different counts and there are

18  different penalties that apply to different counts.

19           DEFENDANT DUCTAN:  In terms of my range --

20           THE COURT:  We'll talk about -- should there be a

21  verdict, we'll talk about that at that time.  Right now I

22  don't see any need -- I don't want punishment brought before

23  the jury at all.

24           MR. LEE:  If I could just interject.  This goes to

25  the aggravated ranges in 841.  And we've talked, and it's my

155

1  opinion that the way the indictment is drafted and current

2  state of law that he's looking at a range of zero to five

3  years if he's convicted of the drug counts under an 841 and

4  that's my advice to him.  Yet there's no aggravated amounts

5  alleged in the indictment.  I don't want to waive the issue --

6             THE COURT:  The government agree with that?

7             MR. WASHINGTON:  Yeah, I think it's less than

8  50 pounds of marijuana.

9             MR. LEE:  It is.  I just didn't want to waive the

10  issue for appellate purposes.

11             THE COURT:  You haven't.  I don't think it's an

12  issue for the jury.  I don't want either side talking about

13  punishment.

14             MR. LEE:  That's right.

15             THE COURT:  We'll resolve it -- should there be a

16  verdict, and a sentencing hearing, we'll resolve that.  It

17  appears that the parties are in agreement as to what the drug

18  count maximums are.

19             MR. LEE:  Yes, sir.  I just want to make sure we

20  have a good record on that.

21             THE COURT:  I want to repeat, I don't want either

22  side talking about punishment in front of the jury.

23             All right.  Let's call the jury.

24             MS. COMERFORD:  Your Honor, if I could raise just

25  one more issue.  We had some difficulties recovering some of

156

1    the other evidence.  It's still in the evidence vault, and

2    that is where my case agent is.  And I don't want to disrupt

3    the flow of instructing the jury and going into my closing,

4    but I would ask for just a few moments of set up if the Court

5    would indulge --

6            THE COURT:  We'll put you on a shot clock between my

7    general instructions and your closing.

8            MS. COMERFORD:  Fair enough.

9            THE COURT:  All right.

10           (The jury was returned to the courtroom at

11   9:47 a.m.)

12           THE COURT:  Good morning.

13           THE JURY:  Good morning.

14           THE COURT:  Members of the jury, now that you have

15   heard the evidence in the case and soon you will hear the

16   closing arguments, I want to instruct you as to some general

17   principles of law that apply.  And after the closing arguments

18   I will discuss the specific offenses charged, I will give you

19   the elements of those offenses and follow with directions to

20   guide your deliberations.

21           As I told you in the preliminary instructions, it is

22   your duty and your responsibility in this trial to find the

23   facts.  You may find those facts only from the evidence which

24   has been presented.  And the evidence consisted of the

25   testimony of the witnesses, the exhibits that were admitted

157

1  into evidence, and any stipulation of fact made by the
2  parties.

3          In reaching your decision as to the facts, it is
4  your sworn duty to follow the law as the Court instructs you.
5  You will apply the law given to you by the Court to the facts
6  which you find from the evidence and reach a verdict.

7          The parties may refer to some of the governing rules
8  of law in their arguments, but if any difference appears to
9  you between the law as stated by the parties and that stated
10 by the Court in these instructions, you are to be governed by
11 these instructions.

12         You are not to single out one instruction alone as
13 stating the law, but must consider all the instructions as a
14 whole.

15         And you may not substitute or follow any personal or
16 private notion or opinion as to what the law is or ought to
17 be.

18         You are required to perform these duties without
19 bias, prejudice, or sympathy for any party.  The law does not
20 permit jurors to decide cases on the basis of bias, prejudice,
21 sympathy, or on any basis other than solely upon the facts and
22 the law arising in the particular case.

23         Now this case involves three charges by Bill of
24 Indictment, conspiracy with intent to distribute marijuana;
25 possession with intent to distribute marijuana; and possession

158

1  of a firearm in furtherance of a drug trafficking crime or

2  using a -- or I'm sorry, or carrying such a firearm.

3      You are instructed that an indictment is but a

4  formal method of accusing the defendant of a crime.  Its

5  purpose is to inform the defendant of the charges against him

6  and bring him to trial.  It is not evidence of any kind

7  against the defendant, nor does it permit any presumption or

8  inference of guilt.  In other words, an indictment is not

9  consistent either with guilt or lack of guilt, it simply puts

10 that question at issue for your decision.

11     It's up to you, the jury, to decide whether the

12 government has proved each element of the crimes alleged in

13 the Bill of Indictment beyond a reasonable doubt.

14     Now a separate crime is charged in each count of the

15 indictment.  Each count, and the evidence pertaining to it

16 should be considered separately.  The fact that you may find

17 the defendant guilty or not guilty as to one of the crimes

18 charged should not control your verdict as to any other.

19     You are here to decide whether the government has

20 proved beyond a reasonable doubt that the defendant is guilty

21 of the crimes charged.  The defendant is not on trial for any

22 act, conduct, or offense not alleged in the indictment.

23 Neither are you concerned with the guilt of any other person

24 or persons not on trial as a defendant in this case.

25     Now every defendant in a criminal case is presumed

1   to be innocent, and this presumption continues throughout the
2   course of the trial.  This presumption will end only if you
3   reach the jury room and arrive unanimously at the conclusion,
4   if you do, that the government has shown to your satisfaction
5   that the defendant is guilty beyond a reasonable doubt.  This
6   burden on the government does not change at any time during
7   the course of the trial.  Presumption of innocence in favor of
8   a defendant is not a mere formality to be disregarded by the
9   jury at its pleasure.  It is a substantive part of our
10  criminal law.  Accordingly, the government must prove each of
11  the elements of the crimes charged in this indictment beyond a
12  reasonable doubt before there can be a conviction.
13          The term "reasonable doubt" means just what it says.
14  It is a doubt based upon reason and common sense.  Its meaning
15  is no doubt self-evident, understood by you, and the Court
16  will not attempt to define the term further.
17          Now there are two types of evidence from which a
18  jury -- which a jury my properly assess in determining whether
19  the government has met its burden of proof as to any offense.
20          One is direct evidence, such as the testimony of an
21  eyewitness.  The other is circumstantial evidence, which is
22  evidence of facts or circumstances from which the existence or
23  nonexistence of other facts in controversy may be inferred.
24          As a general rule, the law makes no distinction
25  between direct and circumstantial evidence.  It simply

160

1   requires that before convicting a defendant the jury must be
2   satisfied of the guilt of such defendant beyond a reasonable
3   doubt from all the evidence in the case.

4           Now while you should only consider evidence
5   presented during the trial of this case, you are permitted to
6   draw such reasonable inferences from the testimony and
7   exhibits as you feel are justified in the light of common
8   experience.

9           In other words, you may make deductions and reach
10  conclusions which reason and common sense lead you to draw
11  from the facts which have been established by the testimony
12  and evidence in the case.

13          You are not required to accept testimony, even
14  though the testimony is uncontradicted and the witness is not
15  impeached.  You may decide, because of the witness's bearing
16  and demeanor, or because of the inherent improbability of the
17  witness's testimony or for other reasons sufficient to you,
18  that such testimony is not worthy of belief.

19          The testimony of a witness may be discredited or
20  impeached by showing that he or she previously made oral or
21  written statements which are inconsistent with his or her
22  present testimony.  The earlier contradictory statements are
23  admissible only to impeach the credibility of the witness and
24  not to establish the truth of those statements.  It is the
25  province of the jury to determine the credibility, if any, to

161

1    be given the testimony of a witness who has been impeached.

2         If a witness is shown knowingly to have testified

3    falsely concerning any material matter, you have a right to

4    distrust such witness's testimony in other particulars; and

5    you may reject all the testimony of that witness or give it

6    such credibility as you may think it deserves.

7         You have heard the testimony of at least one witness

8    who has been convicted of a felony, a crime for which a person

9    may receive a prison sentence for more than a year.  Prior

10   conviction of a crime that is a felony is one of the

11   circumstances that you may consider in determining the

12   credibility of a witness.  While the testimony of a witness

13   may be discredited or impeached by evidence showing that the

14   witness has been convicted of a felony, it is the sole and

15   exclusive right of the jury to determine the weight to be

16   given to the testimony of anyone who has previously been

17   convicted of a felony.

18        Now the testimony of one who provides evidence

19   against a defendant as an informer, must always be examined

20   and weighed by the jury with greater care and caution than the

21   testimony of ordinary witnesses.  You, the jury, must decide

22   whether the witness's testimony has been affected by the

23   benefits that the witness has received or hopes to receive,

24   such as a reduced sentence.

25        You should never convict any defendant upon the

162

1  unsupported testimony of such a witness unless you believe

2  that testimony beyond a reasonable doubt.

3         During the trial, you heard testimony from witnesses

4  who were allowed to give opinion testimony in certain fields.

5  These witnesses were permitted to testify even though they may

6  not have actually witnessed any of the events involved in this

7  trial.

8         The person's training and experience may give him or

9  her specialized knowledge in a technical field.  The law

10 allows that person to state an opinion here about matters in

11 that particular field.  Merely because the witness has

12 expressed an opinion does not mean, however, that you must

13 accept it.  Same as with any other witness, it is up to you to

14 decide whether you believe his or her testimony and choose to

15 rely upon it.  Part of that decision will depend on your

16 judgment about whether the witness's background, training and

17 experience is sufficient to give the opinion that you heard.

18 You must also decide whether the opinions were based on sound

19 reasons, judgment, and information.

20        Your decision on the facts of this case should not

21 be determined by the number of witnesses testifying for or

22 against a party.  You should consider all the facts and

23 circumstances in evidence to determine which of the witnesses

24 you choose to believe or not believe.

25        The law does not require either the defendant or the

163

1    government to cross examine any witness.  You may not draw any
2    inferences from the fact that the government or the defendant
3    did not cross examine a witness.
4            Now the defendant has elected not to testify in this
5    case.  The Court instructs you that he has a constitutional
6    right not to take the stand and testify, not to speak at all
7    or offer any evidence, the burden of proof being entirely upon
8    the government.  You must draw no -- you must draw no adverse
9    inferences of any kind from his exercise of his privilege not
10   to testify.  This right is a fundamental one in America's
11   criminal law and one which cannot be disregarded by the jury
12   at its pleasure.
13           Although the Sixth Amendment guarantees a defendant
14   the right to representation by counsel, it also affords him
15   the right to represent himself if he so chooses.  Here, the
16   defendant was offered the assistance of counsel, and he chose
17   to represent himself.  You should not draw any inferences from
18   the fact that the defendant is not represented by counsel
19   during his trial.
20           Defendant has a right to be present at all
21   proceedings in this case.  But again, that's a matter of
22   election.  He has chosen not to be present during a portion of
23   the trial.  You should not consider his absence in any way in
24   reaching your verdict in the case.
25           You are to judge the facts and apply the law that

164

1    the Court gives to you to reach a verdict.  The fact that the

2    defendant was not present should in no way influence your

3    verdict in any manner.

4         Nor should the fact that the defendant may appear to

5    be in custody affect your verdict in any way.  The fact that

6    the defendant may or may not be in custody does not mean that

7    the defendant committed the offenses charged or any other

8    offense.  Defendants are committed to custody and released

9    from custody for a wide variety of reasons not relevant to

10   your consideration.  The fact that a defendant is or is not in

11   custody should not enter into your deliberation in any way.

12        Let me emphasize that a party's question is not

13   evidence.  At times a party may have incorporated into a

14   question a statement that assumed certain facts to be true and

15   asked the witness if the statement was true.  If the witness

16   does not answer or denies the truth of the statement and if

17   there is no evidence in the record proving that the assumed

18   fact is true, then you may not consider the fact to be true

19   simply because it was contained in the party's question.

20        On the other hand, if the witness adopts or agrees

21   to the assumed facts in his or her answer, then the witness

22   may be considered to have testified to the facts assumed in

23   the question and his or her testimony is evidence of those

24   facts.

25        Now you may have used notes during the trial.  You

165

1  are instructed that your notes are only a tool to aid your own

2  individual memory, should not be substituted for your memory.

3  Moreover, you should not compare your notes with other juror's

4  notes in determining the content of testimony or in evaluating

5  the importance of any evidence.  Remember, your notes are not

6  evidence.

7          Now if you chose not to take notes, remember it was

8  your own individual responsibility to listen carefully to the

9  evidence.  You cannot give this responsibility to someone who

10 took notes.  We depend on the judgment of all members of the

11 jury you must all remember the evidence in this case.

12         Those are the general instructions I wanted to give

13 to you before you heard closing argument.  When the parties

14 are done with closing argument, I'll come back and instruct

15 you on the three specific charges in the indictment.

16         Is the government ready to proceed with its opening

17 statement -- or, I'm sorry, with its closing argument?

18         MS. COMERFORD:  Yes, Your Honor.

19         May it please the Court, Mr. Ductan, ladies and

20 gentlemen of the jury.

21         You heard a wealth of evidence in this case.  But I

22 want to refocus you on what is at the core of the evidence.

23 And that is that on June 3rd, 2004, this man right here, he,

24 he with his hand passed the one pound of marijuana to the

25 confidential informant who then passed it to undercover.  That

1  core act, don't forget it, because it's at the middle of

2  everything else.

3          And we're going to discuss all the other evidence

4  because it informs the nature and the depth of his involvement

5  in the drug conspiracy.  But I don't want you to forget that

6  core act.  He passed that pound of marijuana to the buyer.

7  The buyer that he arranged the sale with.  Don't forget that.

8          I'm going to talk to you a little bit about the law.

9  The Judge will instruct you on the law, and of course he is

10 the ultimate authority.  So I'll hit on the elements that I

11 think are most important and talk about some of the points of

12 law that I think relate to each count.

13         You're going to be presented with a verdict sheet

14 and it's going to present Counts One, Two and Three.  Counts

15 One and Two are going to be dealing with the crime of

16 possession of that marijuana, all those bags you saw

17 yesterday, with the intent to distribute it.

18         Count Two is the conspiracy to possess that

19 marijuana with the intent to distribute it.

20         The conspiracy that existed between Mr. Ductan,

21 Mr. Richardson, and Mr. Lowery.

22         Now Count Two is simply the possession with the

23 intent to distribute it.  So you're not considering

24 conspiracy, you're considering Mr. Ductan's own conduct when

25 you think about Count Two.

1      Now let's talk about what we know that informs Count
2  Two.  Let's talk about what we heard.  Going back to that core
3  act, the passing of the pound of marijuana by Mr. Ductan.
4  When that marijuana is in his hot little hand, he's in
5  possession of it.  He's in actual possession of it.  So check
6  possession off your list.  That's accounted for.

7      When he makes the phone calls to the confidential
8  informant and says, yeah, I'm bringing you 20 pounds of
9  marijuana.  These are statements that go to inform what his
10 intention for that marijuana is.  Because we can't crack open
11 people's heads to know what their thoughts are.  We can only
12 look at how they act and what they say.

13     Now you might be sitting there thinking, but
14 Ms. Comerford, your confidential informant, he didn't have the
15 cleanest record.  You know, you might have some concerns about
16 him.  So what do we do when we have a witness that isn't a
17 preschool teacher.  That isn't our Sunday school teacher.
18 That isn't that perfect person that we would want to hear
19 from?

20     Well, we have to look at what corroborates the
21 statements.  The confidential informant told you he was in the
22 drug trade.  He'd been in the drug trade.  In fact, his
23 involvement in the drug trade is how we got in contact with
24 Phillip Ductan.

25     But I don't know about you, but my mom's knitting

168

1  circle, they don't have a whole lot of leads on where weed's
2  coming in from Georgia.  So sometimes in order to catch drug
3  dealers, we have to pair up with people that are already part
4  of the drug trade, and that's what happened here.  It's a
5  common practice.  You heard from the officers using those
6  confidential informants.

7         And you heard that the CI worked in conjunction with
8  the government to work off some of his charges.  And you heard
9  that he has served all of his time.  And that those are behind
10 him.

11        So as he sat here yesterday and you heard from him,
12 he was like any other witness here under subpoena telling the
13 truth because he was under oath, if you so chose.  He was
14 under the same oath as everyone else.  And he didn't have any
15 charges over him to make him have any other relationship with
16 the government at this point in time, but he certainly did
17 have one at the time he cooperated against this defendant.  We
18 wanted to be clear with you about that.

19        So what tells us that the confidential informant's
20 being truthful?  Well, we have the undercover accompany him.
21 He stands at the door and has a full view of the transaction
22 go down.  Undercover Officer Steven Whitesell.  He'd been in
23 vice and narcotics for just a short time and this was his
24 first undercover deal.  But he stood there and he observed
25 everything that went down when Phillip Ductan passed the pound

1  of marijuana to the CI.

2          Mark Lowery sat right in front of him at that time.

3  He had the keys in his pocket to that vehicle that had the

4  rest of the stash.

5          Richardson sits on a loaded gun in the driver's seat

6  while that core transaction comes down.  Don't take the CI's

7  word for it, take the UC's word for it.  He was standing right

8  there.

9          Don't want to take his word for it, we brought you

10  surveillance video.  We couldn't get inside that car, but we

11  had the parking lot shots for you.  These are things that can

12  corroborate if you have any concerns about hearing from a

13  confidential informant.

14          And I hope that you'll remember that we photographed

15  the evidence with -- inside the vehicle as it was found.  That

16  green backpack that had the sample of marijuana, that's all to

17  corroborate, to show you as it appeared on that day.

18          So the elements of Count Two when you are presented

19  with that verdict sheet, we have possession.  We have that

20  it's tested as marijuana.  You heard from the chemist that

21  used his expertise in analyzing it, confirms it's marijuana.

22  Check those off your list.  It was possessed.

23          We have the entire fact that it was not -- Mark

24  lowery, not Mr. Richardson, it was Mr. Ductan, also known as

25  Black, making those phone calls, setting up this deal saying

170

1    I'm coming with 20 pounds.  I'm coming from Georgia.  That's
2    how we know what his intent was.  And when he passes it,
3    that's the distribution.  That's the sample.
4            So let's move on to Count Two.  Same thing,
5    possession with intent to sell and deliver.  Possession with
6    intent to distribute.  However, you also can -- you're also
7    considering the conspiracy to do such.
8            Now conspiracy under the law the judge will tell you
9    is simply an agreement, an agreement for some criminal
10   purpose.  And it can be -- only has to be between two people.
11           Now I'm going to go back to the snapshot in the car,
12   that core transaction.
13           Mark Lowery sitting in the passenger seat when the
14   transaction goes down.  In his pocket, the keys to the rest of
15   the drug stash.  Landis Richardson sitting on a loaded gun
16   when the deal goes down.  That's your proof.  Their presence
17   during that deal is your main proof that they are connected.
18           But if that's not enough I'm going to back you up to
19   when Officer Bowles first is setting up on the perimeter on
20   the roadway on the I-85 service road near the Cracker Barrel
21   and she sees the blue Ford Expedition and the tan Chevy
22   stopped at the stoplight and the occupants talking.  And who's
23   the driver of that tan Chevy?  It's Mark Lowery.
24           She wasn't able to see exactly who was in that blue
25   Ford Expedition but it was two black males with short hair

1   that fit the description of the person who was later found in
2   the driver seat and Mr. Ductan.

3           So you can make of that what you will.  But I would
4   contend to you that what we have is the interaction between
5   those co-conspirators that were in the car when the
6   transaction went down.

7           So when you're presented with Count One, the
8   conspiracy with possession with intent to distribute
9   marijuana, I'm going to ask that you check guilty.  You have a
10  wealth of evidence beyond a reasonable doubt to find as such.

11          I'm going to move you to Count Three now.  In Count
12  Three you'll be asked to consider what is a violation of
13  924(c).  It's a possession of a firearm in furtherance of the
14  possession with intent to distribute.

15          So it's -- you can't take guns with you when you're
16  dealing drugs.  It's against the law.  It's against the law to
17  deal drugs.  But it's even more against the law to take a gun
18  with you in furtherance of that drug deal.  That's what 924(c)
19  is.

20          There's a couple different ways that you can find
21  that this law was broken.  The Judge will instruct you on that
22  law.  One way is to find that he carried the firearm in
23  relation to the drug trafficking crime, the possession with
24  intent to distribute that marijuana.

25          You can carry a firearm just by driving it around in

172

1    your car, by having it in the car with you if you're a
2    passenger.  It's then been carried or transported.

3           I would contend to you that when Mr. Ductan slinked
4    out of that blue vehicle and set his gun down, when you see
5    that slinking described by Officer Melton in setting that gun
6    down, that's proof of his guilty mind.  That's proof of him
7    trying to get away from there.  Because you want to know why?
8    He was in that car with that gun, with that Smith and Wesson
9    revolver, and that revolver was there for his protection.  His
10   protection of his drug stash.

11          Because you heard from Kelly Little on the stand
12   who's bench in vice and narcotics for 15 years, has gone
13   undercover and interviewed drug dealers, that guns and drugs
14   are related.  That drugs and guns go hand in hand, and that
15   guns are a tool of the drug trade.  Why?

16          Because if someone steals my drug stash, I can't
17   necessarily call the police.  I'm involved with illegal
18   things.  I got to protect my own stash.  That's my livelihood.
19   That was $550 per pound that they were setting up this deal
20   for.

21          So I would contend to you that when Mr. Ductan
22   rolled up to the Cracker Barrel, it wasn't because Charlotte
23   is in such a state of chaos that we have to roll up with
24   loaded guns to protect ourselves when we go to eat chicken and
25   dumplings at the Cracker Barrel.  No, it was because he was

173

1  there to conduct a drug transaction.  And he needed those guns
2  to protect him.  That is what part of the drug transaction --
3  what part of the drug crime this firearm furthered.
4       You talk about liquid courage with alcohol.  For
5  drug dealers, guns are metal courage.  It gives them the
6  courage to get in that car and deal with some other dangerous
7  people.
8       And remember, this was the first meeting between
9  this confidential informant, Mandrell Dunn, and Black, or
10 Phillip Ductan.  There wasn't any trust there yet.  There
11 hadn't been prior drug deals.  Even more reason for him to
12 have a loaded gun.  Even more reason for his co-conspirator to
13 be sitting on a loaded gun, too, in the front driver's seat.
14 They were ready for trouble if trouble went down.  You don't
15 have to use the firearm to find that it furthered this drug
16 crime.  The trust wasn't there, so the guns were.
17      When you get to 924(c), when you get to Count Three,
18 I'm going to ask that you find him guilty, and check guilty.
19 That he possessed a firearm in furtherance of that drug
20 trafficking crime.  Or, if you find that he carried the
21 firearm in furtherance -- in relation to the drug trafficking
22 crime.  However you find it, you must be unanimous in how you
23 decide it, but I'm going to ask that you check, guilty.
24      Ladies and gentlemen of the jury, I want to thank
25 you for your time and your patience throughout this trial.

174

1    You'll hear from Mr. Washington after me.  But I would contend
2    to you that this is a case where, of course we carry the
3    burden.  We welcome the burden.
4         There is a wealth of evidence and there is -- if you
5    need to review it we can -- the Judge will set you up.  But
6    every way you look, there's evidence that comes to the
7    conclusion of guilty in Counts One, Two and Three.
8         But I don't want you to forget that core
9    transaction, because that's the center of it all.  When
10   Phillip Ductan passed that pound of marijuana, that sample to
11   the confidential informant, that was the sample for the
12   greater load.  The other 20 pounds was waiting.
13        Find him guilty.
14        THE COURT:  Mr. Ductan, do you wish to make a
15   closing argument?
16        DEFENDANT DUCTAN:  Good morning, ladies and
17   gentlemen of the jury.
18        I would just like to say that I'm glad that you guys
19   could be here with us today.  To be able to serve on this
20   panel today is a honor, and we thank you that you guys are
21   here today to be able to do so, or I am.  I'm sure Mrs. --
22   government is too.
23        Today you're here to ensure that justice becomes a
24   part of that honor.  Now, we all appreciate our law
25   enforcement agency for keeping us safe.  And quite often,

175

1  doing that they do a good job of doing that.  So we're very

2  thankful for them.

3       Let's just go back to what the prosecutor wants you

4  to believe.  They want you to believe that the defendant

5  coerced two grown men to drive miles away to meet for the

6  first time in the middle of a Cracker Barrel, to do a drug

7  deal.  Let's look at some of the key elements.

8       We got the one pound of marijuana.  We have a

9  weapon, a .38 revolver, nickel plated .38 revolver, and we

10  have a gym bag that also was located in Mr. Lowery's vehicle.

11  And then we also have 18 pounds of marijuana.

12       Now let's just go back to the one pound of

13  marijuana.  It was given testimony of the undercover.  He

14  claims that the defendant reached in the bag, pulled out one

15  pound of marijuana to display it to the CI, confidential

16  informant.

17       Now, upon further analysis of that bag, we didn't

18  find any fingerprints that belong to the defendant.  How could

19  the defendant have reached inside the bag to display this to

20  the CI, and then after further analysis there's no

21  fingerprints.

22       Not only that, you have a takedown that's -- I'm

23  sure there was a lot of members in that takedown team.  They

24  pull up.  Just kind of envision the scene.  Takedown team

25  pulls up.  Apprehends a lot of the occupants inside the

176

1  vehicle.  At that time you could imagine that there was, you
2  know, a lot -- a lot of movement going on.
3          So it is alleged that the defendant ran from the
4  vehicle.  We have black male running from the vehicle.
5  There's officers everywhere.  And then he takes out a nickel
6  plated -- you guys can see that?  Can you all see that?
7          THE JURY:  (Nodding head.)
8          DEFENDANT DUCTAN:  He brandishes a nickel-plated
9  revolver.  You can imagine the scene there was kind of
10  elevated, given the facts that this was a takedown.  So you
11  have a black man run away from the vehicle, displays a
12  revolver, and then sets it on the ground, and he's still here
13  to talk about that today.  That's very -- that's a very
14  fortunate situation.  If that in fact is what happened.
15          Not only that, you have that same nickel-plated
16  revolver with a holster in there that was also taken for
17  analysis, and there's no fingerprints.  No fingerprints of the
18  defendant.  Absolutely none.  Not only that we have four
19  statements that was not allowed, four reports that was not
20  allowed.
21          MS. COMERFORD:  Objection.
22          THE COURT:  Mr. Ductan, you can't talk about things
23  that are not in evidence.
24          DEFENDANT DUCTAN:  Okay.  Well, we have -- we have
25  reports that would contradict the location of that firearm if

1    it was allowed.

2              MS. COMERFORD:  Objection.  Outside the evidence.

3              THE COURT:  The jury should disregard that last

4    statement of Mr. Ductan.

5              DEFENDANT DUCTAN:  Not only that, I would like to

6    bring out the fact that, as you can see, this is -- this is

7    the book bag that the alleged marijuana was inside of.

8              But if you -- I'm sure you can't see from this

9    distance.  But if you look here, there was a glove that was

10   used to ensure the safety of it, to make sure that, you know,

11   they properly dealt with the bag before they did the analysis.

12             So you have the defendant pull out the bag, display

13   it to a CI.  And then it was put back in the bag and

14   immediately after that, there was a takedown.  And of course

15   you can see that there was ensured that the bag was safely put

16   in, and safely and properly analyzed, but no fingerprints.

17             What are the facts?  The facts is, the vehicle, the

18   SUV doesn't belong to the defendant.  That SUV belongs to

19   Mr. Lowery.  You have 18 pounds of marijuana, and not one

20   fingerprint of the defendant is on there?  Not one fingerprint

21   from the one pound of weed.  Not one fingerprint on the

22   revolver.

23             You don't have a description of the two men who was

24   in the vehicle talking to Mr. Lowery at that time.  You have a

25   video that shows the defendant walking from the Cracker Barrel

1  to the vehicle.  But you don't have any audio.  There's no

2  audio as to what actually transpired or what conversation was

3  being told.  So how can we say that this is exactly what took

4  place?

5          The evidence with the gym bag.  It was also brought

6  to our attention by the lead detective Ms. Bowles, that upon

7  interviewing the co-defendant, that he was a physical fitness

8  trainer.  Where was that bag located?  That bag was located in

9  Mr. Lowery's vehicle.  Possession, dominion, control.  Control

10 was given to Mr. Lowery, not the defendant.

11         You guys, we have to think about the character.  One

12 of their key -- one of their key witnesses was Mr. Dunn, who

13 we all know has a very colorful background.  As a matter of

14 fact, with all the people involved in this case, the only

15 person who never had a drug conviction or a crime is the

16 defendant.

17         MS. COMERFORD:  Objection.

18         THE COURT:  Sustained.  Members of the jury, you

19 should disregard that statement, that last statement.

20         DEFENDANT DUCTAN:  I would just like for you guys to

21 basically take into account all the facts beyond a reasonable

22 doubt.  Was the defendant at the Cracker Barrel and so

23 happened to be at a bad place -- at the wrong place at the

24 wrong time?

25         There is no -- there's no audio.  We don't have any

1    phone records of a conversation that was established with

2    Mr. Dunn.  The CI claims that he called and, you know, it was

3    established to, you know, come up and, you know, make a

4    transaction or what have you.  But we don't have any recorded

5    conversation.  We don't have any transcript of any kind.

6           So, you know, we can formulate all kind of ideas as

7    to what actually happened.  But the facts are, we have no

8    fingerprints with the gun.  We have no fingerprints on the

9    marijuana.  We have a vehicle with 18 pounds of marijuana that

10   belongs to Mr. Lowery.

11          We have a bag, a gym bag that belongs to Mr. Lowery.

12   So how can you say that the defendant is in possession or had

13   possession or these things belonged to him?

14          Ladies and gentlemen, I would like for you to take

15   into consideration, I'm sure you're wondering what type of

16   character, or who the defendant actually is.  I'd just like to

17   tell you the defendant --

18          MS. COMERFORD:  Objection.

19          THE COURT:  Overruled.

20          DEFENDANT DUCTAN:  -- the defendant is a loving

21   husband.

22          MS. COMERFORD:  Objection.

23          THE COURT:  I'll sustain anything that's not in

24   evidence.  You can argue what's in evidence.

25          DEFENDANT DUCTAN:  Well, I just want to bring up

180

1   the -- you know, describe --

2            THE COURT:  Just what's in evidence.

3            DEFENDANT DUCTAN:  Let everybody talk about their

4   career --

5            MS. COMERFORD:  Objection.

6            DEFENDANT DUCTAN:  -- and what they --

7            THE COURT:  Mr. Ductan, you can talk about the

8   evidence.  I'll let you do that, not anything that's not in

9   evidence.

10            DEFENDANT DUCTAN:  All right.  Well, in terms of the

11   evidence, I'm sure you guys are intelligent enough and you'll

12   be able to come to a reasonable conclusion in terms of doubt,

13   reasonable doubt, beyond a reasonable doubt.

14            Has the government given you beyond a reasonable

15   doubt that, yes, in fact, this is exactly what transpired.

16   This is exactly what happened.

17            Mr. -- the defendant actually caused two men or had

18   dealings with three individuals to put together this whole

19   scheme to formulate -- to be able to formulate and make a

20   transaction to gain proper -- to gain profit.

21            You know, the background of the defendant is --

22            MS. COMERFORD:  Objection.

23            DEFENDANT DUCTAN:  -- nowhere near what they want

24   you to believe.

25            THE COURT:  Overruled.

181

1        DEFENDANT DUCTAN:  I would just like to thank you

2   all for being able to come out here, and with a reasonable

3   mind to be able to come up with a conclusion whether or not,

4   you know, the defendant, yes in fact, or had intentions of

5   being involved in such a transaction.

6        Unfortunately, the defendant was not able to -- the

7   defendant was not able to --

8        MS. COMERFORD:  Objection.

9        THE COURT:  I think you're going in the wrong

10  direction on that comment, so.

11       DEFENDANT DUCTAN:  I just wanted to just elaborate

12  on a couple things.

13       In fact, ladies and gentlemen, I just want to

14  appreciate you guys for hearing me out.  I just thought that I

15  would take it amongst myself to express that to you all so you

16  could hear from me, myself, and let you know that these

17  individuals that they describe as being drug dealers and so

18  on, so have you, is not the type of character --

19       MS. COMERFORD:  Objection.

20       THE COURT:  Overruled.

21       DEFENDANT DUCTAN:  Is not the man that you guys see

22  here before you today.

23       Unfortunately, given the circumstances and the

24  display that you all see, that is not the case at all.  And I

25  can promise you that.

182

1        But I will ask that you guys have an open mind about

2   this situation, and diligently look at the evidence and the

3   facts.  The key elements of the case would be the one pound of

4   marijuana being displayed.  Right after being displayed, it

5   was a takedown.  There was proper care making sure that the

6   analysis back from that came back accurately.  No

7   fingerprints.

8        You have a weapon, given the hostility of the

9   situation, which is claimed to be brandished, and then put on

10  the ground and later analyzed, no fingerprints.

11       Some statements will contradict the location of

12  that, but we're not able to --

13          THE COURT:  Mr. Ductan.

14          DEFENDANT DUCTAN:  -- make that out.  I'm sorry.

15       Ladies and gentlemen, I just ask that you all do a

16  diligent job of continuing your civil duty.  And I think that

17  you will come to a positive conclusion that there is doubt --

18  that there is doubt beyond a reasonable doubt.  That in fact

19  the defendant probably wasn't involved in such a situation,

20  and he could have been at the wrong place at the wrong time.

21       That's what this case is about.  This case is about

22  individuals colorful background that got together and

23  missed -- defendant so happened to be in the wrong place at

24  the wrong time.  And we're putting together what may

25  presumably seem as though he had something directly to do with

183

the situation.  But we don't have any audio to back that claim
up.  We don't have any transcripts of phone calls, of phone
conversations going back and forth.  So right now everything
we have here is rumored to be.

I just ask that you all come to a conclusion, a
positive conclusion that will allow this man to go back home
to his family.

MS. COMERFORD:  Objection.

THE COURT:  Overruled.

DEFENDANT DUCTAN:  That's what I'm asking you guys
today, for justice to prevail.  Let the system continue to
work in its rightful manner.

Sometimes we can find ourselves on the opposite side
of the law.  But there's a lot of times that given the
situation, this situation, you're able to ensure that the law
is used accurately.

And I'm sure today you guys will come to that
positive conclusion and allow the law to continue to proceed
in a positive manner that it was set up from here for, for all
of us here today.

Ladies and gentlemen, I thank you for allowing me to
speak.  There's a lot more things I wish I was able to say to
you all, but unfortunately that's, you know, restrictions that
I was not allowed for me to elaborate on.

But I would leave you with that, and I thank you.  I

184

1    thank you very much.   I appreciate you.

2              THE COURT:  Mr. Washington.

3              MR. WASHINGTON:   Thank you.

4         Ladies and gentlemen of the jury, I have a brief

5    opportunity to respond to the defendant's closing argument.

6    I'm not going to go back through all of the evidence.  That's

7    not my point here.  But since the government bears the burden,

8    I have the opportunity to specifically address some of the

9    items raised by the defendant in this case.

10             First of all, let's be very clear.  During closing

11   you heard the defendant, the defendant.   Three witnesses took

12   the stand and positively identified the defendant, Phillip

13   Ductan, as the person there at the Cracker Barrel conducting

14   that deal on that day.  You heard that his appearance has

15   changed somewhat over the years.  But they were able to

16   positively identify him as the person who was involved in that

17   deal.

18             Now the defendant raised a lot of issues with

19   respect to fingerprints.  Why weren't there any fingerprints?

20   First of all, they tried.  They tested.  They tried to get

21   fingerprints off the items.  You heard the testimony they were

22   not able to.  Now common sense, right, tells you, somebody

23   touched those packages at some point.  So the fact that there

24   weren't the defendants fingerprints on there really don't tell

25   you anything.  They weren't able to recover any prints off of

1    there.  That was the testimony that you heard.  You don't need
2    fingerprints.  This isn't a who-done-it, okay.

3          The bag that was in the car -- it wasn't found under
4    a tree and we're wondering who left it under the tree.  You
5    had testimony from two individuals who told you when they got
6    in -- or when the confidential informant Mr. Dunn got into the
7    car, that the defendant showed him that bag with the marijuana
8    in it.

9          The police detective told you the exact same thing.
10   He's able to see into the door, and he's able to see the
11   defendant showing that bag of marijuana.  So we know who
12   touched it.  The same with the firearm.

13         As the defendant, this defendant, Mr. Ductan tried
14   to slip away from the scene there at the Cracker Barrel, an
15   officer told you, I saw him put it down.  Again, not a
16   who-done-it.

17         If they found it in the parking lot, and we didn't
18   quite know how it got there, that might be a more important
19   fact that there isn't any fingerprints on it.  But he was seen
20   putting it down.  Again, you know someone touched that gun.
21   So the fact that his fingerprints on it -- or were not on it
22   is not dispositive.

23         There could always potentially be more evidence.
24   Your question in making your decision in finding beyond a
25   reasonable doubt is not what else could have possibly help

186

1    establish the case, but that, was the government's evidence

2    sufficient to establish that?  And the eyewitness seeing the

3    defendant with those items is more than sufficient.

4         With respect to the marijuana found in the gold

5    Tahoe.  And you recall the evidence that one of the occupants

6    of the vehicle had the keys in his pocket.  They went around,

7    they clicked it, and it opened a car.  They found in that car

8    another gun and 18 pounds of marijuana.

9         So ladies and gentlemen of the jury, remember a

10   couple of things.  First of all, remember the deal was set up

11   for 20 pounds of marijuana.  So this is really a classic

12   conspiracy.  A classic conspiracy.  Because there's kind of

13   this division of labor.

14        The defendant, Mr. Ductan is in the car with the --

15   with the flash amount to show that they actually had

16   marijuana.  The other defendant has stashed -- the deal was

17   for 20 pounds, had stashed the remaining marijuana in his car

18   elsewhere.  That is evidence that they were working together.

19        For the conspiracy, the defendant had to have

20   conspired with at least one other person.  And there is

21   evidence that he conspired with the two of them.

22        Ladies and gentlemen of the jury, the defendant

23   argued that there's no -- that he -- arguably he was at the

24   wrong place at the wrong time, that kind of sums up.

25        Ladies and gentlemen of the jury, the evidence that

187

1   was presented to you -- and let me say this, you have to make
2   your decision based upon the evidence that was presented.
3   Even what the attorneys or the parties argued to you, that's
4   intended to guide you, to assist you in understanding the
5   evidence.  It's not new evidence.
6          We have a wonderful, amazing jury system where any
7   defendant can say, you say I did it, prove it.  And the
8   government has to come in and prove guilt beyond a reasonable
9   doubt.  And we do that by introducing exhibits.  And the
10  judge's -- the umpire.  He's making sure that both sides have
11  a fair trial.  But you make your decisions on what was
12  introduced.  And the evidence introduced simply does not
13  suggest that this is a wrong place at the wrong time case.
14         Because the evidence has been that this defendant,
15  Phillip Ductan first of all, set up the deal with Mr. Dunn for
16  this marijuana delivery.  He then arrives at the Cracker
17  Barrel.  You see them meet and talk.  We're not, wrong place
18  at the wrong time.  They talk, they converse.  They then go
19  over to the car.  They get into the car.  And the defendant
20  shows him the marijuana sample that's in the car.
21         Ladies and gentlemen of the jury, it is submitted to
22  you that the evidence is overwhelming with respect to this
23  particular defendant, and the government has proven its case
24  beyond a reasonable doubt.
25         Now listen, there will always be some doubt in every

1   criminal trial.  Because unless you were there and you

2   witnessed the events for yourself, you got to rely on

3   witnesses and evidence as brought into court.  So there's

4   always some -- some doubt there because you had to hear it.

5           But the government is not required to prove its case

6   beyond all possible doubt.  That would be impossible.  Beyond

7   a reasonable doubt.  And in this case the evidence has been

8   overwhelming and there is no reasonable doubt left here.

9           Now the defendant has had a full and fair trial.  He

10  has represented himself, but he has done the things that

11  lawyers do.  Cross examine witnesses and made arguments, and

12  it has been a fair trial, and our system has worked in this

13  case.

14          The evidence is clear and overwhelming as to each

15  count of the indictment, and you can therefore go back into

16  the jury deliberation room and in good faith find this

17  defendant guilty of all three counts as charged.  Thank you.

18          THE COURT:  All right.  Now that you've heard the

19  closing arguments, I want to read Count One in the Bill of

20  Indictment to you.  Then I went want to read the statute that

21  is alleged to have been violated.  And finally I want to tell

22  you the essential elements that must be proven by the

23  government beyond a reasonable doubt.

24          Now in doing this you should keep in mind that you

25  will have a copy of the indictment with you back in the

189

1  deliberation room, so it is not necessary for to you memorize

2  the count in the Bill of Indictment.  I do also want to remind

3  you that the indictment is not evidence.

4          Count One reads that from in or about April of 2004

5  and continuing until the present in Mecklenburg County, within

6  the Western District of North Carolina, and elsewhere, Phillip

7  Ductan, also known as Jacob Miller, Landis Richardson, Mark

8  Lowery, did knowingly and unlawfully, combine, conspire,

9  confederate and agree with each other, and others, both known

10 and unknown to the Grand Jury to possess with intent to

11 distribute a quantity of marijuana, a Schedule I controlled

12 substance, in violation of Title 21, United States Code,

13 Section 841.

14         All in violation of Title 21, United States Code,

15 Section 846.

16         Now you will note that the Bill of Indictment

17 charges that the offense was committed "in or about" a certain

18 date or dates.  The proof need not establish with certainty

19 the exact date of the alleged offense.  It is sufficient the

20 evidence in the case establishes beyond a reasonable doubt

21 that the offense in question was committed on a date

22 reasonably near the date or dates alleged.

23         Title 21, United States Code, Section 846 reads in

24 pertinent part as follows:

25         Any person who conspires to commit any offense

defined in this subchapter commits an offense.

One of the offenses referenced in Section 846, is Section 841 which reads in pertinent part as follows:

It shall be unlawful for any person knowingly or intentionally to distribute or possess with intent to distribute a controlled substance.

Now where a statute specifies several alternative ways in which an offense can be committed in the disjunctive, or using the word "or," the indictment may allege the several ways in the conjunctive, or using the word "and." You may find the defendant guilty of the offense if you find beyond a reasonable doubt that he committed one or more of the means of violating the statute. Thus, where the indictment uses the term "and," you may consider it as "or" unless I specifically instruct you differently.

The defendant is charged with a conspiracy. A conspiracy is an agreement between two or more persons to join together to accomplish some unlawful purpose. It is a kind of "partnership in crime" in which each member becomes the agent of every other member.

For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt: That on or about the date alleged in the indictment, in the Western District of North Carolina,

191

1        1.  That two or more persons, directly or
2   indirectly, reached an agreement to possess with intent to
3   distribute a controlled substance; I instruct you that
4   marijuana is a controlled substance within the meaning of the
5   law;

6        2.  That the defendant knew of the unlawful purpose
7   of the agreement; and

8        3.  That the defendant joined in the agreement
9   willfully, that is, with the intent to further its unlawful
10  purpose.

11       One may become a member of a conspiracy without
12  knowing all the details of the unlawful scheme or the
13  identities of all the other alleged conspirators.  If the
14  defendant understands the unlawful nature of a plan or scheme
15  and knowingly and intentionally joins in that plan or scheme
16  on one occasion, that is sufficient to convict him for
17  conspiracy even though the defendant had not participated
18  before and even though the defendant played only a minor part.

19       The government need not prove that the alleged
20  conspirators entered into any formal agreement, nor that they
21  directly stated between themselves all the details of the
22  scheme.  Similarly, the government need not prove that all of
23  the details of the scheme alleged in the indictment were
24  actually agreed upon or carried out.  Nor must it prove that
25  all of the persons alleged to have been members of the

192

1  conspiracy were such, or that the alleged conspirators

2  actually succeeded in accomplishing their lawful objectives.

3        In determining whether the defendant had a criminal

4  agreement with another person, I instruct you that a person

5  who is at that time acting as a government agent or informant

6  cannot be a co-conspirator.

7        Now mere presence at the scene of an event, even

8  with knowledge that a crime is being committed, or the mere

9  fact that certain persons may have associated with each other

10 and may have assembled together and discussed common aims and

11 interests, does not necessarily establish proof of the

12 existence of a conspiracy.  Also, a person who has no

13 knowledge of a conspiracy, but who happens to act in a way

14 which advances some purpose of the conspiracy, does not

15 thereby become a conspirator.

16       Now I want to transition to definitions of certain

17 terms used in these instructions, and you are to apply the

18 definitions I give you as you consider the evidence.  If I

19 don't define a word, you will assign to that word its

20 ordinary, everyday meaning.

21       "Possession," as that term is used in this case, may

22 be of two kinds; actual possession or constructive possession.

23 A person who knowingly has direct physical control over a

24 thing, at a given time, is then in actual possession of it.

25       A person who, although not in actual possession,

1    knowingly has both the power and the intention, at a given

2    time, to exercise dominion or control over a thing, either

3    directly or through another person or persons, is then in

4    constructive possession of it.

5            Now possession may be sole or joint.  If one person

6    alone has actual or constructive possession of a thing,

7    possession is sole.  If two or more persons share actual or

8    constructive possession of a thing, possession is joint.

9            You may find that the element of possession, as that

10   term is used in these instructions, is present if you find

11   beyond a reasonable doubt that the defendant had actual or

12   constructive possession, either alone or jointly with others.

13           The phrase "with intent to distribute" means to have

14   in mind or to plan in some way to deliver or transfer

15   possession or control over a thing to someone else.

16           In attempting to determine the intent of any such

17   person, you may take into consideration all the facts and

18   circumstances shown by the evidence received in the case

19   concerning that person.

20           In determining a person's "intent to distribute"

21   controlled substances, you may consider, among other things,

22   the quantity of the controlled substance, the presence or

23   absence of equipment used in the processing or sale of

24   controlled substances, and the presence or absence of large

25   amounts of cash or weapons.

194

 1          For you to find the defendant guilty of the charge
 2   in Count One of the indictment, you must -- the government
 3   must prove, beyond a reasonable doubt, that the object of the
 4   conspiracy was to possess with intent to distribute a
 5   controlled substance as alleged in the indictment.
 6          Next, you should turn your attention to the issue of
 7   the type of illegal drug involved.
 8          As to the drug charged in the Bill of Indictment,
 9   you must determine if the substance involved was marijuana.
10   The government may prove this through either direct or
11   circumstantial evidence.  Circumstantial evidence would be
12   evidence from which you would -- you could infer that the
13   material was marijuana, such as testimony concerning the names
14   used by the co-defendant or a co-conspirator to refer to the
15   material or testimony about the material's appearance.
16   Whether the government relies on direct or circumstantial
17   evidence to prove that the material in issue is marijuana, it
18   must prove so beyond a reasonable doubt.
19          The government must show beyond a reasonable doubt
20   that the defendant or co-conspirators knowingly possessed with
21   intent to distribute marijuana and that the defendant
22   willfully joined the conspiracy.
23          The term "knowingly" means that the act was done
24   voluntarily and intentionally, not because of mistake or
25   accident.

195

1      The word "willfully" as used in these instructions
2  to describe the alleged mental state of the defendant, means
3  that he knowingly performed an act deliberately and
4  intentionally or on purpose, as contrasting with acting
5  accidentally or carelessly.
6      Next, I want to explain something about proving a
7  defendant's state of mind.  Ordinarily, there's no way that a
8  defendant's state of mind can be proved directly, because no
9  one can read another person's mind and tell what that person
10 is thinking.  But a defendant's state of mind can be proved
11 indirectly from the surrounding circumstances.  This includes
12 things like what the defendant said, did, how he acted, and
13 any other facts and circumstances in evidence that show what
14 was in the defendant's mind.  You may also consider the
15 natural and probable results of any acts that the defendant
16 knowingly did, and whether it is reasonable to conclude that
17 the defendant intended those results.  This is all for you to
18 decide.
19     Now evidence has been received in this case that a
20 certain person or persons, who are alleged to have been
21 co-conspirators with the defendant, have done or said things
22 during the existence or life of the alleged conspiracy in
23 order to further or advance its goals.
24     Such acts and statements of alleged co-conspirators
25 may be considered by you in determining whether or not the

196

1   government has proven the charges in Count One of the

2   indictment against the defendant.

3         Since these acts may have been performed or these

4   statements may have been made outside the presence of the

5   defendant, and even done or said without his knowledge, these

6   acts or statements should be examined by you with particular

7   care before considering whether they may be used against the

8   defendant.  If you find that the acts or statements were in

9   furtherance of the goals of the conspiracy, and you find that

10  the defendant was or became a member of that conspiracy, you

11  may consider those acts or statements as evidence against the

12  defendant.

13        Acts done or statements made by an alleged

14  co-conspirator before the defendant joined the conspiracy may

15  also be considered by you in determining whether the

16  government has sustained its burden of proof on Count One.

17  But acts done or statements made before the alleged conspiracy

18  began or after it ended, may only be considered against a

19  person who performed the act or made the statement.

20        Now a conspirator is responsible for offenses

21  committed by another conspirator if the conspirator was a

22  member of the conspiracy when the offense was committed and if

23  the offense was committed in furtherance of, and as a

24  foreseeable consequence of, the conspiracy.

25        Therefore, if you have first found the defendant

197

1    guilty of the conspiracy charged in Count One, and if you find

2    beyond a reasonable doubt that during the time that defendant

3    was a member of that conspiracy, another conspirator committed

4    an offense in Count Two or Three in furtherance of and as a

5    foreseeable consequence of that conspiracy, then you may find

6    the defendant guilty of that offense, even though the

7    defendant may not have participated in any of the acts which

8    constitute the offense described in those counts.

9            I now want to read to you Count Two.

10           It reads that on or about June 3rd, 2004, in

11   Mecklenburg County, within the Western District of North

12   Carolina, and elsewhere, Phillip Ductan also known as Jacob

13   Miller, Landis Richardson, Mark Lowery, did knowingly and

14   unlawfully possess with intent to distribute a quantity of

15   marijuana, a Schedule I controlled substance, and did aid and

16   abet one another, in violation of Title 21, United States

17   Code, Section 841, and Title 18, United States Code, Section

18   2.

19           Now I have previously read to you Title 18 -- or

20   Title 21, United States Code, Section 841.

21           Title 18, United States Code, Section 2 reads as

22   follows:

23           Whoever commits on offense against the United States

24   or aids, abets, counsels, commands, induces, or procures its

25   commission, is punishable as a principal.

1    For you to find the defendant guilty of the crime
2    charged in Count Two, you must be convinced that the
3    government has proved each of the following beyond a
4    reasonable doubt:  That on or about the dates alleged within
5    the Western District of North Carolina:

6    1.  That the defendant, or someone aided and abetted
7    by the defendant, knowingly possessed with intent to
8    distribute a controlled substance, and that the substance was
9    in fact marijuana; and

10    2.  That the defendant acted knowingly and
11    intentionally.

12    Now I previously defined for you the terms
13    "possess," "intent to distribute" and "knowingly" and you will
14    use those definitions for this count.

15    Now the guilt of a defendant in a criminal case may
16    be established without proof that the defendant personally did
17    every act constituting the offense alleged.

18    The law recognizes that, ordinarily, anything a
19    person can do for himself may also be accompanied by him
20    through the direction of another person as his agent, or by
21    acting in concert with, or under the direction of another
22    person or persons in a joint effort or enterprise.

23    If another person is acting under the direction of
24    the defendant, or if the defendant joins another person and
25    performs acts with the intent to commit a crime, then the law

199

1  holds the defendant responsible for the acts and conduct of

2  such other persons, just as though the defendant has committed

3  the acts or engaged in such conduct.

4       Before any defendant may be held criminally

5  responsible for the acts of others it is necessary that the

6  accused deliberately associate himself in some way with the

7  crime and participate in it with the intent to bring about the

8  crime.

9       However, mere knowledge that a crime is being

10 committed is not sufficient to establish that a defendant

11 either directed or aided and abetted the crime unless you find

12 beyond a reasonable doubt that the defendant was a participant

13 and not merely a knowing spectator.

14      In other words, you may not find any defendant

15 guilty unless you find beyond a reasonable doubt that every

16 element of the offense as defined in these instructions was

17 committed by some person or persons, and that the defendant

18 voluntarily participated in its commission with the intent to

19 violate the law.

20      The final count is Count Three and I want to read

21 that to you.  It reads that:

22      On or about June 3rd, 2004, in Mecklenburg County,

23 within the Western District of North Carolina, Phillip Ductan,

24 also known as Jacob Miller, Landis Richardson, Mark Lowery,

25 during and in relation to a drug trafficking crime, that is,

200

1   conspiracy to possess with intent to distribute marijuana, a
2   violation of Title 21, United States Code, Section 846, for
3   which they may be prosecuted in a court of the United States,
4   did knowingly carry firearms, and, in furtherance of such drug
5   trafficking crime, did possess one or more of the following
6   firearms, to wit:  Smith and Wesson .38 caliber revolver, a
7   Taurus 9 mm handgun, and a Hungary 9 mm handgun, and did aid
8   and abet one another and others in violation of Title 18,
9   United States Code, Section 2, and Title 18, United States
10  Code, 924(c)(1).
11          Title 18, United States Code, Section 924(c)(1)
12  reads in pertinent part:
13          Any person who, during and in relation to any drug
14  trafficking crime for which the person may be prosecuted in a
15  court of the United States, carries a firearm, or who, in
16  furtherance of such crime, possesses a firearm, commits an
17  offense.
18          Now I've previously read to you 18 United States
19  Code Section 2, which is the aiding and abetting statute.
20          For you to find the defendant guilty of this crime,
21  you must be convinced that the government has proven each of
22  the following beyond a reasonable doubt:
23          1.  That the defendant or someone aided and abetted
24  by the defendant, committed a drug trafficking crime, that is,
25  conspiracy to possess with intent to distribute marijuana; and

201

1    one of the following:

2              A.   That the defendant, or someone aided and abetted

3    by the defendant, knowingly carried a firearm during and in

4    relation to the crime charged; or

5              B.   That the defendant, or someone aided and abetted

6    by the defendant, knowingly possessed a firearm in furtherance

7    of such crime.

8         A "firearm" means any weapon which will or is

9    designed to or may readily be converted to expel a projectile

10   by the action of an explosion, includes any handgun, shotgun,

11   or rifle.

12        To prove the defendant "carried" the firearm, the

13   government must prove that the firearm was carried in the

14   ordinary meaning of the word "carry," such as by transporting

15   a firearm on the person or in a vehicle.

16        The carrying of the firearm cannot be merely

17   coincidental or unrelated to the crime charged.

18        "In relation to" means that the firearm must have

19   some purpose, role or effect with respect to the crime

20   charged.

21        I've previously defined the term "possess" with

22   regard to Count One and you should apply that definition here.

23        To prove the defendant possessed a firearm "in

24   furtherance" of a drug trafficking crime, the government must

25   prove that the defendant possessed a firearm, that furthers,

202

1   advances, or helps forward the crime charged.

2           I've previously defined the term "knowingly" and you

3   should apply that definition here.

4           Now there are two avenues of proof under which a

5   conviction is possible on this count.  The first is carrying a

6   firearm during and in relation to a drug trafficking crime.

7   The second is possessing a firearm in furtherance of a drug

8   trafficking crime.  In order to convict the defendant of the

9   crime charged, your verdict must be unanimous that at least

10  one avenue of proof was established beyond a reasonable doubt.

11          Now members of the jury, you have heard the evidence

12  and the arguments of the parties.  It is your duty to remember

13  the evidence, whether it has been called to your attention or

14  not.  And if your recollection of the evidence differs from

15  that of the parties, you are to rely solely upon your

16  recollection of the evidence in your deliberations.

17          You, as jurors, must decide this case based solely

18  on the evidence presented here within the four walls of this

19  courtroom.  This means that during your deliberations you must

20  not conduct any independent research about this case.  Your

21  duty to follow this instruction is a serious responsibility

22  and the failure to follow it may result in being found in

23  contempt of court.

24          During your deliberations, you must not communicate

25  with or provide any information to anyone by any means about

1  this case.  You may not use any electronic device or media

2  such as a telephone, cellphone, smart phone, iPhone,

3  Blackberry or computer; the internet, any internet service, or

4  any text or instant messaging service; or any internet chat

5  room, blog, or website such as Facebook, My Space, Linked In,

6  You Tube or Twitter to communicate to anyone any information

7  about this case, or to conduct any research about the case

8  while you are serving as jurors.

9          I know I've told you that before but it's important

10  to repeat it as you begin your deliberations.

11          I've not reviewed the contentions of the parties,

12  but it is your duty not only to consider all the evidence, but

13  also to consider all the arguments, contentions, positions

14  urged by the parties and any other contention that arise from

15  the evidence, and to weigh them all in the light of your

16  common sense, and as best you can, to determine the truth of

17  this matter.

18          The law, as indeed it should, requires the presiding

19  judge to be impartial.  Therefore, do not assume from anything

20  I may have done or said that I have any opinion concerning any

21  of the issues in the case.

22          I instruct you that a verdict is not a verdict until

23  all twelve jurors agree unanimously as to what your decision

24  shall be.  You may not render a verdict by majority vote or by

25  any other voting mechanism aside from a unanimous verdict of

204

1    twelve.

2         The Court suggests that as soon as you reach the
3    jury room, before beginning deliberations, you select one of
4    your members to serve as foreperson.  This individual has the
5    same vote as the rest of the jurors, but simply serves to
6    preside over the discussions.  Once you begin deliberating, if
7    you need to communicate with me, the foreperson will send a
8    written message -- a written message to me by knocking on the
9    door and handing it to the Marshal.  However, you are not to
10   tell me how you stand numerically as to your verdict.  For
11   instance, should you be split in your voting at any particular
12   time, you would not tell me that.  You will not tell me the
13   specific number of divisions in your note.

14        We use a verdict sheet.  That is simply the written
15   notice of the decision that you reach in the case.  And as
16   soon as you have reached a verdict as to the counts alleged in
17   the Bill of Indictment, you will return to the courtroom and
18   your foreperson will, on request, hand the verdict sheet to
19   the Clerk.  And there are places on the verdict sheet for the
20   foreperson to enter the verdict, sign it, and date it.

21        Now during the trial items were received into
22   evidence as exhibits.  We have a computer system in the
23   deliberation room that enables you to view the exhibits and
24   the jury instructions electronically.  You will receive
25   further instructions on how to use the system.  If, after you

205

1   have begun your discussions of the case, you think it would be
2   helpful to have any of the actual exhibits with you in the
3   jury room, you should have the foreperson send me a note
4   asking for them.

5        Of course you will not be taking alleged marijuana
6   back in the jury room with you.  If you need to see that you
7   would come back into the -- you would send a note asking to
8   come back into the courtroom to review it and the same would
9   go for any of the firearms that were introduced into evidence.

10       Now if you need a break during deliberations, you
11  certainly can do that.  And if you need a break outside the
12  jury room, the Marshal will escort you.  But it's important
13  that if you're taking a break that you not deliberate about
14  the case while one of your members is not present.  Wait for
15  everybody to be back together before you begin your
16  deliberations again.

17       So, Madam Clerk, do you have the verdict sheet?
18       COURT CLERK:  Yes.
19       THE COURT:  So at this time I'm going to ask, I
20  guess, Ms. Reeder, if you have any personal effects in the
21  jury deliberation room, if you would get those at this time
22  and return to the courtroom.

23       Members of the jury, we're going to give you a copy
24  of the Bill of Indictment, the verdict form, we're going to
25  give you a short tutorial on how to use the computer system in

206

1   the deliberation room.  And once we've finalized with the

2   parties the exhibits that can be released to that computer

3   system, we will do that.  And so at this time you can take the

4   Bill of Indictment and the verdict form and begin your

5   deliberations.

6        Ms. Reeder, if you would stay here while the jurors

7   go and begin their deliberations.

8        (The jury was escorted from the courtroom at

9   11:04 a.m.)

10        THE COURT:  Ms. Reeder, I want to thank you for your

11   participation in the trial.  You served as an alternate.  It

12   can be frustrating, I think, for someone spends their time

13   sitting on a jury and not deliberating at the end of the case.

14   I want to let you know how important your service was.  If for

15   any reason one of your colleagues could not have made it

16   today, we wouldn't have to start over, we would just

17   substitute you in as a juror and we could keep going forward.

18   So fortunately all twelve jurors are here ready to deliberate,

19   and so your services in this case come to an end.  They come

20   to an end with the Court's thanks for you being willing to

21   serve as a juror.  And I would also ask you to call in at the

22   end of the day on Friday for any further instructions on this

23   criminal term.

24        So thanks so much for your service, and call in on

25   Friday and free to go at this time.

1    ALTERNATE JUROR:  All right.  Thank you.

2    (The alternate was escorted from the courtroom.)

3    THE COURT:  I do want to go over with the parties, a

4 couple of things that were part of the jury instructions as I

5 communicated them orally.

6    The first one is in talking about the conspiracy, I

7 inserted a paragraph telling that -- or sentence, telling the

8 jury that an informant or an agent of the government can't be

9 considered by them in terms of the requirement that an

10 agreement be reached by the defendant with one or more

11 persons.

12    The second change was a technical one.  The statute

13 cited, reads on page 17, Title 18.  I changed that to Title 21

14 United States Code Section 841.  We'll make all these changes

15 in the written instructions that are released to the jury

16 shortly.

17    And then the third change I made was, the indictment

18 reads that the predicate 924(c) charge is the conspiracy.  And

19 so when I got to page 23 of the elements, it reads,

20 "possession with intent to distribute marijuana," and I

21 inserted "conspiracy to possess with intent to distribute."

22    Those are the changes that I was aware of from the

23 previous charge conference.

24    MS. COMERFORD:  Thank you, Your Honor.

25    THE COURT:  Ms. Hankins is now going to run

1  through -- so we're having technical difficulties with the TV

2  in the jury room.  So I will have the Marshals bring the

3  jurors down to the jury assembly room.  We're going to have

4  the IT folks fix the TV and then they can begin their

5  deliberations when that is done.

6         So at this time I'm going to have the jury brought

7  down to the jury assembly room and be in a holding pattern

8  while the IT folks fix the TV in the deliberation room.

9         I'm also going to ask the Clerk to go over the

10  electronic copies of the exhibits that we have, make sure the

11  parties agree on what's in and what's not, in terms of

12  exhibits.

13         MS. COMERFORD:  Thank you, Your Honor.

14         THE COURT:  So at this time if the jury would be

15  brought down to the jury assembly room and told that there's

16  some technical things that need to be performed before they

17  can begin their deliberations.

18         (The jury was escorted at 11:10 a.m.)

19         THE COURT:  Madam Clerk, if you would go through the

20  exhibits with the parties at this time.

21         (The Court Clerk complies.)

22         THE COURT:  All right.  Everybody in agreement as to

23  the exhibits to be released?

24         MS. COMERFORD:  Yes, Your Honor.

25         DEFENDANT DUCTAN:  Yes.

209

1          THE COURT:  Madam Clerk, if you would release the

2     exhibits at this time.

3          Anything further from either side?

4          MR. WASHINGTON:  Nothing from the government, Your

5     Honor.

6          THE COURT:  Mr. Brafford, I see you're here.  We

7     discussed the issue of forfeiture before, and Mr. Ductan has

8     indicated he does not wish to waive jury trial on the issue of

9     forfeiture.  So if there is a verdict that triggers a

10    forfeiture trial, we'll begin that immediately after the jury

11    deliberation.

12         MR. BRAFFORD:  Yes, Your Honor.  I would propose, as

13    far as the government, that the jury can simply be charged

14    with filed instructions.

15         THE COURT:  Well, however you want to handle the

16    government end.

17         MR. BRAFFORD:  I don't anticipate putting on any

18    evidence or argument.

19         THE COURT:  If you wish to submit proposed

20    instructions.

21         MR. BRAFFORD:  They were filed yesterday.

22         THE COURT:  Great.  We'll take a look at it, hand it

23    out to the parties and see what happens.

24         Anything further from either side?

25         MS. COMERFORD:  Nothing, Your Honor.

1          THE COURT:  All right.  Well, we'll stand in recess
2   until further notice.
3          MR. LEE:  Do I have time to run down the street and
4   get a cup of coffee, Your Honor?
5          THE COURT:  Yeah.  Right now -- is the system up and
6   running?
7          MR. PATEL:  Yes, sir.
8          THE COURT:  Have we brought the jury back?
9          COURT CLERK:  No.  I have to go downstairs and get
10  them, Judge.
11         THE COURT:  They need to come from the jury assembly
12  room to the jury deliberation room and begin deliberations.
13  My guess is, as long as we have your cellphone number, you can
14  do that.
15         MR. LEE:  Thank you, sir.  I'll be right back.
16         THE COURT:  We'll stand in recess at this time.
17         (The court stood at ease waiting for a response from
18  the jury at 11:22 a.m.)
19         (The jury knocks at 11:59 a.m.:)
20         (Defendant present.)
21         THE COURT:  All right.  If we could come into
22  session.
23         The jury has submitted a question.
24         "We need clarification on the wording of Count Three
25  in the Grand Jury charges versus the verdict charges."

1          I've reviewed both instruments, they appear -- the

2     verdict form appears to me to be an accurate summary of the

3     charge in the indictment.

4          MS. COMERFORD:  Your Honor, since we didn't get to

5     review the revised, would you mind --

6          THE COURT:  Since you didn't what?

7          MS. COMERFORD:  We didn't get to read your final

8     revised verdict sheet as to number three, would you mind just

9     reading to us --

10         THE COURT:  Yeah.  I'll give you copies.  I thought

11    you had gotten it.

12         (Copies being distributed.)

13         THE COURT:  So my suggestion for answering this

14    question is to bring them back in and reread the elements to

15    them that are set forth on page 23, and then to indicate that

16    the verdict sheet is a proper summary of those elements.

17         DEFENDANT DUCTAN:  Excuse me, Your Honor.  If I may,

18    defense doesn't see any reason -- in terms of the forfeiture,

19    defense doesn't see any reason to have a jury deliberating on

20    those issues.  It's really not necessary.

21         THE COURT:  All right.

22         DEFENDANT DUCTAN:  So I would like to waive that

23    jury deliberation.

24         THE COURT:  Very well.  That's an interesting

25    question, because that decision has to be raised with the

212

1   defendant before deliberations began, which we did.  And now

2   that he's waiving it now -- we'll deal with that if we need to

3   later on.

4              With respect to this question any --

5              MR. WASHINGTON:  With respect to that approach, I

6   think that would be fine with the government.

7              THE COURT:  Just come in, read the essential

8   elements to them, and then say those elements are summarized

9   appropriately in the verdict form?

10             MR. WASHINGTON:  Yes, Judge.

11             THE COURT:  Any objection from either side to doing

12  it that way?

13             DEFENDANT DUCTAN:  No objection.

14             THE COURT:  All right.  Let's call the jury in.

15             (The jury was returned to the courtroom at 12:13

16  p.m.)

17             THE COURT:  Members of the jury, you have sent me a

18  note saying that, we need clarification on the wording of

19  Count Three in the Grand Jury charges versus the verdict

20  charges.

21             And in response to that note what I'm going to do is

22  read to you the essential elements of Count Three, and then to

23  indicate to you that the verdict form is a place to record

24  your decision.  It does not alter the elements or indictment

25  in any way.  And so the elements are as follows:

213

1          For you to find the defendant guilty of this crime,
2     you must be convinced that the government has proven each of
3     the following beyond a reasonable doubt:
4          1:  That the defendant, or someone aided and abetted
5     by the defendant, committed a drug trafficking crime, that is,
6     conspiracy to possess with intent to distribute marijuana; and
7     one of the following:
8          A.  That the defendant, or someone aided and abetted
9     by the defendant, knowingly carried a firearm during and in
10    relation to the crime charged; or
11         B.  That the defendant, or someone aided and abetted
12    by the defendant, knowingly possessed a firearm in furtherance
13    of such crime.
14         Those are the elements.  The burden is on the
15    government to prove each of those elements beyond a reasonable
16    doubt.
17         And so with that answer, I would ask you to go back
18    and continue your deliberations.  If you have any other
19    questions, please communicate with me in the way you did with
20    this note.  Thank you.
21         (The jury was escorted from the courtroom at
22    12:14 p.m.)
23         THE COURT:  All right.  So with respect to the
24    forfeiture Mr. Ductan waived.  I'm assuming that's a valid
25    waiver.  Any objection from the government?

214

1          MR. WASHINGTON:  No, Your Honor.

2          MR. BRAFFORD:  Your Honor, I might add.  There might

3  be a risk with an attorney who regularly appears before the

4  Court of just routinely asserting the right to a jury and then

5  waiving it later and just nullifying the time requirement, but

6  I don't think that's a concern at this point.

7          THE COURT:  All right.  Thank you.

8          Should there be a need to deal with the forfeiture

9  issue, it will be dealt with at sentencing in light of the

10 waiver of the defendant.

11         MR. BRAFFORD:  We would anticipate filing a motion

12 later if the Court doesn't want to rule today.

13         THE COURT:  All right.  Thank you.

14         (The court stood at ease waiting for a response from

15 the jury at 12:16 p.m.)

16         (The jury knocks at 12:27 p.m.:)

17         THE COURT:  The jury's indicated they've reached a

18 verdict.  Are we ready for the jury?

19         MS. COMERFORD:  Yes, Your Honor.

20         THE COURT:  Call the jury.

21         (The jury was returned to the courtroom at

22 12:32 p.m.)

23         THE COURT:  Members of the jury, have you selected a

24 foreperson?

25         THE JURY:  Yes.

215

1          THE COURT:  Ms. Bobbitt, is that you?

2          JUROR:  That is me, yes.

3          THE COURT:  Has the jury reached a verdict?

4          JUROR:  Yes, we have.

5          THE COURT:  Have you recorded that verdict on the

6    verdict sheet?

7          JUROR:  I have.

8          THE COURT:  At this time would you give that verdict

9    form to the deputy clerk.

10          JUROR:  (Complies.)

11          THE COURT:  I'm going to inspect the verdict form

12    and then I'm going to ask the clerk to publish it in open

13    court.  And I want you to listen carefully to the publishing

14    of the verdict, either side may wish to have you individually

15    polled to make sure it's your own individual verdict.

16          Madam Clerk, would you publish the verdict in open

17    court.

18          COURT CLERK:  United States of America versus

19    Phillip Ductan.  Jury verdict.

20          As to Count One:

21          We, the jury, unanimously find the defendant,

22    guilty.

23          As to Count Two:

24          We, the jury, unanimously find the defendant,

25    guilty.

216

1              As to Count Three:

2              We, the jury, unanimously find the defendant,

3   guilty.

4              THE COURT:  Does either side wish to have the

5   verdict -- or the jury polled?

6              MS. COMERFORD:  Not from the government, Your Honor.

7              DEFENDANT DUCTAN:  No.

8              THE COURT:  Very well.  The Court -- at the Court's

9   request, Madam Clerk, would you poll the jury.

10             COURT CLERK:  Ladies and gentlemen, you've heard the

11  verdict as published.

12             Juror No. 1, was this your verdict; is this still

13  your verdict?

14             JUROR:  Yes.

15             COURT CLERK:  Juror No. 2, was this your verdict; is

16  this still your verdict?

17             JUROR:  Yes.

18             COURT CLERK:  Juror No. 3, was this your verdict; is

19  this still your verdict?

20             JUROR:  Yes.

21             COURT CLERK:  Juror No. 4, was this your verdict; is

22  this still your verdict?

23             JUROR:  Yes.

24             COURT CLERK:  Juror No. 5, was this your verdict; is

25  this still your verdict?

217

1           JUROR:  Yes.

2           COURT CLERK:  Juror No. 6, was this your verdict; is

3  this still your verdict?

4           JUROR:  Yes.

5           COURT CLERK:  Juror No. 7, was this your verdict; is

6  this still your verdict?

7           JUROR:  Yes.

8           COURT CLERK:  Juror No. 8, was this your verdict; is

9  this still your verdict?

10          JUROR:  Yes.

11          COURT CLERK:  Juror No. 9, was this your verdict; is

12  this still your verdict?

13          JUROR:  Yes.

14          COURT CLERK:  Juror No. 10, was this your verdict;

15  is this still your verdict?

16          JUROR:  Yes.

17          COURT CLERK:  Juror No. 11, was this your verdict;

18  is this still your verdict?

19          JUROR:  Yes.

20          COURT CLERK:  And Juror No. 12, was this your

21  verdict; is this still your verdict?

22          JUROR:  Yes.

23          THE COURT:  Members of the jury, thank you for your

24  service.  As I said at the beginning of the selection process,

25  our criminal justice system could not function without

218

1  citizens being willing to serve as jurors.  You have provided
2  an extraordinary service to your community and to our court
3  system.

4          Still, if you would call in at the end of the day on
5  Friday, we will give you an update as to the rest of the
6  criminal term.

7          But with respect to your service in this case, very
8  grateful for it.  I hope that it was a meaningful experience
9  to you.  Very little we do for jurors other than provide
10 parking tokens to you.  But one of the ways in which we wanted
11 to acknowledge your role in this justice system as judges of
12 the facts, was to stand when you entered and exit the
13 courtroom.  That was one of the little ways we could
14 communicate our respect for you as jurors.  And so we will do
15 that as you leave today.

16         You're free to go about your business.  You go with
17 the Court's thanks.  And again, if you would call back in
18 Friday after 5:00.  Thank you very much.

19         (Thereupon, the jury was excused.)

20         THE COURT:  Mr. Ductan, in light of the jury
21 verdict, I wanted to let you know what you could expect from
22 this point forward.

23         The case will be turned over to the probation
24 department to prepare a presentence report, which will take
25 several months to put together.  Once that report is done, it

219

1  will be sent to both parties, and both parties will have an

2  opportunity to object to any information in the presentence

3  report that you wish to object to.  And then the probation

4  office will respond to those objections, and then the case

5  will be ready for calendaring for sentencing.  It's likely to

6  be a four to six month process for that to occur.  So the next

7  time that you appear in this court is likely to be around the

8  six month period of time from now, and we'll have a sentencing

9  hearing, you will be allowed to speak at that sentencing

10 hearing, tell me anything you wish to tell me and then I will

11 pronounce sentence.

12        So that's what you can expect from this point

13 forward.  You will be interviewed by the probation office in

14 the preparation of the presentence report.

15        So anything further from either side?

16        MS. COMERFORD:  Not from the government.

17        DEFENDANT DUCTAN:  No, Your Honor.

18        THE COURT:  Very well.  Then this matter is

19 concluded.  Mr. Ductan, at this time you're remanded into the

20 custody of the Marshals.

21        (The matter is concluded at 12:38 p.m.)

22              (End of Proceedings.)

23              *  *  *  *  *  *

24

25

220

1  UNITED STATES DISTRICT COURT
   WESTERN DISTRICT OF NORTH CAROLINA
2  CERTIFICATE OF OFFICIAL REPORTER

3

4            I, Laura Andersen, Federal Official Court Reporter,

5  in and for the United States District Court for the Western

6  District of North Carolina, do hereby certify that pursuant to

7  Section 753, Title 28, United States Code that the foregoing

8  is a true and correct transcript of the stenographically

9  reported proceedings held in the above-entitled matter and

10 that the transcript page format is in conformance with the

11 regulations of the Judicial Conference of the United States.

12

            Dated this the 15th day of May, 2014.

13

14

15                         S/Laura Andersen
                           Laura Andersen, RMR
16                         Federal Official Court Reporter

17

18

19

20

21

22

23

24

25

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:04-cr-252

**FILED**
**CHARLOTTE, NC**

DEC 05 2012

**US DISTRICT COURT**
**WESTERN DISTRICT OF NC**

UNITED STATES OF AMERICA        )
                                )
        vs.                     )        <u>VERDICT FORM</u>
                                )
PHILLIP DUCTAN                  )


1.      As to Count One, charging the defendant with conspiracy to possess with intent to

distribute a quantity of marijuana, in violation of 21 U.S.C. § 846, we, the jury, unanimously find

the defendant:

            Guilty: ___✓___            Not Guilty: _____


2.      As to Count Two, charging the defendant with possession with intent to distribute

a quantity of marijuana, in violation of 21 U.S.C. § 841, or aiding and abetting that offense, in

violation of 18 U.S.C. § 2, we, the jury, unanimously find the defendant:

            Guilty: _____            Not Guilty: _____


Final 1.0 Page 1

3.    As to Count Three, charging the defendant with carrying a firearm during and in relation to a drug trafficking crime or possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1), or aiding and abetting that offense, in violation of 18 U.S.C. § 2, we, the jury, unanimously find the defendant:

Guilty: ___✓_____    Not Guilty: _____

Signed: 

FOREPERSON

Dated: __5 Dec 2012_____

Final 1.0 Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT

 2         FOR THE WESTERN DISTRICT OF NORTH CAROLINA

 3                    CHARLOTTE DIVISION

 4

 5   UNITED STATES OF AMERICA,          )

 6                                      )

 7           -vs-                       ) 3:04-cr-252-RJC-DSC-1

 8                                      )

 9   PHILLIP DUCTAN,                    )

10                                      )

11   ----------------------------------

12

13         TRANSCRIPT OF SENTENCING PROCEEDINGS

14      BEFORE ROBERT J. CONRAD, JR., CHIEF JUDGE

15             Wednesday, February 26th, 2014

16

17   APPEARANCES OF COUNSEL:
          On Behalf of the Government:
18              ERIN ELIZABETH COMERFORD, ESQ.
                U.S. Attorneys Office
19              227 West Trade Street - Suite 1650
                Charlotte, NC   28202
20
          On Behalf of the Defendant:
21              KENNETH D. SNOW, ESQ.
                The Snow Legal Group, PLLC
22              229 South Brevard Street - Suite 300
                Charlotte, NC   28202
23
     ALSO PRESENT:
24   Susan Hankins, Courtroom Deputy Clerk

25   REPORTED BY:  Beverly J. Gramm, RPR, Notary Public
```

1          MR. SNOW:  May it please the Court, Your

2     Honor, defense is ready to proceed.

3          THE COURT:  Very well.  We're here in the

4     United States v. Phillip Ductan for sentencing.

5     Mr. Ductan was found guilty by a jury on

6     December 5th, 2012.

7          After that, Mr. Ductan, your case was

8     referred to the Federal Probation Department

9     for the purpose of preparing a Presentence

10    Report.  I've received and reviewed that

11    report.

12         Have you had a chance to read the

13    Presentence Report?

14         MR. DUCTAN:  Yes, I have.

15         THE COURT:  Do you believe you understand

16    it?

17         MR. DUCTAN:  Yes, I have, pretty much.

18         MR. SNOW:  If I may, Your Honor, he has

19    not had an opportunity to read the last

20    revision.  I believe that was filed yesterday.

21    He has read and looked over everything else,

22    Your Honor.

23         THE COURT:  And the revisions yesterday

24    were in the defendant's favor?

25         MR. SNOW:  That's correct, Your Honor.

```
 1        THE COURT:  As I understand it.  Well, let
 2   me ask you this.  Have you had enough time to
 3   go over the Presentence Report with your
 4   attorney?
 5        MR. DUCTAN:  Well, not the latest one that
 6   he's described.
 7        THE COURT:  Well, here's what I think
 8   we're going to do.  But with respect to the
 9   initial Presentence Report, which was objected
10   to, you read that, understood it, and you had
11   enough time to talk with your attorney about
12   it?
13        MR. DUCTAN:  Yes, the previous one.
14        THE COURT:  And then the objections which
15   were filed were resolved in the defendant's
16   favor; is that correct, Mr. Snow?
17        MR. SNOW:  One, Your Honor, yes.  That's
18   correct, Your Honor.
19        THE COURT:  Very well.  And so what I'll
20   do is go forward with this sentencing hearing
21   because I believe that the defendant has had
22   adequate opportunity to go over that
23   Presentence Report with Mr. Snow, and then I'll
24   allow Mr. Snow to make any additional
25   objections you wish to make.
```

1          I'll make some guideline rulings, but

2    before imposing any sentence at all I'll give

3    both Mr. Snow and Mr. Ductan an opportunity to

4    be heard.  So you can sit down at this time,

5    Mr. Ductan.

6          MR. DUCTAN:  Thank you, Your Honor.

7          THE COURT:  In light of the revised

8    Presentence Report, it appears to the Court

9    that the correct offense level for Count I is a

10   14, a criminal history category of 3, with a

11   resulting range of 21 to 27 months.

12         And that the correct advisory guideline

13   range for Count III, the gun count, is a six

14   month -- 60 month consecutive sentence.

15         Do the parties agree those are -- before

16   any consideration of variance or departure,

17   those are the correct guidelines to consult?

18         MR. SNOW:  Your Honor, I apologize to the

19   Court.  I'm having a problem hearing the Court.

20         THE COURT:  I'll speak up then.  In terms

21   of the advisory guidelines, it seems to me that

22   for Count I the correct level is 14, with a

23   criminal history of 3, with a resulting range

24   of 21 to 27 months.

25         MR. SNOW:  That's correct, Your Honor.

```
 1        THE COURT:  And Count III carries with it
 2   a mandatory minimum 60 months consecutive
 3   sentence.
 4        MR. SNOW:  That is correct, Your Honor.
 5        THE COURT:  All right.  And so those are
 6   the guidelines I'll consult for purposes of
 7   sentencing.
 8        Mr. Snow, I'll be glad to hear from you on
 9   behalf of Mr. Ductan at this time.
10        MR. SNOW:  Your Honor, as to the
11   objections, we don't have any argument.  It
12   seems to me that probation has amended the
13   objections in our favor.  If the Court is
14   inclined to accept that correction, we have no
15   further argument.
16        As to the second argument, the second
17   objection that we filed, Your Honor, my client
18   still disagrees with -- I've seen some
19   paperwork relative to his position on that.  He
20   still disagrees with how --
21        THE COURT:  The criminal history
22   objection, the Georgia conviction for forgery?
23        MR. SNOW:  That's correct, Your Honor.
24   But we are -- at this point we don't have an
25   argument for that, Your Honor.  He has
```

 1   indicated to me that he disagrees.

 2        THE COURT:  I'll note the disagreement.

 3   I'll find that the probation office's response

 4   to that objection is correct and adequate and

 5   overrule any objection to that.

 6        MR. SNOW:  Thank you, Your Honor.  As to

 7   the arguments, Your Honor, that is all the

 8   arguments we have relative to objections.

 9        THE COURT:  All right.  And then -- very

10   well.  So you see no basis to conclude any

11   different than what I had indicated earlier

12   would be the guidelines I consulted.

13        So those will be the guidelines, advisory

14   guidelines, in effect.  I'll be glad to hear

15   from you, Mr. Snow, on behalf of Mr. Ductan.

16        MR. SNOW:  One second, Your Honor.

17        (Discussion held off the record.)

18        MR. SNOW:  May it please the Court, Your

19   Honor.  I have -- as the Court is aware, I've

20   been representing Mr. Ductan for the last

21   probably six or seven months.

22        I wasn't his attorney at trial.  I

23   understand he had a counsel, however he was

24   representing him pro se.  But I'll tell the

25   Court, Your Honor, throughout this period of

1    time that I've represented Mr. Ductan, Your

2    Honor, it has been a pleasure to work with.

3         And he has indicated his concern with his

4    children, the fact that he is in quite a pickle

5    here with his children.  Your Honor, I would

6    recognize that his children, his wife -- if

7    you'd stand -- recognize -- actually surprised

8    me, as well as Mr. Ductan, today and drove here

9    today from Georgia to support him.

10        I think that does speak for who he is.  I

11   can only tell the Court in my experience with

12   Mr. Ductan, Your Honor, throughout this

13   period --

14        THE COURT:  You all may be seated.  Thank

15   you.

16        MR. SNOW:  -- he has been very respectful

17   to me, very patient, and asked a lot of

18   important questions.  But I believe that once

19   he is -- gets through this matter, I believe

20   certainly, he will have a life outside of this.

21        I'd ask the Court to consider that he has

22   a family, he has -- he has a caring family

23   support system that once he's released he will

24   be able to reacclimate himself to society.

25        I believe, Your Honor, I believe looking

1    at the Presentence Report in which the Court

2    has seen, and I believe the sentence, the 18 to

3    27 months plus the 60 months, Your Honor, is an

4    applicable and right legal sentence in this

5    case.

6        So I'd ask the Court to consider and

7    sentence him within the guideline range in the

8    consecutive 60 months.

9        THE COURT:  Thank you.  Mr. Ductan, you

10   don't have to say anything, but if there's

11   anything you wish to tell me, I'll be glad to

12   hear from you.

13       MR. DUCTAN:  First of all, I would just

14   like to apologize to the Court for any

15   disruption that may have tooken (sic) place

16   previous in any of the other proceedings.

17       And, first and foremost, I would

18   definitely like to apologize to my family

19   because I know they've been going through a

20   lot.  My wife's been going through a lot and my

21   children, you know, they definitely have a lot

22   of hardship because of my action.

23       So I took full responsibility for my

24   actions.  But I also know that, you know, this

25   is not who I am.  And I will ask the Court to

```
 1   consider that when you're entering your
 2   judgment, to allow me to have a second chance
 3   to be able to prove to the Court that I am a
 4   changed man, a different man, but also to my
 5   children, to be able to set an example for them
 6   and, you know, lead them in the right
 7   direction.
 8        I'm a father and a loving husband and I'd
 9   like to be able to have that opportunity to
10   make it back home to them.  And that's pretty
11   much all I have to say.
12        You know, in closing, I just pray that
13   Jehovah God guides you in the right direction
14   when you're entering your judgment.  That's all
15   I have to say.
16        THE COURT:  Thank you.  Miss Comerford?
17        MS. COMERFORD:  Thank you, Your Honor.
18   Your Honor, now that we have many of the
19   objections resolved, I don't know that there's
20   a lot more that I need to say.
21        The only thing that I'll point out is that
22   Attachment A and B have been provided in
23   response to the objection to flesh out any
24   concerns the Court might have about what is the
25   ultimate drug weight.
```

```
 1          It appears clear, from a review of the
 2   discovery as compared with the trial testimony,
 3   that this particular defendant was the phone
 4   contact with the confidential informant.  And
 5   you heard from that confidential informant at
 6   trial.
 7          And his trial transcript is attached as an
 8   exhibit, if the Court needs to review it.  But
 9   the original order up was for a hundred pounds
10   of marijuana.  And the deal was that that was
11   going to be delivered in 20-pound installments,
12   and that is what the Court has before him.
13          And following the Rule of Lenity and
14   following the application note cited in my
15   response, the government is joining that level
16   14, because 20 pounds was what was on hand at
17   that time and I believe does appropriately
18   reflect the sale of this particular offense.
19          The government is asking for the high end
20   of the range, 27.  And I would base that partly
21   on the fact that I believe that the evidence is
22   clear that such deliveries would have continued
23   if law enforcement had not intercepted them on
24   this day, based on the fact that the original
25   agreement was for 100 pounds.
```

Appeal: 14-4220    Doc: 24    Filed: 08/25/2014    Pg: 353 of 376

1          And I would argue that that high end of

2    the range is sufficient but not greater than

3    necessary to further the purposes of sentencing

4    that are set forth under 3553, from a defendant

5    who managed to evade law enforcement much

6    longer than his co-defendants and finally has

7    come to justice.

8          We contend that 27 months followed by a

9    sentence of 60 months for Count III would be

10   appropriate to promote respect for the law and

11   all the other 3553 factors.

12         THE COURT:  Let me ask you this.  You're

13   jointly recommending that the Court use

14   20 pounds as the 2D1.1 drug amount for purposes

15   of establishing an advisory guideline range?

16         MS. COMERFORD:  Yes, sir.  That will --

17   and just to be more specific, the 444 grams of

18   marijuana located in the blue Ford SUV and the

19   8,056 grams of marijuana located in the tan

20   Chevy Tahoe that the Court heard about during

21   the trial.

22         So that actually, I'm not as quick with my

23   conversions to let me talk in grams.  We have

24   converted that to 8.6 kilograms, and that is

25   what brings us to our base offense level of 14.

 1      THE COURT:  But you're essentially waiving

 2   the argument that you otherwise could pursue

 3   that the amount, the relevant conduct amount

 4   for conspiracy purposes is a lot larger?

 5      MS. COMERFORD:  That is correct, Your

 6   Honor.  And to be candid with the Court, I

 7   wanted to respond a lot more timely than I did

 8   and I needed additional review and I needed

 9   those trial transcripts to be firm in my

10   position.

11      And I believe that with this case

12   happening as long ago as it did, I wasn't

13   receiving as firm of an answer from law

14   enforcement until today.

15      I have Steven Weitzel, the detective that

16   was the handler for the confidential informant,

17   you saw him in the videos that replayed for the

18   Court that day.  His review of the discovery

19   makes his recollection firm that the original

20   order up was for that larger amount of

21   100 pounds.

22      And so I'm very clear today in the time

23   that I needed to respond and make my position

24   known to the Court, I was working with that

25   understanding at the time.

```
 1          THE COURT:  All right.

 2          MS. COMERFORD:  So just based on the Rule

 3   of Lenity, that was the position I took.  And I

 4   believe that the trial transcript certainly

 5   support the level 14.  It's the additional

 6   discovery that adds that other background.

 7          THE COURT:  All right.  Thank you.

 8   Mr. Ductan, if you would please stand.

 9          (Defendant complies.)

10          THE COURT:  I've consulted the advisory

11   guidelines, the trial testimony in this case,

12   it was a case that went on before it, I've

13   studied the information in the Presentence

14   Report, listened to the arguments of the

15   attorneys, the allocution of Mr. Ductan, it

16   certainly appears to me as part of the history

17   and characteristics of the defendant that he

18   does seem to have a wonderful family, and based

19   upon the information in the Presentence Report,

20   he seems very engaged with them.

21          And that is a mitigating factor in his

22   favor and I will consider that with other

23   history and characteristics of Mr. Ductan,

24   including his criminal history, which includes

25   a forgery conviction and a probationary term of
```

```
 1   imprisonment, a revocation of probation, and
 2   subsequent convictions related to stolen
 3   property, unlawful use of identification, and
 4   then the involvement in the instant offense for
 5   which the jury concluded guilt beyond a
 6   reasonable doubt and the drug and
 7   firearm-related charges; take all that into
 8   consideration in fashioning a sentence.
 9        Pursuant to the Sentencing Reform Act of
10   1984, it is the judgment of the Court that the
11   defendant, Phillip Ductan, is hereby committed
12   to the custody of the Bureau of Prisons to be
13   imprisoned for a term of 24 months in each of
14   Counts I and II and a term of 60 months on
15   Count III, to be served consecutively to the
16   term imposed on Counts I and II for a total
17   term of 84 months, which the Court deems
18   sufficient but not greater than necessary to
19   accomplish the sentencing objectives of Section
20   3553(a), including the need for the imposed
21   sentence to reflect the seriousness of the
22   offense, promote respect for the law, just
23   punishment, adequate deterrence, and,
24   importantly in this case, to protect the public
25   from further crimes of the defendant.
```

1     The defendant has a history of prior

2  convictions, was on probation at the time of

3  the instant offense, had previous revocations

4  of probation, and the sentence is designed in

5  part to promote respect for the law, reflect

6  the seriousness of the offense, and to deter

7  other criminal conduct.

8     Upon release from imprisonment, the

9  defendant shall be placed on supervised

10  release for a term of five years.  This term

11  consists of terms of five years on each of

12  Counts I, II, and III.  All terms to run

13  concurrent.

14     Within 72 hours from release from the

15  custody of the Bureau of Prisons the defendant

16  shall report in person to the probation office

17  in the district to which he is released.

18     And while on supervised release,

19  Mr. Ductan shall not commit another federal,

20  state, or local crime and shall comply with the

21  standard conditions that have been adopted by

22  the Court in the Western District of North

23  Carolina.

24     Further ordered that the defendant pay to

25  the United States a special assessment of $300,

1  due and payable immediately.

2      Other than what we've already discussed,

3  is there any legal reason why the sentence

4  should not be imposed as stated?

5      MS. COMERFORD:  No, Your Honor.

6      MR. SNOW:  No, Your Honor.

7      THE COURT:  Let it be imposed.

8  Mr. Ductan, you can appeal your conviction if

9  you believe there's some defect in the

10 proceeding.

11     You also have a right to appeal your

12 sentence under certain circumstances,

13 particularly if you think the sentence is

14 contrary to law.  Any notice of appeal must be

15 filed within 14 days from the entry of

16 judgment.

17     And if you are unable to pay the cost of

18 an appeal, you may apply for leave to appeal,

19 with no cost to you.  And if you request, a

20 Clerk of Court will prepare and file a Notice

21 of Appeal on your behalf.

22     The Court recommends that you talk to your

23 attorney about these appeal rights.  But do you

24 understand these rights as I've just explained

25 them to you?

```
 1        MR. DUCTAN:  Yeah.  Yeah.

 2        THE COURT:  Anything further from either

 3   side?

 4        MS. COMERFORD:  Not from the government.

 5   Thank you, Your Honor.

 6        THE COURT:  Mr. Snow?

 7        MR. SNOW:  Your Honor, the Court would

 8   please make a recommendation that he be placed

 9   as close to Atlanta, Georgia, as possible.

10        THE COURT:  I'll make that part of the

11   judgment.

12        MR. SNOW:  Thank you, Your Honor.

13        THE COURT:  This matter is concluded.

14   Mr. Ductan is remanded into the custody of the

15   marshals at this time.

16        (Hearing concluded at 2:18 p.m.)

17

18

19

20

21

22

23

24

25
```

```
 1    STATE OF NORTH CAROLINA
      COUNTY OF MECKLENBURG
 2
                     REPORTER'S CERTIFICATE
 3

 4           I, Beverly J. Gramm, Registered

 5    Professional Reporter, certify that the foregoing

 6    proceedings were taken before me at the time and

 7    place therein set forth;

 8           That the testimony of the parties, the

 9    questions propounded, and all objections and

10    statements made at the time of the proceedings were

11    recorded stenographically by me and were thereafter

12    transcribed;

13           That the foregoing is a true and correct

14    transcript of my shorthand notes taken.  I further

15    certify that I am not a relative or employee of any

16    attorney or the parties, nor financially interested

17    in the action.

18           I declare under penalty of perjury under

19    the laws of North Carolina that the foregoing is

20    true and correct.

21           This the 18th day of April, 2014.

22    ------------------------------------------
      BEVERLY J. GRAMM
23    Registered Professional Reporter
      My Commission Expires:  April 23, 2018
24

25
```

UNITED STATES -vs- PHILLIP DUCTAN
Sentencing on 02/26/2014                    Index: $300..based

**$**

**$300**  15:25

**1**

**100**  10:25
  12:21

**14**  4:10,22
  10:16
  11:25 13:5
  16:15

**18**  8:2

**1984**  14:10

**2**

**20**  10:16
  11:14

**20-pound**
  10:11

**2012**  2:6

**21**  4:11,24

**24**  14:13

**27**  4:11,24
  8:3 10:20
  11:8

**2:18**  17:16

**2D1.1**  11:14

**3**

**3**  4:10,23

**3553**  11:4,

**11**

**3553(a)**
  14:20

**4**

**444**  11:17

**5**

**5th**  2:6

**6**

**60**  4:14 5:2
  8:3,8 11:9
  14:14

**7**

**72**  15:14

**8**

**8,056**  11:19

**8.6**  11:24

**84**  14:17

**A**

**accept**  5:14

**accomplish**
  14:19

**Act**  14:9

**action**  8:22

**actions**  8:24

**additional**
  3:24 12:8
  13:5

**adds**  13:6

**adequate**
  3:22 6:4
  14:23

**adopted**
  15:21

**advisory**
  4:12,21
  6:13 11:15
  13:10

**agree**  4:15

**agreement**
  10:25

**allocution**
  13:15

**amended**  5:12

**amount**  11:14
  12:3,20

**apologize**
  4:18 8:14,
  18

**appeal**  16:8,
  11,14,18,
  21,23

**appears**  4:8
  10:1 13:16

**applicable**
  8:4

**application**
  10:14

**apply**  16:18

**appropriately**
  10:17

**argue**  11:1

**argument**
  5:11,15,
  16,25 12:2

**arguments**
  6:7,8
  13:14

**assessment**
  15:25

**Atlanta**  17:9

**attached**
  10:7

**Attachment**
  9:22

**attorney**
  3:4,11
  6:22 16:23

**attorneys**
  13:15

**aware**  6:19

**B**

**back**  9:10

**background**
  13:6

**base**  10:20
  11:25

**based**  10:24
  13:2,18

**basis**  6:10

**behalf**  5:9
  6:15 16:21

**blue**  11:18

**brings**  11:25

**Bureau**  14:12
  15:15

---

**C**

**candid**  12:6

**caring**  7:22

**Carolina**
  15:23

**carries**  5:1

**case**  2:7
  8:5 13:11,
  12 14:24

**category**
  4:10

**chance**  2:12
  9:2

**changed**  9:4

**characteristic
s**  13:17,23

**charges**  14:7

**Chevy**  11:20

**children**
  7:4,5,6
  8:21 9:5

**circumstances**
  16:12

**cited**  10:14

**clear**  10:1,
  12:22

**Clerk**  16:20

**client**  5:17

**close**  17:9

**closing**  9:12

**co-defendants**
  11:6

**Comerford**
  9:16,17
  11:16 12:5
  13:2 16:5
  17:4

**commit**  15:19

**committed**
  14:11

**compared**
  10:2

**complies**
  13:9

**comply**  15:20

**concern**  7:3

**concerns**
  9:24

**conclude**
  6:10

**concluded**
  14:5
  17:13,16

**concurrent**
  15:13

**conditions**
  15:21

**conduct**  12:3
  15:7

**confidential**
  10:4,5
  12:16

**consecutive**
  4:14 5:2
  8:8

**consecutively**
  14:15

**consideration**
  4:16 14:8

**consists**
  15:11

**conspiracy**
  12:4

**consult**  4:17
  5:6

**consulted**
  6:12 13:10

**contact**  10:4

**contend**  11:8

**continued**
  10:22

**contrary**
  16:14

**conversions**
  11:23

**converted**
  11:24

**conviction**
  5:22 13:25
  16:8

**convictions**
  15:2

**correct**  2:25
  3:16,18
  4:9,12,17,
  22,25 5:4,
  23 6:4
  12:5

**correction**
  5:14

**cost**  16:17,
  19

**counsel**  6:23

**count**  4:9,
  13,22 5:1
  11:9 14:15

**Counts**
  14:14,16
  15:12

**Court**  2:1,3,
  15,23 3:1,
  7,14,19
  4:7,8,19,
  20 5:1,5,
  13,21 6:2,
  9,18,19,25
  7:11,14,21
  8:1,6,9,
  14,25 9:3,
  16,24
  10:8,
  11:12,13,

20 12:1,6,
18,24
13:1,7,
14:10,17
15:22
16:7,20,22
17:2,6,7,
10,13

crime  15:20

crimes  14:25

criminal
4:10,23
5:21 13:24
15:7

custody
14:12
15:15
17:14

_____

**D**

day  10:24
12:18

days  16:15

deal  10:10

December  2:6

deems  14:17

defect  16:9

defendant
3:21 10:3
11:4 13:9,
17 14:11,
25 15:1,9,
15,24

defendant's
2:24 3:15

defense  2:2

delivered
10:11

deliveries
10:22

Department
2:8

departure
4:16

designed
15:4

detective
12:15

deter  15:6

deterrence
14:23

direction
9:7,13

disagreement
6:2

disagrees
5:18,20
6:1

discovery
10:2 12:18
13:6

discussed
16:2

discussion
6:17

disruption
8:15

district
15:17,22

doubt  14:6

drove  7:8

drug  9:25
11:14 14:6

Ductan  2:4,
5,7,14,17
3:5,13
4:3,5,6
5:9 6:15,
20 7:1,8,
12 8:9,13
13:8,15,23
14:11
15:19 16:8
17:1,14

due  16:1

_____

**E**

earlier  6:11

effect  6:14

end  10:19
11:1

enforcement
10:23 11:5
12:14

engaged
13:20

entering
9:1,14

entry  16:15

essentially
12:1

establishing
11:15

evade  11:5

evidence
10:21

exhibit  10:8

experience
7:11

explained
16:24

_____

**F**

fact  7:4
10:21,24

factor  13:21

factors
11:11

family  7:22
13:18

fashioning
14:8

father  9:8

favor  2:24
3:16 5:13
13:22

federal  2:8
15:19

file  16:20

filed  2:20
  3:15 5:17
  16:15

finally  11:6

find  6:3

firearm-
related  14:7

firm  12:9,
  13,19

flesh  9:23

Ford  11:18

foremost
  8:17

forgery  5:22
  13:25

forward  3:20

found  2:5

full  8:23

_____

G

_____

Georgia  5:22
  17:9

give  4:2

glad  5:8
  6:14 8:11

God  9:13

government
  10:15,19
  17:4

grams  11:17,
  19,23

greater  11:2
  14:18

guideline
  4:1,12 8:7
  11:15

guidelines
  4:17,21
  5:6 6:12,
  13,14
  13:11

guides  9:13

guilt  14:5

guilty  2:5

gun  4:13

_____

H

_____

hand  10:16

handler
  12:16

happening
  12:12

hardship
  8:22

hear  5:8
  6:14 8:12

heard  4:4
  10:5 11:20

hearing  3:20
  4:19 17:16

held  6:17

high  10:19
  11:1

history
  4:10,23
  5:21
  13:16,23,
  24 15:1

home  9:10

Honor  2:2,
  18,22,25
  3:17,18
  4:6,18,25
  5:4,10,17,
  23,25 6:6,
  7,16,19,25
  7:2,5,12,
  25 8:3
  9:17,18
  12:6 16:5,
  6 17:5,7,
  12

hours  15:14

hundred  10:9

husband  9:8

_____

I

_____

identification
  14:3

II  14:14,16
  15:12

III  4:13
  5:1 11:9
  14:15
  15:12

immediately
  16:1

important
  7:18

importantly
  14:24

imposed
  14:16,20
  16:4,7

imposing  4:2

imprisoned
  14:13

imprisonment
  14:1 15:8

inclined
  5:14

includes
  13:24

including
  13:24
  14:20

informant
  10:4,5
  12:16

information
  13:13,19

initial  3:9

installments
  10:11

instant  14:4
  15:3

intercepted
  10:23

involvement
  14:4

UNITED STATES -vs- PHILLIP DUCTAN
Sentencing on 02/26/2014

**J**

Jehovah    9:13

joining
  10:15

jointly
  11:13

judgment
  9:2,14
  14:10
  16:16
  17:11

jury    14:5

justice    11:7

**K**

kilograms
  11:24

**L**

larger    12:4,
  20

latest    3:5

law    10:23
  11:5,10
  12:13
  14:22 15:5
  16:14

lead    9:6

leave    16:18

legal    8:4
  16:3

Lenity    10:13
  13:3

level    4:9,22
  10:15
  11:25 13:5

life    7:20

light    4:7

listened
  13:14

local    15:20

located
  11:18,19

long    12:12

longer    11:6

looked    2:21

lot    7:17
  8:20,21
  9:20 12:4,
  7

loving    9:8

**M**

make    3:24,
  25 4:1
  9:10 12:23
  17:8,10

makes    12:19

man    9:4

managed    11:5

mandatory
  5:2

marijuana
  10:10
  11:18,19

marshals
  17:15

matter    7:19
  17:13

minimum    5:2

mitigating
  13:21

month    4:14

months    4:11,
  24 5:2
  6:21 8:3,
  11:8,9
  14:13,14,
  17

**N**

needed    12:8,
  23

North    15:22

note    6:2
  10:14

notice
  16:14,20

**O**

objected    3:9

objection
  5:17,22
  6:4,5 9:23

objections
  3:14,25
  5:11,13
  6:8 9:19

objectives
  14:19

offense    4:9
  10:18
  11:25
  14:4,22
  15:3,6

office    15:16

office's    6:3

opportunity
  2:19 3:22
  4:3 9:9

order    10:9
  12:20

ordered
  15:24

original
  10:9,24
  12:19

overrule    6:5

**P**

p.m.    17:16

paperwork
  5:19

part    13:16
  15:5 17:10

parties    4:15

UNITED STATES -vs- PHILLIP DUCTAN
Sentencing on 02/26/2014          Index: partly..remanded

partly  10:20

patient  7:17

pay  15:24
  16:17

payable  16:1

period  6:25
  7:13

person  15:16

Phillip  2:4
  14:11

phone  10:3

pickle  7:4

place  8:15

pleasure  7:2

point  5:24
  9:21

position
  5:19
  12:10,23
  13:3

pounds  10:9,
  16,25
  11:14
  12:21

pray  9:12

prepare
  16:20

preparing
  2:9

Presentence
  2:9,13
  3:3,9,23

4:8 8:1
13:13,19

pretty  2:17
  9:10

previous
  3:13 8:16
  15:3

prior  15:1

Prisons
  14:12
  15:15

pro  6:24

probation
  2:8 5:12
  6:3 14:1
  15:2,4,16

probationary
  13:25

problem  4:19

proceed  2:2

proceeding
  16:10

proceedings
  8:16

promote
  11:10
  14:22 15:5

property
  14:3

protect
  14:24

prove  9:3

provided
  9:22

public  14:24

punishment
  14:23

purpose  2:9

purposes  5:6
  11:3,14
  12:4

Pursuant
  14:9

pursue  12:2

─────────────

**Q**
─────────────

questions
  7:18

quick  11:22

─────────────

**R**
─────────────

range  4:11,
  13,23 8:7
  10:20
  11:2,15

reacclimate
  7:24

read  2:12,
  19,21 3:10

ready  2:2

reason  16:3

reasonable
  14:6

received
  2:10

receiving
  12:13

recognize
  7:6,7

recollection
  12:19

recommendation
  17:8

recommending
  11:13

recommends
  16:22

record  6:17

referred  2:8

reflect
  10:18
  14:21 15:5

Reform  14:9

related  14:2

relative
  5:19 6:8

release
  15:8,10,
  14,18

released
  7:23 15:17

relevant
  12:3

remanded
  17:14

UNITED STATES -vs- PHILLIP DUCTAN
Sentencing on 02/26/2014          Index: replayed..thing

replayed
  12:17

report  2:10,
  11,13 3:3,
  9,23 4:8
  8:1 13:14,
  19 15:16

represented
  7:1

representing
  6:20,24

request
  16:19

resolved
  3:15 9:19

respect  3:8
  11:10
  14:22 15:5

respectful
  7:16

respond
  12:7,23

response  6:3
  9:23 10:15

responsibility
  8:23

resulting
  4:11,23

review  10:1,
  12:8,18

reviewed
  2:10

revised  4:7

revision
  2:20

revisions
  2:23

revocation
  14:1

revocations
  15:3

rights
  16:23,24

Rule  10:13
  13:2

rulings  4:1

run  15:12

─────────────
           S
─────────────

sale  10:18

seated  7:14

Section
  14:19

sentence
  4:2,14 5:3
  8:2,4,7
  11:9 14:8,
  21 15:4
  16:3,12,13

sentencing
  2:4 3:20
  5:7 11:3
  14:9,19

seriousness
  14:21 15:6

served  14:15

set  9:5
  11:4

sic  8:15

side  17:3

sir  11:16

sit  4:4

Snow  2:1,
  18,25
  3:16,17,
  23,24 4:3,
  18,25 5:4,
  8,10,23
  6:6,15,16,
  18 7:16
  17:6,7,12

society  7:24

speak  4:20
  7:10

special
  15:25

specific
  11:17

stand  7:7
  13:8

standard
  15:21

state  15:20

stated  16:4

States  2:4
  15:25

Steven  12:15

stolen  14:2

studied
  13:13

subsequent
  14:2

sufficient
  11:2 14:18

supervised
  15:9,18

support  7:9,
  23 13:5

surprised
  7:7

SUV  11:18

system  7:23

─────────────
           T
─────────────

Tahoe  11:20

talk  3:11
  11:23
  16:22

tan  11:19

term  13:25
  14:13,14,
  16,17
  15:10

terms  4:20
  15:11,12

testimony
  10:2 13:11

thing  9:21

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889

**UNITED STATES -vs- PHILLIP DUCTAN**
**Sentencing on 02/26/2014**                    Index: time..yesterday

**time**  3:2,11
  4:4 5:9
  7:1 10:17
  12:22,25
  15:2 17:15

**timely**  12:7

**today**  7:8,9
  12:14,22

**tooken**  8:15

**total**  14:16

**transcript**
  10:7 13:4

**transcripts**
  12:9

**trial**  6:22
  10:2,6,7
  11:21 12:9
  13:4,11

---
          **U**
---

**ultimate**
  9:25

**unable**  16:17

**understand**
  2:15 3:1
  6:23 16:24

**understanding**
  12:25

**understood**
  3:10

**United**  2:4
  15:25

**unlawful**
  14:3

---
          **V**
---

**variance**
  4:16

**videos**  12:17

---
          **W**
---

**waiving**  12:1

**wanted**  12:7

**weight**  9:25

**Weitzel**
  12:15

**Western**
  15:22

**wife**  7:6

**wife's**  8:20

**wonderful**
  13:18

**work**  7:2

**working**
  12:24

---
          **Y**
---

**years**  15:10,
  11

**yesterday**
  2:20,23

**Huseby, Inc.**
**1230 West Morehead Street, #408, Charlotte, NC 28208**
www.huseby.com
**(704) 333-9889**

AO 245B  (WDNC Rev. 02/11) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Western District of North Carolina

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) amendedTitle**JUDGMENT IN A CRIMINAL CASE** |
| | ) (For Offenses Committed On or After November 1, 1987) |
| **V.** | ) |
| | ) |
| **Phillip Ductan** | ) Case Number:  DNCW304CR00252-001 |
| | ) USM Number:  99822-004 |
| | ) |
| | ) Kenneth D. Snow |
| | ) Defendant's Attorney |

**THE DEFENDANT:**

☒  Pleaded guilty to count(s) <u>1-3</u>.

☐  Pleaded nolo contendere to count(s) which was accepted by the court.

☐  Was found guilty on count(s) after a plea of not guilty.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense(s):

| Title and Section | Nature of Offense | Date Offense Concluded | Counts |
|---|---|---|---|
| 21:846 | Conspiracy to possess with intent to distribute marijuana (21:841(b)(1)(D)) | 9/28/04 | 1 |
| 21:841(b)(1)(D) | Possession with intent to distribute marijuana and aiding and abetting same (18:2) | 6/3/04 | 2 |
| 18:924(c)(1) | Possession of a firearm during and in relation to a drug trafficking crime and aiding and abetting the same (18:2) | 6/3/04 | 3 |

The Defendant is sentenced as provided in pages 2 through 6 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984, <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), and 18 U.S.C. § 3553(a).

☐  The defendant has been found not guilty on count(s).

☒  Count(s) <u>4</u> (is)(are) dismissed on the motion of the United States.

**IT IS ORDERED** that the Defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay monetary penalties, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Date of Imposition of Sentence:  2/26/2014

*Robert J. Conrad Jr.*

Robert J. Conrad, Jr.
United States District Judge

Date: March 11, 2014

AO 245B  (WDNC Rev. 02/11) Judgment in a Criminal Case

Defendant: Phillip Ductan                                                          Judgment- Page **2** of **6**
Case Number: DNCW304CR00252-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of
Counts 1 & 2: TWENTY FOUR (24) MONTHS each count to run concurrently.  Count 3: SIXTY (60) MONTHS to run
consecutively to Counts 1 & 2 FOR A TOTAL OF EIGHTY-FOUR (84) MONTHS.

☒  The Court makes the following recommendations to the Bureau of Prisons:
   - Placed in a facility as close to Atlanta, GA as possible, consistent with the needs of BOP.

☒  The Defendant is remanded to the custody of the United States Marshal.

☐  The Defendant shall surrender to the United States Marshal for this District:

       ☐  As notified by the United States Marshal.
       ☐  At _ on _.

☐  The Defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

       ☐  As notified by the United States Marshal.
       ☐  Before 2 p.m. on _.
       ☐  As notified by the Probation Office.

# RETURN

I have executed this Judgment as follows:

_____
_____
_____
_____

Defendant delivered on _____ to _____ at

_____, with a certified copy of this Judgment.


_____
              United States Marshal

                                                    By: _____
                                                          Deputy Marshal

Defendant: Phillip Ductan                                      Judgment- Page **3** of **6**
Case Number: DNCW304CR00252-001

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>Counts 1 – 3: FIVE (5) YEARS each count to run concurrently</u>.

☐   The condition for mandatory drug testing is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

# STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court and any additional conditions ordered.

1.   The defendant shall not commit another federal, state, or local crime.
2.   The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon.
3.   The defendant shall pay any financial obligation imposed by this judgment remaining unpaid as of the commencement of the sentence of probation or the term of supervised release on a schedule to be established by the Court.
4.   The defendant shall provide access to any personal or business financial information as requested by the probation officer.
5.   The defendant shall not acquire any new lines of credit unless authorized to do so in advance by the probation officer.
6.   The defendant shall not leave the Western District of North Carolina without the permission of the Court or probation officer.
7.   The defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer.
8.   A defendant on supervised release shall report in person to the probation officer in the district to which he or she is released within 72 hours of release from custody of the Bureau of Prisons.
9.   The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
10.  The defendant shall support his or her dependents and meet other family responsibilities.
11.  The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other activities authorized by the probation officer.
12.  The defendant shall notify the probation officer within 72 hours of any change in residence or employment.
13.  The defendant shall refrain from excessive use of alcohol and shall not unlawfully purchase, possess, use, distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as duly prescribed by a licensed physician.
14.  The defendant shall participate in a program of testing and treatment or both for substance abuse if directed to do so by the probation officer, until such time as the defendant is released from the program by the probation officer; provided, however, that defendant shall submit to a drug test within 15 days of release on probation or supervised release and at least two periodic drug tests thereafter for use of any controlled substance, subject to the provisions of 18:3563(a)(5) or 18:3583(d), respectively; The defendant shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing or monitoring which is (are) required as a condition of supervision.
15.  The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.
16.  The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
17.  The defendant shall submit his person, residence, office, vehicle and/or any computer system including computer data storage media, or any electronic device capable of storing, retrieving, and/or accessing data to which they have access or control, to a search, from time to time, conducted by any U.S. Probation Officer and such other law enforcement personnel as the probation officer may deem advisable, without a warrant. The defendant shall warn other residents or occupants that such premises or vehicle may be subject to searches pursuant to this condition.
18.  The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed by the probation officer.
19.  The defendant shall notify the probation officer within 72 hours of defendant's being arrested or questioned by a law enforcement officer.
20.  The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court.
21.  As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.
22.  If the instant offense was committed on or after 4/24/96, the defendant shall notify the probation officer of any material changes in defendant's economic circumstances which may affect the defendant's ability to pay any monetary penalty.
23.  If home confinement (home detention, home incarceration or curfew) is included you may be required to pay all or part of the cost of the electronic monitoring or other location verification system program based upon your ability to pay as determined by the probation officer.
24.  The defendant shall cooperate in the collection of DNA as directed by the probation officer.
25.  The defendant shall participate in transitional support services under the guidance and supervision of the U.S. Probation Officer. The defendant shall remain in the services until satisfactorily discharged by the service provider and/or with the approval of the U.S. Probation Officer.

AO 245B  (WDNC Rev. 02/11) Judgment in a Criminal Case

Defendant: Phillip Ductan                                                    Judgment- Page **4** of **6**
Case Number: DNCW304CR00252-001

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the Schedule of Payments.

| ASSESSMENT | FINE | RESTITUTION |
|:---:|:---:|:---:|
| $300.00 | $0.00 | $0.00 |

☐ The determination of restitution is deferred until. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

## FINE

The defendant shall pay interest on any fine or restitution of more than $2,500.00, unless the fine or restitution is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the Schedule of Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

☒ The court has determined that the defendant does not have the ability to pay interest and it is ordered that:

☒ The interest requirement is waived.

☐ The interest requirement is modified as follows:

## COURT APPOINTED COUNSEL FEES

☐ The defendant shall pay court appointed counsel fees.

☐ The defendant shall pay $0.00 towards court appointed fees.

AO 245B  (WDNC Rev. 02/11) Judgment in a Criminal Case

Defendant: Phillip Ductan                                          Judgment- Page **5** of **6**
Case Number: DNCW304CR00252-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A ☐ Lump sum payment of $0.00 due immediately, balance due
    ☐ Not later than_____
    ☐ In accordance ☐ (C), ☐ (D) below; or

B ☒ Payment to begin immediately (may be combined with ☐ (C), ☐ (D) below); or

C ☐ Payment in equal Monthly (E.g. weekly, monthly, quarterly) installments of $50.00 to commence
    60 (E.g. 30 or 60) days after the date of this judgment; or

D ☐ Payment in equal Monthly (E.g. weekly, monthly, quarterly) installments of $ 50.00 to commence
    60 (E.g. 30 or 60) days after release from imprisonment to a term of supervision. In the event the entire
    amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision, the
    U.S. Probation Officer shall pursue collection of the amount due, and may request the court to establish or
    modify a payment schedule if appropriate 18 U.S.C. § 3572.


Special instructions regarding the payment of criminal monetary penalties:

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court costs:

☐ The defendant shall forfeit the defendant's interest in the following property to the United States


Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalty payments are to be made to the United States District Court Clerk, 401 West Trade Street, Room 210, Charlotte, NC 28202, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program. All criminal monetary penalty payments are to be made as directed by the court.


Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Defendant: Phillip Ductan                                                           Judgment- Page **6** of **6**
Case Number: DNCW304CR00252-001


### STATEMENT OF ACKNOWLEDGMENT

I understand that my term of supervision is for a period of _____months, commencing on _____.

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

I understand that revocation of probation and supervised release is mandatory for possession of a controlled substance, possession of a firearm and/or refusal to comply with drug testing.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.


(Signed)    _____    Date: _____
                    Defendant

(Signed)    _____    Date: _____
                    U.S. Probation Office/Designated Witness

# DISTRICT COURT OF THE UNITED STATES
## IN THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISISION

### Case No. 3:04CR00252-RJC-DSC

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **NOTICE OF APPEAL** |
| | ) | |
| v. | ) | |
| | ) | |
| **PHILLIP DUCTAN** | ) | |
| | ) | |
| _____ | | |

Pursuant to Rule 4(b) of the Federal Rules of Appellate Procedure, NOTICE IS HEREBY GIVEN that the defendant, Phillip Ductan, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the judgment entered in this court in the above-captioned case.  As judgment was entered by the Honorable Robert J. Conrad on March 12, 2014, this notice is therefore filed within the time specification established in Rule 4(b).

Mr. Ductan has requested that his appeal be handled by the Federal Defenders of Western North Carolina.

Respectfully submitted this the 18th day of March, 2014.

/s/ Kenneth D. Snow
Kenneth D. Snow
NCBAR 27619
Attorney for Phillip Ductan
229 S Brevard Street, Suite 300
Charlotte, NC 28202
(704)358-0026
(704)358-0029 fax
kennsnow@snowlegal.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA    )
                            )    CASE NO.: **3:04CR00252-RJC-DSC**
    v.                      )    CERTIFICATE OF SERVICE
                            )
PHILLIP DUCTAN.             )

    This is to certify that the undersigned has this date served a Notice of Appeal upon Assistant United States Attorney, Elizabeth Greene, opposing counsel in the above referenced matter, via the ECF filing system addressed as follows:

Erin Comerford
Assistant District Attorney
**erin.comerford@usdoj.gov**
227 West Trade St Ste 1650
Charlotte, NC 28202

    This 18th day of March, 2014.

                                        /s/ Kenneth D. Snow
                                        Kenneth D. Snow
                                        NCBAR 27619
                                        Attorney for Phillip Ductan
                                        229 S Brevard Street, Suite 300
                                        Charlotte, NC 28202
                                        (704)358-0026
                                        (704)358-0029 fax
                                        kennsnow@snowlegal.com